## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF WASHINGTON; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; JOSH SHAPIRO, in his official capacity as Governor of the COMMONWEALTH OF PENNSYLVANIA; STATE OF RHODE ISLAND; STATE OF VERMONT; and STATE OF WISCONSIN, | NO. 1:25-cv-12006 |
| Plaintiffs, | |
| v. | |
| FEDERAL EMERGENCY MANAGEMENT AGENCY; DAVID RICHARDSON, in his official capacity as Senior Official Performing the Duties of the Administrator of the Federal Emergency Management Agency; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as the Secretary of the Department of Homeland Security; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

## COMPLAINT

1

## I.    INTRODUCTION

1.    For nearly thirty years, and across five Presidential administrations, FEMA's pre-disaster mitigation program has operated on a simple premise: by proactively fortifying our communities against disasters before they strike, rather than just responding afterward, we will reduce injuries, save lives, protect property, and, ultimately, save money that would otherwise be spent on post-disaster costs.

2.    Studies have shown that that each dollar spent on mitigation saves an average of $6 in post-disaster costs, with some investments saving even more. Thus, Congress has consistently funded an all-purpose pre-disaster mitigation program—now called Building Resilient Infrastructure and Communities, or BRIC—for decades, and explicitly directed FEMA to make mitigation a core part of its mission.

3.    Over the past four years, FEMA has selected nearly 2,000 projects to receive roughly $4.5 billion in BRIC funding. From Washington to North Carolina and Arizona to Maine, and everywhere in between, every state in the nation is relying on this program.

4.    All that changed when Cameron Hamilton, who the Trump Administration unlawfully installed to act as FEMA's Administrator, suddenly—and illegally—shut down the program. Mr. Hamilton's purported termination of the BRIC program was unlawful for three reasons.

5.    First, the BRIC termination is directly contrary to Congress's statutory direction that Defendants must prioritize mitigation and are specifically barred from substantially reducing FEMA's mitigation functions. By unilaterally shutting down FEMA's flagship pre-disaster mitigation program, Defendants have acted unlawfully and violated core separation of powers principles.

6.      Second, the steps Defendants have taken to implement the termination—refusing to spend funds Congress directed toward BRIC or trying to spend them on other programs—also violate the Constitution and unlawfully intrude on Congress's power of the purse.

7.      Third, neither Mr. Hamilton nor his successor, David Richardson, were lawfully appointed to run FEMA, and they therefore lack the authority to shut down the BRIC program.

8.      The impact of the shutdown has been devastating. Communities across the country are being forced to delay, scale back, or cancel hundreds of mitigation projects depending on this funding. Projects that have been in development for years, and in which communities have invested millions of dollars for planning, permitting, and environmental review are now threatened. And in the meantime, Americans across the country face a higher risk of harm from natural disasters.

9.      Plaintiffs bring this lawsuit to compel FEMA to reverse the unlawful termination of the BRIC program so that communities across the country can resume this critical work.

## II.      JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action under 28 U.S.C. § 1331.

11.      Venue is proper under 28 U.S.C. §§ 1391(b)(2), 1391(e)(1) because defendants are agencies of the United States and officers of the United States acting in their official capacities; a substantial part of the events and omission giving rise to the claims occurred in this district; and plaintiff Commonwealth of Massachusetts resides in this district.

## III.      PARTIES

### A.      Plaintiffs

12.      The State of Washington is a sovereign state of the United States of America. Washington is represented by Attorney General Nicholas W. Brown. The Attorney General of

Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern. Wash. Rev. Code § 43.10.

13.    The Commonwealth of Massachusetts is a sovereign state of the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, the Commonwealth's chief legal officer.

14.    The State of Arizona is a sovereign state of the United States of America. Arizona is represented by Attorney General Kris Mayes, who is the chief law enforcement officer of Arizona and is authorized to act in federal court on behalf of the State.

15.    The State of California is a sovereign state of the United States of America. California is represented by Attorney General Rob Bonta, who is the chief law enforcement officer of California and authorized to sue on the State's behalf, including its agencies and residents.

16.    The State of Colorado is a sovereign state of the United States of America. Colorado is represented by and through its Attorney General Phil Weiser. The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

17.    The State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under Conn. Gen. Stat. § 3-125 to pursue this action on behalf of the State of Connecticut.

18.    The State of Delaware is a sovereign state of the United States of America. Delaware is represented by and through its Attorney General, Kathleen Jennings. The Attorney General is Delaware's chief law enforcement officer and is authorized to pursue this action pursuant to Del. Code Ann. tit. 29, § 2504.

19.     The State of Illinois is a sovereign state in the United States of America. Illinois is represented by Kwame Raoul, the Attorney General of Illinois, who is the chief law enforcement officer of Illinois and authorized to sue on the State's behalf. Under Illinois law, the Attorney General is authorized to represent the State's interests by the Illinois Constitution, article V, § 15. *See* 15 Ill. Comp. Stat. 205/4.

20.     The State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to Me. Rev. Stat. Ann. tit., 5 § 191.

21.     The State of Maryland is a sovereign State of the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief legal officer of Maryland.

22.     The State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

23.     The State of Minnesota is a sovereign state of the United States. Minnesota is represented by and through its chief legal officer, Minnesota Attorney General Keith Ellison, who is the chief law enforcement officer of Minnesota and is authorized to institute this action. Minn. Stat. § 8.01.

24.     The State of New Jersey is a sovereign state in the United States of America. New Jersey is represented by Attorney General Matthew Platkin, who is the State's chief law enforcement officer.

25.     The State of New York, represented by and through its Attorney General Letitia James, is a sovereign State of the United States of America. As the State's chief legal officer, and

pursuant to N.Y. Executive Law § 63, the Attorney General is authorized to act on behalf of the State in this matter.

26.    The State of North Carolina is a sovereign state in the United States of America. North Carolina is represented by Attorney General Jeff Jackson who is the chief law enforcement office of North Carolina.

27.    The State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

28.    Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6), 732-303.

29.    The State of Rhode Island is a sovereign state of the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

30.    The State of Vermont is a sovereign state of the United States. Vermont is represented by Attorney General Charity R. Clark, who is Vermont's chief legal officer and is authorized to pursue this action on behalf of the State. Vt. Stat. Ann. tit. 3, § 159.

31.    The State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to sue on behalf of the State.

**B.    Defendants**

32.    The Federal Emergency Management Agency (FEMA) is a federal agency within the Department of Homeland Security. 6 U.S.C. § 313.

33.    David Richardson is the Department of Homeland Security's Assistant Secretary for the Countering Weapons of Mass Destruction Office, and he is also acting, unlawfully, as the FEMA Administrator under the title "Senior Official Performing the Duties of the Administrator." He is sued in his official capacity.

34.    The United States Department of Homeland Security (DHS) is a cabinet-level Executive Agency. 5 U.S.C. §§ 101, 105.

35.    Kristi Noem is the Secretary of Homeland Security, and she is sued in her official capacity.

36.    The United States of America is a sovereign nation that may be named as a defendant under the Administrative Procedure Act. 5 U.S.C. § 702.

## IV.    ALLEGATIONS

**A.    FEMA's Pre-Disaster Mitigation Program Has Helped the Nation Protect Against Disasters for Nearly 30 Years**

37.    Following a series of devastating hurricanes, floods, and earthquakes in the 1980s and 1990s, Congress and FEMA recognized that fortifying against natural disasters before they strike, rather than just reacting to them, can save lives, protect property, and save the federal government "significant sums" that it would otherwise spend on "post-disaster clean-up and response." H.R. Rep. No. 104-812, at 78–79 (1996) (Conf. Rep.).

38.    Congress thus decided that FEMA "should be taking an increasingly active role in developing and participating in pre-disaster mitigation programs," and in 1997 started

appropriating funds for FEMA to develop a program to assist state and local governments in protecting against natural disasters. *Id.*

39.     With these appropriations, FEMA started a pilot program called Project Impact in 1997, which focused mainly on helping communities to evaluate the hazards they faced and develop mitigation plans.

40.     After a promising start, a bipartisan group of representatives co-sponsored legislation that would codify the program in statute and expand its focus to helping communities across the country implement these mitigation measures. The Committee Report explained that "the only way to control post-disaster spending for response, relief, and recovery is to increase pre-disaster funding for mitigation, planning, and preparedness," and cited testimony from FEMA suggesting "that mitigation measures return $3 for every $1 spent." H.R. Rep. No. 106-40, at 11, 21 (1999).

41.     The bill, which ultimately came to be known as the Disaster Mitigation Act of 2000, passed the House of Representatives by a vote of 415 to 2, and passed the Senate by unanimous consent. President Clinton signed the bill into law a few months later, and communities large and small have relied on the program ever since.

42.     The concept is simple: FEMA provides financial and technical assistance to support state, local, tribal, and territorial governments in implementing "cost-effective" measures that are "designed to reduce injuries, loss of life, and damage and destruction of property" from natural disasters. 42 U.S.C. § 5133(b). Recipients may also use these funds to assess hazards they face and develop plans for mitigating them. 42 U.S.C. § 5133(e). Each grant can cover up to 75% of a project's costs, and the federal share can rise to 90% for small rural communities. 42 U.S.C. § 5133(h).

43.     Congress has since required FEMA to award a portion of the funds competitively based on criteria established by Congress, including the extent to which a proposed project will mitigate damage from natural disasters, its cost-effectiveness, the applicant's commitment to spending its own funds on disaster mitigation, and the extent to which the project maximizes "net benefits to society" beyond FEMA savings. *See* 42 U.S.C. §§ 5133(f), (g).

44.     To ensure that the benefits would be widespread, Congress provided that any state that "received a major disaster declaration in the previous 7 years" is eligible for grants, required FEMA to grant a minimum amount of funding to communities in every eligible state each year, and placed an annual cap on the amount any one state can receive. 42 U.S.C. § 5133(f)(2).

45.     Congress also took measures to ensure that small rural communities would be included: it specified that one mandatory consideration in awarding the grants is the extent to which a project benefits a "small impoverished community," which is "a community of 3,000 or fewer individuals that is economically disadvantaged." 42 U.S.C. § 5133(a). Only rural communities can qualify for this preference—small portions of larger cities cannot. 44 C.F.R. § 201.2. Congress recognized that small rural communities often do not have sufficient resources to contribute to significant mitigation projects, so it allowed FEMA to cover up to 90% of project costs rather than the 75% limit applicable to other applicants. *See* 42 U.S.C. §§ 5133(a), (f)(2), (g)(9).

46.     The program has gone by different names over the years—Project Impact, Pre-Disaster Mitigation (PDM), and Building Resilient Infrastructure and Communities (BRIC)—but regardless of the name, it has been wildly successful. These critical funds have supported hundreds

of projects in every corner of the country, and, along with other federal mitigation grants, they have also helped to avoid over $150 billion in costs.[1]

47.    For instance, before the Trump Administration shut it down, BRIC was poised to fund hundreds of critical, lifesaving projects, including: (1) floodwalls, levees, pump stations, and stormwater management systems to protect against flooding, (2) seismic retrofits to fortify against earthquakes, (3) saferooms to provide shelter from tornadoes, (4) an evacuation tower to allow for escape from tsunamis, (5) soil remediation to protect against landslides, (6) vegetation management to reduce damage from wildfires, and (7) shoreline upgrades to protect against erosion and flooding. Many of these projects were intended to protect critical infrastructure, ensuring that electricity, heat, clean water, and medical care remain available in emergencies.

48.    Not only is the program widely relied upon, it has proven to be cost-effective too. A 2005 study commissioned by FEMA found that each dollar FEMA spends on mitigation saves the federal government about "$3.65 in avoided post-disaster relief costs and increased federal tax revenue."[2] Another study by the Congressional Budget Office estimated that each dollar spent on the program would avoid roughly three dollars in future losses.[3] And a 2019 study found that each dollar the federal government invested in mitigation between 1993 and 2016 will avoid roughly $6 in costs.[4] To put that in absolute terms, two decades of federal investments in mitigation have saved Americans $157.9 billion.[5] And some mitigation efforts can save even more.

---

[1] *See* Nat'l Inst. of Bldg. Scis., Natural Hazard Mitigation Saves: 2019 Report  8 (figure 4), 10 (table 4), 37 (table 2-1) (Dec. 2019), https://nibs.org/wp-content/uploads/2025/04/NIBS_MMC_MitigationSaves_2019.pdf.

[2] Nat'l Inst. Of Bldg. Scis., Natural Hazard Mitigation Saves: An Independent Study to Assess the Future Savings from Mitigation Activities 6 (2005), https://drupal.nibs.org/files/pdfs/hms_vol2_ch1-7.pdf.

[3] Cong. Budget Off., Potential Cost Savings from the Pre-Disaster Mitigation Program 2 (Sept. 2007), https://www.cbo.gov/sites/default/files/110th-congress-2007-2008/reports/09-28-disaster.pdf.

[4] Nat'l Inst. of Bldg. Scis., Natural Hazard Mitigation Saves: 2019 Report 37, 39 (Dec. 2019), https://nibs.org/wp-content/uploads/2025/04/NIBS_MMC_MitigationSaves_2019.pdf

[5] *Id.*, 8, 10.

