# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF WASHINGTON, et al.,

       Plaintiffs,

v.

FEDERAL EMERGENCY
MANAGEMENT AGENCY, et al.,

       Defendants.

No. 1:25-cv-12006

LEAVE TO FILE GRANTED ON
JULY 16, 2025

# PLAINTIFFS' MEMORANDUM IN SUPPORT OF
# MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    BACKGROUND .................................................................................................. 2

   A. FEMA's Pre-Disaster Mitigation Program Has Helped the Nation Protect
      Against Disasters for Nearly 30 Years ................................................................ 2

   B. The Modern BRIC Program ................................................................................. 6

   C. Defendants Suddenly Shut Down the BRIC Program ......................................... 8

   D. Defendants Move BRIC Funds Out of the National Public Infrastructure
      Predisaster Mitigation Fund to Spend on Other Programs ............................... 10

III.   ARGUMENT ..................................................................................................... 10

   A. Plaintiffs Are Likely to Succeed on the Merits Because Defendants'
      Shutdown of the BRIC Program Is Unlawful .................................................... 11

      1.  Congress has not authorized Defendants to substantially reduce
          FEMA's mitigation functions and capabilities by shutting
          down the BRIC program ............................................................................ 11

      2.  Defendants' repurposing of funds set aside for BRIC is unlawful ............ 16

      3.  Defendants' withholding of funds Congress appropriated for
          BRIC is unlawful. ...................................................................................... 17

      4.  Cameron Hamilton was not lawfully acting as FEMA's
          Administrator when he ordered the BRIC termination. .............................. 18

   B. Plaintiffs Face Imminent Irreparable Harm Absent Preliminary Relief ............... 21

   C. The Balance of the Equities and Public Interest Impact Weigh in Favor
      of Granting Preliminary Relief .......................................................................... 25

IV.    CONCLUSION .................................................................................................. 26

## I.    INTRODUCTION

For nearly thirty years, and across five Presidential administrations, FEMA's pre-disaster mitigation program has operated on a simple premise: by proactively fortifying our communities against disasters before they strike, rather than just responding afterward, we will reduce injuries, save lives, protect property, and, ultimately, save money that would otherwise be spent on post-disaster costs. Indeed, studies have shown that each dollar spent on mitigation saves an average of $6 in post-disaster costs, with some investments saving even more. Thus, Congress has consistently funded an all-purpose pre-disaster mitigation program—now called Building Resilient Infrastructure and Communities, or BRIC—for decades, and explicitly directed FEMA to make mitigation a core part of its mission. Over the past four years, FEMA has selected nearly 2,000 projects to receive roughly $4.5 billion in BRIC funding. From Washington to North Carolina and California to Maine, and everywhere in between, every state in the nation is relying on this program.

All that changed when Cameron Hamilton, who the Trump Administration unlawfully installed to act as FEMA's Administrator, suddenly—and illegally—shut down the program. Mr. Hamilton's purported termination of the BRIC program was unlawful for three reasons. First, the BRIC termination is directly contrary to Congress's statutory direction that FEMA must prioritize mitigation and is specifically barred from substantially reducing its mitigation functions. By unilaterally shutting down FEMA's flagship pre-disaster mitigation program, Defendants have acted unlawfully and violated core Separation of Powers principles. Second, the steps Defendants have taken to implement the termination—refusing to spend funds Congress directed toward BRIC or trying to spend them on other programs—also violate the Constitution and unlawfully intrude on Congress's power of the purse. Third, neither Mr. Hamilton nor his successor,

1

David Richardson, were lawfully appointed to run FEMA, and they therefore lack the authority to shut down the BRIC program.

The impact of the shutdown has been devastating. Communities across the country are being forced to delay, scale back, or shut down hundreds of mitigation projects depending on this funding. Projects that have been in development for years, and in which communities have invested millions of dollars for planning, permitting, and environmental review are now threatened. And in the meantime, Americans across the country face a higher risk of harm from natural disasters.

Despite this, Defendants revealed in June that they have unlawfully diverted $4.071 billion away from BRIC and are poised to spend that money on other programs in just a few weeks. If Defendants spend down those funds before the Court can reach final judgment, they are likely to be unrecoverable, and Plaintiff States will be left without a meaningful remedy for at least some of their claims. Plaintiff States therefore respectfully request a narrow injunction barring Defendants from spending these funds on non-BRIC programs during the pendency of this litigation. Absent an injunction, the Court's jurisdiction and ability to grant final relief are likely to be impaired.

## II.     BACKGROUND

### A.     FEMA's Pre-Disaster Mitigation Program Has Helped the Nation Protect Against Disasters for Nearly 30 Years

Following a series of devastating hurricanes, floods, and earthquakes in the 1980s and 1990s, Congress recognized that fortifying against natural disasters before they strike, rather than just reacting to them, can save lives, protect property, and save the federal government "significant sums" that it would otherwise spend on "post-disaster clean-up and response." H.R. Rep. No. 104-812, at 78–79 (1996) (Conf. Rep.). Congress thus decided that "FEMA should be taking an

2

increasingly active role in developing and participating in pre-disaster mitigation programs," and in 1997 started appropriating funds for FEMA to develop a program to assist state and local governments in protecting against natural disasters. *Id.*

FEMA started a pilot program called Project Impact in 1997, which focused mainly on helping communities to evaluate the hazards they faced and develop mitigation plans. After a promising start, Congress codified the program and expanded its focus to helping states to implement these mitigation measures. The Committee Report explained that "the only way to control post-disaster spending for response, relief, and recovery is to increase pre-disaster funding for mitigation, planning, and preparedness," and cited testimony from FEMA suggesting "that mitigation measures return $3 for every $1 spent." H.R. Rep. No. 106-40, at 11, 21 (1999).

The concept is simple: FEMA provides financial and technical assistance to support state, local, tribal, and territorial governments in implementing "cost-effective" mitigation measures that are "designed to reduce injuries, loss of life, and damage and destruction of property" from natural disasters. 42 U.S.C. § 5133(b). Recipients may also use these funds to assess hazards they face and develop plans for mitigating them. 42 U.S.C. § 5133(e). Each grant can cover up to 75% of a project's costs, and the federal share can rise to 90% for small rural communities. 42 U.S.C. § 5133(h).

