# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STATE OF WASHINGTON, et al., <br><br> Plaintiffs, <br><br> v. <br><br> FEDERAL EMERGENCY MANAGEMENT AGENCY, et al., <br><br> Defendants. | Civil Action No. 25-cv-12006-RGS |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Animated by an incorrect understanding that Defendants have terminated the Federal Emergency Management Agency's ("FEMA") pre-disaster mitigation programs, Plaintiffs' motion for preliminary injunction seeks to enjoin Defendants from spending funds appropriated or set aside for the Building Resilient Infrastructure and Communities ("BRIC") or Congressionally Directed Spending ("CDS") Pre-Disaster Mitigation ("PDM") programs for non-BRIC or non-PDM purposes during the pendency of this litigation. Doc. 5 at 1. Plaintiffs claim that "[i]f Defendants spend down those funds before the Court can reach final judgment, they are likely to be unrecoverable." *Id.*

Plaintiffs' motion should be denied. *First*, this Court lacks jurisdiction because Plaintiffs lack standing and their claims are not ripe for review. Plaintiffs lack actual or imminent injury because, despite Plaintiffs' allegations to the contrary, Defendants have not terminated the BRIC, Defendants have not terminated any grant awards, and Defendants have not repurposed funds for BRIC or PDM programs. *See* Declaration of David Richardson ("Richardson Decl.") at ¶¶ 5-6, 8. *Second*, this Court lacks jurisdiction because 1) the Stafford Act precludes judicial review of

1

discretionary decisions regarding disaster assistance; and 2) even if the Stafford Act's discretionary function exception did not apply, the claims are breach of contract claims over which the Court of Federal Claims has exclusive jurisdiction. *Third*, even if Plaintiffs' claims were tenable under the Administrative Procedure Act ("APA"), they are not ripe for judicial review because 1) there has been no final agency action; and 2) FEMA's decisions regarding disaster assistance funding are discretionary. *Lastly*, Plaintiffs have failed to show that they will suffer irreparable harm without a preliminary injunction, that public policy weighs in favor of an injunction, or that they are likely to succeed on the merits.

## BACKGROUND

### I.    Statutory Background

FEMA is a component within the United States Department of Homeland Security ("DHS"). Richardson Decl. ¶ 1. FEMA's statutory authority is derived primarily from the Robert T. Stafford Disaster Relief and Emergency Assistance Act of 1988 ("Stafford Act"), 42 U.S.C. §§ 5121–5207. The Stafford Act provides the framework for presidential emergency and disaster declarations, enabling FEMA to provide both physical and financial assistance to affected states, territories, tribes, and localities. 42 U.S.C. § 5170. It also authorizes funding for pre-disaster mitigation projects to reduce future risks and costs. *See* 42 U.S.C. § 5133. This includes the BRIC grant program. Richardson Decl. ¶ 3.

The purpose of the BRIC program is to provide technical and financial assistance to States and local governments for cost-effective pre-disaster hazard mitigation measures that reduce injuries, loss of life, and damage and destruction of property. Richardson Decl. ¶ 4. The BRIC is currently funded by set-asides from the Disaster Relief Fund ("DRF") and appropriated funding through the Infrastructure Investment and Jobs Act ("IIJA"). Richardson Decl. ¶ 5. To be used

for BRIC financial and technical assistance, Section 203(i) of the Stafford Act, 42 U.S.C. § 1533(i), provides the President with discretion to set-aside an amount equal to 6% of the estimated aggregate amount of the grants to be made pursuant to sections 403, 406, 407, 408, 410, 416 and 428 for a major disaster within the DRF. Richardson Decl. ¶ 6. In 2021, Congress appropriated BRIC through IIJA an additional one billion dollars to be disbursed between fiscal years 2022 to 2026, with $200 million being made available per fiscal year. Richardson Decl. ¶ 6.

Under the CDS PDM grant program, Congress makes federal funds available to applicable states, U.S. territories, federally recognized tribal governments, and local communities to plan for and implement sustainable cost-effective measures designed to reduce the risk to individuals and property from future natural hazards. Richardson Decl. ¶ 5. While CDS PDM uses the same statutory authority as BRIC, it differs from BRIC in that only states, territories, or federally recognized tribal governments with projects identified by Congress in the appropriate year's Appropriations Act are eligible to apply for CDS PDM assistance. Richardson Decl. ¶ 5. These projects have been fully obligated, and recipients continue to draw down funds for reimbursements for expenditures for these projects. Richardson Decl. ¶ 5. Congress did not appropriate any funds for CDS PDM for Fiscal Year 2025. Richardson Decl. ¶ 5.

## II.    Factual Background

On April 2, 2025, Cameron Hamilton, in his role as the Senior Official Performing the Duties ("SOPD") of FEMA Administrator, signed a memorandum, "Future of the BRIC Program" (the "Hamilton Memo"). Doc. 9-6. The Hamilton Memo addressed how FEMA planned to evaluate all existing grants and their priorities, scope, and implementation timelines to ensure consistency with DHS and the Administration's direction and guidance.[1] Richardson Decl. ¶ 7.

---

[1] The Hamilton Memo did not address the CDS PDM program. Richardson Decl. ¶ 5.

The Hamilton Memo laid out the proposed next steps for the future of the BRIC program, including proposing the cancelation of the 2024 Fiscal Year Notice of Funding Opportunity ("NOFO"), cancelation of projects selected for further review and not yet awarded, evaluation of obligated projects that have not yet been completed, and requiring that any additional period of performance extensions on any BRIC projects be subject to the SOPD of the FEMA Administrator's approval.  Richardson Decl. ¶ 7.

FEMA has not ended the BRIC program, contrary to publicity otherwise.[2]  Richardson Decl. ¶ 8.  FEMA has not issued any notices terminating any projects (including projects selected for further review from fiscal years 2020-2023), FEMA has not terminated any BRIC grants, and FEMA continues to pay all partially and fully obligated grants.  Richardson Decl. ¶¶ 11(B), (D). If FEMA decides to terminate any project (which, again, it has not done), it will follow the proper termination and close out procedures established by 2 C.F.R. Part 200 and the terms and conditions of the award.  Richardson Decl. ¶ 11(B).  And, though FEMA has discretion to grant or deny requests for extensions of project deadlines, FEMA has not denied any such requests to date, and it is in the process of establishing a formal evaluation process for these requests. Richardson Decl. ¶ 11(C).  Lastly, though the Fiscal Year 2024 BRIC NOFO has been removed from Grants.gov and the FEMA website, funding is still available for future BRIC funding opportunities, and there is nothing prohibiting FEMA from issuing another NOFO.  Richardson Decl. ¶ 11(A).

