UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 25-12006-RGS

STATE OF WASHINGTON, *et al.*

v.

FEDERAL EMERGENCY MANAGEMENT AGENCY, *et al.*

MEMORANDUM AND ORDER ON PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUCTION

August 5, 2025

STEARNS, D.J.

Plaintiffs State of Washington; Commonwealth of Massachusetts; State of Arizona; State of California; State of Colorado; State of Connecticut; State of Delaware; State of Illinois; State of Maine; State of Maryland; State of Michigan; State of Minnesota; State of New Jersey; State of New York; State of North Carolina; State of Oregon; Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania; State of Rhode Island; State of Vermont; and State of Wisconsin (collectively, the States) filed this action against the Federal Emergency Management Agency (FEMA); David Richardson, in his official capacity as Senior Official Performing the Duties of the Administrator of FEMA; the United States Department of Homeland Security (DHS); Kristi Noem, in her official capacity as Secretary of DHS;

and the United States of America (collectively, the Government) based on the alleged termination of the Building Resilient Infrastructure and Communities (BRIC) pre-disaster mitigation program. In a nine-count Complaint, the States accuse the Government of violating the Administrative Procedure Act (APA), 5 U.S.C. §§ 706(A)-(C), and several clauses of the U.S. Constitution. Before the court now is the States' motion for a preliminary injunction. On July 31, 2025, the court convened a hearing on the motion. For the following reasons, the court will allow the States' motion in substance.

## FACTUAL BACKGROUND

The BRIC program provides "technical and financial assistance to States and local governments for cost-effective pre-disaster hazard mitigation measures that reduce injuries, loss of life, and damage and destruction of property." Richardson Decl. [Dkt # 76] ¶ 4. It is funded through direct Congressional appropriations, *see* Infrastructure Investment and Jobs Act (IIJA), Pub. L. 117-58, 135 Stat, 429 (2021), and through set asides from the Disaster Relief Fund (DRF), *see* Stafford Act § 203(i), 42 U.S.C. § 5133(i).

On April 2, 2025, Cameron Hamilton, the then-Senior Official Performing the Duties of the Administrator of FEMA, issued a memorandum

purporting to "provid[e] new direction for the BRIC Program." Hamilton Memo [Dkt # 9-6]. Among other changes, the memorandum specified that FEMA: (1) "will cancel the FY24 Notice of Funding Opportunity (NOFO) for the BRIC grant program," (2) "will [n]ot award the BRIC projects selected but not yet awarded across all fiscal years," and (3) "will . . . [n]ot grant any additional period of performance extensions on any BRIC projects, without [Hamilton's] prior approval." *Id.*

Two days later, on April 4, 2025, Hamilton announced the changes to the public, issuing a press release stating that "FEMA is ending the [BRIC] program" and "will . . . immediately return[]" any funds which had not yet been distributed "either to the Disaster Relief Fund or the U.S. Treasury." April 4 Press Release [Dkt # 9-7]. The Deputy Regional Administrator for FEMA Region 1 viewed this press release as "announc[ing] the cancellation of the [BRIC] program," Brantley Decl. [Dkt # 72-1], Ex. A, and, on April 7, 2025, notified the Director at the Massachusetts Emergency Management Agency via email that:

> Effective immediately, FEMA will implement the following actions:
> 
> - Cancel all BRIC subapplications that were selected but not obligated, across all fiscal years. This includes project types such as safe rooms and shelters, flood reduction, phased infrastructure, hazard mitigation planning, project

      scoping, utility and infrastructure protection, and wildfire management.

- No further period of performance extensions will be approved for any BRIC projects without prior approval from the FEMA Administrator.

    - Regional offices will work with grant recipients to review partially completed projects and collect key information, including the period of performance end date, amounts obligated and paid, and a description of remaining work. No progression to Phase 2 will be authorized.

    - For fully obligated projects, FEMA will collect similar data. Again, no extensions beyond the current period of performance will be granted without Administrator-level approval.

- Obligation of all BRIC-related management costs will cease, and FEMA will review the status of management cost requirements in conjunction with the above project reviews. Remaining funds may be de-obligated unless required for managing partially or fully obligated projects. Most construction projects are anticipated to proceed, but phased projects-where only Phase 1 has been awarded-will be most impacted. These projects will be permitted to progress to the next Phase 1 milestone and then conclude. No additional funding will be provided for construction or closeout.