49.    Communities in every state have benefited from federally funded mitigation grants, with most states saving at least $1 billion in post-disaster costs, and four states—Louisiana, New Jersey, New York, and Texas—each avoiding at least $10 billion in post-disaster costs.[6]

50.    While cost savings are one major benefit of the program, these dollars represent more than money. They represent lives saved, homes spared, businesses surviving, and public services—like hospitals, schools, and fire departments—remaining open when people need them most.

**B.    Congress Expanded the Program During President Trump's First Term and FEMA Rebranded it as BRIC**

51.    Given the success of the program, Congress has continued to invest in it. In 2018, in the wake of Hurricane Harvey causing more than $100 billion of damage to Texas, Hurricane Maria killing thousands in Puerto Rico, Hurricane Irma devastating Florida, and wildfires ravaging California, Congress held hearings to assess what more it could do.

52.    President Trump's first FEMA Administrator, Brock Long, explained in written testimony that "Building more resilient communities is the best way to reduce risks to people, property, and taxpayer dollars. I cannot overstate the importance of focusing on investing in mitigation before a disaster strikes."[7] And he emphasized the point in oral testimony, too: "We have to do more pre-disaster mitigation. Pre-disaster mitigation is the key to becoming more resilient and reducing disaster impacts."[8]

53.    A few months later, FEMA released its 2018–2022 Strategic Plan. FEMA's "Strategic Goal 1" was "Build a Culture of Preparedness," and its first objective was to

---

[6] *See id.*, 119.
[7] *2017 Hurricane Season: Oversight of the Federal Response: Hearing Before the S. Comm. On Homeland Sec. & Gov't Affairs*, 115th Cong. 58 (2017) (statement of William "Brock" Long, Administrator, FEMA).
[8] *Id.*, 9

"Incentivize Investments that Reduce Risk, Including Pre-Disaster Mitigation, and Reduce Disaster Costs at All Levels." FEMA explained:

> Buying down the risk prior to a disaster pays off – either by lowering the cost of the disaster or eliminating the need for a presidentially-declared disaster altogether because of the lessened impact. FEMA plays a critical role in enabling and incentivizing investments that reduce risk and increase pre-disaster mitigation.

And FEMA pledged to "work with Congress to develop flexible and holistic approaches for more Federal funds to be spent on risk reduction and pre-disaster mitigation."[9]

54.     When Administrator Long returned to Congress a few months later, he reiterated that "developing resilient communities ahead of an incident reduces loss of life and economic disruption," and stated bluntly: "It is a no-brainer: More investment in pre-disaster mitigation rather than doing it after the fact is ultimately going to reduce disaster costs."[10]

55.     Following these hearings, Senators Ron Johnson (R-WI), Claire McCaskill (D-MO), and John Kennedy (R-LA) co-sponsored the Disaster Recovery Reform Act of 2018 (DRRA) to increase the consistency of funding for the pre-disaster mitigation program. For most of its history, the program was funded exclusively through ordinary appropriations, which could be unpredictable and made planning for and executing long-term infrastructure projects difficult. This bill would allow FEMA to also set aside certain funds from the Disaster Relief Fund, which funds FEMA's post-disaster grants, into a dedicated National Public Infrastructure Predisaster Mitigation Fund. *See* 42 U.S.C. § 5133(i)(1). By setting aside a fraction of these post-disaster funds for pre-disaster mitigation, FEMA could establish "a greater balance . . . between pre- and post-disaster resilience investments," which would "save lives and Federal tax dollars." S. Rep. No. 115-446, at 3 (2018).

---

[9]     Fed. Em. Mgmt. Agency, 2018–2022 Strategic Plan 13-14 (2018), https://www.fema.gov/sites/default/files/2020-07/strat_plan_2018-2022.pdf.

[10] *FEMA: Prioritizing a Culture of Preparedness: Hearing Before the S. Comm. On Homeland Sec. & Gov't Affairs*, 115th Cong., 5, 43 (2018) (testimony of William "Brock" Long, Administrator, FEMA).

56.     At the same time, Congress indicated that it would appropriate more funds for the Disaster Relief Fund so that there would be no reduction in the amount available for post-disaster grants. *See* 42 U.S.C. § 5133(i)(3).

57.     The bill passed the House of Representatives by a vote of 398–23 and passed the Senate by a vote of 93–6. President Trump signed it into law a few days later.

58.     FEMA announced that this new "reliable stream of sufficient funding" would allow communities "to plan and execute mitigation programs to reduce disaster risk nationwide."[11] And in a subsequent report FEMA reiterated that Congress's expansion of the pre-disaster mitigation program under the DRRA "supports FEMA's efforts to incentivize pre-disaster mitigation by providing a more reliable stream of funding that enables communities to better plan and execute mitigation programs that reduce their disaster risk."[12]

59.     After the bill passed, FEMA rebranded what was then called the "Pre-Disaster Mitigation (PDM)" program as the "Building Resilient Infrastructure and Communities (BRIC)" program. FEMA publicized the change well before it went into effect and ensured that existing projects under the Pre-Disaster Mitigation program would be unaffected. Congress also authorized FEMA to transfer funds previously appropriated for the program, when it was still called the Pre-Disaster Mitigation program, into the new National Public Infrastructure Predisaster Mitigation Fund.[13]

60.     In addition to appropriating funds for FEMA to set aside for BRIC, Congress also appropriated another $1 billion directly to the program as part of the bipartisan Infrastructure

---

[11] Press Release, Fed. Em. Mgmt. Agency, Disaster Recovery Reform Act of 2018 Transforms Field of Emergency Management (Oct. 5, 2018), https://www.fema.gov/press-release/20250602/disaster-recovery-reform-act-2018-transforms-field-emergency-management.

[12] Fed. Em. Mgmt. Agency, Annual Report on Disaster Recovery Reform Act (DRRA) (Oct. 2019), https://www.fema.gov/sites/default/files/2020-07/fema_DRRA-annual-report_2019.pdf

[13] *See, e.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47 § 310, 138 Stat. 460, 611 (2024) (allowing transfer of PDM funds to BRIC fund).

Investment and Jobs Act (IIJA). *See* Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429, 1387 (2021). In doing so, Congress required FEMA to make at least $200 million available for grants for each of fiscal years 2022, 2023, 2024, 2025, and 2026, in addition to the amounts FEMA set aside for the National Public Infrastructure Predisaster Mitigation Fund. *See id.* (providing that "in addition to amounts set aside pursuant to . . . 42 U.S.C. § 5133 . . . $200,000,000 . . . *shall* be made available" for each of fiscal years 2022, 2023, 2024, 2025, and 2026) (emphasis added).

61.     And since then, Congress has continued to appropriate additional funds for specific BRIC projects through Congressionally directed spending.[14]

## C.     The Modern BRIC Program

62.     Following Congress's passage of the DRRA, the BRIC program works as follows.

63.     FEMA estimates the total cost of certain post-disaster grants and then uses that number to determine how much money it can set aside for BRIC and move into the National Public Infrastructure Predisaster Mitigation Fund. *See* 42 U.S.C. § 5133(i)(1). To ensure that the BRIC set aside does "not reduce the amounts otherwise made available for" the post-disaster grants, FEMA incorporates additional funds for BRIC into its budget requests to Congress. *See* 42 U.S.C. § 5133(i)(3).[15]

---

[14] *See, e.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47 cl. 12(B), 138 Stat. 460, 608 (2024) (appropriating approximately $191 million "for pre-disaster mitigation grants under . . . 42 U.S.C. § 5133(e)").

[15] *See also* William L. Painter, Cong. Rsch. Serv. R45484, The Disaster Relief Fund: Overview and Issues 31(2024), https://www.congress.gov/crs-product/R45484 ("In FY2020, FEMA began to request funding for a statutorily established set-aside for the Building Resilient Infrastructure and Communities program . . . . The law, as it requires there to be no reduction in those grants as a result of the set-aside, implies the need for additional funding in the DRF appropriation."); Dep't Homeland Security, *Federal Emergency Management Agency: Disaster Relief Fund, Fiscal Year 2024 Congressional Justification* 3, https://www.dhs.gov/sites/default/files/2023-03/FEDERAL%20EMERGENCY%20MANAGEMENT%20AGENCY_Remediated.pdf ("The FY 2024 Budget includes $1.0B set aside for the BRIC program."); Dep't Homeland Security, *Federal Emergency Management Agency: Disaster Relief Fund, Fiscal Year 2023 Congressional Justification* 3, https://www.dhs.gov/sites/default/files/2022-03/Federal%20Emergency%20Management%20Agency_Remediated.pdf ("The FY 2023 Budget includes $1.0B set aside for the BRIC program.").

64.     After FEMA receives funding from Congress, it sets aside the funds for the BRIC program and moves them into the National Public Infrastructure Predisaster Mitigation Fund. *See* 42 U.S.C. § 5133(i)(1). Once the funds are set aside, they must remain in the National Public Infrastructure Predisaster Mitigation Fund. 42 U.S.C. 5133(f)(3) (providing that any funds lawfully withdrawn from selected projects must be used for BRIC grants the next year); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 503(d)(2), 138 Stat. 460, 615 (2024) (providing that Defendants cannot reprogram or transfer funds "to increase or decrease funding for grant programs").

65.     FEMA then issues a notice of funding opportunity (NOFO) setting out the amount of funding available for that year, the criteria the agency will apply in selecting projects, and the application instructions.[16] One mandatory criterion is that every project selected must be "cost-effective," meaning that it will save more money than it costs. 42 U.S.C. § 5133(e)(1)(A).

66.     Applying for a BRIC grant is a significant undertaking. In addition to demonstrating cost-effectiveness, States and their subapplicants often must undertake months or years of costly planning and design, feasibility studies and modeling, environmental review, and stakeholder engagement to prepare their applications. FEMA then reviews the applications and selects the most promising projects while ensuring that each state that applies is allocated a minimum amount of funding required by the law, and that no one state receives too much funding. *See* 42 U.S.C. § 5133(f)(2). Once projects are selected, applicants often go through additional rounds of planning, permitting, environmental review, and stakeholder engagement before a final grant agreement is signed and all the funds are fully obligated.

---

[16] *See, e.g.*, Dep't of Homeland Security, Notice of Funding Opportunity for Fiscal Year 2023: Building Resilient Infrastructure and Communities Program (Oct. 12, 2022), https://www.floridadisaster.org/globalassets/fy-2023-bric-notice-of-funding-opportunity-nofo.pdf.

67.    To ensure that the federal BRIC funds are available for states at the end of this lengthy process, Congress has provided that once projects are selected—*i.e.*, once BRIC funds are allocated to states—Defendants cannot withdraw them unless the funds "remain unobligated by the end of the third fiscal year after the fiscal year for which the amounts were allocated." 42 U.S.C. § 5133(f)(3)(A). And even if the funds are withdrawn at that time, they must be returned to the National Public Infrastructure Predisaster Mitigation Fund and made "available to be awarded on a competitive basis" during the next fiscal year. *See* 42 U.S.C. § 5133(f)(3)(B).

68.    Once a project receives final approval, the funds are formally obligated, and construction may begin.

**D.    Every State Is Relying on the BRIC Program.**

69.    The BRIC program is critically important nationwide. Over the past four years, FEMA has selected nearly 2,000 projects from every corner of the country to receive roughly $4.5 billion in funding.

70.    Due to the unique threats they face, coastal communities have received the largest allocations over the past four years, with California, Louisiana, Texas, New York, New Jersey, Florida, North Carolina, and Washington leading the way.

71.    But interior communities rely on BRIC too: Pennsylvania and Utah have received the next largest allocations, and Ohio is not far behind. And before the administration unlawfully terminated BRIC, FEMA was poised to fund upgrades to electrical infrastructure in Iowa (~$11 million), Nebraska (~$25 million), and Kentucky (~$6.4 million) so that residents can maintain power and heat during storms; flood mitigation in Ohio (~$24 million), Montana (~$7 million), Idaho (~$7 million), West Virginia (~$7 million), and Indiana (~$6.2 million), to reduce injuries and property damage; pump stations in Pennsylvania (~$100 million) to protect infrastructure

during severe storms; and a pump station in North Dakota (~$7.1 million) to provide a small community with a reliable water source, even during low river flows.

72.    In fact, BRIC has been so popular that it has been oversubscribed each application cycle, even as FEMA has increased the amount of funding available. Over the last four years there were hundreds more applications than could be selected, seeking billions more dollars than was available:

| Fiscal Year | Funds Available[17] | Funds Applied For[18] |
|---|---|---|
| 2020 | $500 Million | $3.1 Billion |
| 2021 | $1 Billion | $3.5 Billion |
| 2022 | $2.295 Billion | $3.6 Billion |
| 2023 | $1 Billion | $5.4 Billion |
| 2024 | $750 Million | BRIC Cancelled |

| Fiscal Year | Projects Selected[19] | Applications[20] |
|---|---|---|
| 2020 | 408 | 987 |
| 2021 | 371 | 789 |
| 2022 | 518 | 801 |
| 2023 | 720 | 1,235 |

---

[17] This figure is based on the Notice of Funding Opportunity for each fiscal year.

[18] This figure is the sum of the "federalShareAmount" column for all applications, as determined by the methodology in footnote 20.