The program has been critically important nationwide. Over the past four years, FEMA has selected nearly 2,000 projects from every corner of the country to receive roughly $4.5 billion in funding. Vail Decl., Ex. 30 ¶12. All fifty states have participated in the program, and it has been oversubscribed every year, even as Congress has made more funds available. Vail Decl., Ex. 30 ¶¶10, 12. Before the Trump Administration shut it down, BRIC was poised to fund hundreds of critical, lifesaving projects including: (1) floodwalls, levees, pump stations, and stormwater

3

management systems to protect against flooding, Vail Decl., Ex. 33 ¶7(c); Ex. 36 ¶ 6; Ex. 37 ¶¶6-10; Ex. 32 ¶¶14-15; Ex. 45 ¶6(a); Ex. 31 ¶¶7-9; Ex. 43 ¶¶6(a)-(c); Ex. 48 ¶¶11-20, (2) seismic retrofits to fortify against earthquakes, *Id.,* Ex. 33 ¶7(a); Ex. 44 ¶6; Ex. 31 ¶¶13-14, (3) saferooms to provide shelter from tornados, *Id.,* Ex. 39 ¶7; Ex. 47 ¶¶6-7, 16, (4) an evacuation tower to allow for escape from tsunamis, *Id*., Ex. 44 ¶¶6-7, (5) soil remediation to protect against landslides, *Id.*, Ex. 33 ¶7(b), (6) vegetation management to reduce damage from wildfires, *Id*., Ex. 33 ¶7(e), and (7) shoreline upgrades to protect against erosion and flooding, *Id*., Ex. 42 ¶¶8-10, 13. Many of these projects protect critical infrastructure, ensuring that electricity, heat, clean water, and medical care remain available in emergencies, *Id*., Ex. 33 ¶7(b); Ex. 31 ¶¶10-14; Ex. 34 ¶¶7-8; Ex. 35 ¶6(a); Ex. 37 ¶¶7-10; Ex. 48 ¶¶11-14; Ex. 41 ¶¶6(a)-(e); Ex. 44 ¶¶6-9; Ex. 50 ¶5(b).

Congress's assessment that the program would be cost-effective has also proven true: A 2005 study commissioned by FEMA found that each dollar FEMA spends on mitigation saves the federal government about "$3.65 in avoided post-disaster relief costs and increased federal tax revenue." Vail Decl., Ex. 1 at 15. And a more recent study from 2019 shows that each dollar the federal government invested in mitigation between 1993 and 2016 will avoid roughly $6 in costs. *Id.,* Ex. 2 at 8, 10.

Given the program's effectiveness in protecting both people and pocketbooks, Congress has continued to invest in it. In 2018, in the wake of several major hurricanes and wildfires, Congress held hearings to assess what more it could do. President Trump's first FEMA Administrator, Brock Long, explained in written testimony that "Building more resilient communities is the best way to reduce risks to people, property, and taxpayer dollars. I cannot overstate the importance of focusing on investing in mitigation before a disaster strikes." *2017 Hurricane Season: Oversight of the Federal Response: Hearing Before the S. Comm. on Homeland*

4

*Sec. and Gov't Affairs*, 115th Cong. 58 (2017) (statement of William "Brock" Long, Administrator of the Fed. Emerg. Mgmt. Agency), available at https://www.govinfo.gov/content/pkg/CHRG-115shrg29658/pdf/CHRG-115shrg29658.pdf. And he emphasized the point in his oral testimony too: "We have to do more pre-disaster mitigation. Pre-disaster mitigation is the key to becoming more resilient and reducing disaster impacts." *Id.* at 9. When Administrator Long returned to Congress a few months later, he reiterated that "developing resilient communities ahead of an incident reduces loss of life and economic disruption," and stated bluntly: "It is a no-brainer: More investment in pre-disaster mitigation rather than doing it after the fact is ultimately going to reduce disaster costs." *FEMA: Prioritizing a Culture of Preparedness: Hearing Before the S. Comm. on Homeland Sec. and Gov't Affairs*, 115th Cong. 43, 5 (2018) (testimony of William "Brock" Long, Administrator of the Fed. Emerg. Mgmt. Agency), available at https://www.govinfo.gov/content/pkg/CHRG-115shrg32452/pdf/CHRG-115shrg32452.pdf.

Following these hearings, Senators Ron Johnson (R-WI), Claire McCaskill (D-MO), and John Kennedy (R-LA) co-sponsored the Disaster Recovery Reform Act of 2018 (DRRA) to increase the consistency of funding for the pre-disaster mitigation program. For most of its history, the program was funded exclusively through ordinary appropriations, which could be unpredictable and made planning for and executing long-term infrastructure projects difficult. The DRRA would allow FEMA to also set aside funds from the Major Declarations component of the Disaster Relief Fund, which funds FEMA's post-disaster grants, for the BRIC program, and to store those funds in the National Public Infrastructure Predisaster Mitigation Fund. *See* 42 U.S.C. § 5133(i)(1). By setting aside a fraction of these post-disaster funds for pre-disaster mitigation, FEMA could establish "a greater balance . . . between pre- and post-disaster resilience investments" which would "save lives and Federal tax dollars." S. Rep. No. 115-446, at 3 (2018).

The bill passed the House of Representatives by a vote of 398–23 and passed the Senate by a vote of 93–6. President Trump signed it a few days later. FEMA later rebranded what was then called the "Pre-Disaster Mitigation (PDM)" program as the "Building Resilient Infrastructure and Communities (BRIC)" program and announced that this new "reliable stream of sufficient funding" would allow communities "to plan and execute mitigation programs to reduce disaster risk nationwide." Vail Decl., Ex. 3 at 3.

In addition to appropriating funds for FEMA to set aside for BRIC, Congress also appropriated another $1 billion directly to the program through the bipartisan Infrastructure Investment and Jobs Act (IIJA). *See* Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429, 1387 (2021). In doing so, Congress required FEMA to make at least $200 million available for BRIC grants for each of fiscal years 2022, 2023, 2024, 2025, and 2026, in addition to the amounts FEMA set aside in the National Public Infrastructure Predisaster Mitigation Fund. *See id.* (providing that "in addition to amounts set aside pursuant to . . . 42 U.S.C. § 5133 . . . $200,000,000 . . . *shall* be made available" for each of fiscal years 2022, 2023, 2024, 2025, and 2026) (emphasis added).

And since then, Congress has continued to appropriate funds for specific BRIC projects through Congressionally directed spending. *See, e.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Title III, cl. 12(B), 138 Stat. 460, 608 (2024) (appropriating approximately $191 million "for pre-disaster mitigation grants under . . . 42 U.S.C. § 5133(e)").

## B.    The Modern BRIC Program

Following Congress's passage of the DRRA, the modern BRIC program works as follows: FEMA estimates the total cost of certain post-disaster grants and then uses that number to determine how much money it can set aside for BRIC and move into the National Public Infrastructure Predisaster Mitigation Fund. *See* 42 U.S.C. § 5133(i)(1). To ensure that the BRIC

set aside does "not reduce the amounts otherwise made available for" the post-disaster grants, FEMA factors BRIC funding into its annual appropriations requests and lists BRIC as a separate line item in its Disaster Relief Fund budget estimates. 42 U.S.C. § 5133(i)(3); *see also* William L. Painter, Cong. Rsch. Serv. R45484, The Disaster Relief Fund: Overview and Issues 31 (2024) ("In FY2020, FEMA began to request funding for the statutorily established set-aside for the Building Resilient Infrastructure and Communities program . . . . The law, as it requires there to be no reduction in [post-disaster] grants as a result of the set-aside, implies the need for additional funding."); Vail Decl., Exs. 14, 15, 16, 17, 18.