---

[2] Hamilton was appointed as the Assistant Administrator for the Office of Response and Recovery in January 2025 and was serving as the SOPD of the Administrator until his departure in May 2025.  Richardson Decl. ¶ 10.  Despite FEMA's public announcements, when Hamilton left his role as Assistant Administrator, FEMA had not ended BRIC.  Richardson Decl. ¶ 10.

FEMA has not transferred or reprogrammed any BRIC funding for other purposes. Richardson Decl. ¶ 12. The IIJA funds appropriated to DHS/FEMA for the BRIC program are only available for that program and cannot be used for other purposes. Richardson Decl. ¶ 12. DHS and FEMA have not sought a recission of any IIJA funds by Congress, nor has FEMA spent, diverted, or used any of the funds for other programs or projects. Richardson Decl. ¶ 12. Additionally, the funds that FEMA set-aside from the DRF for BRIC remain in the DRF. Richardson Decl. ¶ 13.

DHS and FEMA continue to evaluate whether to end the BRIC program or to revise it in a manner consistent to achieve its original purpose. Richardson Decl. ¶ 9. Any final agency decisions regarding the future of the BRIC program, however, will need to be approved by the Secretary or the Deputy Secretary of DHS. Richardson Decl. ¶ 13.

## LEGAL STANDARDS

### I.    Subject Matter Jurisdiction

Before addressing the merits of a motion for preliminary injunction, the Court must assess whether it has subject matter jurisdiction. *See Acosta Ramirez v. Banco Popular de P.R.*, 712 F.3d 14, 18 (1st Cir. 2013) ("Federal courts are obligated to resolve questions pertaining to subject-matter jurisdiction before addressing the merits of a case"). Plaintiffs bear the burden of establishing that the court's exercise of jurisdiction is within the bounds of the Constitution and is authorized by statute. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

Plaintiffs in this case must establish subject matter jurisdiction, first, by meeting Article III's case-or-controversy requirement, and second, by showing whether Congress has waived sovereign immunity and, if so, whether this Court may hear their claims. Article III restricts federal court jurisdiction to "Cases" and "Controversies," U.S. Const. art. III, § 2, and two

manifestations of the Article III limitation are the interrelated justiciability doctrines of standing and ripeness, which must be established before a case may be heard. *Reddy v. Foster*, 845 F.3d 493, 499 (1st Cir. 2017). Moreover, the United States is immune from suit except where it has explicitly waived its immunity. *United States v. Mitchell*, 445 U.S. 535, 538 (1980). The test for deciding whether sovereign immunity has been waived is "stringent," the waiver must be "unmistakably clear," and the Court must "indulge every reasonable presumption against" waiver. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675, 678, 682 (1999). A "difficult question of jurisdiction" makes it more difficult for Plaintiffs to show a likelihood of success on the merits and therefore weighs against preliminary relief. *Munaf v. Geren*, 553 U.S. 674, 690 (2008).

## II.    Preliminary Injunction

A preliminary injunction "is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012) (citation omitted). A movant may be awarded such an extraordinary remedy only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To establish entitlement, Plaintiffs bear the burden of establishing (1) a likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) the balance of the equities favor the movant, and (4) an injunction is in the public's interest. *See Allscripts Healthcare, LLC v. DR/Decision Res., LLC*, 592 F. Supp. 3d 1, 3 (D. Mass. 2002). The last two factors "merge when the Government is the [party] opposing" the preliminary injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Irreparable harm "constitutes a necessary threshold showing for an award of preliminary injunctive relief," *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79

(1st Cir. 2009), and is "the basis for injunctive relief." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (citation omitted).

## ARGUMENT

### I.     This Court Lacks Jurisdiction Over Plaintiffs' Claims.

This Court lacks jurisdiction over Plaintiffs' claims for several reasons:  1) Plaintiffs lack standing and their claims are not ripe for review; 2) Plaintiffs fail to establish a waiver of sovereign immunity; 3) even if Plaintiffs could establish a waiver of sovereign immunity, Plaintiffs' claims are contract claims that must be heard by the Court of Federal Claims.

### A.     Plaintiffs Lack Standing And Their Claims Are Not Ripe for Review.

First, all of Plaintiffs' purported injuries exist in the abstract and are contingent on future events that have not yet occurred.  For that reason, Plaintiffs have failed to establish subject matter jurisdiction under Article III.

To establish standing, a plaintiff must establish an injury in fact—that is, an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List. v. Driehaus*, 573 U.S. 149, 158 (2014).  An allegation of future injury may suffice if the threatened injury is "certainly impending" or if there is a "substantial risk that the harm will occur." *Id.*  But, if a future injury is "too speculative for Article III purposes", then there is no standing to sue. *Blum v. Holder*, 744 F.3d 790, 799 (1st Cir. 2014).  Because "standing is not dispensed in gross," each plaintiff must demonstrate standing for each claim that it presses against each defendant, and for each form of relief that it seeks. *Murthy v. Missouri*, 603 U.S. 43, 61 (2024).  In short, the standing doctrine seeks "to keep federal courts out of disputes involving conjectural or hypothetical injuries[.]" *Reddy*, 845 F.3d at 500.

The ripeness doctrine seeks to prevent the adjudication of claims relating to "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998).  "Determining whether administrative action is ripe for judicial review requires [courts] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citation omitted).  As explained by the Supreme Court, the basic function of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbot Lab'ys v. Gardner*, 387 U.S. 136, 148-49 (1967).  Such is the case here.

Plaintiffs' claims are premature.  To start, all of Plaintiffs' purported harms flow from their misunderstanding that the BRIC has been terminated.  *See*, *e.g.*, Doc. 9-31 at ¶¶ 6-16 (detailing "some of the important projects in Washington that have been affected by the BRIC cancellation"); Doc. 9-32 at ¶ 22 ("The cancellation of the BRIC program is devastating for the Commonwealth"); Doc. 9-34 at ¶ 11 ("The cancellation of the BRIC program harms Colorado"); Doc. 9-35 at ¶ 9 ("Indeed the termination of the BRIC award for the Bridgeport project above now risks the loss of millions of dollars in HUD funding").  But the BRIC has not been terminated.  Richardson Decl. ¶ 8.  Not a single grant has been terminated.  Richardson Decl. ¶ 11(B).  Simply put, Plaintiffs' purported harms have not occurred.