*Id.* Less than two weeks later, FEMA issued an advisory confirming that the BRIC program "is concluding" and outlining "next steps." April 16 Advisory [Dkt # 9-8].

    Consistent with its public statements, FEMA removed the FY 2024 NOFO from its website, *see* Richardson Decl. ¶ 11, and, in its June 2025

4

monthly report to Congress (published on July 9, 2025), purported to "revers[e]" the set-aside of funds previously allocated to BRIC, Disaster Relief Fund: Monthly Report as of June 30, 2025 (June 2025 Monthly DRF Report) [Dkt # 9-19] at 4, 20 (showing a net gain of $4.071 billion to the DRF and a net loss of $4.071 billion in available BRIC funding attributable to "Reversal of Building Resilient Infrastructure and Communities Set Aside"); *see also* Hamilton Test. [Dkt # 66-2] at 4 (testifying under oath to the House Appropriations Committee that FEMA had made "available within the DRF funds that were previously set-aside for [BRIC] projects that would not take place for many years"). FEMA does not, however, appear to have cancelled any grants or denied any requests for extensions to date. Richardson Decl. ¶ 11.

## DISCUSSION

### I. *Subject Matter Jurisdiction*

The court begins with the issue of subject matter jurisdiction, as "[f]ederal courts are obliged to resolve questions pertaining to subject-matter jurisdiction before addressing the merits of a case." *Acosta-Ramirez v. Banco Popular de Puerto Rico*, 712 F.3d 14, 18 (1st Cir. 2013). The Government raises three challenges to the existence of jurisdiction: ripeness, standing, and sovereign immunity.

5

*a. Ripeness*

"Questions of ripeness that arise incident to challenged governmental actions in the declaratory judgment context are gauged by means of a two-part test." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir. 1995). "First, the court must consider whether the issue presented is fit for review." *Id.* The critical question is "whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all." *Id.* at 536, quoting *Massachusetts Ass'n of Afro-Am. Police, Inc. v. Boston Police Dep't*, 973 F.2d 18, 20 (1st Cir. 1992) (per curiam). Second, the court must "consider the extent to which hardship looms." *Ernst & Young*, 45 F.3d at 535. This inquiry is focused on "whether the challenged action creates a 'direct and immediate' dilemma for the parties." *Id.*, quoting *W.R. Grace & Co. v. EPA*, 959 F.2d 360, 364 (1st Cir. 1992).

The court finds the first prong satisfied here. Although the Government equivocates about whether it has, in fact, ended the BRIC program, the States' evidence of steps taken by FEMA to implement the announced termination portend the conclusion that a determination has in fact been made and that FEMA is inching towards a *fait accompli*. The agency has cancelled new funding opportunities and informed stakeholders that they should no longer expect to obtain any unobligated funds in existing

projects. Even more tellingly, the monthly Congressional report of the DRF for June 30, 2025, which was published by FEMA on July 9, 2025, shows a net gain of $4.071 billion in the DRF account and a corresponding net loss of $4.071 billion in the BRIC account, each labeled "Reversal of Building Resilient Infrastructure and Communities Set Aside." June 2025 Monthly DRF Report at 4, 20. Against this background, the carefully crafted assurances of Richardson that "the Secretary of Homeland Security has not made a final decision to end the BRIC program" and that no grants have yet been cancelled, Richardson Decl. ¶ 11, while perhaps literally true, do not convince the court that in reality the termination of BRIC is merely a theoretical possibility rather than a preordained outcome.

The court also finds the hardship prong satisfied. Although minor "next steps" may remain before the claimed harm will fully coalesce, *see* Defs.' Opp'n [Dkt # 58] at 8-9, the prospect of harm nonetheless hangs overhead like the legendary Sword of Damocles. It cannot be the case that a court must defer taking any palliative steps to avert the potential harm until the sword literally drops. Indeed, Supreme Court precedents in analogous contexts point in the opposite direction. *See, e.g., Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) ("When the plaintiff alleges an intention to engage in a course of conduct arguably affected with a

7

constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'"), quoting *Doe v. Bolton*, 410 U.S. 179, 188 (1973); *see also Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 9 (1st Cir. 2012) (citing *Babbitt* for the same premise).