[19] This figure is based on OpenFEMA data last updated on June 24, 2025 and downloaded from FEMA.gov on July 10, 2025. *See* https://www.fema.gov/openfema-data-page/hma-subapplications-v2. The "Projects Selected" figure includes the total number of projects that are labeled "Identified for Further Review" in the "selectionStatus" column.

[20] This figure includes the total number of projects that are labeled as "Identified for Further Review," "Not Selected," or "Did Not Meet HMA Requirements" in the "selectionStatus" column. Projects that were "Withdrawn" are omitted.

E.    **The Second Trump Administration Suddenly Shuts Down the BRIC Program**

73.    Although the first Trump Administration expanded the BRIC program, the second Trump Administration has expressed hostility toward FEMA from the start.

74.    Before President Trump entered office for the second time, former officials associated with President Trump developed a series of policy proposals in a Heritage Foundation report called "Project 2025." The section on FEMA asserts, without evidence, and contrary to FEMA's position during the first Trump administration, that FEMA grants "do not provide measurable gains for preparedness or resiliency," and argues that these grants "should be terminated."[21] It cautions, however, that doing so "will require action by Members of Congress who repeatedly vote to fund grants."[22]

75.    On January 24, 2025, just four days after being sworn into office, President Trump told reporters, "I think we're going to recommend that FEMA go away."[23]

76.    That same day, he issued an Executive Order creating a Council to Assess the Federal Emergency Management Agency, which is supposed to perform "a full-scale review" of FEMA and "recommend to the President improvements or structural changes" to the agency. Exec. Order No. 14180, 90 Fed. Reg. 8743 (Jan. 24, 2025).

77.    Then, in a televised cabinet meeting on March 24, 2025, Department of Homeland Security Secretary Kristi Noem said, "we're going to eliminate FEMA."

78.    The next day, Secretary Noem, Corey Lewandowksi, and Cameron Hamilton, who was leading FEMA at the time, met and "debated the possibility of rescinding President Donald

---

[21] *See* Ken Cuccinelli, *Department of Homeland Security* at 154, *in Project 2025: Mandate for Leadership: The Conservative Promise* (The Heritage Foundation, 2023), https://www.justsecurity.org/wp-content/uploads/2024/05/Project-2025-Mandate-for-Leadership-The-Conservative-Promise.pdf.

[22] *Id.*

[23] Zack Colman, *Trump's talking about shutting down FEMA. Republicans hate that idea.*, Politico, February 2, 2025, https://www.politico.com/news/2025/02/02/republicans-trump-fema-disasters-00201983.

Trump's recent executive order establishing a FEMA Review Council and instead moving more quickly to dismantle the agency."[24]

79.     But eliminating FEMA is illegal. In addition to fundamental separation of powers principles barring Defendants from unilaterally shuttering congressionally created agencies, Congress took a belt-and-suspenders approach with FEMA and passed a statute in 2006 entitled "Preserving the Federal Emergency Management Agency," which requires FEMA to "be maintained as a distinct entity" within DHS. 6 U.S.C. § 316(a).

80.     As an alternative to eliminating FEMA, Defendants also discussed "narrowing and focusing the aperture of FEMA's mission dramatically" by "narrowing the agency's responsibilities to helping survivors in the immediate aftermath of disasters."[25] As part of that effort, Secretary Noem said "that she wants to eliminate FEMA's role in funding long-term rebuilding efforts and halt multibillion-dollar grants programs that help communities prepare for disasters."[26] When reached for comment, a DHS spokesperson essentially confirmed the reporting: "We are grateful the press is covering Secretary Noem's efforts to eliminate waste, fraud, and abuse within the Department of Homeland Security."[27]

81.     But narrowing FEMA's mission and functions to only post-disaster response is illegal too: the same statute that bars Defendants from eliminating FEMA also prohibits them from "substantially or significantly reduc[ing] . . . the authorities, responsibilities, or functions of the Agency or the capability of the Agency to perform those missions, authorities, responsibilities,

---

[24] Gabe Cohen, *'We're not preparing': As Trump officials vow to eliminate FEMA, the agency is already in turmoil*, CNN, March 26, 2025, https://www.cnn.com/2025/03/26/politics/fema-payments-staffing-stalled-turmoil/index.html.
[25] Thomas Frank, *FEMA on the chopping block*, E&E News by Politico, March 26, 2025, https://www.eenews.net/articles/fema-on-the-chopping-block/.
[26] *Id.*
[27] *Id.*

except as otherwise specifically provided in an Act enacted after October 4, 2006." 6 U.S.C. § 316(c)(1).

82.     This provision was added in the wake of Hurricane Katrina, after Congress determined that one of the key reasons FEMA was unprepared was that DHS leadership had rejected the concept of "integrated emergency management," which posits that the most effective way to reduce damage from disasters is for a single agency to engage in four interrelated functions: mitigation, preparation, response, and recovery.[28] Instead of following this approach, DHS leadership had stripped FEMA of its preparedness responsibilities and assigned them to others within DHS.[29] Congress concluded that this "was a mistake" and that "preparedness, response, recovery, and mitigation require synergy" so FEMA must engage in all four functions.[30]

83.     As a result, Congress provided by law that each of these four functions, including mitigation, is a core component of FEMA's mission: "The primary mission of" FEMA "is to reduce the loss of life and property and protect the Nation from all hazards" through "a risk-based, comprehensive emergency management system of *preparedness*, *protection*, response, recovery, *and mitigation*." 6 U.S.C. § 313(b)(1) (emphasis added); *see also* 6 U.S.C. § 313(b)(2)(D) (providing that the Administrator "shall . . . integrate the Agency's emergency preparedness, protection, response, recovery, and mitigation responsibilities"); 6 U.S.C. § 314(a)(9)(A) (providing that the FEMA "Administrator shall provide federal leadership necessary to . . . mitigate against a natural disaster," including by maintaining "a risk-based, comprehensive emergency management system" that includes "mitigation" and by "taking sustained actions to reduce or eliminate long-term risks to people and property from hazards and their effects").

---

[28] S. Rep. No. 109-322, at 221–22 (2006).
[29] *Id.*
[30] *Id.*

84. And Congress also provided that Defendants may not alter that mission, nor can they materially reduce FEMA's ability to carry out any of these functions, unless "otherwise specifically provided" by Congress "in an Act enacted after October 4, 2006." 6 U.S.C. § 316(c)(1).

85. Congress has not enacted any statute "after October 4, 2006" "specifically" authorizing Defendants to terminate FEMA's pre-disaster mitigation grant program or reduce FEMA's mitigation functions and capabilities.

86. Nevertheless, a few days after the March 25 Noem–Lewandowski–Hamilton meeting, Mr. Hamilton, then the so-called "Senior Official Performing the Duties of FEMA Administrator," sent a memo ("the Hamilton Memo") directing the termination of the BRIC program and setting out rules for the agency to apply in carrying out the termination.[31] The memo asserted, without evidence, that "Building Resilient Infrastructure and Communities (BRIC) grants have not increased the level of hazard mitigation as much as desired, and may supplant state, local, tribal and territorial capital investment planning."[32]

87. Two days later, FEMA issued a press release entitled "FEMA Ends Wasteful, Politicized Grant Program, Returning Agency to Core Mission of Helping Americans Recovering from Natural Disasters," in which it announced that "FEMA is ending the Building Resilient Infrastructure and Communities (BRIC) program."[33]

---

[31] Memorandum from Cameron Hamilton to Christopher Logan, *Future of the Building Resilient Infrastructure and Communities (BRIC) Program* (April 2, 2025), available at https://www.oregon.gov/oem/Memos%20and%20Executive%20Orders/250404_SOPDO_Administrator_Memo_on_BRIC.pdf.

[32] *Id.*
[33] Press Release, Fed. Em. Mgmt. Agency, FEMA Ends Wasteful, Politicized Grant Program, Returning Agency to Core Mission of Helping Americans Recovering from Natural Disasters (Apr. 4, 2025), https://www.fema.gov/press-release/20250404/fema-ends-wasteful-politicized-grant-program-returning-agency-core-mission.

88.     Defendants acknowledged that Congress had appropriated $1 billion toward the BRIC program through the bipartisan Infrastructure Investment and Jobs Act but announced that FEMA would not spend those funds as Congress had instructed. *Id.* Instead, Defendants stated that they would be withholding the funds and returning roughly $882 million dollars to the U.S. Treasury. *Id.* The press release also said that Defendants would move BRIC funds out of the National Public Infrastructure Predisaster Mitigation Fund and back into the Disaster Relief Fund. *Id.*

89.     About two weeks after that, FEMA issued an "Update on FEMA Ending the Building Resilient Infrastructure and Communities Program" that provided more detail about how FEMA is implementing the Hamilton Memo.[34] Specifically, FEMA announced:

   a.     "[T]he Fiscal Year 2024 BRIC funding opportunity is cancelled, no applications submitted will be reviewed and no funds will be awarded."

   b.     "Fully obligated projects that have *not* started construction will not be approved and will end."

   c.     "FEMA will not be extending project deadlines without the Senior Official Performing the Duties of the FEMA Administrator's approval."

   d.     "For previous funding cycles, FEMA will cancel all of the BRIC projects selected but not obligated across fiscal years 2020-2023."

   e.     "Management costs will only continue for partially or fully obligated projects."

90.     Consistent with the Hamilton Memo, FEMA revealed in June that at some point in April, FEMA initiated a "Reversal of Building Infrastructure and Communities Set Aside" and unlawfully diverted $4.071 billion out of the National Public Infrastructure Predisaster Mitigation

---

[34] FEMA Advisory, Update on FEMA Ending the Building Resilient Infrastructure and Communities Program (Apr. 16, 2025), available at https://www.floods.org/wp-content/uploads/FEMA-Advisory-Update-on-FEMA-Ending-the-Building-Resilient-Infrastructure-and-Communities-Program-April-16-2025.pdf.

Fund into the Major Declarations component of the Disaster Relief Fund, which funds FEMA's post-disaster grants.[35]

91.    FEMA projects that it will start spending the BRIC funds on these other post-disaster programs in just a few weeks.[36]

### F.    Cameron Hamilton Was Not Lawfully Acting as the FEMA Administrator When He Terminated BRIC

92.    At the time Mr. Hamilton purported to shut down the BRIC program, he was not lawfully acting as the FEMA Administrator.

93.    The Constitution's Appointments Clause provides the "exclusive means" of appointing Officers of the United States. *Lucia v. SEC*, 585 U.S. 237, 244 (2018). That Clause provides that principal "Officers of the United States" may be appointed only if they are nominated by the President "by and with the Advice and Consent of the Senate." U.S. Const., art. II, § 2, cl. 2. This "is also the default manner of appointment for inferior officers," which applies unless Congress authorizes the President, "Courts of Law," or the head of a department to appoint the inferior officer. *Edmond v. United States*, 520 U.S. 651, 660 (1997); U.S. Const., art. II, § 2, cl. 2.

94.    The FEMA Administrator is an Officer of the United States because the Administrator's duties on behalf of the United States are ongoing, and not occasional or temporary, and the FEMA Administrator exercises significant authority on behalf of the United States. By statute, the Administrator "shall be appointed by the President, by and with the advice and consent of the Senate." 6 U.S.C. § 313(c)(1).

---

[35] *See* Fed. Em. Mgmt. Agency, Disaster Relief Fund: Monthly Report 4, April 30, 2025, https://www.fema.gov/sites/default/files/documents/fema_ocfo_may-2025-disaster-relief-fund-report_06042025.pdf.

[36] *See* Fed. Em. Mgmt. Agency, Disaster Relief Fund: Monthly Report 5, June 30, 2025, https://www.fema.gov/sites/default/files/documents/fema_ocfo_disaster-relief-fund-report_072025.pdf.

95.    In addition, Congress has set minimum qualifications for who may serve as FEMA Administrator. In the wake of Hurricane Katrina, the Senate Committee on Homeland Security and Government Affairs made recommendations for how FEMA could be reformed so that it would perform better when the next disaster struck. One of the Committee's key findings was that FEMA did not perform as Congress expected during Katrina in part because of "unqualified senior political leadership."[37] Among other problems, "FEMA's senior political appointees, including Director Michael Brown and Deputy Director Patrick Rhode, had little or no prior relevant emergency-management experience before joining FEMA."[38]

96.    As a result, Congress changed the law to require FEMA's Administrator to have "a demonstrated ability in and knowledge of emergency management and homeland security" and "not less than 5 years of executive leadership and management experience in the public or private sector." 6 U.S.C. § 313(c)(2).

97.    Mr. Hamilton was never nominated to serve as FEMA Administrator, nor was he confirmed by the Senate. Moreover, he "lacks the emergency management experience required under federal law."[39] *See* 6 U.S.C. § 313(c)(2).

98.    Nonetheless, the administration tried to work around the required process: On January 20, 2025, Deanne Criswell, the FEMA Administrator under President Biden, resigned. Rather than nominating Mr. Hamilton as FEMA Administrator and seeking Senate confirmation, the administration appointed him to serve as the Associate Administrator of FEMA's Office of

---

[37] S. Rep. No. 109-322, at 225 (2006); *see also id.* at 214–15.
[38] *Id.*, at 593.
[39] Thomas Frank, *Fired FEMA chief threatened to quit weeks ago*, Politico, May 8, 2025, https://www.politico.com/news/2025/05/08/fema-chief-fired-cameron-hamilton-00335840.