After Congress appropriates the funds, FEMA sets aside the funds for BRIC and moves them into the National Public Infrastructure Predisaster Mitigation Fund. *See* 42 U.S.C. § 5133(i)(1). Once the funds are set aside, they must remain in the National Public Infrastructure Predisaster Mitigation Fund. 42 U.S.C. § 5133(f)(3) (providing that any funds withdrawn from selected projects must be used for BRIC grants the next year); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 503(d)(2), 138 Stat. 460, 615 (2024) (providing that Defendants cannot reprogram or transfer funds "to increase or decrease funding for grant programs").

FEMA then issues a notice of funding opportunity setting out the amount of funding available for that year, the criteria the agency will apply in selecting projects, and the application instructions. *See, e.g.*, Vail Decl., Ex. 10 at 54-56. After reviewing the applications, FEMA selects the most promising projects while ensuring that each eligible state is allocated a minimum amount of funding required by law, and that no one state receives too much funding. *See* 42 U.S.C. § 5133(f)(2).

Once projects are selected, the States generally must then go through months or years of costly planning, permitting, environmental review, and stakeholder engagement before a final

grant agreement is signed and all the funds are fully obligated. Vail Decl., Ex. 10 at 54–56; Ex. 31 ¶8; Ex. 32 ¶10. To ensure that the federal BRIC funds are available for states at the end of this lengthy process, Congress has provided that once projects are selected—*i.e.*, once BRIC funds are allocated to states—Defendants cannot withdraw them unless the funds "remain unobligated by the end of the third fiscal year after the fiscal year for which the amounts were allocated." 42 U.S.C. § 5133(f)(3)(A). And even if the funds are withdrawn at that time, they must be returned to the National Public Infrastructure Predisaster Mitigation Fund and made "available to be awarded on a competitive basis" during the next fiscal year. 42 U.S.C. § 5133(f)(3)(B). Once a project receives final approval, the funds are formally obligated, and construction may begin. *See, e.g.*, Vail Decl., Ex. 10 at 56; Ex. 31 ¶¶7-9.

## C.    Defendants Suddenly Shut Down the BRIC Program

Although the first Trump Administration expanded the BRIC program, the second Trump Administration has expressed hostility toward FEMA from the start. Just four days after being sworn into office, President Trump told reporters, "I think we're going to recommend that FEMA go away." Zack Colman, *Trump's talking about shutting down FEMA. Republicans hate that idea.*, Politico, Feb. 2, 2025, https://www.politico.com/news/2025/02/02/republicans-trump-fema-disasters-00201983. That same day, he issued an Executive Order creating a Council to Assess the Federal Emergency Management Agency, which is supposed to perform "a full-scale review" of FEMA and "recommend to the President improvements or structural changes" to the agency. Exec. Order No. 14180, 90 Fed. Reg. 8743 (Jan. 24, 2025). Then, in a televised cabinet meeting on March 24, 2025, Department of Homeland Security Secretary Kristi Noem announced, "we're going to eliminate FEMA." Vail Decl., Ex. 4 at 3.

The next day, Secretary Noem, Corey Lewandowksi, and Cameron Hamilton, then the so-called "Senior Official Performing the Duties of FEMA Administrator," met and "debated the

possibility of rescinding President Donald Trump's recent executive order establishing a FEMA Review Council and instead moving more quickly to dismantle the agency." *Id.*, Ex. 5 at 2. At that meeting, Defendants discussed "narrowing and focusing the aperture of FEMA's mission dramatically" by "narrowing the agency's responsibilities to helping survivors in the immediate aftermath of disasters." *Id.*, Ex. 4 at 3. As part of that effort, Secretary Noem said "that she wants to eliminate FEMA's role in funding long-term rebuilding efforts and halt multibillion-dollar grants programs that help communities prepare for disasters." *Id.* at 2. When reached for comment, a DHS spokesperson essentially confirmed the reporting: "We are grateful the press is covering Secretary Noem's efforts to eliminate waste, fraud, and abuse within the Department of Homeland Security." *Id.* at 3.

A few days later, Mr. Hamilton sent a memo to a subordinate directing the termination of the BRIC program (the Hamilton Memo). *See id.*, Ex. 6. Two days after that, FEMA issued an advisory entitled "FEMA Ends Wasteful, Politicized Grant Program, Returning Agency to Core Mission of Helping Americans Recovering from Natural Disasters," in which it announced that "FEMA is ending the Building Resilient Infrastructure and Communities (BRIC) program." *Id.*, Ex. 7. The advisory acknowledged that Congress had appropriated $1 billion toward the BRIC program through the IIJA but announced that FEMA would not spend those funds as Congress had instructed. *Id.* Instead, FEMA stated that it would be withholding the funds and returning roughly $882 million to the U.S. Treasury. *Id.* The press release also said that FEMA would move BRIC funds out of the National Public Infrastructure Predisaster Mitigation Fund and back into the Disaster Relief Fund. *Id.*

About two weeks after that, FEMA issued an "Update on FEMA Ending the Building Resilient Infrastructure and Communities Program" that provided more detail about how FEMA would implement the Hamilton Memo. *Id.*, Ex. 8. Specifically, FEMA announced:

- "[T]he Fiscal Year 2024 BRIC funding opportunity is cancelled, no applications submitted will be reviewed and no funds will be awarded."
- "Fully obligated projects that have *not* started construction will not be approved and will end."
- "FEMA will not be extending project deadlines without the Senior Official Performing the Duties of the FEMA Administrator's approval."
- "For previous funding cycles, FEMA will cancel all of the BRIC projects selected but not obligated across fiscal years 2020-2023."
- "Management costs will only continue for partially or fully obligated projects."

**D.    Defendants Move BRIC Funds Out of the National Public Infrastructure Predisaster Mitigation Fund to Spend on Other Programs**

Consistent with the Hamilton Memo, FEMA revealed in June that at some point in April it had initiated a "Reversal of Building Infrastructure and Communities Set Aside" and moved roughly $4.1 billion set aside for BRIC out of the National Public Infrastructure Predisaster Mitigation Fund and back into the Major Declarations component of the Disaster Relief Fund. *Id.*, Ex. 9 at 8, 23 (showing reversal of $4.071 billion from BRIC Set Aside into Major Declarations fund). Defendants also revealed that they are poised to spend down these funds on other programs in August. *Id.* at 19 (showing Major Declarations balance projected to be under $4.071 billion by the end of August 2025); *see* Ex. 19 at 15 (same). If Defendants do so, these funds are likely to be gone forever. Plaintiffs thus urgently seek interim relief enjoining Defendants from spending these funds on non-BRIC programs during the pendency of this litigation.

**III.    ARGUMENT**

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that

the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

**A.    Plaintiffs Are Likely to Succeed on the Merits Because Defendants' Shutdown of the BRIC Program Is Unlawful**

**1.    Congress has not authorized Defendants to substantially reduce FEMA's mitigation functions and capabilities by shutting down the BRIC program**

Executive Branch agencies' "power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). That means an agency "literally has no power to act . . . unless and until Congress confers power upon it," *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), and that an agency "may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress," *In re Aiken County*, 725 F.3d 255, 260 (D.C. Cir. 2013). When agencies "act improperly" or "beyond their jurisdiction, what they do is ultra vires." *City of Arlington*, 569 U.S. at 297.