Nor are they "certainly impending".  *Susan B. Anthony*, 573 U.S. at 158.  The *possibility* that the BRIC might be terminated at an unknown point in the future is not sufficient to establish standing.  *See Whitmore v. Arkansas*, 495 U.S. 149, 159-160 (1990).  And Plaintiffs' concern that terminations might happen soon is not based in fact.  The FEMA Advisory issued on April 16, 2025 and relied upon by Plaintiffs makes clear that "next steps" still need to occur before any

terminations can take place.  Doc. 9-8.  These "next steps" include "outreach" and "coordination" from FEMA with respect to each individual recipient, as well as an update to FEMA's website with a "full list of projects selected for funding over the last four years.  The status will show what is fully obligated, partially obligated and cancelled."  Doc. 9-8.  Plaintiffs do not allege that either of these "next steps" have taken place, nor do they allege that they have received "outreach" or "coordination" from FEMA, or that their specific project has been identified on FEMA's website as having been cancelled.  *See* Docs. 9-30 through 9-50.

Moreover, if FEMA decided to terminate one of Plaintiff's grants (which, again, it has not done), FEMA will follow the proper termination and close out procedures established by 2 C.F.R. Part 200 which include, among other things, providing notification of the termination to the recipient and an opportunity for the recipient to object to the termination.  Richardson Decl. ¶ 11(B); 2 C.F.R. §§ 200.341.  There can be no impending harm when this process has not even begun, much less been completed.

 Even more attenuated are Plaintiffs' claims that they will be injured if funds allocated to the BRIC are spent elsewhere.  To be harmed by the alleged reallocation of BRIC funds, Plaintiffs would first need to seek reimbursement and be denied.  There are no allegations that Plaintiffs have done so.  *See* Docs. 9-30 through 9-50.  This makes sense, given that BRIC recipients continue to draw down funds for reimbursements for expenditures for approved projects and FEMA continues to pay all partially and fully obligated projects.  Richardson Decl. ¶¶ 6, 11(B). Nor are there allegations that Plaintiffs intend to submit requests for reimbursement in the near (or even distant) future, only underscoring the lack of "certainly impending" harm here.  *See* Docs. 9-30 through 9-50.  Plaintiffs contend that absent immediate relief they "will be unable to carry out the projects that depend on funds—losing the time, effort, and millions of dollars they have already

invested in these projects, as well as the trust and goodwill they have built with stakeholders and industry partners."  Doc. 5 at 2.  But these assertions are speculative, unsupported by evidence, and belied by the fact that Plaintiffs' projects continue to receive funding.  Richardson Decl.  ¶¶ 6, 11(B).  And to the extent Plaintiffs argue they might be harmed by a termination in the future, any such harm is not imminent, and FEMA would comply with the proper termination and close out procedures established by 2 C.F.R. Part 200.  Richardson Decl. ¶ 11(B).

For these reasons, this Court should follow Supreme Court precedent and decline to "entangle" itself in an abstract disagreement based on events and purported harms that undisputedly have not occurred—and, indeed, may *never* occur.  *Abbot Lab'ys*, 387 U.S. at 148-49.

## B.      Plaintiffs Fail to Establish a Waiver of Sovereign Immunity

Plaintiffs' failure to demonstrate a specific waiver of the government's sovereign immunity is another jurisdictional bar to this case.  Plaintiffs attempt to invoke the APA as a source of the Court's federal question jurisdiction.  Doc. 1 ¶ 36.  But the APA's waiver of sovereign immunity does not apply to matters for which "another statute precludes judicial review" or matters that are "committed to agency discretion by law."  5 U.S.C. § 701(a); *see Heckler v. Chaney*, 470 U.S. 821, 830 (1985) ("The APA's comprehensive provisions for judicial review of 'agency actions,' are contained in 5 U.S.C. §§ 701-706 . . . [b]ut before any review at all may be had, a party must first clear the hurdle of § 701(a).").  The Stafford Act "preclude[s] judicial review" as contemplated by APA § 701(a)(1) in the circumstances presented here.

Under the Stafford Act, Congress has specifically immunized the government from "any claim based on the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a Federal agency or an employee of the Federal Government in

carrying out the provisions of this chapter."  42 U.S.C. § 5148.  In other words, Congress has "precluded judicial review of all disaster relief claims based upon the discretionary actions of federal employees."  *Rosas v. Brock*, 826 F.2d 1004, 1008 (11th Cir. 1987); *see also Ornellas v. United States*, 2 Cl. Ct. 378, 380 (1993) ("Liability should not be imposed on the federal government for discretionary acts or omissions of its agencies or employees in distributing benefits under such gratuitous programs.").

Here, the relevant question is whether FEMA's decision to award funding to Plaintiffs is discretionary.  To answer that question, courts rely on the two-part test developed by the Supreme Court in *United States v. Gaubert*, 499 U.S. 315 (1991): (1) whether the challenged conduct involves an "'element of judgment or choice'" and (2) whether "judgment is of the kind that the discretionary function exception was designed to shield."  *St. Tammany Par., ex rel. Davis v. FEMA,* 556 F.3d 307, 323 (5th Cir. 2009) (quoting *Gaubert*, 499 U.S. at 322-23).  Both prongs are met here.

FEMA retains broad discretion in setting priorities and determining which projects further the agency's goals.  The Stafford Act's pre-disaster mitigation provision, 42 U.S.C. § 5133, is couched in discretionary terms and does not mandate funding for any particular entity.  *See, e.g.,* 42 U.S.C. § 5133(b) ("The President *may* establish a program…to assist in the implementation of predisaster mitigation measures….");  *id.* § 5133(c) ("…the President, using amounts…established under subjection (i)…*may* provide technical and financial assistance…").  And case law supports that "[e]ligibility determinations, the distribution of limited funds, and other decisions regarding the funding of eligible projects are inherently discretionary."  *St. Tammany Par.*, 556 F.3d at 325; *see, e.g.*, *Santos v. FEMA*, 327 F. Supp. 3d 328, 344 (D. Mass. 2018) (finding that housing assistance under the Stafford Act comes under the discretionary function exception); *Ridgely v.*

*FEMA*, 512 F.3d 727, 735-36 (5th Cir. 2008) (finding that FEMA decision to discontinue rental assistance is discretionary and does not create an entitlement, "even if assistance is being offered and [the individual] meets the eligibility criteria"); *City of San Bruno v. FEMA*, 181 F. Supp. 2d 1010, 1014 (N.D. Cal. 2001) ("Distributing limited funds is inherently a discretionary responsibility."); *Fargo v. FEMA*, No. 19-CV-00004, 2019 WL 1769746, at *3 (D. N. Mar. I. Apr. 23, 2019) ("Most FEMA funding decisions are discretionary and not subject to review in the courts.").