### b. Standing

The standing inquiry has three elements. "First, the plaintiff must have suffered an 'injury in fact'–an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted). "Second, there must be a causal connection between the injury and the conduct complained of." *Id.* "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561, quoting *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 38, 43 (1976).

The parties dispute only the first element, specifically, whether the States have alleged an injury in fact that is actual or imminent. For the reasons discussed above, the court agrees with the States that the claimed harm is likely imminent and not merely speculative. *See McInnis-Misenor*

8

*v. Maine Med. Ctr.*, 319 F.3d 63, 69 (1st Cir. 2003) ("In general, standing and ripeness inquiries overlap. The overlap is most apparent in cases that deny standing because an anticipated injury is too remote, for example.") (citations omitted).

### c. Sovereign Immunity

The court need not linger over the issue of sovereign immunity. The Government argues that, because the APA, by its plain text, does not apply where "statutes preclude judicial review," 5 U.S.C. § 701(a), and because 42 U.S.C. § 5148 disclaims liability for "any claim based upon the exercise or performance of or the failure to exercise or perform a discretionary function or duty," the States cannot rely on the APA to establish any waiver of sovereign immunity.[1] The problem is this: The States' claims are based not on any discretionary choice of the agency (*e.g.*, which projects to select or even whether to implement the program). They are premised on the agency acting where it allegedly *lacked* discretion – significantly reducing the

---

[1] As it stated during the July 31 hearing, the court agrees with the States that the Tucker Act, which confers exclusive jurisdiction over contract actions against the United States on the Court of Federal Claims, is inapplicable here. The States do not assert any contract-based claims or seek any contractual remedies. The Government appears to acknowledge as much elsewhere, arguing in support of its ripeness challenge that it has not terminated any specific contracts or grants (which might give rise to a Tucker Act claim).

9

operations of the BRIC program post-establishment without any prior authorization from Congress. The claims thus do not fall within the scope of § 5148.

## II. *Preliminary Injunction*

Courts consider the following when determining whether to award a preliminary injunction: "(1) the movant's likelihood of success on the merits, (2) the potential for irreparable harm, (3) a balancing of the relevant equities, and (4) the effect on the public interest." *Campbell Soup Co. v. Giles*, 47 F.3d 467, 470 (1st Cir. 1995). "Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996); *see also CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 55 (1st Cir. 2020) (Likelihood of success on the merits is the factor that "weighs most heavily in the preliminary injunction analysis."); *Ryan v. U.S. Immig. & Customs Enf't*, 974 F.3d 9, 20 (1st Cir. 2020) ("If the movant 'cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.'"), quoting *New Comm Wireless Servs. Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

### a. *Likelihood of Success on the Merits*

The Government challenges likelihood of success on the merits only on two threshold grounds: (1) the States have not identified any final agency

action giving rise to an APA claim; and (2) the APA precludes judicial review because the claims are premised on action committed to agency discretion by law.[2]

The court does not find either argument persuasive. First, while it may technically be correct to say that the Secretary of DHS has not formally issued any declaration of final agency action,[3] the agency's actions in the wake of the announcements nonetheless signal that a final determination has been made from which concrete consequences have been felt. *See Bennett v. Spear*, 520 U.S. 154, 177-178 (1997) (agency action is final if it marks the consummation of the decision making process and determines rights and obligations from which legal consequences flow); *see also Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) ("[A]n agency pronouncement will be considered binding as a practical matter if it . . . is applied by the agency

---

[2] The Government does not dispute that the States have otherwise substantively established a likelihood of success on the merits of their claims. This is wise. Section 316 of Title 6 of the U.S. Code states that the Secretary of DHS "may not substantially or significantly reduce . . . the authorities, responsibilities, or functions of [FEMA] or the capability of [FEMA] to perform those missions, authorities, responsibilities, except as otherwise specifically provided in an Act enacted after October 4, 2006," *id.*, and mitigation is one of the key "authorities, responsibilities, or functions of" FEMA, *see* 6 U.S.C. §§ 313(b)(1), 313(b)(2), 314(a)(9)(A).