Response and Recovery on January 20, 2025, and then, within two days, elevated him to act as the Administrator under the title "Senior Official Performing the Duties of the Administrator."[40]

99.    That approach is not authorized by Congress or the Constitution. Through the Federal Vacancies Reform Act of 1998 (FVRA), Congress has provided the "*exclusive* means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive Agency . . . for which appointment is required to be made by the President, by and with the advice and consent of the Senate." 5 U.S.C. § 3347(a) (emphasis added).

100.    Congress provided that when a Presidentially-nominated and Senate-confirmed officer resigns, the "first assistant to the office" automatically becomes the acting officer unless the President directs either another Presidentially nominated and Senate-confirmed person to temporarily fill the role or appoints a senior officer or employee of the agency who was in that position for at least "90 days" in "the 365-day period preceding the date of" the resignation. 5 U.S.C. § 3345(a).

101.    Mr. Hamilton did not satisfy any of these criteria: he was not the first assistant to the FEMA Administrator on January 20, 2025, he had not been nominated by the President and confirmed by the Senate to any office, and he was not a senior officer or employee at FEMA or DHS for at least 90 days in the year preceding the vacancy. Instead, during the year prior to the vacancy, Mr. Hamilton was the Director of Business Strategy at a consulting firm called ProSoDel LLC and a candidate for Congress. Mr. Hamilton thus could not lawfully act as the FEMA Administrator, and his termination of the BRIC program was unlawful.

---

[40] Christopher Flavelle, *Former Navy SEAL Said to Be Interim Head of FEMA*, The New York Times, Jan. 22, 2025, https://www.nytimes.com/2025/01/22/climate/fema-announcement-cameron-hamilton.html.

**G.      The Trump Administration Replaced Hamilton with Another Illegal Administrator**

102.    On May 7, 2025, Mr. Hamilton testified before Congress that "I do not believe that it is in the best interests of the American people to eliminate the Federal Emergency Management Agency." He was fired the next day.

103.    FEMA then announced that David Richardson, who was appointed in January 2025 to serve as DHS's Assistant Secretary for the Countering Weapons of Mass Destruction Office, would act as Administrator. Mr. Richardson has never been confirmed by the Senate to any position, nor does he meet the criteria set out by the FVRA: he was not the first assistant to the FEMA Administrator on January 20, 2025, he had not been nominated by the President and confirmed by the Senate to any office at that time, and he was not a senior officer or employee at FEMA or DHS for at least 90 days in the 365 days preceding the vacancy.

104.    Like Hamilton, Richardson "has no prior emergency management experience," so he also does not meet the statutory qualifications for the FEMA Administrator.[41]

105.    In his first meeting with FEMA staff, Mr. Richardson declared: "I can't recall the full title, but essentially, I'm acting. I don't need the full title. All I need is the authority from the president to put me in here as some degree of acting and I will make sure his intent gets completed."[42]

106.    Richardson is incorrect. The President's say-so does not override the Constitution. To lawfully act as FEMA Administrator, Richardson must either be confirmed by the Senate or satisfy the requirements of the FVRA. Because Mr. Richardson has not been nominated by the President and confirmed by the Senate and does not satisfy the requirements of the FVRA, he is

---

[41] Rebecca Hersher, *The Trump administration says it wants to eliminate FEMA. Here's what we know*, NPR, June 26, 2025, https://www.npr.org/2025/06/26/nx-s1-5430469/faq-fema-elimination
[42] Nicole Sganga, *New FEMA head tells staff: "Don't get in my way . . . I will run right over you*, CBS News, May 9, 2025, https://www.cbsnews.com/news/fema-acting-administrator-david-richardson-staff-meeting/.

also unlawfully acting as FEMA Administrator and has no lawful authority to implement the termination of the BRIC program.

107.    To date, after nearly six months in office, President Trump has failed to nominate a FEMA Administrator for Senate confirmation.

**H.    The Steps Defendants Have Taken to Implement the Hamilton Memo—Including Refusing to Spend Congressionally Appropriated Funds on BRIC and Preparing to Spend Those Funds on Other Programs—Are Independently Unlawful**

**1.    Refusing to spend funds Congress appropriated for BRIC is unlawful.**

108.    Our Constitution "exclusively grants the power of the purse to Congress, not the President." *City & County. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). That means when Congress appropriates funds for Defendants to make available, Defendants must do so.

109.    "[T]he President is without authority to thwart congressional will by canceling appropriations passed by Congress." *Id.* And "the President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." *In re Aiken County*, 725 F.3d 255, 260 (D.C. Cir. 2013).

110.    If the President "has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program . . . the President must propose the recission of funds, and Congress may then decide whether to approve a rescission bill." *Id.* at 261 n.1.

111.    Defendants did not follow that process here, and their refusal to make available the funds Congress appropriated for BRIC grants in the Infrastructure Investment and Jobs Act and their plan to instead return those funds to the Treasury is unlawful.

112.    To the extent FEMA is withholding any other Congressionally appropriated funds, such as funds directed to particular BRIC projects through Congressionally directed spending or funds left over from when the program was called Pre-Disaster Mitigation, that, too, is unlawful.

**2.    Moving the BRIC funds out of the National Public Infrastructure Predisaster Mitigation Fund to spend on other programs is unlawful.**

113.    When Congress authorized FEMA to set aside funds from the Disaster Relief Fund for the National Public Infrastructure Predisaster Mitigation Fund, it intended for those funds to be used for BRIC grants, not for other programs. So Congress took measures to ensure that funds that are set aside for BRIC are used for BRIC.

114.    First, Congress provided that once BRIC projects are selected (*i.e.,* once BRIC funds are allocated to a State), FEMA cannot withdraw those funds unless they remain unobligated at "the end of the third fiscal year after the fiscal year for which the amounts were allocated." 42 U.S.C. § 5133(f)(3)(A). And even then, any withdrawn funds must be returned to the National Public Infrastructure Predisaster Mitigation Fund and reallocated to new BRIC projects the following year. 42 U.S.C. § 5133(f)(3)(B).

115.    Second, Congress has barred DHS and FEMA from repurposing grant funds in its appropriations Acts. In 2024, Congress instructed DHS and FEMA that "no funds shall be reprogrammed within or transferred between appropriations to increase or decrease funding for grant programs," and Congress has carried this restriction forward.[43] So FEMA cannot take funds set aside for BRIC grants and spend them on other programs. *See* 6 U.S.C. § 316(d) (confirming that Defendants are required to follow restrictions in appropriations Acts).

---

[43] Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 503(d)(2), 138 Stat. 460, 615 (2024); Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, § 101, 138 Stat. 1524, 1524 (2024) (appropriating funds "under the authority and conditions provided" in "the applicable appropriations Acts for fiscal year 2024"); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101, 139 Stat. 9, 10 (2025) (same).

116.    But FEMA revealed in June that in April it had initiated a "Reversal of Building Infrastructure and Communities Set Aside" and unlawfully diverted $4.071 billion out of the National Public Infrastructure Predisaster Mitigation Fund into the Major Declarations component of the Disaster Relief Fund, which is used to fund post-disaster grants.[44]

## I.    FEMA's Termination of BRIC Has Caused, and Is Continuing to Cause, Irreparable Harm to Plaintiff States and Communities Around the Country

117.    FEMA's termination of the BRIC program has caused serious harm. Not only are States unable to move forward with many of their planned projects, they also risk wasting the substantial time, effort, and money they have already invested in these projects, and undermining the trust they have built with local communities and industry partners, which will make it harder to undertake projects like this in the future. Each day that passes causes more harm and increases the chances that these projects will not be able to go forward, as communities face expiring permits, escalating costs, and eroding stakeholder trust. And since BRIC grants account for most of the funding for these projects, if the termination is not reversed, many of these projects will have to be scaled back, delayed, or canceled entirely. That would deprive communities around the country of the economic benefits these projects will bring and, most importantly, leave them more vulnerable to natural disasters for years to come.

118.    The following are just a few examples of the projects that FEMA's termination of the BRIC program has put at risk.

---

[44] *See* FEMA, Disaster Relief Fund: Monthly Report as of April 30, 2025 at 4 (2025), https://www.fema.gov/sites/default/files/documents/fema_ocfo_may-2025-disaster-relief-fund-report_06042025.pdf

## WASHINGTON

### *North Shore Leveee and North Shore Levee West*

119.     Located on Washington's rural Western coastline, Aberdeen and Hoquiam's working-class communities have experienced decades of severe flooding caused by intense rainfall and coastal surges. As a direct response to these recurring disasters, Washington applied for BRIC funding to construct concrete floodwalls, miles of earthen levees, and raised roadways that would protect these communities from further damage. Once completed, these levees would protect 1,354 business, 5,100 properties, and more than 3,000 jobs located in the designated flood zone. They would also reduce construction and insurance costs, leaving more than $5 million per year in residents' pockets, and promote economic development and future investments.

120.     FEMA selected the projects years ago, allocating $50 million to the North Shore Levee Project and $47.5 million to the North Shore Levee West Project. In anticipation of federal funding, State and local partners invested over $31 million of their own funds in project design, permitting, and pre-construction work. After years of rigorous environmental review, Hoquiam's North Shore Levee West project received a Finding of No Significant Impact from FEMA on March 25, 2025, which was the last step before the paperwork could be finalized and the project could move forward.

121.     But just days later, Defendants shut down the BRIC program, and it is now unclear if these projects will ever get built. These communities cannot fund the projects on their own, and without federal funds, they may need to cancel them entirely. If that were to occur, all the time, effort, and money the State and local partners invested in the project would be wasted, and the community would likely continue to face recurrent severe flooding.

### *Goldendale Emergency Preparedness Microgrid*

122.    Klickitat County is a rural community in southern Washington that frequently loses power during wildfires and severe weather. To help protect the community during power outages, Washington applied for a BRIC grant to construct a solar and battery microgrid that would allow the local hospital and a nearby school district to generate their own electricity so that they could support critical operations even when the grid goes down. This emergency power source would ensure that local residents can receive the medical care they need during emergencies while also providing a sheltering place, with electricity, for more than 9,000 residents frequently at risk of losing power.

123.    FEMA selected the project and allocated more than $9 million toward it. Phase I design, final engineering estimates, and permitting were completed in March 2025, and the next step was for a Phase II amendment, which would allow for construction to begin. But Defendants shut down the BRIC program a few weeks later, and without BRIC funding, this community will be forced to scale back the project so much that the rural hospital will be unable to maintain many of its critical services during outage-causing events, and the school facility will not be fully equipped to provide safe and sanitary emergency sheltering.

## MASSACHUSETTS

124.    In Massachusetts, FEMA awarded almost $50 million in BRIC funds to the cities of Chelsea and Everett, for the Island End River Coastal Flood Resilience Project, the largest grant to the Commonwealth. This grant was a significant contribution to a $120 million project designed address the catastrophic flooding of Island End River during severe coastal storms. The project was intended to fund a $42 million underground storm surge control facility, 4,460 linear-foot storm surge barrier, revamped riverwalk, and 18,000 square feet of nature-based resilience

improvements that include wetland upgrades and a restored salt marsh. The loss of BRIC funding for the Island End River Flood Barrier project puts at risk over $7 billion in annual economic activity, access to the region's supply of fresh produce, a major and vital transportation corridor, and the safety of more than 5,000 residents living in the floodplain.

125.    Also in Massachusetts, the Town of Manchester-by-the-Sea was awarded almost $5 million in BRIC funds to replace the town's Central Street Bridge and remove a collapsing culvert. The existing Central Street Bridge, which serves a major roadway and is the town's main thoroughfare, currently overtops during extreme storms and is structurally deficient. A culvert failure would have major consequences to transportation and community safety including response times for emergency services, impacts to schools, transportation of goods and services, access to government services, and loss of utility services for all of Cape Ann as this bridge carries the entire electric supply to all four Cape Ann towns.

## ARIZONA

126.    Between 2020 and 2023, Arizona was selected for 25 BRIC grants, totaling $9.8 million dollars. Roughly $1.2 million of these funds were directed to the State for salaries and other management costs. Because of the BRIC termination, Arizona will not receive the full amount of state management costs.

127.    The remaining BRIC funding supports critical disaster mitigation projects, including a $4.6 million infrastructure project in the City of Buckeye, Arizona. The City regularly experience floods that threaten the safety of its businesses and families. The BRIC funding would have been used to divert floodwater away from the historic downtown by connecting the drainage system to existing irrigation canals and constructing a retention basin to collect the floodwater.

128.    The Town of Camp Verde, Arizona was similarly selected for a roughly $860,000 BRIC grant to secure a major roadway against flooding. The roadway, Verde Lakes Drive, sustained significant damage from floods in March 2023, resulting in a declaration of emergency in Camp Verde. The BRIC grant would fund flood mitigation improvements and secure the area against flooding.

129.    Arizona does not have the budgetary resources or flexibility to make up for the lost funding without drawing funding away from other important initiatives. Without BRIC funding, Arizona is facing an increased risk of lost lives, property damage, and public safety burdens.