Here, not only has Congress not authorized Defendants to shut down the BRIC program, Congress has barred it. In 2006, Congress determined that one of the key reasons FEMA was unprepared for Hurricane Katrina was that DHS leadership had rejected the concept of "integrated emergency management," which posits that the most effective way to minimize damage from disasters is for a single agency to engage in four interrelated functions: mitigation, preparation, response, and recovery. S. Rep. No. 109-322, at 221–22 (2006). Instead of following this approach, DHS had stripped FEMA of its preparedness responsibilities and assigned them to others within DHS. *Id.* Congress concluded that this "was a serious mistake" and that "preparedness, response, recovery, and mitigation require synergy," so FEMA must engage in all four functions. *Id.* at 221-22; *see* 6 U.S.C. § 313(b)(2)(D) (requiring FEMA Administrator "to integrate [FEMA's] emergency preparedness, protection, response, recovery, and mitigation responsibilities").

To ensure that Defendants could not countermand that judgment, Congress provided by law that *all* of these functions, including mitigation, are core components of FEMA's mission, *see* 6 U.S.C. § 313(b)(1) (setting out FEMA's mission to include "leading and supporting" a "comprehensive emergency management system of preparedness, protection, response, recovery, *and mitigation*") (emphasis added); 6 U.S.C. § 313(b)(2) (requiring FEMA Administrator to engage in mitigation); 6 U.S.C. § 314(a)(9)(A) (same), and barred Defendants from "substantially or significantly" "reduc[ing]" FEMA's "authorities, responsibilities, or functions" or "the capability of [FEMA] to perform those missions, authorities, [or] responsibilities, except as otherwise specifically provided in an Act enacted after October 4, 2006." 6 U.S.C. § 316(c)(1).

Congress has not enacted any law after October 4, 2006 specifically authorizing Defendants to substantially reduce FEMA's mitigation functions or to shut down the BRIC program. In fact, Congress's approach has been the opposite: in the nineteen years since Congress barred Defendants from substantially reducing FEMA's mitigation functions, Congress has appropriated billions of dollars toward the program and provided it with a new funding stream. *See supra* § II.A; Jared T. Brown, Cong. Rsch. Serv., RL34537, FEMA's Pre-Disaster Mitigation Program, Overview and Issues 5 (2014). And at every turn, Congress has concluded that FEMA needs to engage in *more* pre-disaster mitigation to fulfill its mitigation mission, not less: "This *under-utilized* method of disaster management through mitigation offers the potential to minimize the impact of disasters on citizens while decreasing Federal spending." S. Rep. No. 115-446, at 3 (2018) (emphasis added).

Under any reasonable definition of the term, Defendants' shuttering of FEMA's largest and most versatile pre-disaster mitigation program "substantially" reduces FEMA's mitigation functions and capabilities. *See* Substantial, *Black's Law Dictionary* (12th ed. 2024) (defining

"substantial" as "material," "important," and "considerable in extent, amount, or value"); Substantial, Concise Oxford English Dictionary (12th ed. 2011) ("Of considerable importance, size, or worth"); Substantial, Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/substantial (last visited July 14, 2025) ("large in size, value, or importance").

FEMA administers only three major disaster mitigation grant programs: (1) the BRIC program, (2) the Flood Mitigation Assistance program (FMA), and (3) the Hazard Mitigation Grant program (HMGP). *See* 42 U.S.C. §§ 5133, 4104c, 5170c. Eliminating any one of these programs would substantially reduce FEMA's mitigation functions and capabilities, but given the unique and important role BRIC plays in FEMA's mitigation efforts, eliminating BRIC is especially damaging. BRIC is FEMA's flagship pre-disaster mitigation grant program. Until now, it has provided a substantial portion of FEMA's pre-disaster mitigation funding, and it is FEMA's *only* annual pre-disaster mitigation grant program that has allowed communities in all fifty states to fortify against a wide variety of natural disasters before they strike.

The Flood Mitigation Assistance Program (FMA) is FEMA's only other significant pre-disaster mitigation grant program, and it is considerably more limited than BRIC. Unlike BRIC grants, which can be used to mitigate against a wide variety of disasters, FMA grants are limited to protecting communities and structures covered by federal flood insurance programs against flooding. *See* 42 U.S.C. §§ 4104c(a), (c)(2)(A)(ii); 44 C.F.R. § 77.6(c). So FMA does little to mitigate against earthquakes, wildfires, tornadoes, extreme heat, or winter storms. Moreover, eliminating BRIC substantially reduces the funding available for pre-disaster mitigation. As the table below illustrates, BRIC has accounted for *nearly 70%* of the funds FEMA has made available for pre-disaster mitigation over the past five fiscal years. While much smaller reductions would

13

also be substantial, eliminating 70% of the funding for this lifesaving work undoubtedly meets the

mark.

| Fiscal Year | BRIC[1] | FMA[2] |
|---|---|---|
| 2020 | $500 Million | $160 million |
| 2021 | $1 Billion | $160 million |
| 2022 | $2.295 Billion | $800 million |
| 2023 | $1 Billion | $800 million |
| 2024 | $750 Million | $600 million |
| **Total** | **$5.545 Billion** | **$2.72 Billion** |

The Hazard Mitigation Grant Program (HMGP) also differs materially from BRIC.

HMGP is a *post*-disaster mitigation program, meaning that this funding is available only in the

wake of a major disaster or fire, and only if the administration allows it. *See* 42 U.S.C. § 5170c(a);

44 C.F.R. § 206.40(a). That means investments are determined based on where disasters happen

to strike rather than based on the States' and FEMA's rigorous analysis of the most protective and

cost-effective mitigation measures. And since major disasters often strike with little warning,

HMGP does not allow communities the same opportunity to plan for and implement the most

protective and cost-effective mitigation measures, nor does it allow FEMA to allocate funds to

where they will have the most impact, which are the main reasons Congress created and expanded

the pre-disaster mitigation program in the first place. *See* S. Rep. No. 115-446, at 3 (2018) (citing

GAO report concluding that "the federal government placed far too great an emphasis on post-

disaster mitigation funding versus pre-disaster resilience efforts"); H.R. Rep. No. 106-40, at 11,

---

[1] *See* Vail Decl., Exs. 21, 22, 23, 24; *id.*, Ex. 10 at 3.
[2] *See id.*, Exs. 25, 26, 27, 28.

20 (1999) (concluding that "the only way to control post-disaster spending . . . is to increase pre-disaster funding" and lamenting that "the federal government still spends three dollars on post-disaster assistance for every dollar it spends on mitigation").