There is no question that these funding decisions are grounded in public policy. The application process itself underscores as much, *see* 42 U.S.C. § 5133(f) (financial assistance is awarded on a "competitive basis" depending on the requested mitigation activities), and Plaintiffs themselves acknowledge that funding is awarded on a project-by-project basis, depending on how cost-effective, technically feasible, and environmentally permittable the proposed project is. *See*, *e.g.*, Doc. 9-32 at ¶¶ 7-8; Doc. 9-33 at ¶ 4; Doc. 9-34 at ¶ 6. As one declarant put it, FEMA selects only "the most promising projects" for BRIC funding. Doc. 9-34 at ¶ 6. Which projects are "the most promising" is necessarily grounded in public policy. *See Sunrise Village Mobile Home Park v. Phillips & Jordan, Inc.*, 960 F. Supp. 283, 286 (S.D. Fla. 1996) ("Implicit in this statute are the policies of protecting public safety and health and restoring order following a natural disaster").

Because the provision of disaster relief assistance is discretionary and grounded in public policy, and because Plaintiffs have not—and cannot—cite any language to the contrary, the Stafford Act's discretionary function exception applies and "preclude[s] judicial review" as contemplated by APA § 701(a)(1).

**C.     The Court of Federal Claims Has Exclusive Jurisdiction Over Plaintiffs' Claims.**

Even if this Court were to conclude that the Stafford Act's discretionary function exception did not apply, this Court would still lack jurisdiction because Plaintiffs seek to enforce contractual rights and receive contractual remedies, triggering jurisdiction in the Court of Federal Claims under the Tucker Act.  Plaintiffs argue they are entitled to the payment of billions of dollars pursuant to funding agreements that, in their view, either have been terminated or will be terminated at some point in the future.  In challenging those terminations (which, again, have not occurred), Plaintiffs seek an order to enforce FEMA's contractual obligation to pay.  Specifically, Plaintiffs seek to enjoin FEMA's purported "termination of the BRIC program" and to "restore the status quo as it existed before the termination".  Doc. 1 at 63-64.  In short, Plaintiffs ask for specific performance of contractual agreements.

The Tucker Act confers exclusive jurisdiction on the Court of Federal Claims to hear cases involving express or implied contracts with the United States which exceed $10,000.  28 U.S.C. § 1491(a)(1).  Therefore, "the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court" under the APA.  *Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004); *see also Glaskin v. Klass*, 996 F. Supp. 67, 72 (D. Mass. 1998).  Moreover, Congress has by statute explicitly forbidden district court jurisdiction for such contractual claims.  28 U.S.C. § 1346(a)(2) ("the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States…").  This jurisdictional divide ensures that contract claims against the government are channeled to the court that has "unique expertise" in that area.  *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985).

13

In *Department of Education v. California*, the Supreme Court addressed this issue in the same context in which Plaintiffs' claims arise, *i.e.*, grant awards. 604 U.S. ----, 145 S. Ct. 966 (2025) (per curiam). The Court explained that the government is "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA," *id.* at 968-69, because suits seeking such relief belong in the Court of Federal Claims:

> The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U. S. C. §702. Nor does the waiver apply to claims seeking "money damages." *Ibid.* True, a district court's jurisdiction "is not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds. *Bowen* v. *Massachusetts*, 487 U. S. 879, 910 (1988).[2] But, as we have recognized, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here. *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 212 (2002). Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." 28 U. S. C. §1491(a)(1).

*Id.* at 968.[3]

Even before the Supreme Court's decision in *California*, the First Circuit held that where "the essence of the [Plaintiffs'] action is in contract," a plaintiff may not evade the Tucker Act's exclusive grant of jurisdiction "by the mystique of a different form of complaint," such as a suit under the APA. *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978); *see also Diaz*

---

[3] Recently, this Court applied the Supreme Court's reasoning in a similar case involving grants. *See Mass. Fair Hous. Ctr. v. Dep't of Hous. & Urban Dev.*, No. 3:25-cv-30041-RGS (Text Order entered Apr. 14, 2025). Citing *California*, this Court found that, even though plaintiffs based their claims on federal statutes instead of contracts, their claims still "sought to enforce a contractual obligation to pay money." *Id.* It went on to dissolve its own temporary restraining order based on the Supreme Court's "unmistakable directive that, for jurisdictional purposes, the proper forum for this case is the Court of Federal Claims." *Id.* Other district courts have followed suit. For example, in *Vera Institute of Justice v. DOJ*, No. 25-cv-1643 (APM), 2025 WL 1865160 (D.D.C. Jul. 7, 2025), the Court dismissed plaintiffs' request for a preliminary injunction arising from DOJ's termination of grants where DOJ had determined that the awards no longer effectuated the program goals or agency priorities. *Id.* at *14. The Court found that it lacked jurisdiction, deciding that the matter was essentially a contract dispute and that exclusive jurisdiction accordingly lay with the Federal Court of Claims under the Tucker Act. *Id.* at *8.

*v. Johnson*, No. *19-1501*, 2020 WL 9437887, at *5 (1st Cir. Nov. 12, 2020) (holding that plaintiff "cannot manufacture an APA claim by asking the court to declare that the failure to fund his proposal was an arbitrary or capricious act"). And, here, Plaintiffs seek to compel continued payment of money under the terms of funding agreements, and to prevent the termination of funding agreements—all of which is to say Plaintiffs seek continued payment under contracts. *See* Doc. 1 at 63-64 (requesting an injunction to "restore the status quo as it existed before the termination").

"[D]espite [Plaintiffs'] valiant effort to frame the suit as one for declaratory or injunctive relief"—or as a suit under the APA—"this kind of litigation should be understood for what it is," a "suit for money for which the Court of Federal Claims can provide an adequate remedy," and which "therefore belongs in that court." *Suburban Mortg. Assocs. v. U.S. Dep't of Housing & Urban Dev.*, 480 F.3d 1116, 1118 (Fed. Cir. 2007); *see also U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, No. 1:25-cv-465, 2025 WL 763738, at *7 (D.D.C. Mar. 11, 2025) ("Sure, the Conference seeks to set aside agency action. But the agency action that it asks the Court to reverse is the Government's decision to cease a financial relationship with the Conference."). Just as the Supreme Court held in *California*, this Court should hold that Plaintiffs' claims belong in the Court of Federal Claims.

## D.     The United States Has Not Waived Sovereign Immunity To Compel Specific Performance Of Contracts.

The Court also lacks jurisdiction because the relief that Plaintiffs request would bar Defendants from terminating grant agreements—compelling the United States to specifically perform those agreements—and Congress has not waived the United States' sovereign immunity for that relief. First Circuit precedent recognizes that the United States has not waived sovereign immunity for specific performance and requires courts to dismiss actions that would compel the

United States to perform a contract. *See Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3-4 (1st Cir. 1989) (stating "[w]e are unaware of any waiver of sovereign immunity by the United States as to specific performance for breach of contract" and dismissing for lack of subject matter jurisdiction).