[3] The court notes, however, that the Hamilton-era pronouncements use the type of language indicative of a final decision – "is" and "will." *See* Hamilton Memo; April 4 Press Release; April 26 Advisory.

in a way that indicates it is binding."). As discussed in more depth above, the agency has taken affirmative steps to give effect to the termination announcements, including cancelling the FY 2024 NOFO and redirecting more than $4 billion from the BRIC account to the DRF. That certain administrative steps nonetheless remain to be performed before the contemplated termination can be fully consummated (or even that the Government remains free to change its mind at any point during the process) does not diminish the weight of the evidence indicating that FEMA's ultimate intent is to dismantle the BRIC program altogether.

Second, the court is not convinced that Congress vested in the agency any discretion to reallocate funds from the BRIC account.[4] Even assuming Congress appropriated funds to the agency in one lump-sum payment (without expressing any intent for a specific portion to be set aside for BRIC), it is undisputed that the agency subsequently chose to allocate 6% of each appropriation between the fiscal years between 2019 and 2025 to the BRIC program. June 2025 Monthly DRF Report at 20 (reflecting a 6% set-aside in the BRIC account for each fiscal year between 2019 and 2025); *see also*

---

[4] The Government does not dispute that any funds appropriated under the IIJA "are only available for that program and cannot be used for other purposes" – *i.e.*, that they cannot be returned to the U.S. Treasury and used elsewhere. Defs.' Opp'n at 5.

Disaster Relief Fund: Monthly Report as of April 30, 2025 [Dkt # 9-9] at 19 (same). Section 5133 of Title 42 of the U.S. Code appears to limit the discretion of the executive branch to redirect funds once they are allocated to BRIC (and also to regulate the timing of when unobligated funds can be withdrawn from a project), undercutting any notion that Congress permitted the agency to act as it did. *See also* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 503(d)(2), 138 Stat. 460, 615 (2024) (limiting the ability of the Government to reprogram funds to "increase or decrease funding for grant programs"); 6 U.S.C. § 316(d) ("In reprogramming or transferring funds, the Secretary shall comply with any applicable provisions of any Act making appropriations for the Department . . . relating to the reprogramming or transfer of funds.").

    b. *Remaining Factors*

The States have shown a realistic existence of irreparable harm. The funds, if spent on other purposes, will be lost forever. *Cf. Dep't of Educ. v. California*, 145 S. Ct. 966, 969 (2025) (per curiam) (recognizing that money, once spent, can be irrecoverable). The States have also shown that the balance of hardship and public interest factors tip in their favor. There is an inherent public interest in ensuring that the government follows the law, and the potential hardship accruing to the States from the funds being

13

repurposed is great. The BRIC program is designed to protect against natural disasters and save lives. The potential hardship to the Government, in contrast, is minimal.[5] The requested relief is appropriately narrow – to merely prevent the Government from spending the funds elsewhere, not to compel the payment of any sum – and even without the BRIC funds, the DRF is operating at a surplus well above the reserves the Government itself estimated to be necessary to "maintain[] the ability to fund initial response operations for new significant events." *See* Disaster Relief Fund: Fiscal Year 2025 Funding Requirements [Dkt # 66-10] at 6; *see also* Disaster Relief Fund: Fiscal Year 2024 Funding Requirements [Dkt # 9-18] at 6. And nothing prevents the Government from asking the court to release any necessary funds on an emergency basis should a disaster of unprecedented proportions occur while the injunction remains in place.

---

[5] Given the negligible burden placed on the Government by the requested injunction, it is difficult – if not impossible – for the Government to show that the injunction will cause it any irreparable harm. The injunction does no more than ensure that the status quo is maintained until the underlying issues are fully litigated and the court is able to render (an appealable) judgment on the merits. Not unexpectedly, in responding to the court's questioning during the July 31 hearing, Government counsel was unable to articulate any immediate hardship the Government would face given its assurances that no final decision on the termination of BRIC has been made. Any future hardship at most would be one of timing delay should the Government in the interim determine to proceed with the discontinuation of BRIC.

## ORDER

For the forgoing reasons, the motion for a preliminary injunction is <u>ALLOWED</u>. The Government is preliminarily enjoined from spending the funds allocated to BRIC for non-BRIC purposes until the court is able to render a final judgment on the merits.

        SO ORDERED.

        <u>/s/ Richard G. Stearns</u>
        UNITED STATES DISTRICT JUDGE