## CALIFORNIA

130.    FEMA selected the City of Rancho Palos Verdes' subapplication for a $32.99 million project under the BRIC program. That grant would have funded a project to reduce geologic landslide movement that threatens most of the City's residents and infrastructure, including a major arterial roadway that provides community and emergency access, sanitation sewer lines located along this roadway, electric and communication lines, potable water lines, and gas lines. The project would reduce risk of sudden/major land movement that could cause the above infrastructure to fail and threaten over 15,000 homes and nearly 40,000 people. This landslide movement involves one of the largest continuously active landslides in the United States and has already resulted in significant damage. With this project, the City could take important steps to stop or slow this ongoing movement. But without this project, this landslide movement will continue to threaten critical infrastructure, damage homes and property, and endanger lives. The landslide movement is irreversible after it occurs.

131.    FEMA selected the City of Sacramento's subapplication for a $21.36 million project under the BRIC program. The grant would have funded a project to mitigate flooding of

five major interchanges, 3.9 miles of a major interstate highway, a runway at an airport, surface streets, 27,000 housing units, and more. Among other things, the project would have improved floodwall sections, improved levee sections, and relocated a pump station. The U.S. Army Corps of Engineers considers the Sacramento region to be one of the most at-risk regions, if not the most at-risk region, in the country for "catastrophic" flooding, noting that it relies on an aging system to reduce its flood risk.

132.    FEMA selected Kern County's subapplication for a $32.39 million project under the BRIC program. The grant would have funded a project to seismically retrofit the Kern Valley Healthcare District's hospital that provides acute care and emergency medical services to a remote population in the mid-northern region of the Kern River Valley area. Unless seismically retrofitted, the hospital may soon need to close. This would force hundreds of thousands of Californians to seek services at hospitals over two hours away.

## COLORADO

### *City of Greeley Goldhill Pipeline Project*

133.    This project, which was Identified for Further Review in BRIC FY 2022, would protect the City of Greeley's water supply against climate-related and human-made hazards. Greeley relies on two water treatment plants, but the current transmission system lacks a connection between the two plants, making the system vulnerable to water shortages and rationing if one plant needs to be taken offline. The proposed project would have built a pipeline to allow treated water to flow in both directions between the plants, thereby increasing flexibility in water management, maximizing the benefits of diversified water sources, and making sure the system can respond effectively to the hazards of wildfire, drought, and cyberattack. The Greeley project would have benefitted 152,861 residents of Greeley, Windsor, Milliken, and Evans along with

approximately 6,000 students at the University of Northern Colorado. Between 40 and 50 percent of the benefitting population is considered vulnerable under multiple socio-economic factors. The total cost of the Greeley project is $18,425,795.28. If the project had moved forward under the BRIC program, FEMA would have contributed $13,819,346.46 of the costs.

**CONNECTICUT**

134.    The BRIC 2022 Resilient Bridgeport Coastal Flood Defense System ("Resilient Bridgeport") was developed to address recurrent flooding and coastal storm surge risks affecting Bridgeport's South End, an area repeatedly impacted by major storm events. Bridgeport is Connecticut's most populous city and the fifth largest city in New England. It sits at the mouth of the Pequonnock River on Long Island Sound and houses the I-95 corridor, one of the busiest interstate thoroughfares connecting the New York metropolitan area with New England.

135.    The key project objectives included:  protecting approximately 65 acres within the 100-year floodplain from storm surge, flooding, and future sea level rise (up to 2.5 feet); safeguarding two critical power-generating facilities capable of supplying electricity to approximately 1.1 million homes; constructing comprehensive flood defense infrastructure, including floodwalls, raised roads, stormwater management systems, and a proposed resilience hub; and reducing long-term flood risk, displacement, and infrastructure damage, while enhancing emergency response capabilities.

136.    The BRIC project termination means not only a loss of the anticipated $47 million in BRIC program funds, but that Bridgeport's South End remains fully exposed to future flooding events. This unmitigated flood risk impacts residential communities, including low-income and vulnerable populations. There is an ongoing vulnerability of two major power generation facilities, risking widespread power outages affecting over 1 million homes.

## DELAWARE

137.    The Delaware Emergency Management Agency was forced to cancel 11 projects as a result of the cancelation of the BRIC Program. Among the canceled projects, was a project to improve storm water management in Lewes, Delaware. Flooding events in this area may result in large scale losses including causing damage to structures and homes. In addition, failure to properly mitigate flood waters in this area could result in eliminating access to homes, disruption of water and sanitary and sewer services, and have additional determinantal impacts on downstream roads, residences, and business. The purpose of this now canceled project was to create infrastructure to avoid stormwater runoff inundation on downstream streets and properties.

138.    The cancellation of the BRIC program is devastating for Delaware. In addition to the lost federal funding, DEMA and its subgrantees have invested time, study, and their own financial resources into planning, design, public engagement, environmental review, and permitting for BRIC projects intended to protect communities and critical infrastructure from natural disasters and extreme weather events. Moreover, each BRIC project requires conducting a rigorous cost-benefit analysis that ensures the project will be cost-effective. That time and effort and those financial resources will be wasted if FEMA will not consider or fund these projects.

139.    Many of the BRIC projects in Delaware cannot move forward without BRIC funding. As a result of the termination of the BRIC program, Delaware is facing an increased risk of lost lives, property damage, and public safety burdens. Delaware does not have the budgetary resources or flexibility to make up for the lost funding without drawing funding away from other important initiatives.

## ILLINOIS

140.    Two of the subgrantees selected for BRIC funding in Illinois from Federal Fiscal Years 2020 through 2023, are the Village of DePue, and the Metropolitan Water Reclamation District of Greater Chicago (MWRD), which were awarded grant funding for specific flood mitigation projects. These two projects are crucial for major critical infrastructure protections for residents of the State of Illinois, including agriculture and healthcare infrastructure.

141.    The Village of DePue is a Central Illinois community of approximately 1,600 residents in Bureau County on the shores of Lake DePue and near the Illinois River. DePue must move its vulnerable wastewater treatment plant out of a FEMA recognized regulatory floodway to reduce the risk of catastrophic flooding of this critical infrastructure and mitigate the risk of significant public health, environmental, and economic harm. Relocation is essential to safeguard clean drinking water for the community, prevent raw sewage from backing into homes, and protect against contamination of Lake DePue—a national powerboat championship site—and the Illinois River, which affect downstream communities including Peoria, Hennepin, and Pekin, along with regional farms and rural manufacturing. The wastewater treatment plant has already faced severe historical flooding, with the Illinois River nearly breaching its levee in 2008 and 2013.

142.    BRIC funding is critical for this project not only because of present and future risk, but also due to DePue's historical environmental and economic challenges as the city is home to a Superfund Site from early 20th-century zinc smelting and fertilizer production that left toxic waste in the community and that limits the City's available resources to address on-going environmental challenges. Moving the plant will protect public health, the environment, and the region's economy.

143.     Another BRIC funded project in Illinois, the MWRD project, seeks to reduce major flooding of critical infrastructure in the Des Plaines River Valley by addressing a growing and costly flood risk within the Prairie Creek sub-watershed. Past floods include a 1986 event that caused an estimated $35 million in damage and forced over 15,000 evacuations, as well as significant historical flooding of this sub-watershed in August 2007, September 2008, and April 2013, which demonstrate an ongoing threat to the community.

144.     The MWRD project aims to directly reduce the risk of such widespread disruption in the Des Plaines River Valley communities, including Maine Township, Park Ridge, and Des Plaines, Illinois. It is also essential to safeguard a vital healthcare lifeline by protecting critical access routes to Advocate Lutheran General Hospital, a Level I Trauma Center and one of the largest hospitals in the Chicago area. Advocate Lutheran General provides comprehensive and specialized care to serve the healthcare needs of tens of thousands of residents across 28 communities within Chicago, Cook County, and Lake County, Illinois. Ensuring uninterrupted access to this facility during a flood is critical for the health and safety of the hospital's extensive service population.

## MAINE

### *York County Coastal Sand Dune Restoration and Protection Initiative*

145.     In January 2024, coastal flooding in southern Maine caused $70 million in damage to public and private property and infrastructure. The flooding destroyed large stretches of coastline, which is a critical resource for both Maine residents and its tourism industry, which is a vital part of the State's economy. In addition to the immediate damage, the flooding caused significant destruction of the dunes that provide a protective buffer for coastal properties, leaving them even more vulnerable to future storms. In response and with the support of BRIC funding,

the York County Emergency Management Agency developed a BRIC application for the York County Coastal Sand Dune Restoration and Protection Initiative to commence a comprehensive phased project to rebuild dunes and widen beaches in a climate-resilient way. The project is intended to better protect critical infrastructure, homes, and businesses from future storms. With the cancellation of BRIC FY24, the region lost $41.4 million in potential funding. Without engineering studies and mitigation efforts, these communities remain exposed to worsening storm impacts.

### MARYLAND

146.    In Maryland, the City of Crisfield had been working on community-driven solutions to its longstanding and severe flooding challenges for years. Crisfield applied for BRIC funds in FFY23 and was later selected for further review by FEMA, a promising sign for the community which holds a high-risk score of 85.36 on FEMA's National Risk Index. [Phase/Stage] One of the project, if approved, would offer $36 million in federal funds, which would be transformational to the flood mitigation efforts of the city, which was founded in 1663 and is home to 2,475 residents today. FEMA's termination of the BRIC program now puts Crisfield's entire flood mitigation project at risk, since many of the non-federal resources the city leveraged to meet its expected federal cost-share responsibilities required the city to have a comprehensive funding plan in place, which includes the expected federal BRIC funds

### MICHIGAN

147.    Two related flood reduction/stormwater infrastructure improvement projects in southeast Michigan. Stormwater related flooding in this area has resulted in costly federal disaster declarations in 2000, 2014, and 2021. These BRIC projects, one for the City of Detroit and one for

the City of Hamtramck, were projects to improve the stormwater infrastructure in those communities to help prevent stormwater flooding disasters in the future.

148.    A $2,000,000 award to the Michigan Department of Licensing and Regulatory's Bureau of Construction Codes that would have funded a dedicated project team to assess the needs of local governments and building inspectors to identify gaps in code inspectors' knowledge of building codes as Michigan transitions through the adoption of the 2021 and 2024 suites of building codes developed by the International Code Council ("ICC") and adopted by the State. The project team intended to use this needs assessment to develop educational materials on the latest building codes adopted by the state and deliver training and outreach programs to enhance code knowledge and compliance of building inspectors, design professionals, and contractors. The funding was also to be used to purchase enhanced code materials and analysis published by the ICC for inspectors in the bureau and working in local units of government to improve and ensure the consistency of code application in plan reviews and inspections. Additionally, the project team intended to work partner organizations to develop the skilled workforce needed by the state and local units of government to enforce building codes across the state.

## MINNESOTA

149.    In the State of Minnesota, BRIC funding is primarily used by counties to update their hazard mitigation plans on a five-year cycle. At the time of writing, terminated BRIC funding was slated to support thirty-four Minnesota counties in updating their current plans. The process of updating a plan requires substantial time and resources to ensure the inclusion of accurate, quantifiable data. BRIC funding enables jurisdictions to engage qualified consultants to support and guide this process. The hazard mitigation plans serve as foundational documents that provide jurisdictions with a comprehensive understanding of their current threat and risk landscape, and

they outline specific strategies to reduce or eliminate risks associated with identified hazards. Moreover, these plans are a federal requirement for jurisdictions seeking eligibility for post-disaster assistance, as outlined in Section 322 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. § 5165. Disrupting these plans will have compounding negative consequences for Minnesota residents during and post-disaster.

## NEW JERSEY

### NJWSA Spruce Run Dam Foundation Grouting Project

150.    New Jersey is using BRIC funds to strengthen the Spruce Run Reservoir Dam, part of the Raritan Basin System that supplies water to 1.5 million residents. The project will protect approximately 249,000 people and associated infrastructure by restoring the dam's integrity, preventing potential dam failure, and reducing downstream flood risk from this Class 1 High Hazard Potential Dam, which stores 11 billion gallons of water.

### PANYNJ Elevation-Floodproofing of Building 111 Infrastructure Mitigation

151.    New Jersey is also using BRIC funds to elevate and floodproof critical electrical and mechanical systems at Port Newark-Elizabeth Marine Terminal's primary water and fire pump station. The project will benefit over 20,000 port workers and protect hundreds of critical structures by ensuring uninterrupted firefighting, potable water, and transportation operations at one of the nation's busiest ports.

## NEW YORK

152.    New York is slated to receive $50 million from the BRIC program for the Seaport Costal Resilience Project (project number EMN-2021-BR-069-0012 ) (SCRP), a multi-phased

project[45] aimed at protecting (i) New York City residents and (ii) City property and infrastructure from the risks associated with rising sea levels, increased rain events, and the impact of extreme heat, all of which are exacerbated by climate change. The Project would reduce flood risk through innovative design and engineering strategies that will integrate flood protection into a public esplanade and historic district, improve access to the waterfront, and implement green and nature-based solutions to improve marine habitat and address the urban heat island effect. The Project will directly protect 91 buildings, including New York City Housing Authority buildings, and critical transportation routes in the Financial District. Further, SCRP will be integrated into a broader infrastructure project, the "Big U," aimed at protecting lower Manhattan from the climate change impacts of floodwater and stormwater events. The cost-benefit calculation of SCRP, including mitigations, is more than $681 million in benefits. In April 2025, the City sought, but had not yet received a response, to an extension request to complete the grant activities associated with SCRP.