Compounding the problem, the Trump administration has also taken measures to restrict the availability of HMGP funding. Shortly after he terminated the BRIC program, Mr. Hamilton sent a memorandum to an Office of Management and Budget official laying out measures the administration could take to "rebalance FEMA's role in disasters." *See* Vail Decl., Ex. 11 at 2. One measure Hamilton recommended was for the administration to "not automatically approve" HMGP funding following major disasters. *Id.* Mr. Hamilton noted that the "President has already taken" this action, recommend that he "continue to not approve HMGP" to "reduce Federal disaster costs." *Id.* So not only is post-disaster mitigation not an adequate substitute for BRIC; the administration is *also* taking measures to restrict access to HMGP funds. When considered against this backdrop, the BRIC termination's effect on FEMA's mitigation capabilities is even more substantial.

In the end, Congress determined decades ago, when it codified the pre-disaster mitigation program, that FEMA's existing mitigation programs alone do not suffice to fulfill FEMA's mitigation mission. Congress reaffirmed BRIC's importance in 2018, when it provided a new funding stream for the program, and again in 2021, when it appropriated another $1 billion toward it. Defendants' conviction that FEMA should engage in only post-disaster response does not allow them to countermand Congress's judgment. *Cf. Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994) (holding that agency cannot adopt policies that "conflict with the policy judgments that undergird the statutory scheme.").

## 2.    Defendants' repurposing of funds set aside for BRIC is unlawful

When Congress authorized FEMA to set aside funds from the Disaster Relief Fund for the National Public Infrastructure Predisaster Mitigation Fund, it intended for those funds to be used for BRIC grants, not for other programs. So Congress took measures to ensure that funds that are set aside for BRIC are used for BRIC.

First, Congress provided that once BRIC projects are selected (*i.e.,* once BRIC funds are allocated to a State), Defendants cannot withdraw those funds unless they remain unobligated "at the end of the third fiscal year after the fiscal year for which the amounts were allocated." 42 U.S.C. § 5133(f)(3). And even then, any withdrawn funds must be returned to the National Public Infrastructure Predisaster Mitigation Fund and reallocated to new BRIC projects the following year. *Id.*

Second, Congress has barred Defendants from repurposing grant funds in its appropriations Acts. In 2024, Congress instructed Defendants that "no funds shall be reprogrammed within or transferred between appropriations . . . to increase or decrease funding for grant programs," and Congress has carried this restriction forward. Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 503(d)(2), 138 Stat. 460, 615 (2024); *see also e.g.*, Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101, 139 Stat. 9, 10 (2025) (appropriating funds "under the authority and conditions provided in applicable appropriations Acts for fiscal year 2024"). "Reprogramming" funds is "shifting funds within an appropriation or fund account to use them for purposes other than those contemplated at the time of appropriation." U.S. Gov't Accountability Off., GAO-05-734SP, A Glossary of Terms Used in the Federal Budget Process 85 (2005), https://www.gao.gov/assets/gao-05-734sp.pdf. At the time these funds were appropriated to the Disaster Relief Fund, both Congress and Defendants knew Defendants could set aside 6% of the funds for BRIC, and both contemplated that Defendants would do so. In fact,

Defendants stated as much in their budget estimates to Congress, and Congress appropriated the funds on that basis. *See* Vail Decl., Ex. 14 at 9-10; Ex. 15 at 8-9; Ex. 16 at 7-8; Ex. 17 at 8-9; Ex. 18 at 8-9. Defendants' efforts to reprogram the funds that were set aside for BRIC "decrease[s] funding" for the BRIC grant program and is therefore unlawful. *See* 6 U.S.C. § 316(d) (confirming that Defendants are required to follow restrictions in appropriations Acts).

### 3. Defendants' withholding of funds Congress appropriated for BRIC is unlawful.

Defendants' withholding of funds Congress appropriated directly for BRIC is illegal too. "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018). Doing so "violates the constitutional principle of the Separation of Powers," the Appropriations Clause, and the Spending Clause. *Id.* Here, Congress appropriated funds directly to the BRIC program and ordered Defendants to make them available: "$200,000,000 *shall* be made available" for each of fiscal years 2022, 2023, 2024, 2025, and 2026. Infrastructure Investment and Jobs Act (IIJA), Pub. L. No. 117-58, 135 Stat. 429, 1387 (2021). Defendants have no lawful authority to ignore that mandate, *In re Aiken Cnty.*, 725 F.3d at 260, yet they have announced that that is what they are doing: "Approximately $882 million of funding from the Infrastructure Investment and Jobs Act will be returned to the U.S. Treasury." Vail Decl., Ex. 7 at 2.

In addition to these IIJA funds, Congress has authorized FEMA to transfer funds appropriated for the program in earlier years, when it was still called the Pre-Disaster Mitigation Program, into the National Public Infrastructure Predisaster Mitigation Fund, and Congress has also appropriated funds for specific BRIC projects through Congressionally directed spending. *See, e.g.,* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 310, 138 Stat. 460,

17

611 (2024) (allowing transfer of PDM funds to BRIC fund); *id.* at cl. 12(B), 138 Stat. 460, 608 (appropriating approximately $191 million "for pre-disaster mitigation grants under . . . 42 U.S.C. § 5133(e)"). To the extent Defendants are attempting to withhold these funds or to spend them on other programs, that, too, is unlawful.

4.    **Cameron Hamilton was not lawfully acting as FEMA's Administrator when he ordered the BRIC termination.**

Not only does the BRIC shutdown violate these laws, but Mr. Hamilton was not even lawfully acting as the FEMA Administrator when he gave the order. The Constitution's Appointments Clause provides the "exclusive means" of appointing Officers of the United States. *Lucia v. SEC*, 585 U.S. 237, 244 (2018). That Clause provides that principal "Officers of the United States" may be appointed only if they are nominated by the President "by and with the Advice and Consent of the Senate." U.S. Const. art. II, § 2, cl. 2. This "is also the default manner of appointment for inferior officers," which applies unless Congress authorizes the President, "Courts of Law," or the head of a department to appoint the inferior officer. *Edmond v. United States*, 520 U.S. 651, 660 (1997); U.S. Const. art. II, § 2, cl. 2.

FEMA's Administrator is an Officer of the United States because the Administrator's duties on behalf of the United States are ongoing, and not occasional or temporary, and the Administrator exercises significant authority on behalf of the United States. *See Lucia*, 585 U.S. at 245–46. The Administrator is responsible for "lead[ing] the Nation's efforts to prepare for, protect against, respond to, recover from, and mitigate against the risk of natural disasters." 6 U.S.C. § 313(b)(2)(A). In doing so, the Administrator oversees a multi-billion dollar annual budget, and a workforce in the thousands. Vail Decl., Ex. 20 at 2; Pub. L. No. 118-47, 138 Stat. 460, 607–609 (2024). FEMA's Administrator must therefore be nominated by the President and confirmed by the Senate unless the Administrator is an inferior officer and Congress has selected another permissible

18

method of appointment. U.S. Const., art. II, § 2, cl. 2. But Congress has not done so. Instead, Congress doubled down on the default rule: "The Administrator shall be appointed by the President, by and with the advice and consent of the Senate." 6 U.S.C. § 313(c)(1).