Here, Plaintiffs ask the Court to compel specific performance of grants as described above. Of course, if the Court bars Defendants from terminating grant awards, then the Court is ordering Defendants to perform those agreements by paying the grants. Because courts cannot order agencies to specifically perform agreements, a district court in Utah—citing the First Circuit's holding in *Coggeshall*—recently dismissed a purported APA claim brought by a grantee against the Small Business Administration ("SBA") following SBA's termination of a grant. *Imaginarium LLC v. United States Small Bus. Admin.*, 618 F. Supp. 3d 1225, 1232 (D. Utah 2022). There, SBA approved a grant then denied the grant, and the grantee sued for relief under the APA that would order the SBA to follow the law (as the grantee saw the law). *Id.* at 1228, 1231. The court explained "some of Plaintiff's requests for declaratory judgment require the Court to order specific performance by the SBA of its alleged contractual obligations to Plaintiff—this is well beyond the Court's power." *Id.* at 1232. Just so here.

## II. Even If The Court Rules It Has Jurisdiction, Plaintiffs' Claims Fail On The Merits.

Even if this Court should find that it has jurisdiction, Plaintiffs have not demonstrated a likelihood of success on the merits.

### A. APA Claims (Counts II, IV, VI, VIII)

Plaintiffs' APA claims fail because judicial review under the APA is not available in the absence of "final agency action"—which is lacking here. 5 U.S.C. § 704. In addition, the APA

does not allow judicial review to the extent that a relevant statute precludes it, or the agency action is "committed to agency discretion by law".  *See* 5 U.S.C. § 701(a)(1).

>    1.    There Is No Final Agency Action Here.

Under the test first laid out in *Bennett v. Spear*, an agency action is considered "final" if two conditions are met:  first, it marks the "consummation" of the agency's decision-making process; and second, the action determines rights or obligations or creates legal consequences.  *See Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2025) (citing *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  On *Bennett*'s second prong, courts follow a "pragmatic" approach and determine whether an action is final "based on the concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it."  *California Communities Against Toxics v. Env't Prot. Agency*, 934 F.3d 627, 637 (D.C. Cir. 2019) (interpreting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016)).

There is no final agency action here.  Neither the Hamilton Memo nor the FEMA Advisory relied upon by Plaintiffs constitute final agency actions.  They are mechanisms for communicating interim updates regarding the BRIC program, but they do not themselves have the force or effect of law or any direct impact on an existing grant award.  They neither mark the consummation of the agency's decision-making process nor create concrete consequences.  *See Harper*, 118 F.4th at 116.  The language of the Hamilton Memo makes this clear:  it contemplates that fully obligated and partially completed projects will be subject to a "program review" after which there will be a "recommendation on future activities…based on an analysis of the information collected."  Doc. 9-6.  Similarly, the FEMA Advisory states, under a subheading entitled "Outstanding BRIC Projects and Next Steps"—which, by its plain language, contemplates that future action still needs to occur—that FEMA will be "reaching out and coordinating with recipients on projects."  Doc.

9-8.   It goes on to state that "[f]or phased projects, FEMA Regions will work closely with applicants on already obligated projects to determine the best path forward for those projects." Doc. 9-8.  Simply put, final agency action with respect to any of Plaintiffs' projects that have been selected or fully obligated has not occurred.

Removing any doubt, the Richardson Declaration states that FEMA and DHS are continuing to evaluate whether to end the BRIC program or to revise it in a manner to achieve its original purpose.   Richardson Decl. ¶ 9.   But any final agency action—including any grant termination—would need to be approved by the Secretary or Deputy Secretary of DHS. Richardson Decl. ¶¶ 8, 13.  This has not yet occurred.  In short, the Hamilton Memo and FEMA Advisory cannot be considered final agency actions.  They did not create any consequences— certainly not against any named Plaintiffs—and any future plaintiffs injured by FEMA's subsequent actions—should they occur—can pursue their claims in an appropriate forum. Plaintiffs' current claims, however, are not subject to APA review.

>    2.   FEMA's decisions in entering and performing grants are committed to agency
>         discretion by law

Even if Plaintiffs' claims were not based in contract, the APA precludes judicial review because FEMA's grant funding decisions are "committed to agency discretion by law."  5 U.S.C. § 701(a)(2). The "allocation of funds" is an "administrative decision traditionally regarded as committed to agency discretion."  *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993).  "[T]he very point of a lump-sum appropriation," the *Lincoln* Court explained, "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192.

That same principle squarely applies to FEMA discretionary grant funding.  The purported terminated grants are not prescribed by any federal statute or regulation, either in terms of amounts

or who the recipients are.  Nor has BRIC received funding through targeted appropriations that require expenditures on Plaintiffs' specific projects.  Instead, "[the] expenditures resulted from executive discretion, not congressional action."  *Hein v. Freedom From Religion Found, Inc.*, 551 U.S. 587, 605 (2007).  As *Lincoln* made clear, FEMA's "allocation of funds" from those lump-sum appropriations to various programs and priorities "requires 'a complicated balance of a number of factors,'" including whether the agency's "'resources are best spent' on one program or another" and "whether a particular program 'best fits the agency's overall policies.'"  508 U.S. at 193 (quoting *Heckler*, 470 U.S. at 831).  And that discretion includes the authority to terminate grants that no longer advance agency priorities, *i.e.*, pre-disaster hazard mitigation measures that are not, in the governments' view, "cost-effective" and "designed to reduce injuries, loss of life, and damage and destruction of property[.]"  42 U.S.C. § 5133(b).

### B.  Constitutional Claims (Counts I, III, V, and IX)

Plaintiffs assert that the alleged termination of BRIC and repurposing and/or withholding of BRIC funds violates separation of powers principles.  Doc. 1 at 49-64.  This argument fails for several reasons.  *First*, Congress has explicitly authorized FEMA to take the challenged actions. "[W]hen the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate."  *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015).  Congress specifically states that the President "may establish a program" to provide "financial assistance" in the implementation of pre-disaster hazard mitigation measures.  42 U.S.C. § 5133(b).  The statute goes on to state that any financial assistance provided must be "cost effective" and "designed to reduce injuries, loss of life, and damage and destruction of property."  *Id.*  Taken

together these provisions explicitly authorize FEMA to wield significant discretion in setting FEMA's priorities and allocation of financial assistance.