153.    New York State has 31 open BRIC projects totaling $244,526,656 benefiting the City of New York and other municipalities throughout the State, with an additional 7 projects totaling $138,008,847 from the BRIC 2022 and 2023 grant cycles that have been selected but not yet awarded. These projects are all in jeopardy of being defunded as a result of FEMA's constructive termination of the BRIC program. If FEMA does not extend periods of performance or approve additional project phases, it will significantly impact the State's ability to prepare for disasters and prevent loss of life and property resulting from hurricanes, floods, tornadoes, or other natural hazards.

---

[45] Phase 1 of the project (appx. 7.5mm) includes environmental reviews, regulatory and permitting approvals, design completion and stakeholder engagement; phase 2 of the project (appx. 43mm) includes the implementation of the project.

154.    For example, the BRIC funding is being used for the Upper Minkel Dam Decommissioning and Riparian Corridor Restoration project. This project would remove the Upper Minkel Dam, a high hazard Class "C" Dam in Westchester County, and restore the stream and surrounding land which would significantly reduce the potential flood hazard associated with the dam. The design will allow for a low flow channel into Purdy Pond and includes a higher elevation flood storage shelf that will reduce, and possibly eliminate, future flood events. The Town of New Castle will not be able to complete the project if FEMA does not approve Phase 2 construction.

155.    New York State received 37 applications from 26 State and local subapplicants totaling $290 million that it intended to submit to FEMA in response to the BRIC 2024 NOFO.

## NORTH CAROLINA

156.    The State of North Carolina is a sovereign state of the United States of America. North Carolina is represented by Attorney General Jeff Jackson who is the chief law enforcement officer of North Carolina.

157.    Rowan County and the City of Salisbury, North Carolina have experienced multi-day shutdowns of the pump station that provides drinking water to over 50,000 of their residents because of flooding and hazardous conditions at the station. The City of Salisbury was selected for a FY 2021 BRIC grant of approximately $22.5 million, which would improve water supply resiliency by relocating the pump station to an area where it could be safely accessed during storms. The City of Salisbury has invested over $3 million in engineering fees alone for the project. FEMA obligated funds for this project but then cancelled the BRIC program before construction could begin. The sudden withdrawal of funds for the project imperils its future.

## OREGON

158.    BRIC funding is administered in Oregon by the Oregon Department of Emergency Management (OEM)—a state agency that coordinates and maintains a statewide emergency services system for emergency and disaster communications. Oregon and its subgrantees have 29 open projects selected for BRIC funding in the amount of $128,736,327.

159.    For example, a project in Oregon's Clatsop County was selected for BRIC funding to assist with tsunami and earthquake preparedness. Clatsop County includes a substantial portion of the Oregon coastline, which is especially vulnerable to a potential earthquake and tsunami caused by the Cascadia Subduction Zone. The project in Clatstop County seeks to integrate a Tsunami Vertical Evacuation Refuge Structure into a community hospital. This would create a multi-purpose structure to provide a shelter for the hospital patients and staff, as well as members of the general population in the hospital's immediate vicinity, that is elevated level above the predicted tsunami inundation levels. The total estimated cost of this project is $19,853,032, of which the federal government was expected to contribute $13,897,122 through BRIC. BRIC's termination places the impending construction phase of this project in jeopardy; neither the County nor the State can afford to resume the project without federal funding.

160.    BRIC's termination would also imperil a project to improve the Medford Water Commission's water distribution system. That project seeks to improve the system's resilience to seismic risk, wildfires, and droughts by creating a "backbone" water supply for critical infrastructure in the City of Medford and the surrounding area. This project was selected for $34,806,505 in BRIC funding, and in a site visit late last year, FEMA staff indicated that the grant was on track for those funds to be obligated by the summer of 2025. The potential loss of those

funds would imperil the broader project's scope which, in its entirety, will cost four times the amount of the federally-funded portion.

161.    BRIC's termination also imperils an effort to relocate the City of Grants Pass's existing water treatment plant outside of a special flood hazard area and replace it with a facility that is resistant to seismic activity, drought, and extreme weather. An application seeking $50 million of BRIC funds for this project was selected for funding, and based on a meeting with FEMA in late 2024, the community anticipated that federal funds would be obligated by summer of 2025.

162.    OEM has also invested substantial state administrative resources—including three full-time employees along with private, contracted consultants—to help bridge the gap between smaller Oregon communities seeking BRIC funding and larger communities with more resources. BRIC's termination would leave OEM with roughly $200,000 of uncompensated costs resulting from these efforts that otherwise would have been reimbursed by federal funds. This would place a significant unanticipated strain on OEM's resources.

## PENNSYLVANIA

163.    Pennsylvania had 47 projects competitively selected between FY2020 and FY2023 that have now been terminated. The federal share for these projects was over $130 million. Pennsylvania is one of 16 states with an Enhanced Hazard Mitigation Plan and the selected projects were pieces of Pennsylvania's enhanced mitigation strategy.

164.    One $2 million award would have allowed the placement of a HESCO flood barrier in the Eastwick neighborhood of Southwest Philadelphia. Eastwick is a residential neighborhood with about 12,000 people that sits along the Delaware River. It has repeatedly experienced losses because of flooding. The barrier was a critical piece of a larger scale mitigation strategy being

implemented by Pennsylvania, the City of Philadelphia, the United States Army Corps of Engineers, United States Fish & Wildlife and FEMA.

165.    Two separate $50 million awards would have supported two Philadelphia Water Department pump stations. One of those awards would have been used to build gates to prevent flood water from entering the 42nd Street pump station, increased that pump station's capacity from 8 million gallons per day to 100 million gallons per day, and improved its operational quality for both normal and storm operations. Those enhancements would have delivered better water service to the local community, reduced overflows into the Schuylkill River, and better protected the neighborhood from flooding impacts. The second award, for which Philadelphia committed to overmatch the federal award, would have achieved similar ends in Northeast Philadelphia.

166.    Yet another award for about $2.7 million would have been used to acquire and demolish 21 properties in Scranton—a community of around 80,000—that have sustained repetitive flood losses. Scranton intended to eliminate future losses for the homeowners and return the parcels to their natural state

167.    Two awards selected for FY2022, for which the federal share totaled more than $10 million, would have significantly contributed to mitigating flood impacts sustained over the years in Dover Township, York County and Bridgeville Borough, Allegheny County. The mitigation project in Dover, a township with about 22,000 people, would have enhanced the flood storage and attenuation capacity of Little Conewago Creek. The Bridgeville Borough award was part of an effort to upsize stormwater culverts, install two screw pumps, install initial levee walls, and perform grading to create additional capacity for Chartiers Creek. Most of Bridgeville Borough's 5,000 residents live near the project area.

168.    Pennsylvania, through the Pennsylvania Emergency Management Agency (PEMA), and local government sub-applicants had invested significant time and money into preparing applications for each of BRIC's application periods.

169.    Pennsylvania also was ready to apply for 22 projects for FY2024, seeking more than $25 million from FEMA.

## RHODE ISLAND

170.    The University of Rhode Island (URI) and its subgrantees have 1 open project selected for BRIC funding from Federal Fiscal Years 2020 through 2023 in the amount of $348,978.18. This project is called Seamless Web-based Flood Risk Mapping Tool for Coastal and Inland Waters of RI in a Changing Climate; extension of STORMTOOLS using FEMA maps and hydrological modeling.

171.    URI's BRIC project cannot move forward without BRIC funding. As a result of the termination of the BRIC program, Rhode Island will have less data and information regarding inland flooding and inland flood risk. Additionally, due to the loss of future funding opportunities without the BRIC program, Rhode Island is facing an increased risk of lost lives, property damage, and public safety burdens due to a loss of ability to predict and model storms.

## VERMONT

172.    In Vermont, BRIC funding has been predominately used for planning and scoping activities. Planning funding is typically for the development of Local Hazard Mitigation Plans (LHMPs). These plans are required to apply for funding under all FEMA Hazard Mitigation Assistance (HMA) programs. Scoping projects are to complete design work and develop infrastructure applications. Annual BRIC funding allowed Vermont communities to plan future

risk reduction for all natural hazards and to design flood reduction projects to ensure readiness following disasters.

173.    For example, a Lower Whetstone Brook Project Scoping Study in Brattleboro, Vermont, totaling $127,760 (federal share), has previously been selected under this grant and has now been cancelled. This project was developed to assess floodplain restoration opportunities in a stretch of river with the potential to significantly reduce flood levels during high-flow storm events in a heavily populated downtown area.

174.    Another project, Flat Iron Bridge Project Scoping in Wolcott, Vermont, totaling $71,250, has previously been selected under this grant in Vermont and has now been cancelled. This project would greatly benefit a community that experienced heavy flooding in Vermont's July 2023 major flood event by developing plans to upsize their infrastructure and reduce flood risk to residents.

## WISCONSIN

175.    In Wisconsin, the Potosi School District was selected to receive $2,736,800 in FY22 for a community tornado shelter to provide near-absolute life safety protection for 886 occupants against 250 mile per hour wind speeds. The nearby Village of Cuba City was selected to receive $8,319,451 in FY22 to construct a multi-use tornado shelter, rated to provide near-absolute life safety protection for 2,333 occupants against 250 mile per hour wind speeds. Both projects had undergone a lengthy and thorough FEMA review and were ready for obligation by FEMA prior to the cancellation of the BRIC program. The communities of Potosi and Cuba City had also passed referenda to secure matching funds for the grants.

176.    Potosi and Cuba City, where tornado safe room projects were cancelled, lie in an area of Wisconsin that is among the highest risk for tornadoes. The county has averaged a tornado

every year since 1950. In 2024, a tornado touched down only 1.4 miles away from the planned safe room in Potosi.

177.    The Town of Whitestown, located along the Kickapoo River in one of the most flood-prone areas of the state, was selected to receive $131,366 in FY23 to protect a bridge against scouring during flooding events. The Kickapoo River is prone to flooding annually and regularly causes damage to the communities along its riverbanks. Record-setting rainfall of 12 or more inches in some areas caused major flooding down the entire span of the river in August 2018. Without the Town of Whitestown bridge improvements, the bridge will become impassable during the next flooding event, leaving residents stranded from emergency police, fire, and EMS services. Scouring could also eventually lead to bridge collapse. This project had likewise undergone a lengthy and thorough FEMA review and was ready for obligation by FEMA prior to the cancellation of the BRIC program.

## V.    FIRST CAUSE OF ACTION

Violation of the Separation of Powers
(Termination of BRIC Program – Substantially Reducing Mitigation Functions)

178.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

179.    Federal courts possess the power in equity to grant injunctive relief "with respect to . . . violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc*, 575 U.S. 320, 326–27 (2015).

180.    The Constitution provides that "All legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1.

181.    Executive Branch agencies' "power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). That means an

agency "literally has no power to act . . . unless and until Congress confers power upon it," *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), and that an agency "may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress," *In re Aiken County*, 725 F.3d 255, 260 (D.C. Cir. 2013).

182.    Congress has not authorized Defendants to terminate the BRIC program.

183.    In fact, Congress has prohibited it: Congress barred Defendants from "substantially or significantly" reducing "the authorities, responsibilities, or functions of [FEMA] or the capability of the Agency to perform those missions, authorities, responsibilities, except as otherwise specifically provided in an Act enacted after October 4, 2006." 6 U.S.C. § 316(c)(1).

184.    Congress has expressly provided by law that mitigating against future disasters is, and must remain, one of FEMA's core functions: FEMA's "primary mission . . . is to reduce the loss of life and property and protect the Nation from all hazards" through "a risk-based, comprehensive emergency management system of preparedness, protection, response, recovery, *and mitigation*." 6 U.S.C. § 313(b)(1) (emphasis added).

185.    And Congress instructed that the "Administrator *shall* provide Federal leadership necessary to prepare for, *protect against*, respond to, recover from, *or mitigate against*, a natural disaster, act of terrorism, or other man-made disaster, including . . . by leading and supporting the Nation in a risk-based, comprehensive emergency management system of *mitigation,* by taking sustained actions to reduce or eliminate long-term risks to people and property from hazards and their effects." 6 U.S.C. § 314(a)(9)(A) (emphasis added).

186.    Congress has not enacted any statute "after October 4, 2006" "specifically" authorizing Defendants to terminate the BRIC program or reduce FEMA's mitigation functions and capabilities.

187.    Defendants' shuttering of FEMA's flagship pre-disaster mitigation program and withholding of billions of dollars intended for pre-disaster mitigation runs afoul of these laws.

188.    Congress determined decades ago, when it codified the pre-disaster mitigation program, that FEMA's existing mitigation programs alone were not sufficient to fulfill FEMA's mitigation mission. And Congress reaffirmed BRIC's importance in 2018, when it provided a new funding stream for the program, and again in 2021, when it appropriated another $1 billion dollars toward it. At every turn Congress has made clear that FEMA needs to engage in *more* pre-disaster mitigation to fulfill its mission, not less, and Congress has barred Defendants from unilaterally countermanding that judgment. *See, e.g.*, 6 U.S.C. §§ 313(b)(1), 316(c)(1).