Mr. Hamilton was not nominated by the President to serve as FEMA Administrator, nor was he confirmed by the Senate, so he had no lawful authority to act as FEMA Administrator at the time he terminated the BRIC program. Congress has provided the "*exclusive* means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive Agency . . . for which appointment is required to be made by the President, by and with the advice and consent of the Senate" through the Federal Vacancies Reform Act of 1998 (FVRA). 5 U.S.C. § 3347(a) (emphasis added). The FVRA provides that when a Presidentially-nominated and Senate-confirmed officer resigns, the "first assistant to the office" automatically becomes the acting officer unless the President directs either another Presidentially nominated and Senate-confirmed person to temporarily fill the role or appoints a senior officer or employee of the agency who was in that position for at least "90 days" in "the 365-day period preceding the date of" the resignation. *Id.* § 3345(a).

Mr. Hamilton did not satisfy any of these criteria. On January 20, 2025, when Deanne Criswell, President Biden's outgoing FEMA Administrator, resigned, Mr. Hamilton was not the first assistant to the FEMA Administrator, he had not been nominated by the President and confirmed by the Senate to any office, and he was not a senior officer or employee at FEMA or DHS for at least 90 days in the year preceding the vacancy. Instead, during the year prior to the vacancy, Mr. Hamilton was the Director of Business Strategy at a consulting firm called ProSoDel, LLC and a candidate for Congress. Vail Decl., Ex. 12 at 4-5. Mr. Hamilton thus could not lawfully act as the FEMA Administrator, and his termination of the BRIC program was void *ab initio* and

should be set aside. *See Lucia*, 585 U.S. at 251 (holding that plaintiffs who make successful Appointments Clause challenges are "entitled to relief"); *Ryder v. United States*, 515 U.S. 177, 182–83 (1995) (holding same and that "[a]ny other rule would create a disincentive to raise Appointments Clause challenges"); *Noel Canning v. N.L.R.B.*, 705 F.3d 490, 493 (D.C. Cir. 2013) (holding that actions taken by unlawfully appointed NLRB board members were "void *ab initio*" and vacating challenged order), *aff'd* 573 U.S. 513 (2014).

The current acting Administrator, David Richardson, also has no lawful authority to ratify or implement the BRIC termination as he, too, was unlawfully appointed. Mr. Richardson was not nominated by the President or confirmed by the Senate, nor does he meet the criteria set out by the FVRA: he was not the first assistant to the FEMA Administrator on January 20, 2025, he had not been nominated by the President and confirmed by the Senate to any office at that time, and he was not a senior officer or employee at FEMA or DHS for at least 90 days in the 365 days preceding the vacancy. Although Mr. Richardson was a senior officer at DHS before Mr. Hamilton was fired, the relevant lookback period under the FVRA is the "period preceding the date of . . . resignation . . . of the applicable officer"—*i.e.*, the time before the vacancy occurred— which was on January 20, 2025, when Deanne Criswell resigned. 5 U.S.C. § 3345(a)(3)(A). Mr. Richardson was not a senior official at FEMA or DHS during that time.

Defendants seem to have taken the position that they can sidestep the Appointments Clause by labeling the person acting as Administrator the "Senior Official Performing the Duties of the Administrator," but the Constitution is concerned with substance, not labels, and cannot be so easily evaded. *See Bullock v. U.S. Bureau of Land Mgmt.*, 489 F.Supp.3d 1112, 1125 (D. Mont. 2020) ("Federal Defendants' argument attempting to distinguish an 'Acting Director' from an 'official performing the Director's duties under the Secretary's delegation' represents a

20

distinction without a difference."). Indeed, even Mr. Richardson has acknowledged that, regardless of the label, he is acting as FEMA's Administrator: "I can't recall the full title, but essentially, I'm acting. I don't need the full title. All I need is the authority from the president to put me in here as some degree of acting and I will make sure that his intent gets completed." Vail Decl., Ex. 13 at 3-4.

The Appointments Clause provides the "exclusive means" of appointing Officers of the United States. *Lucia*, 585 U.S. at 244. Neither Hamilton nor Richardson were appointed through the constitutionally required process, so their termination of the BRIC program and implementation of that termination are *void ab initio*.

**B.    Plaintiffs Face Imminent Irreparable Harm Absent Preliminary Relief**

Defendants spending BRIC funding on other programs will irreparably harm the Plaintiff States by delaying, scaling back, and shutting down critical mitigation projects and leaving Plaintiff States more vulnerable to natural disasters. To ensure BRIC funding remains available for the lifesaving purposes to which Congress directed it, a preliminary injunction is necessary to prevent Defendants from spending it elsewhere.

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). In other words, a "preliminary injunction preserves the court's ability to grant final relief." *Together Emps v. Mass Gen. Brigham Inc.*, 19 F.4th 1, 7 (1st Cir. 2021) (citing 11A C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure § 2948.1 (3d ed. Apr. 2021 update)). Preserving the status quo is critical here because Defendants intend to spend the funds meant for BRIC on other programs, and they intend to do so imminently—in only a few weeks. *See* Vail Decl., Ex. 19 at 15 (showing Major Declarations balance projected to be under $4.071 billion by the end of August 2025). Absent an injunction, the Court's ability to grant final relief is likely to be impaired

and Plaintiffs will likely be left remediless for at least some of their claims, even if they ultimately succeed on the merits. *See, e.g.*, *County of Suffolk v. Sebelius*, 605 F.3d 135, 137 (2d Cir. 2010) (holding that plaintiffs' claims were moot because "HHS had awarded the funds at issue to other grant recipients"). This imminent risk of mootness alone is grounds to preliminarily enjoin Defendants from spending down the BRIC funds during the pendency of this litigation. *See* 5 U.S.C. § 705 ("[T]o prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process . . . to preserve status or rights pending conclusion of the review proceedings."); *State of Maine v. Fri*, 486 F.2d 713, 716 (1st Cir. 1973) (affirming interim order preserving EPA funds pending Maine's suit that did "no more than preserve the possibility of effective final relief until the merits of Maine's claim are decided"); *Population Inst. v. McPherson*, 797 F.2d 1062, 1081 (D.C. Cir. 1986) (holding that "if the government . . . is permitted to *distribute* the $10 million to other organizations . . . Appellant will suffer irreparably injury . . . because this court will be unable to grant effective relief"); *see also Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 290 (1940) (affirming injunction freezing "assets in danger of dissipation or depletion" to "preserve the status quo pending final determination of the questions raised by the bill"); *A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1369 (2025) (granting preliminary injunctive relief against deportations to preserve the Court's jurisdiction).