*Second*, the Executive has implicit authority to terminate grants because Congress authorized the Executive to make grant awards and left the design, implementation, and administration of those grants to the Executive's discretion. *See* 42 U.S.C. § 5133(b). Congress knows how to write laws that constrain Executive Branch discretion, including laws that mandate inclusion of terms in agency contracts. *Am. Tel. and Tel. Co. v. United States*, 124 F.3d 1471, 1478 (Fed. Cir. 1997), aff'd, 307 F.3d 1374 (Fed. Cir. 2002). Congress did not do so here. *See Brendsel v. Off. of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52, 65 (D.D.C. 2004) (Congress' "silence is controlling"). Because Congress empowered the Executive to administer grants and did not cabin its discretion to terminate grants, no separation of powers concern exists.

## C. Appointments Clause and FVRA Claims (Counts VII and VIII)

Furthermore, Plaintiffs have failed to establish a likelihood of success on their Appointments Clause and Federal Vacancies Reform Act ("FVRA") claims.

### 1. Plaintiffs Fail to Establish a Violation of the Appointments Clause

Plaintiffs' Appointments Clause claims are predicated on the incorrect assumption that either Hamilton or Richardson was at any time designated as Acting Administrator of FEMA. *See* Doc. 1 ¶¶ 243-248, 254, 269; Doc. 8 at 19-21. Neither individual was ever designated to that role. Richardson Decl. ¶¶ 1, 10, 13. Since Deanne Criswell's resignation on January 20, 2025, the office of FEMA Administrator—and any "Acting Administrator" designation—has remained vacant. After the change in administration, Hamilton was appointed to his role as Assistant Administrator of FEMA's Office of Response and Recovery. Richardson Decl. ¶ 10. He was later assigned to perform the delegable duties of the Administrator as the SOPD of FEMA Administrator.

Richardson Decl. ¶¶ 10, 13.  Following Hamilton's departure, Richardson has been performing the same delegable functions in his capacity as SOPD.  Richardson Decl. ¶¶ 1, 13.

The temporary performance of these duties by a person not confirmed to the role does not raise an Appointments Clause issue.  As the Federal Circuit recently observed, "Although an inferior officer generally cannot issue a final agency decision, he may perform the functions and duties of an absent [Presidentially-nominated, Senate-confirmed officer ("PAS officer")] on a temporary, acting basis."  *Arthrex, Inc. v. Smith & Nephew*, Inc., 35 F.4th 1328, 1333 (Fed. Cir. 2022).  The Supreme Court's decision in *United States v. Eaton*, 169 U.S. 331 (1898), long established that an inferior officer may temporarily exercise the authority of a principal officer without violating the Appointments Clause.  In *Eaton*, the Court upheld the temporary appointment of a "vice consul" to perform the duties of a principal "consul," reasoning that a subordinate who "is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, is not thereby transformed into the superior and permanent official." *Id.* at 343.  The Court cautioned that, absent this rule, "every delegation of power to an inferior to perform under any circumstances or exigency the duties of a superior officer" would be invalid, seriously hindering the discharge of administrative duties.  *Id.*  *Eaton* confirms that there is no Appointments Clause concern here.  Because Hamilton and Richardson have each performed the Administrator's delegable duties only on a temporary basis during a vacancy, their service raises no Appointments Clause concern.

2.    Plaintiffs Fail to Establish a Violation of the FVRA

Nor can Plaintiffs show a likelihood of success on their claims under the FVRA for a straightforward reason: the FVRA limits only the performance of non-delegable functions or duties

21

of an office, and the duties at issue here—including the administration of FEMA grant programs—are delegable.

The FVRA provides the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive Agency . . . for which appointment is required to be made by the President, by and with the advice and consent of the Senate."  5 U.S.C. § 3347(a).  The statute further states that any action taken by a person who is not lawfully performing a "function or duty" of a vacant office "shall have no force or effect" and "may not be ratified."  5 U.S.C. § 3348(d)(1)–(2).  Invoking these provisions, Plaintiffs ask the Court to void alleged actions taken by Hamilton and to preclude Richardson from ratifying them.  Doc. 1 ¶¶ 247, 254, Prayer for Relief.  But that request misapprehends the statute.  The actions at issue in this case—BRIC program evaluation, NOFO cancellation, obligation management, performance extension policies—are delegable.  Richardson Decl. ¶ 13.  The FVRA's section 3348 thus does not preclude an official other than a Senate-confirmed or validly Acting Administrator from performing them.

Plaintiffs' argument overlooks the narrow statutory definition of "function or duty."  Under § 3348(a)(2), the term is limited to duties that are expressly required "to be performed by the applicable officer (*and only that officer*)" (emphasis added).  Duties that are not exclusive to the PAS officer fall outside § 3348 and may be delegated to other officials.

Most courts have endorsed this narrow construction.  *See, e.g.*, *Kajmowicz v. Whitaker*, 42 F.4th 138, 148-152 (3d Cir. 2022) ("Of course, the Vacancies Reform Act includes neither the terms nondelegable nor exclusive.  But Congress need not have included these terms when it already included the parenthetical qualifier 'and only that officer[.]'" (citations omitted)); *Arthrex*, 35 F.4th at 1336 ("This statutory language is unambiguous: the FVRA applies only to functions

and duties that a PAS officer alone is permitted by statute or regulation to perform. It does not apply to delegable functions and duties."); *Stand Up for California! v. U.S. Dep't of Interior*, 994 F.3d 616, 625-26 (D.C. Cir. 2021) (observing FVRA applies to "exclusive duties"); *Schaghticoke Tribal Nation v. Kempthorne*, 587 F.3d 132, 135 (2d Cir. 2009) (holding the FVRA did not prohibit an inferior officer from performing a function of a PAS officer who had resigned because the agency's regulations permitted the PAS officer to delegate that function); *United States v. Harris County*, No. 4:16-CV-2331, 2017 WL 7692396, at *7 n.5 (S.D. Tex. Apr. 26, 2017) (noting, the "actions in this case were not barred by the [FVRA]" because "the relevant duties" were "delegable").  Where statutory language is clear, "the court's work is done." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 674, 140 S. Ct. 1731, 1749 (2020).

The Department of Justice's Office of Legal Counsel (OLC) reached the same conclusion shortly after the statute's enactment.  OLC has stated, "Most, and in many cases all, the responsibilities performed by a PAS officer will not be exclusive, and the Act permits non-exclusive responsibilities to be delegated to other appropriate officers and employees in the agency."  *See* Guidance on Application of Fed. Vacancies Reform Act of 1998, 23 Op. O.L.C. 60, 72 (1999).  OLC found that Congress intentionally confined the FVRA's penalties to non-delegable duties, as Congress understood that government operations could be "seriously impaired" otherwise.  *Id.*

This practical concern is especially acute in the emergency management context.  Reading the FVRA to freeze FEMA operations whenever the office of Administrator is vacant would risk "administrative paralysis" precisely when the Nation may need immediate federal response capacity.  *See Arthrex*, 35 F.4th at 1337 (quoting S. Rep. No. 105-250, at 30–31).  Upon a Presidential disaster declaration under the Stafford Act, FEMA must act quickly to allocate

resources, approve grants, and coordinate response efforts.  The overly broad reading of § 3348 posited by Plaintiffs would cast doubt on essential FEMA decisions rendered during any vacancy in the office of Administrator and could freeze FEMA's operations in precisely the moments when they are most needed.