189.    The Court should therefore enjoin FEMA's termination of the BRIC program as a violation of the Separation of Powers.

## VI.    SECOND CAUSE OF ACTION

Administrative Procedure Act
Agency Action Contrary to Law, 5 U.S.C. §§ 706(2)(A)–(C)
(Termination of BRIC Program – Substantially Reducing Mitigation Functions)

190.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

191.    Congress enacted the APA "as a check upon administrators whose zeal might have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quotations omitted). The APA thus provides that courts must "hold unlawful and set aside agency action" that is contrary to law. 5 U.S. C. § 706(2)(A)–(C).

192.    Defendants are agencies under the APA. 5 U.S.C. §§ 551(1), 701(b)(1).

193.    Defendants took final agency action when Defendants terminated the BRIC program and implemented the termination.

194.    Defendants' termination of the BRIC program is contrary to law because Congress has not authorized them to terminate the BRIC program or substantially reduce FEMA's mitigation functions and capabilities. In fact, Congress has specifically barred it. *See* 6 U.S.C. §§ 316(c)(1), 313(b)(1), 313(b)(2)(3), 314(a)(9)(A). Therefore, the BRIC termination violates these statutes and the Separation of Powers.

195.    The Court should therefore set aside this unlawful agency action.

## VII.    THIRD CAUSE OF ACTION

Violation of the Separation of Powers
(Repurposing BRIC Funds)

196.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

197.    Federal courts possess the power in equity to grant injunctive relief "with respect to . . . violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27.

198.    Executive Branch agencies' "power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington*, 569 U.S. at 297. That means an agency "literally has no power to act . . . unless and until Congress confers power upon it," *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), and that an agency "may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress," *In re Aiken County*, 725 F.3d 255, 260 (D.C. Cir. 2013).

199.    When Congress authorized FEMA to set aside funds from the Disaster Relief Fund for the National Public Infrastructure Predisaster Mitigation Fund, it intended for those funds to

be used for BRIC grants, not for other programs. So Congress took measures to ensure that funds that are set aside for BRIC are used for BRIC.

200.    First, Congress provided that once BRIC projects are selected (*i.e.*, once BRIC funds are allocated to a State), FEMA cannot withdraw those funds unless they remain unobligated "at the end of the third fiscal year after the fiscal year for which the amounts were allocated." 42 U.S.C. § 5133(f)(3). And even then, any withdrawn funds must be returned to the National Public Infrastructure Predisaster Mitigation Fund and reallocated to new BRIC projects the following year. *Id.*

201.    Second, Congress has barred DHS and FEMA from repurposing grant funds in its appropriations Acts. In 2024, Congress instructed DHS and FEMA that "no funds shall be reprogrammed within or transferred between appropriations to increase or decrease funding for grant programs," and Congress has carried this restriction forward.[46] So FEMA cannot take funds set aside for BRIC grants and spend them on other programs. *See* 6 U.S.C. § 316(d) (confirming that Defendants are required to follow restrictions in appropriations Acts).

202.    Nevertheless, Defendants initiated a "Reversal of Building Infrastructure and Communities Set Aside" and unlawfully diverted $4.071 billion out of the National Public Infrastructure Predisaster Mitigation Fund into the Major Declarations component of the Disaster Relief Fund, which is used to fund post-disaster grants.

203.    This repurposing of BRIC funds for non-BRIC purposes is unlawful and should be enjoined.

---

[46] Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 503(d)(2), 138 Stat. 460, 615 (2024); *see also e.g.*, Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101, 139 Stat. 9, 10 (2025) (appropriating funds "under the authority and conditions provided" in "the applicable appropriations Acts for fiscal year 2024").

## VIII.   FOURTH CAUSE OF ACTION

Administrative Procedure Act
Agency Action Contrary to Law, 5 U.S.C. §§ 706(2)(A)–(C)
(Repurposing BRIC Funds)

204.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

205.    Congress enacted the APA "as a check upon administrators whose zeal might have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright*, 603 U.S. at 391. The APA thus provides that courts must "hold unlawful and set aside agency action" that is contrary to law. 5 U.S. C. §§ 706(2)(A)–(C).

206.    Defendants are agencies under the APA. 5 U.S.C. §§ 551(1), 701(b)(1).

207.    Defendants took final agency action when Defendants moved funds set aside for the BRIC program out of the National Public Infrastructure Predisaster Mitigation Fund and into the Major Declarations component of the Disaster Relief Fund so that they could be spent on other programs.

208.    Defendants' efforts to repurpose the funds Congress designated for BRIC violates 42 U.S.C. § 5133(f)(3), the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 503(d)(2), 138 Stat. 460, 614–15 (2024), Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101, 139 Stat. 9, 10 (2025), and the Separation of Powers.

209.    The Court should therefore set aside this unlawful agency action.

## IX.    FIFTH CAUSE OF ACTION

Violation of the Separation of Powers, Appropriations Clause, Spending Clause
(Withholding Appropriated Funds)

210.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

211.    Federal courts possess the power in equity to grant injunctive relief "with respect to . . . violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27.

212.    The Constitution's Spending Clause, art I, § 8, cl. 1, provides that Congress, not the Executive, "shall have Power to lay and collect Taxes, Duties, Imports, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."

213.    The Constitution's Appropriations Clause, art. I, § 9 cl. 7, provides that Congress, not the Executive, has the power to appropriate money from the Treasury.

214.    "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018). Doing so "violates the constitutional principle of the Separation of Powers." *Id.*

215.    In the bipartisan Infrastructure Investment and Jobs Act ("IIJA"), Congress appropriated $1 billion dollars to the BRIC program. *See* Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429, 1387 (2021). In doing so, Congress provided that "200,000,000 shall be made available" for each of fiscal years 2022, 2023, 2024, 2025, and 2026. *Id.*

216.    FEMA issued a Notice of Funding Opportunity for BRIC grants for Fiscal Year 2024 on January 6, 2025. The application submission deadline was April 18, 2025.

217.    Plaintiff states then spent significant time and effort preparing applications for Fiscal Year 2024 BRIC funds.

218.    Roughly two weeks before the deadline, FEMA shut down the BRIC program, and two days before the deadline, FEMA announced that "the Fiscal Year 2024 BRIC funding opportunity is cancelled, no applications submitted will be reviewed and no funds will be

awarded."[47] FEMA also announced that it would "immediately return[]" the IIJA funds to "the U.S. Treasury." *Id.*

219.    Defendants are thus refusing to make the funds available for BRIC grants as Congress required and are instead withholding the funds.

220.    By doing so, Defendants have violated the Separation of Powers, the Appropriations Clause, and the Spending Clause.

221.    Defendants' withholding of these funds injures Plaintiff States because it deprives each state of the minimum amount of funding to which that state is entitled each fiscal year, 42 U.S.C. § 5133(f)(2)(A), and it deprives States of the opportunity to compete for the remaining funding. *See W. Va. Ass'n of Cmty. Health Ctrs., Inc. v. Heckler*, 734 F.2d 1570, 1576 (D.C. Cir. 1984) ("[A]ppellants have standing to seek relief that would allow them to compete for additional funding.").

222.    All Plaintiff States have applied for, and received, BRIC grants in the past, and all intend to apply in the future. Some Plaintiff States, including Washington, applied for Fiscal Year 2024 BRIC grants by the deadline notwithstanding Defendants' unlawful termination of the program and withholding of Congressionally appropriated funds, while other Plaintiff States chose not to apply in light of FEMA's unequivocal statement that "no applications submitted will be reviewed and no funds will be awarded."[48] Regardless, all Plaintiff States stand ready to apply promptly should the program be reinstated.

---

[47]FEMA Advisory, Update on FEMA Ending the Building Resilient Infrastructure and Communities Program (Apr. 16, 2025), https://www.floods.org/wp-content/uploads/FEMA-Advisory-Update-on-FEMA-Ending-the-Building-Resilient-Infrastructure-and-Communities-Program-April-16-2025.pdf.

[48] FEMA Advisory, Update on FEMA Ending the Building Resilient Infrastructure and Communities Program (Apr. 16, 2025), https://www.floods.org/wp-content/uploads/FEMA-Advisory-Update-on-FEMA-Ending-the-Building-Resilient-Infrastructure-and-Communities-Program-April-16-2025.pdf.

223.    To the extent FEMA is withholding any other Congressionally appropriated funding for the pre-disaster mitigation program, 42 U.S.C. § 5133, such as funding directed to particular BRIC projects through Congressionally directed spending or funding left over from when the program was called Pre-Disaster Mitigation, that, too, is unlawful.

224.    The Court should thus enjoin Defendants' withholding of Congressionally appropriated funds.

## X.    SIXTH CAUSE OF ACTION

Administrative Procedure Act
Agency Action Contrary to Law, 5 U.S.C. §§ 706(2)(A)–(C)
(Withholding Appropriated Funds)

225.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

226.    Congress enacted the APA "as a check upon administrators whose zeal might have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright*, 603 U.S. at 391. The APA thus provides that courts must "hold unlawful and set aside agency action" that is contrary to law. 5 U.S. C. §§ 706(2)(A)–(C).

227.    Defendants are agencies under the APA. 5 U.S.C. §§ 551(1), 701(b)(1).

228.    Defendants took final agency action when Defendants withheld the funds Congress appropriated for the BRIC program.

229.    The Constitution's Spending Clause, art I, § 8, cl. 1, provides that Congress, not the Executive, "shall have Power to lay and collect Taxes, Duties, Imports, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."

230.    The Constitution's Appropriations Clause, art. I, § 9, cl. 7, provides that Congress, not the Executive, has the power to appropriate money from the Treasury.

231.    "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018). Doing so "violates the constitutional principle of the Separation of Powers." *Id.*

232.    In the bipartisan Infrastructure Investment and Jobs Act ("IIJA"), Congress appropriated $1 billion dollars to the BRIC program. *See* Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429, 1387 (2021). In doing so, Congress provided that "200,000,000 shall be made available" for each of fiscal years 2022, 2023, 2024, 2025, and 2026. *Id.*

233.    Roughly two weeks before the deadline, FEMA shut down the BRIC program, and two days before the deadline, FEMA announced that "the Fiscal Year 2024 BRIC funding opportunity is cancelled, no applications submitted will be reviewed and no funds will be awarded."[49] FEMA also announced that it would "immediately return[]" the IIJA funds to "the U.S. Treasury."[50]

234.    Defendants are thus refusing to make the funds available for BRIC grants as Congress required and are instead withholding the funds.

235.    By doing so, Defendants have violated the Separation of Powers, the Appropriations Clause, the Spending Clause, and any Acts of Congress appropriating funds for this program, including but not limited to the IIJA.

236.    The Court should therefore set aside this unlawful agency action.

---

[49] FEMA Advisory, Update on FEMA Ending the Building Resilient Infrastructure and Communities Program (Apr. 16, 2025), available at https://www.floods.org/wp-content/uploads/FEMA-Advisory-Update-on-FEMA-Ending-the-Building-Resilient-Infrastructure-and-Communities-Program-April-16-2025.pdf.
[50] *Id.*

## XI.    SEVENTH CAUSE OF ACTION

Violation of the Appointments Clause
(Termination of BRIC Program – No Authority to Act as Administrator)

237.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

238.    Federal courts possess the power in equity to grant injunctive relief "with respect to . . . violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27.

239.    The Appointments Clause provides that "Officers of the United States" must be nominated by the President "by and with the Advice and Consent of the Senate" unless the officer is an "inferior Officer" and Congress "by Law" vests the appointment of that officer "in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const., Art. II, § 2, cl. 2.

240.    The FEMA Administrator is an Officer of the United States because the Administrator exercises significant authority on behalf of the United States, and his or her duties on behalf of the United States are ongoing, and not occasional or temporary. The Administrator is responsible for "lead[ing] the Nation's efforts to prepare for, protect against, respond to, recover from, and mitigate against the risk of natural disasters." 6 U.S.C. § 313(b)(2)(A). And in doing so, the Administrator oversees a multi-billion dollar annual budget, and a workforce of thousands.[51]

241.    Congress has not vested the President alone, the Courts of Law, or the Head of a Department with authority to appoint the FEMA Administrator.

242.    In fact, Congress has confirmed that the FEMA "Administrator shall be appointed by the President, by and with the advice and consent of the Senate." 6 U.S.C. § 313(c)(1).

---

[51] Dep't Homeland Security, *Federal Emergency Management Agency: FEMA Budget Overview. Fiscal Year 2026 Congressional Justification* 3, https://www.dhs.gov/sites/default/files/2025-06/25_0613_fema_fy26-congressional-budget-justificatin.pdf (at FEMA-6 and FEMA-7).

243.    Cameron Hamilton, who acted as FEMA Administrator between January 2025 and May 2025, was not nominated by the President and confirmed by the Senate.

244.    The FVRA provides the "*exclusive* means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive Agency . . . for which appointment is required to be made by the President, by and with the advice and consent of the Senate." 5 U.S.C. § 3347(a) (emphasis added).