Moreover, the BRIC program shutdown has, and will continue to, irreparably harm Plaintiff States in several ways. First, the loss of federal funding here is so severe that many of these projects will not be able to move forward unless the termination is reversed. Vail Decl., Ex. 33 ¶11; Ex. 34 ¶12; Ex. 35 ¶9; Ex. 36 ¶9; Ex. 37 ¶14.; Ex. 32 ¶22, ¶26; Ex. 48 ¶24; Ex. 49  ¶9; Ex. 39 ¶11; Ex.40 ¶9; Ex. 43 ¶9; Ex.45 ¶9; Ex. 46 ¶9. Courts have long held that being "driven out of business" constitutes irreparable harm, and that is what is likely to happen to Plaintiff States' projects here,

absent interim relief. *Commodity Futures Trading Comm'n v. Brit. Am. Commodity Options Corp.*, 434 U.S. 1316, 1320 (1977); *HiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022); *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). BRIC funds account for a substantial portion of the funding for these projects and Plaintiff States do not have the resources to replace them without taking funds away from other important initiatives. Vail Decl., Ex. 33 ¶12; Ex. 34 ¶13; Ex. 35¶10; Ex. 36 ¶10; Ex. 37 ¶15; Ex. 32 ¶27; Ex. 48 ¶28; Ex. 49 ¶10; Ex. 39 ¶12; Ex. 40 ¶11; Ex. 43 ¶10; Ex. 45¶10; Ex. 46 ¶10.

If the shutdown is not reversed, and soon, the uncertainty and delay alone is likely to kill off several of these critical projects: "When an . . . infrastructure project predicated on [federal funding] loses that funding—even, as Defendants insist, temporarily—that program runs the risk of dying on the vine." *Washington v. U.S. Dep't of Transp.*, 2025 WL 1742893, at *28 (W.D. Wash. June 24, 2025). That is because infrastructure projects require more than just money; they also require time-sensitive coordination among numerous stakeholders through permits, cost estimates, and subcontracts. *See id.* (noting that infrastructure projects depend on federal funding "to pay for particular things, at particular times, in particular places"); Vail Decl., Ex. 31 ¶22; Ex. 32 ¶22. The longer the delay, the more projects that are likely to fold, as permits expire, costs increase, and partners lose trust. Vail Decl., Ex. 31 ¶¶22-23; Ex. 32 ¶22. These harms are irreparable. *See California v. U.S. Dep't of Transp.*, 2025 WL 1711531, at *3 (D. R.I. 2025) (holding that being forced "to scale back, reconsider, or cancel ongoing transportation projects" constitutes irreparable harm); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-CV-00097-MSM-PAS, 2025 WL 1116157, at *21 (D.R.I. Apr. 15, 2025) (holding that "shuttering planned projects" and "curtailing or ending current projects" constitute irreparable harm).

The uncertainty and delay is doubly damaging here because it threatens not only Plaintiff States' current projects, but also any future mitigation projects they plan to undertake because the sudden withdrawal of funding undermines the trust and goodwill they have built with stakeholders and industry partners that Plaintiff States need to work with get these projects done. Vail Decl., Ex. 31 ¶22-23; Ex. 44 ¶10. This harm is irreparable too. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) ("By its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages."); *S. Educ. Found. v. U.S. Dep't of Educ.*, No. CV 25-1079 (PLF), 2025 WL 1453047, at \*14 (D.D.C. May 21, 2025) ("Reputational injury can also suffice to establish irreparable harm.").

But the most significant irreparable harm Plaintiff States face is that as these projects are delayed, cancelled, and scaled back, Plaintiff States will face loss of lives, increased injuries, damage to State property, interruption of State business, and dramatically increased post-disaster costs as a result of natural disasters. *See Massachusetts v. Nat'l Inst. of Health*, 770 F.Supp.3d 277, 320 (D. Mass 2025) ("threats to [human] lives represent[] a dire risk of a quintessentially irreparable nature"). For instance: In California, an ongoing massive landslide threatens "a major arterial roadway . . . which provides community and emergency access, sanitation sewer lines located along this roadway, electric and communication lines, potable water lines and gas lines" as well as "over 15,000 homes and nearly 40,000 people," Vail Decl., Ex. 33 ¶7(b). In Illinois, a rural community faces contaminated drinking water, raw sewage backing up into homes, and contamination of local waterways. Vail Decl., Ex. 37 ¶7. In Maryland, communities at "very high risk" of sea level rise face even more flooding. Vail Decl., Ex 48 ¶25. In Massachusetts, recurrent flooding threatens "over $7 billion in annual economic activity, access to the region's supply of fresh produce, major and vital transportation corridor, and the safety of more than 5,000 residents

living in the floodplain." Vail Decl., Ex. 32 ¶15. In New Jersey, "approximately 5,500 residents and over 1,800 structures including homes and businesses" are at risk of flooding, and "critical electrical and mechanical systems" at "Port Newark-Elizabeth Marine Terminal's primary water and fire pump station" are at risk, threatening interrupted "firefighting, potable water, and transportation operations at one of the nation's busiest ports." Vail Decl., Ex. 41 ¶6(c), ¶6(e). In Oregon, hospital patients, staff, and members of the local coastal community are left with nowhere to evacuate to if a tsunami hits. Vail Decl., Ex. 44 ¶6-7. In Washington, the City of Shoreline and nearby communities face the risk of earthquake-induced soil liquefaction beneath a major roadway, which will "effectively cripple the community's first-responder and emergency-service capabilities" and damage underground utilities. Vail Decl., Ex. 31 ¶13-14. All of this harm would have been reduced or even avoided if the BRIC program had not been terminated.

## C.     The Balance of the Equities and Public Interest Impact Weigh in Favor of Granting Preliminary Relief

The balance of the equities and the public interest impact "merge when the Government is the opposing party," and both favor entering the limited injunction Plaintiffs request here. *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

There is a strong public interest in the government following the law, and "no public interest in the perpetuation of unlawful agency action." *Somerville Pub. Sch. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025) (citation modified) (quoting *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). On one side of the balance is an ongoing illegal campaign to "eliminate FEMA," or at least to narrow the agency's mission to *only* post-disaster response, even though Congress gave FEMA a broader mission. On the other side of the balance are scores of communities who have relied on this program for years, who suddenly had the rug

25

pulled out from under them and are now facing the prospect of being unable to complete critical, lifesaving projects into which they have invested countless hours and millions of dollars of their own funds.

If Defendants are allowed to spend down these funds before this Court can finally determine whether the BRIC termination is lawful, there is a serious likelihood that Plaintiff States will be unable to recover these funds or carry out the projects that depend on them, even if they succeed on the merits. That will mean that all the time and effort they invested in these projects will be wasted, and they will lose out on the economic benefits from the projects, face more damage from natural disasters, and pay much more in post-disaster costs.

The impacts on Defendants, by contrast, are modest. While Plaintiff States and the public face the imminent and likely permanent loss of projects that will protect lives, property, and public funds, as well as all the time, effort, and state dollars that Plaintiffs have already invested in these projects, the only impact on Defendants is that they must maintain the status quo and cannot spend these funds, which should be set aside for the BRIC program anyway, on other programs. The federal government faces no "harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

## IV.    CONCLUSION

Defendants unlawfully shut down the BRIC program and are poised to spend funds meant for BRIC on other programs. If they are not enjoined by early-to-mid-August, those funds are likely to be lost forever, and the Court's jurisdiction is likely to be threatened. Plaintiff States thus seek a narrow injunction barring Defendants from spending these funds on non-BRIC programs during the pendency of the litigation.

DATED this 16th day of July 2025.