The FEMA organic statute assigns the Administrator responsibility for, among other things, "supervising grant programs administered by the Agency."  6 U.S.C. § 314(a)(12).  Nothing in that provision (or elsewhere in § 314) states that only the Administrator may perform such supervision.  The Stafford Act similarly vests broad disaster relief and mitigation authorities in the President.  *See, e.g.*, 42 U.S.C. §§ 5133 (pre-disaster hazard mitigation), 5148 (discretionary function).  Those authorities have been delegated to DHS and FEMA.  *See* Exec. Order 12673, 54 Fed. Reg. 12,571 (Mar. 28, 1989); Exec. Order 13286, 68 Fed. Reg. 10,617 (Mar. 5, 2003); amending Exec. Order 12148, 44 Fed. Reg. 43,239 (July 24, 1979).  FEMA's implementing regulations expressly contemplate sub-delegation: "Administrator means the head of the Federal Emergency Management Agency, *or his/her designated representative*."  44 C.F.R. § 201.2 (emphasis added).

Plaintiffs identify no statute or regulation reserving BRIC grant administration exclusively to the FEMA Administrator.  Nor do they identify any specific BRIC-related action taken by Hamilton (or continued by Richardson) that falls within a non-delegable category.  The record reflects that both officials acted pursuant to delegated authority during a vacancy.  Richardson Decl. ¶¶ 1, 10, 13; Exhibits 1 and 2.  Accordingly, § 3348's "no force or effect" remedy does not apply.  And even if Plaintiffs were correct that Hamilton was not lawfully "acting" under FVRA succession pathways—a claim Defendants dispute—that would not invalidate his actions.  Because the relevant BRIC-related functions are delegable, the FVRA provides no basis to void

them, and Richardson (as current SOPD) may ratify, modify, or supersede them consistent with governing delegations.  Plaintiffs' FVRA claim thus fails as a matter of law.

### D. *Ultra Vires* Claim (Count IX)

Finally, Plaintiffs' *ultra vires* challenge fails at the threshold because an alternative procedure for judicial review exists.  *See Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) (finding a non-statutory *ultra vires* claim will not be recognized if there is a "meaningful and adequate means of vindicating" plaintiffs' rights).  Here, for all the reasons that the Tucker Act precludes APA actions for claims that are in essence contractual, the Tucker Act also impliedly precludes a non-statutory equitable *ultra vires* action based on such claims.  Plaintiffs can seek relief from the Court of Federal Claims, which can adequately vindicate their asserted rights by awarding damages if they prevail.  Plaintiffs also seek review under the APA in this case.  Plainly, then, even on Plaintiffs' own view, the *ultra vires* cause of action is not the only one available to them.

### III. Plaintiffs Have Not Carried Their Burden To Show That They Face Likely Imminent Irreparable Harm If FEMA Uses Unobligated BRIC Funds For Disaster Relief.

The Court should deny Plaintiffs' Motion because they have not carried their "high burden" of demonstrating irreparable harm.  *E.E.O.C. v. Astra U.S.A, Inc.*, 94 F.3d 738, 743 (1st Cir. 1996); *see In re TelexFree Sec. Litig.*, No. CV 4:14-MD-02566, 2021 WL 11604879, at *7 (D. Mass. April 21, 2021) (finding likelihood of success on the merits but denying emergency relief for failure to show irreparable harm).  "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store."  *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).  The irreparable harm must be "actual and imminent", not remote and speculative.  *See Sierra Club v. Larson*, 769 F. Supp. 420, 422 (D. Mass. 1991).  And it must occur before the Court can adjudicate

a preliminary injunction motion. *See Pub. Serv. Co. of New Hampshire v. Town of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987) (affirming denial of preliminary injunction in the absence of indication that the merits of the case would not be decided before harms occurred).

Here, Plaintiffs are not at risk of irreparable harm if FEMA ultimately uses the $4.1 billion in unobligated BRIC funds for post-disaster response or recovery efforts. Plaintiffs contend that absent immediate judicial relief, they "will be unable to carry out the projects that depend on the funds—losing the time, effort, and millions of dollars they have already invested in these projects, as well as the trust and goodwill they have built with stakeholders and industry partners." Doc. 5 at 2. They further claim that they will "lose out on the economic benefits from the projects, face more damage from natural disasters, and pay much more in post-disaster costs." *Id.* But these assertions are speculative and unsupported by evidence of imminent harm. Plaintiffs' existing projects continue to receive funding. Richardson Decl. ¶ 11(B). And to the extent Plaintiffs argue that they will suffer irreparable harm from the loss of a potential future funding opportunity, such harm is neither immediate nor irreparable as a matter of law.

Even if this Court were to direct FEMA to proceed with new BRIC funding for FY 2024, Plaintiffs would be eligible to compete for only $750 million—the amount identified in FEMA's published NOFO for that fiscal year—not the full $4.1 billion in unobligated BRIC funds. Doc. 1 ¶ 72. FEMA's historical practice has been to limit BRIC NOFOs to levels well below the total balance available for the program in the DRF set aside. *See, e.g.*, CRS Insight IN11187, *Federal Emergency Management Agency (FEMA) Hazard Mitigation Assistance*, by Diane P. Horn, Jan. 19, 2023, at p. 1, available at https://www.congress.gov/crs-product/IN11515 ("As of December 31, 2022, there was $3.995 billion in the 6% set-aside in the DRF. . . . FEMA anticipates that $500

million will be available for BRIC in FY2023."). Thus, even under Plaintiffs' theory, they are not entitled to compete for the entire BRIC balance.