245.    Congress provided that when a Presidentially-nominated and Senate-confirmed officer resigns, the "first assistant to the office" automatically becomes the acting officer unless the President directs either another Presidentially nominated and Senate-confirmed person to temporarily fill the role or appoints a senior officer or employee of the agency who was in that position for at least "90 days" in "the 365-day period preceding the date of" the resignation. 5 U.S.C. § 3345(a).

246.    Hamilton did not satisfy any of the criteria under the FVRA, such as being the "first assistant to the office" or being a senior officer or employee of the agency for at least 90 days before the position of FEMA Administrator became vacant. *See, e.g.*, 5 U.S.C. § 3345(a).

247.    Because Hamilton was not lawfully appointed as FEMA Administrator nor authorized to act as Administrator under the FVRA, he was acting without authority when he terminated the BRIC program, and his memo directing the termination of the BRIC program and his efforts to implement that termination were void *ab initio* and should be vacated and set aside. *Noel Canning v. N.L.R.B.*, 705 F.3d 490, 493 (D.C. Cir. 2013) (holding that actions taken by unlawfully appointed NLRB board members were "void *ab initio*" and vacating challenged order), *aff'd* 573 U.S. 513 (2014); *see also Lucia v. SEC*, 585 U.S. 237, 251 (2018).

248.    David Richardson, who is currently acting as FEMA Administrator, also was not nominated by the President and confirmed by the Senate and also does not satisfy the requirements of the FVRA, so he, too, is serving unlawfully and thus cannot ratify Hamilton's termination of the BRIC program and lacks authority to implement that termination.

249.    The Court should vacate and set aside Hamilton and Richardson's termination of the BRIC program, and implementation of the termination, and declare these actions void *ab initio*.

### XII.    EIGHTH CAUSE OF ACTION

Administrative Procedure Act
Agency Action Contrary to Law, 5 U.S.C. § 706(2)(A)–(C)
(Termination of BRIC Program – No Authority to Act as Administrator)

250.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

251.    Congress enacted the APA "as a check upon administrators whose zeal might have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright*, 603 U.S. at 391. The APA thus provides that courts must "hold unlawful and set aside agency action" that is contrary to law. 5 U.S. C. § 706(2)(A)–(C).

252.    Defendants are agencies under the APA. 5 U.S.C. §§ 551(1), 701(b)(1).

253.    Defendants took final agency action when Defendants terminated the BRIC program and implemented the termination.

254.    For the reasons explained above, Defendants' termination of the BRIC program was contrary to law because Hamilton and Richardson were not lawfully appointed to serve as FEMA Administrator and thus were without lawful authority to act as FEMA's Administrator when they ordered and implemented the BRIC termination.

255.    The Court should therefore set aside this unlawful agency action.

## XIII.  NINTH CAUSE OF ACTION

Equitable *Ultra Vires*
(BRIC Termination, Withholding Appropriated Funds, Repurposing BRIC Funds)

256.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

257.    Federal courts possess the power in equity to grant injunctive relief "with respect to . . . violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27.

258.    When agencies "act improperly" or "beyond their jurisdiction, what they do is ultra vires." *City of Arlington*, 569 U.S. at 297.

259.    No Constitutional provision authorizes Defendants to unilaterally terminate the BRIC program.

260.    No statute authorizes Defendants to unilaterally terminate the BRIC program.

261.    As described above, multiple Constitutional and statutory provisions bar Defendants from unilaterally terminating the BRIC program.

262.    Therefore, Defendants' termination of the BRIC program is *ultra vires*.

263.    No Constitutional provision authorizes Defendants to refuse to spend Congressionally appropriated funds.

264.    No statute authorizes Defendants to refuse to spend Congressionally appropriated funds.

265.    Therefore, Defendants' refusal to spend funds Congress appropriated for the BRIC program is *ultra vires*.

266.    No Constitutional provision authorizes Defendants to use funds set aside for the BRIC program for other purposes.

267.    No statute authorizes Defendants to use funds set aside for the BRIC program for other purposes.

268.    Therefore, Defendants' redirecting of funds set aside for the BRIC program for other purposes is *ultra vires*.

269.    Cameron Hamilton and David Richardson were both appointed to act as FEMA Administrator unlawfully, and thus lacked authority to act as FEMA Administrator and their termination of the BRIC program and implementation of that termination were *ultra vires*.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

a.    Declare unlawful Defendants' termination of the BRIC program, withholding of Congressionally appropriated funds, and redirecting funds set aside for the BRIC program to other agency initiatives.

b.    Declare that Cameron Hamilton was acting as FEMA Administrator unlawfully when he terminated and implemented the termination of the BRIC program, and that such termination and implementation of the termination were void *ab initio*.

c.    Declare that David Richardson is acting as FEMA Administrator unlawfully and has no legal authority to ratify or implement the termination of the BRIC program.

d.    Vacate and set aside Defendants' termination of the BRIC program, withholding of Congressionally appropriated funds, and redirecting funds set aside for the BRIC program to other agency initiatives.

e.    Preliminarily and permanently enjoin Defendants' termination of the BRIC program, and any action to implement that termination, and restore the status quo as it existed

before the termination, including by requiring Defendants to reopen the fiscal year 2024 Notice of Funding Opportunity, evaluate applications, and select recipients in a reasonable time period.

       f.      Preliminarily and permanently enjoin Defendants from withholding funds Congress has appropriated for pre-disaster mitigation.

       g.      Preliminarily and permanently enjoin Defendants from obligating, using, expending, or otherwise placing beyond the Court's jurisdiction the court funds set aside for the BRIC program except for purposes of the BRIC program.

       h.      Preliminarily enjoin Defendants from obligating, using, expending, or otherwise placing outside the jurisdiction of the court funds Congress appropriated for pre-disaster mitigation programs (including Congressionally directed spending toward particular projects) for programs other than the pre-disaster mitigation program.

       i.      Preliminarily and permanently enjoin the time-limited expiration of any of the funds appropriated for pre-disaster mitigation to preserve the Court's jurisdiction and to account for any time during which FEMA was not fully and actively administering the program, which Plaintiffs anticipate will be the amount of time between April 2, 2025 and final judgment.

       j.      Enjoin defendants from enforcing the period of performance for each BRIC grant and the time under 42 U.S.C. § 5133(f)(3) for any period of time during which FEMA was not fully and actively administering the program, which Plaintiffs anticipate will be the amount of time between April 2, 2025 and final judgment.

       k.      Permanently enjoin Defendants from implementing the Hamilton Memo and the BRIC termination.

       l.      Award Plaintiff States their costs and reasonable attorney's fees; and

       m.      Award such additional relief as the interests of justice may require.

DATED this 16th day of July 2025.

**ANDREA JOY CAMPBELL**
Attorney General
Commonwealth of Massachusetts

*/s/ Hannah C. Vail*
HANNAH C. VAIL, BBO No. 698577
JAK KUNDL, BBO No. 713951
Assistant Attorneys General
AMY LAURA CAHN, BBO No. 716706*
Special Assistant Attorney General
Massachusetts Office of the Attorney General
One Ashburton Place
Boston, MA 02108
617-963-2512
hannah.vail@mass.gov
jak.kundl@mass.gov
amy.laura.cahn@mass.gov
*Attorneys for Plaintiff Commonwealth of
Massachusetts*

**NICHOLAS W. BROWN**
Attorney General
State of Washington

*/s/ Tyler Roberts*
TYLER ROBERTS*
JENNIFER K. CHUNG*
NIYA TAWACHI*
ANDREW R.W. HUGHES*
Assistant Attorneys General
CRISTINA SEPE*
Deputy Solicitor General
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
tyler.roberts@atg.wa.gov
jennifer.chung@atg.wa.gov
niya.tawachi@atg.wa.gov
andrew.hughes@atg.wa.gov
cristina.sepe@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

**KRISTIN K. MAYES**
Attorney General
State of Arizona

*/s/ Lauren Watford*
LAUREN WATFORD*
Assistant Attorney General
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, Arizona 85004
602-542-3333
Lauren.Watford@azag.gov
*Attorneys for the State of Arizona*

**ROB BONTA**
Attorney General
State of California

*/s/ David Green*
R. MATTHEW WISE*
Supervising Deputy Attorney General
DAVID GREEN*
CHRISTOPHER KISSEL*
HARALD H. KIRN*
Deputy Attorneys General
California Office of the Attorney General
1300 I Street
Sacramento, CA 95814
916-445-9555
matthew.wise@doj.ca.gov
david.green@doj.ca.gov
christopher.kissel@doj.ca.gov
harold.kirn@doj.ca.gov
*Attorneys for Plaintiff State of California*

**PHILIP J. WEISER**
Attorney General
State of Colorado

*/s/ Finnuala Tessier*
FINNUALA TESSIER*
SAMUEL WOLTER*
Assistant Attorneys General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
720-508-6000
finnuala.tessier@coag.gov
samuel.wolter@coag.gov
*Attorneys for Plaintiff State of Colorado*

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Ashley Meskill*
ASHLEY MESKILL*
Assistant Attorney General
Connecticut Office of the Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5270
ashley.meskill@ct.gov
*Attorneys for Plaintiff State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

*/s/ Vanessa L. Kassab*
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
vanessa.kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

**KWAME RAOUL**
Attorney General
State of Illinois

*/s/ Aleeza M. Strubel*
ALEEZA M. STRUBEL*
Complex Litigation Counsel
SARAH J. GALLO*
Assistant Attorney General
Illinois Office of the Attorney General
115 S. LaSalle Street
Chicago, IL 60604
773-914-3046
aleeza.strubel@ilag.gov
sarah.gallo@ilag.gov
*Attorneys for Plaintiff State of Illinois*

**AARON M. FREY**
Attorney General
State of Maine

*/s/ Reid Hayton-Hull*
REID HAYTON-HULL*
Assistant Attorney General
Maine Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
207-626-8800
reid.hayton-hull@maine.gov

**ANTHONY G. BROWN**
Attorney General
State of Maryland

*/s/ Robert N. Brewer*
ROBERT N. BREWER*
Assistant Attorney General
Maryland Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-6924
rbrewer@oag.state.md.us

*Attorneys for the State of Maine*

**DANA NESSEL**
Attorney General
State of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI*
ADAM DE BEAR*
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
giovanattin@michigan.gov
deaeara@michigan.gov
*Attorneys for Plaintiff State of Michigan*

**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

*/s/ Phoenix N. Meyers*
PHOENIX N. MEYERS*
Deputy Attorney General
New Jersey Office of the Attorney General
25 Market Street
Trenton, NJ 08625
609-696-5289
phoenix.meyers@law.njoag.gov
*Attorney for Plaintiff State of New Jersey*

**JEFF JACKSON**
Attorney General

LAURA HOWARD
Chief Deputy Attorney General
State of North Carolina

*/s/ Daniel T. Wilkes*
DANIEL T. WILKES*
Assistant Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6415

*Attorneys for Plaintiff State of Maryland*

**KEITH ELLISON**
Attorney General
State of Minnesota

*/s/ Cat Rios-Keating*
CAT RIOS-KEATING*
Special Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota St., Suite 600
St. Paul, MN 55101
651-300-7302
catherine.rios-keating@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

**LETITIA JAMES**
Attorney General
State of New York

*/s/ Colleen K. Faherty*
COLLEEN K. FAHERTY*
Special Trial Counsel
New York Office of the Attorney General
28 Liberty Street
New York, NY 10005
212-416-6046
Colleen.Faherty@ag.ny.gov
*Attorney for Plaintiff State of New York*

**DAN RAYFIELD**
Attorney General
State of Oregon

*/s/ Scott P. Kennedy*
SCOTT P. KENNEDY*
BRIAN S. MARSHALL*
Senior Assistants Attorney General
Oregon Office of the Attorney General
1162 Court Street NE
Salem, OR 97301
971-453-9050
scott.kennedy@doj.oregon.gov
brian.s.marshall@doj.oregon.gov

dwilkes@ncodoj.gov
*Attorney for Plaintiff State of North Carolina*

**JOSH SHAPIRO**
in his official capacity as Governor of the
Commonwealth of Pennsylvania

JENNIFER SELBER
General Counsel

*/s/ Jacob B. Boyer*
JACOB B. BOYER*
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
717-460-6786
jacobboyer@pa.gov
*Counsel for Governor Josh Shapiro*

**CHARITY R. CLARK**
Attorney General
State of Vermont

*/s/ Ryan P. Kane*
RYAN P. KANE*
Deputy Solicitor General
Vermont Office of the Attorney General
109 State Street
Montpelier, VT 05609
802-828-2153
ryan.kane@vermont.gov
*Attorney for Plaintiff State of Vermont*

*Attorneys for Plaintiff State of Oregon*

**PETER F. NERONHA**
Attorney General
State of Rhode Island

*/s/ Randelle L. Boots*
RANDELLE L. BOOTS*
Special Assistant Attorney General
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400
rboots@riag.ri.gov
*Attorney for Plaintiff State of Rhode Island*

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

*/s/ Lynn K. Lodahl*
LYNN K. LODAHL*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-6219
lynn.lodahl@wisdoj.gov
*Attorney for Plaintiff State of Wisconsin*

*pro hac vice application forthcoming