<div style="display: flex;">
<div style="width: 50%;">

**ANDREA JOY CAMPBELL**
Attorney General
Commonwealth of Massachusetts

*/s/ Hannah C. Vail*
HANNAH C. VAIL, BBO No. 698577
JAK KUNDL, BBO No. 713951
Assistant Attorneys General
AMY LAURA CAHN, BBO No. 716706*
Special Assistant Attorney General
Massachusetts Office of the Attorney General
One Ashburton Place
Boston, MA 02108
617-963-2512
hannah.vail@mass.gov
jak.kundl@mass.gov
amy.laura.cahn@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*

</div>
<div style="width: 50%;">

**NICHOLAS W. BROWN**
Attorney General
State of Washington

*/s/ Tyler Roberts*
TYLER ROBERTS*
JENNIFER K. CHUNG*
NIYA TAWACHI*
ANDREW R.W. HUGHES*
Assistant Attorneys General
CRISTINA SEPE*, WSBA #53609
Deputy Solicitor General
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
tyler.roberts@atg.wa.gov
jennifer.chung@atg.wa.gov
niya.tawachi@atg.wa.gov
andrew.hughes@atg.wa.gov
cristina.sepe@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

</div>
</div>

<div style="display: flex;">
<div style="width: 50%;">

**ROB BONTA**
Attorney General
State of California

*/s/ David Green*
R. MATTHEW WISE
Supervising Deputy Attorney General
DAVID GREEN*
CHRISTOPHER KISSEL*
HARALD H. KIRN*
Deputy Attorneys General
California Office of the Attorney General
1300 I Street
Sacramento, CA 95814
916-445-9555
matthew.wise@doj.ca.gov
david.green@doj.ca.gov
christopher.kissel@doj.ca.gov
harold.kirn@doj.ca.gov
*Attorneys for Plaintiff State of California*

</div>
<div style="width: 50%;">

**PHILIP J. WEISER**
Attorney General
State of Colorado

*/s/ Finnuala Tessier*
FINNUALA TESSIER*
SAMUEL WOLTER*
Assistant Attorneys General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
720-508-6000
finnuala.tessier@coag.gov
samuel.wolter@coag.gov
*Attorneys for Plaintiff State of Colorado*

</div>
</div>

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Ashley Meskill*
ASHLEY MESKILL*
Assistant Attorney General
Connecticut Office of the Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5270
ashley.meskill@ct.gov
*Attorney for Plaintiff State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

*/s/ Vanessa L. Kassab*
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
vanessa.kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

**KWAME RAOUL**
Attorney General
State of Illinois

*/s/ Aleeza M. Strubel*
ALEEZA M. STRUBEL*
Complex Litigation Counsel
SARAH J. GALLO*
Assistant Attorney General
Illinois Office of the Attorney General
115 S. LaSalle Street
Chicago, IL 60604
773-914-3046
aleeza.strubel@ilag.gov
sarah.gallo@ilag.gov
*Attorneys for Plaintiff State of Illinois*

**AARON M. FREY**
Attorney General
State of Maine

*/s/ Reid Hayton-Hull*
REID HAYTON-HULL*
Assistant Attorney General
Maine Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
207-626-8800
reid.hayton-hull@maine.gov
*Attorney for the State of Maine*

**ANTHONY G. BROWN**
Attorney General
State of Maryland

*/s/ Robert N. Brewer*
ROBERT N. BREWER*
Assistant Attorney General
Maryland Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-6924
rbrewer@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

**DANA NESSEL**
Attorney General
State of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI*
ADAM DE BEAR*
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
giovanattin@michigan.gov

deaeara@michigan.gov
*Attorneys for Plaintiff State of Michigan*

**KEITH ELLISON**
Attorney General
State of Minnesota

*/s/ Cat Rios-Keating*
CAT RIOS-KEATING*
Special Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota St., Suite 600
St. Paul, MN 55101
651-300-7302
catherine.rios-keating@ag.state.mn.us
*Attorney for Plaintiff State of Minnesota*

**LETITIA JAMES**
Attorney General
State of New York

*/s/ Colleen K. Faherty*
COLLEEN K. FAHERTY*
Special Trial Counsel
New York Office of the Attorney General
28 Liberty Street
New York, NY 10005
212-416-6046
Colleen.Faherty@ag.ny.gov
*Attorney for Plaintiff State of New York*

**DAN RAYFIELD**
Attorney General
State of Oregon

*/s/ Scott P. Kennedy*
SCOTT P. KENNEDY*
BRIAN S. MARSHALL*
Senior Assistants Attorney General
Oregon Office of the Attorney General
1162 Court Street NE
Salem, OR 97301
971-453-9050

**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

*/s/ Phoenix N. Meyers*
PHOENIX N. MEYERS*
Deputy Attorney General
New Jersey Office of the Attorney General
25 Market Street
Trenton, NJ 08625
609-696-5289
phoenix.meyers@law.njoag.gov
*Attorney for Plaintiff State of New Jersey*

**JEFF JACKSON**
Attorney General

LAURA HOWARD
Chief Deputy Attorney General
State of North Carolina

*/s/ Daniel T. Wilkes*
DANIEL T. WILKES
Assistant Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6415
dwilkes@ncodoj.gov
*Attorney for Plaintiff State of North Carolina*

**JOSH SHAPIRO**
in his official capacity as Governor of the
Commonwealth of Pennsylvania

JENNIFER SELBER
General Counsel

*/s/ Jacob B. Boyer*
JACOB B. BOYER*
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200

29

scott.kennedy@doj.oregon.gov
brian.s.marshall@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

Harrisburg, PA 17101
717-460-6786
jacobboyer@pa.gov
*Counsel for Governor Josh Shapiro*

**PETER F. NERONHA**
Attorney General
State of Rhode Island

*/s/ Randelle L. Boots*
RANDELLE L. BOOTS
Special Assistant Attorney General
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400
rboots@riag.ri.gov
*Attorney for Plaintiff State of Rhode Island*

**CHARITY R. CLARK**
Attorney General
State of Vermont

*/s/ Ryan P. Kane*
RYAN P. KANE*
Deputy Solicitor General
Vermont Office of the Attorney General
109 State Street
Montpelier, VT 05609
802-828-2153
ryan.kane@vermont.gov
*Attorney for Plaintiff State of Vermont*

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

*/s/ Lynn K. Lodahl*
LYNN K. LODAHL*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-6219
lynn.lodahl@wisdoj.gov
*Attorney for Plaintiff State of Wisconsin*

*pro hac vice application forthcoming

## CERTIFICATE OF SERVICE

I certify that this document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF). I further certify that on July 16, 2025 I provided a copy of the foregoing document to the following attorneys at the U.S. Department of Justice by email:

Brad Rosenberg
Special Counsel
Federal Programs Branch
U.S. Department of Justice
brad.rosenberg@usdoj.gov

Abraham George
Chief, Civil Division
District of Massachusetts
abraham.george@usdoj.gov

Rayford Farquhar
Chief, Defensive Litigation, Civil Division
U.S. Attorney's Office for the District of Massachusetts
rayford.farquhar@usdoj.gov

*/s/ Hannah C. Vail*
Hannah C. Vail