Moreover, a substantial portion of the $4.1 billion balance accumulated in the DRF set-aside due to unusually high major disaster appropriations related to the COVID-19 pandemic. *See id.*; *see also* CRS Report R47676, *Disaster Relief Fund State of Play: In Brief*, by William L. Painter, Apr. 9, 2025, at p. 9, available at http://www.congress.gov/crs-product/R47676 (graphical depiction of the substantial COVID-19 obligations that were added to the DRF); *id.* at 13 ("COVID-19 response obligations represented 45% of total DRF major disaster obligations for FY2022-FY2024"). When Congress enacted the automatic 6% transfer provision in 2018, it likely did not anticipate this scale of accumulation for pre-disaster mitigation. *See, e.g.*, CRS Report R47048, *FEMA's Role in the COVID-19 Federal Pandemic Response*, by Diane P. Horn *et al.*, Feb. 10, 2022, at pp. 1, 32 , available at https://www.congress.gov/crs-product/R47048 (discussing FEMA's unprecedented role in the pandemic response and observing that the COVID-era BRIC set aside "far exceeds FEMA's expectation that this fund would receive $300-500 million per year on average, based on historical disaster expenditures"). As a result, the balance of funding available for BRIC has outpaced FEMA's capacity to award and manage grants consistent with the program's statutory and regulatory framework. Because BRIC receives a percentage share of major disaster appropriations, the fund amounts available for the program can continue to grow regardless of whether FEMA is able to obligate the funds each year. This structural surplus underscores the speculative nature of Plaintiffs' alleged harm and further undercuts any claim that the funds must be immediately obligated to avoid loss or depletion.

Finally, because Plaintiffs' primary purported injury is potential loss of money, preliminary relief is not warranted because Plaintiffs could theoretically receive reimbursement for BRIC

awards if they prevail on their claims. *See Blinds To Go, Inc.*, 370 F.3d at 162 (stating no

irreparable harm where monetary award will make plaintiff whole). And, while some Plaintiffs

have recognized their ability to provide coverage for lost funding, *see e.g.* Doc. 9-31 at ¶ 21

(recognizing that Washington could "make up for the lost funding" by "drawing funding away"

from other initiatives; Doc. 9-32 at ¶ 27 (same for Massachusetts); Doc. 9-39 at ¶ 12 (same for

Michigan), the result would be the same even if Plaintiffs could *not* recover costs in the interim.

*See United States v. Michigan*, 230 F.R.D. 492, 495 n. 1 (E.D. Mich. 2005) ("[Movant] argues that

its ratepayers are low-income and do not have the luxury of saying, 'It's only money.' The rule

that equitable remedies cannot issue when the damages are monetary in nature has been ingrained

in law for 'half a millennium or so,' and no judge within the English common law tradition has

the luxury of ignoring it") (internal citation omitted).

## IV.    The Balance of Equities and the Public Interest Strongly Disfavor Relief

An injunction barring FEMA from using unobligated BRIC funds for disaster response or

recovery would disrupt the longstanding status quo and disserve the public interest. Plaintiffs

assert that "the only impact on Defendants is that they must follow the law and maintain the status

quo by not spending these funds for non-BRIC purposes during the pendency of the

litigation." Doc. 5 at 3. But that characterization is incorrect.

Since at least May 2021, FEMA has consistently reported that unobligated BRIC funds

remain available for post-disaster response and recovery if necessary.[4] Although Plaintiffs rely on

---

[4] *See* Disaster Relief Fund: Monthly Report, as of April 30, 2021, at 4, available at https://www.fema.gov/sites/default/files/documents/fema_may-2021-disaster-relief-fund-report.pdf ("The BRIC funding continues to be available to FEMA for other purposes should the DRF Majors balance drop too low to cover immediate response or recovery needs."); *see also* Disaster Relief Fund: Monthly Report, as of February 28, 2025, at 4, https://www.fema.gov/sites/default/files/documents/fema_ocfo_march-2025-disaster-relief-fund-report.pdf (same).

FEMA's more recent reports from April and June 2025 to claim that BRIC funds are at risk of being depleted, those reports are not exceptional in content. For the past four years, FEMA's monthly reports have consistently noted that unobligated BRIC funds are available to backstop the Disaster Relief Fund for major disasters if the DRF balance becomes insufficient. Thus, contrary to Plaintiffs' assertions, an injunction would not preserve the status quo. It would instead impose a new and significant restriction on FEMA's emergency response flexibility, potentially limiting the agency's ability to respond to major disasters in real time. That outcome would impose substantial public costs and risks—especially during the current hurricane and wildfire seasons—and cannot be justified on the basis of speculative future harms to parties who are not even guaranteed funding under the BRIC program. The equities and public interest therefore weigh strongly against the requested injunction.

## V.    Any Injunction Should Be Narrowly Tailored

Should the Court conclude that an injunction is required, which it should not do, the "[i]njunctive relief should be no more burdensome to the defendant[s] than necessary to provide complete relief to plaintiffs[.]" *Tamko Roofing Prods*, 282 F.3d at 40 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Indeed, the Supreme Court recently held that federal courts lack the power to issue universal injunctions. *See Trump v. Casa, Inc.* --- S. Ct. ---, 145 S. Ct. 2540, 2550-51, 2025 WL 1773631, at *6 (June 27, 2025). To that end, at most, any remedy should address only sufficiently and specifically proven irreparable harms by Plaintiffs.

## VI.    The Court Should Stay Any Order For Preliminary Relief and Order That Plaintiffs Post Bond.

Based on the arguments in this Opposition, and due to the breadth of the relief sought in Plaintiffs' motion, Defendants respectfully request that the Court stay any preliminary injunction pending the disposition of any authorized appeal. At a minimum, the Court should

administratively stay any order, should the court decide to issue an injunction, for seven days should the court decide to allow an opportunity to seek an emergency, expedited stay.

Moreover, if the Court decides to grant preliminary injunctive relief, the Court should order plaintiffs to post a bond equal to the amounts of any disbursements on terminated grants—should there be any—during the pendency of this ligation.  Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by defendants if they are later found to "have been wrongfully enjoined."  Fed. R. Civ. P. 65(c); *see also iQuartic, Inc. v. Simms*, 15-cv-13015, 2015 WL 5156558, at *6 (D. Mass. 2015) ("A movant for injunctive relief must give security in an amount that the Court considers proper to pay costs and damages sustained by any party found to have been improvidently enjoined.").

## CONCLUSION

For the reasons described above, Plaintiffs' Motion for Preliminary Injunction should be denied.

Dated: July 25, 2025
By:     */s/ Nicole M. O'Connor*
        Nicole M. O'Connor
        Assistant United States Attorney
        United States Attorney's Office
        1 Courthouse Way, Suite 9200
        Boston, MA 02210
        Tel.: 617-748-3112
        Email: Nicole.O'Connor@usdoj.gov

## CERTIFICATE OF SERVICE

I, Nicole M. O'Connor, Assistant United States Attorney, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated: July 25, 2025                    By:    /s/ *Nicole M. O'Connor*
                                                Nicole M. O'Connor
                                                Assistant United States Attorney