# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF WASHINGTON, et al., | No. 1:25-cv-12006-RGS |
| Plaintiffs, | LEAVE TO FILE EXCESS PAGES GRANTED ON SEPTEMBER 23, 2025 |
| v. | |
| FEDERAL EMERGENCY MANAGEMENT AGENCY, et al., | |
| Defendants. | |

## PLAINITIFFS' MEMORANDUM IN SUPPORT OF
## <u>MOTION FOR SUMMARY JUDGMENT</u>

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................................ 1

II.   BACKGROUND ................................................................................................................. 2

    A.   FEMA's Pre-Disaster Mitigation Program Has Helped Our Nation Protect
        Against Disasters for Nearly 30 Years ..................................................................... 2

    B.   The Modern BRIC Program ...................................................................................... 5

    C.   Defendants Suddenly Shut Down the BRIC Program ............................................... 6

    D.   Defendants Implement the BRIC Termination ....................................................... 11

III.  ARGUMENT .................................................................................................................... 13

    A.   The Court Has Jurisdiction ..................................................................................... 13

    B.   The BRIC Termination is Unlawful ........................................................................ 17

    C.   The Court Should Vacate the BRIC Termination, Enter a Permanent Injunction,
        and Declare it Unlawful ......................................................................................... 28

IV.   CONCLUSION ................................................................................................................. 35

## I.    INTRODUCTION

For nearly thirty years, and across five Presidential administrations, the FEMA pre-disaster mitigation program has operated on a simple premise: by proactively fortifying our communities against disasters before they strike, rather than just responding afterward, we will reduce injuries, save lives, protect property, and, ultimately, save money that would otherwise be spent on post-disaster costs. Thus, for decades Congress has consistently funded an all-purpose pre-disaster mitigation program—now called Building Resilient Infrastructure and Communities, or BRIC—and expressly directed FEMA to make mitigation a core part of its mission. Over the past four years, FEMA has selected nearly 2,000 projects to receive roughly $4.5 billion in BRIC funding. From Washington to North Carolina, California to Maine, and everywhere in between, every state in the nation is relying on this program.

All of that changed when Cameron Hamilton, who the Trump Administration unlawfully installed to act as FEMA Administrator, suddenly—and illegally—shut down the program. Mr. Hamilton's purported termination of the BRIC program was unlawful for three reasons. First, the BRIC termination is directly contrary to Congress's statutory direction that FEMA must prioritize mitigation and may not substantially reduce its mitigation functions. By unilaterally shutting down FEMA's flagship pre-disaster mitigation program, Defendants have acted unlawfully and violated core separation of powers principles. Second, the steps Defendants have taken to implement the termination—refusing to spend funds Congress directed to BRIC or trying to spend them on other programs—also violate the Constitution and unlawfully intrude on Congress's power of the purse. Third, neither Mr. Hamilton nor his successor, David Richardson, were lawfully appointed to run FEMA, and they therefore lack authority to shut down the program.

The impact of the shutdown has been devastating. Communities across the country are being forced to delay, scale back, or shut down hundreds of mitigation projects depending on this

1

funding. Projects that have been in development for years, and in which communities have invested millions of dollars for planning, permitting, and environmental review, are now threatened. And in the meantime, Americans across the country face a higher risk of harm from natural disasters. To ensure Defendants do not thwart Congress's efforts to protect Americans from natural disasters before they strike, this Court should permanently enjoin Defendants' unlawful BRIC termination.

## II.    BACKGROUND

### A.    FEMA's Pre-Disaster Mitigation Program Has Helped Our Nation Protect Against Disasters for Nearly 30 Years

Following a series of damaging hurricanes, floods, and earthquakes in the 1980s and 90s, Congress recognized that fortifying against natural disasters before they strike, rather than just reacting after the fact, can save lives, protect property, and save the federal government "significant sums" that it would otherwise spend on "post-disaster clean-up and response[.]" H.R. Rep. No. 104-812, at 78–79 (1996) (Conf. Rep.). Congress thus decided that FEMA "should be taking an increasingly active role in developing and participating in pre-disaster mitigation programs[,]" and in 1997 started appropriating funds for FEMA to develop a program to assist state and local governments in protecting against natural disasters. *Id.*

FEMA started a pilot program called Project Impact in 1997, which focused mainly on helping communities evaluate the hazards they faced and develop mitigation plans. After a promising start, Congress codified the program and expanded its focus to helping states carry out these mitigation measures. The Committee Report explained that "the only way to control post-disaster spending for response, relief, and recovery is to increase pre-disaster funding for mitigation, planning, and preparedness." H.R. Rep. No. 106-40, at 11 (1999). That program is now called BRIC.

The concept is simple: FEMA provides financial and technical assistance to state, local, tribal, and territorial governments to implement "cost-effective" mitigation measures "designed to reduce injuries, loss of life, and damage and destruction of property" from natural disasters. 42 U.S.C. § 5133(b). Recipients may also use these funds to assess hazards they face and develop plans for mitigating them. *Id.* § 5133(e). Each grant can cover up to 75% of a project's costs, and the federal share can rise to 90% for small rural communities. *Id.* § 5133(h).

The program has been critically important nationwide. Over the past four years, FEMA has selected nearly 2,000 projects from all fifty states to receive roughly $4.5 billion in funding. ECF No. 89 (Answer) ¶¶ 3, 74; *see also* Statement of Material Facts (SMF) ¶ 13. Before the Trump Administration shut it down, BRIC was poised to fund hundreds of critical, lifesaving projects including: (1) floodwalls, levees, pump stations, stormwater management systems, and other measures to protect against flooding, SMF ¶ 60; (2) seismic retrofits to fortify against earthquakes*, id.* ¶ 61; (3) saferooms to provide shelter from tornados, *id.* ¶ 62; (4) an evacuation tower to allow for escape from tsunamis, *id.* ¶ 63; (5) soil remediation to protect against landslides, *id.* ¶ 64; (6) vegetation management to reduce damage from wildfires, *id.* ¶ 65; (7) shoreline upgrades to protect against erosion, flooding, and storms, *id.* ¶ 66; and (8) development, updates, and enforcement of building codes to ensure long-term durability and protect public safety, *id.*, ¶ 72. Many of these projects protect critical infrastructure, ensuring that electricity, heat, clean water, and medical care remain available in emergencies. *Id.* ¶¶ 67-70. And these projects save much more money than they cost. *See, e.g.*, Declaration of Jennifer K. Chung (Chung Decl.), Ex. 38 ¶¶ 8-11 (estimating return on investment of over 1300% for flood reduction project); *accord* SMF ¶ 83.

Given the program's effectiveness in protecting both people and pocketbooks, Congress has continued to invest in BRIC. In 2018, in the wake of several major hurricanes and wildfires,

Congress held hearings to assess what more it could do. President Trump's first FEMA Administrator, Brock Long, testified that "[w]e have to do more pre-disaster mitigation. Pre-disaster mitigation is the key to becoming more resilient and reducing disaster impacts."[1] When Administrator Long returned to Congress a few months later, he reiterated that "developing resilient communities ahead of an incident reduces loss of life and economic disruption," and stated bluntly: "It is a no-brainer: More investment in pre-disaster mitigation rather than doing it after the fact is ultimately going to reduce disaster costs."[2]

Following these hearings, Congress passed the Disaster Recovery Reform Act of 2018 (DRRA) to increase the consistency of funding for the pre-disaster mitigation program. For most of its history, the program was funded exclusively through ordinary appropriations, which could be unpredictable and made planning for and executing long-term infrastructure projects difficult. The DRRA would allow FEMA to also set aside funds from the Major Declarations Fund (a component within the Disaster Relief Fund that funds many of FEMA's post-disaster grants), for BRIC, and to designate those funds as the National Public Infrastructure Predisaster Mitigation Fund (Mitigation Fund). *See* 42 U.S.C. § 5133(i)(1). By setting aside a fraction of these post-disaster funds for pre-disaster mitigation, FEMA could establish "a greater balance . . . between pre- and post-disaster resilience investments" which would "save lives and Federal tax dollars." S. Rep. No. 115-446, at 3 (2018).

In addition to appropriating funds for FEMA to set aside for BRIC, Congress also appropriated another $1 billion directly to the program through the bipartisan Infrastructure

---

[1] *2017 Hurricane Season: Oversight of the Federal Response: Hearing Before the S. Comm. on Homeland Sec. and Gov't Affairs*, 115th Cong. 58, 9 (2017) (statement of William "Brock" Long, Administrator of the Fed. Emerg. Mgmt. Agency), available at https://www.govinfo.gov/content/pkg/CHRG-115shrg29658/pdf/CHRG-115shrg29658.pdf.

[2] *FEMA: Prioritizing a Culture of Preparedness: Hearing Before the S. Comm. on Homeland Sec. and Gov't Affairs*, 115th Cong. 43, 5 (2018) (testimony of William "Brock" Long, Administrator of the Fed. Emerg. Mgmt. Agency), available at https://www.govinfo.gov/content/pkg/CHRG-115shrg32452/pdf/CHRG-115shrg32452.pdf.

Investment and Jobs Act (IIJA). *See* Pub. L. No. 117-58, 135 Stat. 429, 1387 (2021). In doing so, Congress required FEMA to make at least $200 million available for BRIC grants for each of fiscal years 2022, 2023, 2024, 2025, and 2026, in addition to the amounts FEMA set aside in the Mitigation Fund. *See id.* (providing that "in addition to amounts set aside pursuant to . . . 42 U.S.C. § 5133 . . . $200,000,000 . . . *shall* be made available" for each of fiscal years 2022, 2023, 2024, 2025, and 2026) (emphasis added). And since then, Congress has continued to appropriate funds for specific BRIC projects through Congressionally directed spending. *See, e.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 608 (2024) (appropriating approximately $191 million "for pre-disaster mitigation grants under . . . 42 U.S.C. § 5133(e)").

## B.    The Modern BRIC Program

Following Congress's passage of the DRRA, the modern BRIC program works as follows: FEMA estimates the total cost of certain post-disaster grants and then uses that number to determine how much money it can set aside for BRIC and move into the Mitigation Fund. *See* 42 U.S.C. § 5133(i)(1). To ensure that the BRIC set aside does "not reduce the amounts otherwise made available for" post-disaster grants, FEMA factors BRIC funding into its annual appropriations requests and lists BRIC as a separate line item in its budget estimates. *Id.* § 5133(i)(3); *see also* William L. Painter, Cong. Rsch. Serv. R45484, The Disaster Relief Fund: Overview and Issues 31 (2024) ("In FY2020, FEMA began to request funding for the statutorily established set-aside for the [BRIC] program . . . . The law, as it requires there to be no reduction in [post-disaster] grants as a result of the set-aside, implies the need for additional funding."); *see, e.g.*, SMF ¶ 2; Chung Decl., Exs. 1-5.

After Congress appropriates the funds, FEMA sets them aside into the Mitigation Fund. *See* 42 U.S.C. § 5133(i)(1). Once the funds are set aside, they must remain in the Mitigation Fund.

*Id.* § 5133(f)(3) (providing that any funds withdrawn from selected projects must be used for BRIC grants the next year); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 503(d)(2), 138 Stat. 460, 615 (2024) (barring Defendants from reprogramming or transferring funds "to increase or decrease funding for grant programs").

FEMA then issues a notice of funding opportunity (NOFO) setting out the amount of BRIC funding available for that year, the criteria the agency will apply in selecting projects, and the application instructions. *See* SMF ¶¶ 7-12. States invest a substantial amount of time and resources developing and preparing BRIC applications, SMF ¶¶ 3, 88 and then FEMA selects the most promising projects while ensuring that each eligible state is allocated at least the minimum amount of funding required by law, and that no one state receives too much funding. *See* 42 U.S.C. § 5133(f)(2).

Once projects are selected, states often then go through months or years of costly planning, permitting, environmental review, and stakeholder engagement before a final grant agreement is signed and the funds are fully obligated. SMF ¶ 5. To ensure that BRIC funds remain available to states through this process, Congress provided that once projects are selected—*i.e.*, once BRIC funds are allocated to States—Defendants cannot withdraw them unless the funds "remain unobligated by the end of the third fiscal year after the fiscal year for which the amounts were allocated[.]" 42 U.S.C. § 5133(f)(3)(A). And even if funds are then withdrawn, FEMA must return them to the Mitigation Fund and make them "available to be awarded on a competitive basis" the next fiscal year. *Id.* § 5133(f)(3)(B). Once a project receives final approval, FEMA obligates the funds. *See* SMF ¶ 6.

## C.    Defendants Suddenly Shut Down the BRIC Program

Although the first Trump Administration expanded the BRIC program, the second Trump Administration has expressed hostility toward FEMA from the start. Just four days after being

6

sworn into office, President Trump told reporters, "I think we're going to recommend that FEMA go away."[3] That same day, he issued an Executive Order creating a Council to Assess the Federal Emergency Management Agency, which is supposed to perform "a full-scale review" of FEMA and "recommend to the President improvements or structural changes" to the agency. Exec. Order No. 14,180, 90 Fed. Reg. 8743 (Jan. 24, 2025). Then, in a televised cabinet meeting on March 24, 2025, DHS Secretary Kristi Noem announced, "we're going to eliminate FEMA."[4]

The next day, Secretary Noem, former Trump campaign manager Corey Lewandowski, and Cameron Hamilton, then the so-called "Senior Official Performing the Duties of FEMA Administrator," met and "debated the possibility of rescinding President Donald Trump's recent executive order establishing a FEMA Review Council and instead moving more quickly to dismantle the agency."[5] At that meeting, Defendants discussed "narrowing . . . FEMA's mission dramatically" by "narrowing the agency's responsibilities to helping survivors in the immediate aftermath of disasters."[6] Specifically, Secretary Noem said "she wants to eliminate FEMA's role in funding long-term rebuilding efforts and halt multibillion-dollar grants programs that help communities prepare for disasters."[7] When reached for comment, a DHS spokesperson essentially confirmed the reporting: "We are grateful the press is covering Secretary Noem's efforts to eliminate waste, fraud, and abuse within the Department of Homeland Security."[8]

On April 2, 2025, Mr. Hamilton sent a memo to a subordinate directing the termination of the BRIC program (the Hamilton Memo). *See* SMF ¶ 21; ECF No. 96 (Administrative Record) at

---

[3] Zack Colman, *Trump's talking about shutting down FEMA. Republicans hate that idea.*, Politico, Feb. 2, 2025, https://www.politico.com/news/2025/02/02/republicans-trump-fema-disasters-00201983.
[4] Thomas Frank, *FEMA on the chopping block*, E&E News by Politico, Mar. 26, 2025, https://www.eenews.net/articles/fema-on-the-chopping-block.
[5] Gabe Cohen, *'We're not preparing': As Trump officials vow to eliminate FEMA, the agency is already in turmoil*, CNN, Mar. 26, 2025, https://www.cnn.com/2025/03/26/politics/ fema-payments-staffing-stalled-turmoil/index.html.
[6] Frank, *supra* n.5.
[7] *Id.*
[8] *Id.*

43. Two days after that, Defendants issued a press release entitled "FEMA Ends Wasteful, Politicized Grant Program, Returning Agency to Core Mission of Helping Americans Recovering from Natural Disasters," in which they announced that "FEMA is ending the [BRIC] program." SMF ¶ 22; ECF No. 96 at 55. Defendants acknowledged that Congress had appropriated $1 billion toward the BRIC program through the IIJA but announced that they would not spend those funds as Congress instructed. ECF No. 96 at 55. Instead, they said they would be withholding the funds and returning roughly $882 million to the U.S. Treasury. *Id.* Defendants also said that FEMA would move BRIC funds out of the Mitigation Fund and use them for post-disaster programs. *Id.*

Four days later, Mr. Hamilton signed off on a "Decision Memo" confirming the earlier announcements and stating that "[n]o additional funding would be authorized." SMF ¶ 25; ECF No. 96 at 56-60. That memo acknowledged that under Defendants' new policy, "States would not be able to complete a large number of projects within their communities, leaving projects unfunded and natural hazard risk reduction would not be achieved." ECF No. 96 at 58. About two weeks after that, Defendants issued an "Update on FEMA Ending the Building Resilient Infrastructure and Communities Program" that provided more detail about how FEMA would implement the Hamilton Memo. SMF ¶ 23; ECF No. 96 at 63. Specifically, Defendants announced:

- "[T]he Fiscal Year 2024 BRIC funding opportunity is cancelled, no applications submitted will be reviewed and no funds will be awarded."
- "Recipients will be able to complete fully obligated projects that have started construction and will be able to expend all associated funds."
- "Fully obligated projects that have *not* started construction will not be approved and will end."
- "FEMA will not be extending project deadlines without the Senior Official Performing the Duties of the FEMA Administrator's approval."
- "For previous funding cycles, FEMA will cancel all of the BRIC projects selected but not obligated across fiscal years 2020-2023."

- "Management costs will only continue for partially or fully obligated projects."

ECF No. 96 at 63-64.

Consistent with the public announcements, internal agency documents show that Defendants treated these as final decisions to be implemented. For instance, Defendants created detailed communication plans and talking points to accompany both the Hamilton Memo and the "Update," which involved communicating the BRIC termination to every level of FEMA, seven congressional committees, every congressional office, all 50 States, at least 25 affected interest groups, and the public. SMF ¶¶ 24, 26; ECF No. 96 at 47-54, 67-77. And internal documents confirm that "[n]o additional funding would be authorized," *id.* at 56, "[n]o new projects or additional phases will be awarded," *id.* at 102, "[n]o additional BRIC funding opportunities will occur annually," *id.* at 74, and that "[w]ith the [BRIC] program ending, FEMA leadership has instructed the agency to no longer set-aside 6% from the Disaster Relief Fund" for BRIC, *id.* at 53. *See* SMF ¶¶ 24-26, 28-29.

FEMA staff then confirmed to Plaintiffs that Defendants had cancelled BRIC and were implementing the Hamilton Memo. *See generally* SMF ¶¶ 30-43. For example:

- FEMA staff sent e-mails attaching the Hamilton Memo with subject lines like "FEMA Cancels Building Resilient Infrastructure and Communities Fiscal Year 2024 Funding Opportunity and will End the Program" and "FEMA Ends Wasteful, Politicized Grant Program, Returning Agency to Core Mission of Helping Americans Recovering From Natural Disasters." *See* SMF ¶¶ 30, 34; Chung Decl., Ex. 20 ¶ 27 p. 17; Ex. 37 ¶ 7, p. 13;

- FEMA staff sent e-mails stating that "FEMA has announced the cancellation of the [BRIC] program," "FEMA is conducting a full analysis to close out the BRIC program," and "[e]ffective immediately, FEMA will implement the following actions," listing the actions in the Hamilton Memo, and offering "support throughout the wind-down process." SMF ¶ 36; *see* Chung Decl., Ex. 21 ¶¶ 22-24, pp. 16-18; Ex. 25 ¶ 8, pp. 9-10; Ex. 31 ¶ 9, pp. 12-13;

- FEMA staff sent e-mails attaching lists of Plaintiffs' "BRIC projects selected between FY20-FY23 that have not been awarded *and will not be awarded* in alignment with the April 2, 2025 memo from the Senior Official Performing the Duties of the FEMA

9

Administrator, Cameron Hamilton." SMF ¶ 38; Chung Decl., Ex. 26 ¶ 7, pp. 11, 17-19 (emphasis added); Ex. 40 ¶ 6, pp. 11, 17-18; *see* Ex. 30 ¶ 19, p. 17.

FEMA staff also held meetings with Plaintiffs about their implementation of the BRIC Termination. *See, e.g.*, Chung Decl., Ex. 23 ¶¶ 9-10 (discussing meeting where FEMA staff member "read a statement by headquarters reaffirming language in the April 4, 2025 FEMA advisory"); Ex. 39 ¶ 9 (describing meeting during which FEMA "outlined the next steps for the BRIC wind-down process"). And DHS's Office of Inspector General contacted at least one Plaintiff to "discuss the effects" that "the recent cancellation of FEMA's BRIC grant program… [has] had on your state." SMF ¶ 43; Chung Decl., Ex. 25 ¶ 9, pp. 12-13.

A few weeks after Defendants announced BRIC would be ending, Mr. Hamilton testified to Congress that he did "not believe that it is in the best interests of the American people to eliminate the Federal Emergency Management Agency," and he was fired the next day.[9] ECF No. 89 ¶ 124. Secretary Noem then appointed David Richardson, who had no emergency management experience, to act as Administrator. ECF No. 96 at 78-79. About a week later, Mr. Richardson sent a memo to Secretary Noem (produced for the first time after the preliminary injunction hearing) acknowledging that "FEMA announced the termination of the BRIC Program on April 4, 2025" and that "FEMA began activities to close out the BRIC program." SMF ¶ 28; ECF No. 96 at 102-03. Mr. Richardson requested that Secretary Noem approve his recommendation that "[n]o new projects or additional phases will be awarded" and that the "remaining $854M" in BRIC funding that Congress required Defendants to make available through the IIJA "will not be awarded" and

---

[9] *Oversight Hearing – The Federal Emergency Management Agency, Hearing before the H. Appropriations Subcomm. on Homeland Security,* 119th Cong. (May 7, 2025) (statement of Cameron Hamilton, Acting Administrator, FEMA), at 1:10:20, *available at* Appropriations Committee, U.S. House of Representatives, https://appropriations.house.gov/schedule/hearings/oversight-hearing-federal-emergency-management-agency.

"will remain unspent at FEMA." ECF No. 96 at 102-103. Secretary Noem signed off on the plan. *Id.* at 102; SMF ¶ 29.

Two months later, Mr. Richardson represented to this Court, under penalty of perjury, that "the Secretary of Homeland Security has not made a final decision to end the BRIC program." ECF No. 96 at 109 ¶ 11. He did not mention this memo.

## D.    Defendants Implement the BRIC Termination

As Mr. Richardson acknowledged in his internal memo (but not in his declaration), Defendants have implemented the BRIC Termination.[10] ECF No. 96 at 102-03. Defendants said that they would "not award the BRIC projects selected but not yet awarded across all fiscal years," *id.* at 43, and since then, Defendants *have not awarded a single BRIC project*, compared with roughly 186, 152, and 167 over the same time period in the last three years. Chung Decl., Ex. 19 ¶¶ 8-9; *see* SMF ¶¶ 50-53, 73. Defendants said that BRIC funds would be reallocated to post-disaster grants, ECF No. 96 at 55, 66, and then shifted the entire balance of the BRIC set-aside from the Mitigation Fund to the Major Declarations Fund to be used on post-disaster programs. SMF ¶ 44; ECF No. 96 at 86, 101 (reversing $4.071 billion from BRIC set aside into Major Declarations Fund); SMF ¶ 104; Chung Decl., Ex. 13 at 4 (Hamilton testimony to Congress: "[W]e've increased resources for disaster response and recovery, making available within the DRF funds that were previously set-aside for [BRIC] projects . . . ."); ECF No. 96 at 52 (stating that funds for 694 selected or partially obligated projects "will be retained in the Disaster Relief Fund to assist with disaster response and recovery").

---

[10] The "BRIC Termination" consists of the Hamilton Memo (ECF No. 96 at 43-44), the April 8, 2025 Decision Memo signed by Cameron Hamilton (ECF No. 96 at 56-60), the May 16, 2025 Decision Memo signed by Secretary Noem (ECF No. 96 at 102-04), and any steps to implement them.

Defendants said that "further obligations for [phased/partially obligated] projects" would "only support pre-construction activities," *id.* at 43-44, and acknowledged in internal documents that these projects "will progress to the next Phase 1 milestone and end," *id.* at 53, 73, that "progression to phase 2 will not be authorized," *id.* at 52, 72, and that "[n]o additional funding will be awarded for these projects to proceed through construction and closeout," *id.* at 53, 73. Since then, Defendants have not allowed a single phased project for any of the 23 Plaintiffs to move to the construction phase. *See* SMF ¶¶ 54, 74.

Defendants said that they would "[n]ot grant any additional period of performance extensions on any BRIC projects, without [the Senior Official Performing the Duties of the Administrator's] prior approval," ECF No. 96 at 43, and Defendants are channeling these requests to David Richardson, *id.* at 110 ¶ C; ECF No. 89 ¶ 109.

And Defendants said that they were "ending the [BRIC] program," ECF No. 96 at 55, that since "the program is concluding, the Fiscal Year 2024 BRIC funding opportunity is cancelled, no applications submitted will be reviewed and no funds will be awarded," *id.* at 63, 75, and that "[n]o additional BRIC funding opportunities will occur annually," *id.* at 74. Sure enough, Defendants cancelled the 2024 NOFO, did not issue a 2025 NOFO, and did not make funds available for either year. SMF ¶¶ 44-48; ECF No. 89 ¶¶ 108, 112; ECF No. 96 at 109 ¶ 11(A). Defendants have also cancelled BRIC Direct Technical Assistance (DTA), a non-financial program through which FEMA assigned experts to work directly with communities and help them apply for BRIC funding. SMF ¶¶ 4, 42, 49.

The result has been that, aside from the few projects Defendants are allowing to wrap up as BRIC winds down, the program has been at a standstill for months.

### III.    ARGUMENT

Summary judgment is proper when there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). "A genuine issue of fact exists where the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 24 (1st Cir. 2009) (quotation omitted). The non-moving party must "present affirmative evidence" to support any alleged dispute of fact.  *Bennett v. Murphy*, 166 F. Supp. 3d 128, 143 (D. Mass. 2016). "[C]onclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact. *Sullivan v. City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009) (quotation omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (requiring more than "a scintilla of evidence" to create a genuine dispute of material fact).

For APA claims, "the traditional Rule 56 standard does not apply; rather, a motion for summary judgment is simply a vehicle to tee up a case for judicial review." *Littlefield v. U.S. Dep't of Interior*, 656 F.Supp.3d 280, 290 (D. Mass. 2023) (citations and quotations omitted). Under the APA, courts must set aside agency action that is "not in accordance with law[,]" "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. §§ 706(2)(A)-(C). Therefore, "an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was . . . unlawful." *Ass'n of Am. Univs. v. NSF*, No. 1:25-CV-11231-IT, --- F.Supp.3d ----, 2025 WL 1725857, at *6 (D. Mass. June 20, 2025) (citations and quotations omitted).

### A.    The Court Has Jurisdiction
#### 1.  Defendants' threshold jurisdictional arguments fail

The Court properly rejected Defendants' jurisdictional arguments. First, the Court correctly held that the Stafford Act's discretionary immunity provision does not apply, as that statute provides immunity only for certain discretionary decisions; it does not allow Defendants to flout Congress's directives or the Constitution. *See* ECF No. 79 (PI Order) at 9-10; 42 U.S.C. § 5148; *Rosas v. Brock*, 826 F.2d 1004, 1008 (11th Cir. 1987) ("[A]dherence to constitutional guidelines is not discretionary; it is mandatory. Accordingly, section 5148 does not deprive the federal courts of jurisdiction of Rosas's constitutional claims; and the district court erred in dismissing those claims."); *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) ("An agency is not free simply to disregard statutory responsibilities . . . ."). Second, the Court correctly held that the Tucker Act does not apply because the Plaintiffs "do not assert any contract-based claims or seek any contractual remedies." ECF No. 79 at 9, n.1. Plaintiffs' claims are instead based on the Constitution and on statutes barring Defendants from substantially reducing FEMA's mitigation functions, repurposing or withholding funds, and acting through unlawfully appointed officials. *See* ECF No. 85 (Amended Complaint) ¶¶ 214-305.

### 2.   The BRIC Termination is final agency action reviewable under the APA

The BRIC Termination, and the steps taken to implement it, are final agency actions reviewable under the APA. To be considered "final" for purposes of the APA, an agency action must generally meet two criteria: (1) it "must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and (2) "the action must be one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation modified). This "inquiry seeks to distinguish a tentative agency position from the situation where the agency views its deliberative process as sufficiently final to demand compliance with its announced position."

*Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990) (citation modified) (quoting *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986)).

a.        **The BRIC Termination is final, not tentative or interlocutory**

The BRIC Termination possesses all the hallmarks of final agency action. To start, the Hamilton Memo was issued by the acting head of FEMA, and its contents were circulated to every level of the agency, seven congressional committees, every congressional office, all 50 States, at least 25 affected interest groups, and the public. *See, e.g.*, ECF No. 96 at 47-54, 67-77. These are not steps one takes for tentative proposals over which the agency is still deliberating.

Moreover, the Hamilton Memo uses definitive and mandatory language throughout: FEMA "*will cancel*" the Fiscal Year 2024 NOFO, "*will not award* the BRIC projects selected but not yet awarded across all fiscal years," and "*will not* grant any additional period of performance extensions on any BRIC projects without [Hamilton's] prior approval." ECF No. 96 at 43-44 (emphasis added). Indeed, for partially obligated/phased projects, it says, "*I am directing* that further obligations for this class of projects only support pre-construction activities." *Id.* (emphasis added). In other words, the Memo "commands, it requires, it orders, it dictates." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000); *see also Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) ("[T]he mandatory language of a document alone can be sufficient to render it binding[.]"); *Pub. Emps. for Env. Resp. v. NPS*, 2021 WL 1198047, *8 (D.D.C. March 30, 2021) (holding that memo's "mandatory—not tentative—language" and the fact that it "emanated from one of the highest-ranking officials at the NPS" demonstrated finality). Unsurprisingly, then, agency staff also understood the Memo to be their "marching orders." *Appalachian Power*, 208 F.3d at 1023. *See* ECF No. 96 at 48 (External Affairs guidance characterizing the Hamilton Memo as a "Directive . . . to Cancel Fiscal Year 2024 funding opportunity and end the BRIC program");

*see, e.g.*, Chung Decl., Ex. 25 ¶ 8, pp. 9-10 (stating that Hamilton "directed the agency to cancel the Fiscal Year 2024 BRIC funding opportunity and to end [DTA]"); Ex. 40 ¶ 6, pp. 11, 17-18 (listing selected BRIC projects "that have not been awarded and will not be awarded in alignment with the [Hamilton Memo]"); *see generally* SMF ¶¶ 30-42.

Further, as the Court already found, "the agency has taken affirmative steps to give effect to the termination announcements." ECF No. 79 at 12; *see also* ECF No. 96 at 102-03 (Richardson acknowledging that "FEMA began activities to close out the BRIC program"); *see supra* § II.D (detailing numerous steps). That Defendants have treated the Hamilton Memo as binding and are implementing it confirms that the agency action is final. *See New York v. Kennedy*, No. 25-1780, --- F.4th ----, 2025 WL 2658233, at *5 (1st Cir. Sept. 17, 2025) (agency announcement that "was followed, just days later, by the Department's dismantling of sub-agencies and a [reduction-in-force] impacting 10,000 employees" was final); *Appalachian Power*, 208 F.3d at 1021 ("If an agency acts as if a document issued at headquarters is controlling in the field . . . then the agency's document is for all practical purposes binding.") (citation modified); *Pub. Emps. for Env't Resp.*, 2021 WL 1198047, at *9 ("the fact that over 380 NPS park units 'fell in line' and adopted the[] measures" demonstrated memo was final).

### b. The BRIC Termination has determined rights and obligations and had legal consequences

As the foregoing demonstrates, the BRIC Termination also determined rights and obligations and had legal consequences. As an initial matter, the Hamilton Memo bound agency staff, and thus determined obligations for the agency itself. *See Biden v. Texas*, 597 U.S. 785, 807-09 (2022) (memo that "bound DHS staff" was final agency action); *NRDC v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011) ("[T]he Guidance binds EPA regional directors and thus qualifies as final agency action."); *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 149 (D.D.C. 2020)

("*Bennett's* second prong is satisfied by legal consequences that affect only the agency itself.") (citing *Sierra Club v. Trump*, 929 F. 3d 670, 698 n.23 (9th Cir. 2019)).

Further, most of Plaintiffs' projects depending on FEMA approvals and funding cannot get them, and thus are now frozen, and—but for this Court's preliminary injunction—the money that is supposed to fund these projects would have been spent on other programs, potentially leaving Plaintiffs with little recourse. *See* SMF ¶¶ 50-56, 73-75. Meanwhile, the period of performance on these projects continues to run, leaving Plaintiffs with less time to actually use the BRIC funds allocated to them. *See* Chung Decl., Ex. 38 ¶ 41; *see Her Majesty the Queen in Right of Ontario*, 912 F.2d at 1531 (recognizing that "administrative inaction" can have "the same impact on the rights of the parties as an express denial of relief,"). And Defendants' refusal to make any more funds available means Plaintiffs cannot secure BRIC awards for fiscal years 2024, 2025, and 2026. *See* SMF ¶¶ 44-48, 87-89.

**B.    The BRIC Termination is Unlawful**

**1.    Defendants are substantially reducing FEMA's mitigation functions and capabilities without Congressional authorization (Counts I, II, IX)**

The BRIC Termination is unlawful because it flatly contravenes Congress's direction that Defendants not substantially reduce FEMA's mitigation functions. *See* ECF No. 79 at 11 n.2 (noting, in light of clear statutory language, that Defendants "wise[ly]" did not dispute that Plaintiffs "substantively established a likelihood of success on the merits of their claims").

Executive Branch agencies' "power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). That means an agency "literally has no power to act . . . unless and until Congress confers power upon it," *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), and that an agency "may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress," *In re*

*Aiken County*, 725 F.3d 255, 260 (D.C. Cir. 2013). When agencies "act improperly" or "beyond their jurisdiction, what they do is ultra vires." *City of Arlington*, 569 U.S. at 297.

Here, not only has Congress not authorized Defendants to shut down the BRIC program, Congress has barred it. In 2006, Congress determined that one of the key reasons FEMA was unprepared for Hurricane Katrina was that DHS leadership had rejected the concept of "integrated emergency management," which posits that the most effective way to minimize damage from disasters is for a single agency to engage in four interrelated functions: mitigation, preparation, response, and recovery. S. Rep. No. 109-322, at 221–22 (2006); *see also* H.R. Rep. No. 109-377, at 151 (2006) ("The four cornerstones to comprehensive emergency management—preparedness, response, recovery, and mitigation—are interdependent and all vital to successful emergency management."). Instead of following this approach, DHS had stripped FEMA of its preparedness responsibilities and assigned them to others within DHS. S. Rep. No. 109-322, at 221–22. Congress concluded that this "was a serious mistake" and that "preparedness, response, recovery, and mitigation require synergy," so FEMA must engage in all four functions. *Id.*; *see* 6 U.S.C. § 313(b)(2)(D) (requiring FEMA Administrator "to integrate [FEMA's] emergency preparedness, protection, response, recovery, and mitigation responsibilities").

To ensure that Defendants could not countermand that judgment, Congress provided by law that *all* of these functions, including mitigation, are core components of FEMA's mission. *See* 6 U.S.C. § 313(b)(1) (setting out FEMA's mission to include "leading and supporting" a "comprehensive emergency management system of preparedness, protection, response, recovery, *and mitigation*") (emphasis added); *id.* § 313(b)(2) (requiring FEMA Administrator to engage in mitigation); *id.* § 314(a)(9)(A) (same). And Congress barred Defendants from "substantially or significantly" "reduc[ing]" FEMA's "authorities, responsibilities, or functions" or "the capability

of [FEMA] to perform those missions, authorities, [or] responsibilities, except as otherwise specifically provided in an Act enacted after October 4, 2006." *Id.* § 316(c)(1).

Congress has not enacted any law after October 4, 2006 specifically authorizing Defendants to substantially reduce FEMA's mitigation functions or to shut down the BRIC program. In fact, Congress's approach has been the opposite: in the nineteen years since Congress barred Defendants from substantially reducing FEMA's mitigation functions, Congress has appropriated billions of dollars toward the program and provided it with a new funding stream.[11] And at every turn, Congress has concluded that FEMA needs to engage in *more* pre-disaster mitigation to fulfill its mission, not less. *See, e.g.*, S. Rep. No. 115-446, at 3 (2018) ("The *under-utilized* method of disaster management through mitigation offers the potential to minimize the impact of disasters on citizens while decreasing Federal spending.") (emphasis added).

Under any reasonable definition of the term, Defendants' shuttering of FEMA's largest and most versatile pre-disaster mitigation program "substantially" reduces FEMA's mitigation functions and capabilities. *See* Substantial, *Black's Law Dictionary* (12th ed. 2024) (defining "substantial" as "material," "important," and "considerable in extent, amount, or value"); Substantial, Concise Oxford English Dictionary (12th ed. 2011) ("Of considerable importance, size, or worth"); Substantial, Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/substantial (last visited July 14, 2025) ("large in size, value, or importance").

FEMA administers only three significant disaster mitigation grant programs: (1) the BRIC program, (2) the Flood Mitigation Assistance program, and (3) the Hazard Mitigation Grant program. *See* 42 U.S.C. §§ 5133, 4104c, 5170c. Eliminating any one of these programs would substantially reduce FEMA's mitigation functions and capabilities, but given the unique and

---

[11] *See supra* § II.A; Jared T. Brown, Cong. Rsch. Serv., RL34537, FEMA's Pre-Disaster Mitigation Program, Overview and Issues 5 (2014).

important role BRIC plays in FEMA's mitigation efforts, eliminating BRIC is especially damaging. BRIC is FEMA's flagship pre-disaster mitigation grant program. Prior to the Termination, BRIC provided a substantial portion of FEMA's pre-disaster mitigation funding, and it is FEMA's *only* annual pre-disaster mitigation grant program that has allowed communities in all fifty states to fortify against a wide variety of natural disasters before they strike.

The Flood Mitigation Assistance Program (FMA) is FEMA's only other significant pre-disaster mitigation grant program, but it is much more limited than BRIC. Unlike BRIC grants, which can be used to mitigate against a wide variety of disasters, FMA grants are limited to protecting communities and structures covered by federal flood insurance programs against flooding. *See* 42 U.S.C. §§ 4104c(a), (c)(2)(A)(ii); 44 C.F.R. § 77.6(c); *see, e.g.*, SMF ¶ 14; Chung Decl., Ex. 18 at 2 (FMA grants available only "to reduce the risk of repetitive flood damage to buildings insured by the National Flood Insurance Program (NFIP)"). So FMA does little to mitigate against a wide variety of disasters, such as earthquakes, wildfires, tornadoes, extreme heat, or winter storms. Eliminating BRIC also substantially reduces the funding available for pre-disaster mitigation. As the table below shows, BRIC has accounted for *nearly 70%* of the funds FEMA made available for pre-disaster mitigation over the past five years. While much smaller reductions would also be substantial, eliminating 70% of the funding for this important work undoubtedly meets the mark.

| Fiscal Year | BRIC[12] | FMA[13] |
|:---:|:---:|:---:|
| 2020 | $500 Million | $160 million |
| 2021 | $1 Billion | $160 million |
| 2022 | $2.295 Billion | $800 million |

---

[12] *See* SMF ¶¶ 7-12.
[13] *See* SMF ¶¶ 14-19.

| 2023 | $1 Billion | $800 million |
|------|-----------|-------------|
| 2024 | $750 Million | $600 million |
| **Total** | **$5.545 Billion** | **$2.72 Billion** |

The Hazard Mitigation Grant Program (HMGP) also differs materially from BRIC. HMGP is a *post*-disaster mitigation program, meaning that this funding is only available shortly after a major disaster or fire, and only if the administration allows it. *See* 42 U.S.C. § 5170c(a); 44 C.F.R. § 206.40(a). That means investments are determined based on where disasters happened to recently strike rather than based on rigorous analysis of the most protective mitigation measures. And since major disasters often strike with little warning, HMGP does not allow communities the same opportunity to plan for and implement the most protective measures, nor does it allow FEMA to allocate funds to where they will have the most impact, which are the main reasons Congress created and expanded the pre-disaster mitigation program in the first place. *See* S. Rep. No. 115-446, at 3 (2018) (citing GAO report concluding that "the federal government placed far too great an emphasis on post-disaster mitigation funding versus pre-disaster resilience efforts"); H.R. Rep. No. 106-40, at 11, 20 (1999) (concluding that "the only way to control post-disaster spending . . . is to increase pre-disaster funding" and lamenting that "the federal government still spends three dollars on post-disaster assistance for every dollar it spends on mitigation").

In short, Congress determined decades ago, when it codified the pre-disaster mitigation program, that FEMA's other mitigation programs alone do not suffice to fulfill FEMA's mitigation mission. Congress reaffirmed BRIC's importance in 2018, when it provided a new funding stream for the program, and again in 2021, when it appropriated another $1 billion toward it. Defendants' apparent disagreement with Congress does not allow them to adopt policies that "conflict with the

policy judgments that undergird the statutory scheme." *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994).

### 2. Defendants' repurposing of funds set aside for BRIC is unlawful (Counts III, IV, IX)

Defendants' attempt to take more than $4 billion in BRIC funds and spend them on other programs is also unlawful. When Congress authorized FEMA to set aside funds from the Disaster Relief Fund for the Mitigation Fund, it intended for those funds to be used for BRIC grants, not for other programs. So Congress took measures to ensure that funds that are set aside for BRIC are used for BRIC.

First, Congress provided that once projects are selected (*i.e.,* once funds are allocated to a State), Defendants cannot withdraw those funds unless they remain unobligated "by the end of the third fiscal year after the fiscal year for which the amounts were allocated[.]" 42 U.S.C. § 5133(f)(3). And even then, any withdrawn funds must be returned to the Mitigation Fund and reallocated to new BRIC projects the following year. *Id.*

Second, Congress barred Defendants from repurposing grant funds in its appropriations Acts. In 2024, Congress instructed Defendants that "no funds shall be reprogrammed within or transferred between appropriations . . . to increase or decrease funding for grant programs," and Congress has carried this restriction forward. Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 503(d)(2), 138 Stat. 460, 615 (2024); *see also e.g.*, Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101, 139 Stat. 9, 10 (2025) (appropriating funds "under the authority and conditions provided in applicable appropriations Acts for fiscal year 2024"). "Reprogramming" funds is "shifting funds within an appropriation or fund account to use them for purposes other than those contemplated at the time of

appropriation."[14]   At the time these funds were appropriated to the Disaster Relief Fund, both Congress and Defendants contemplated that Defendants would set aside funds to use for BRIC. In fact, Defendants stated as much in their budget estimates to Congress, and Congress appropriated the funds on that basis. *See* SMF ¶ 2; Chung Decl., Ex. 1 at 9-10; Ex. 2 at 8-9; Ex. 3 at 7-8; Ex. 4 at 8-9; Ex. 5 at 8-9. Defendants' efforts to reprogram the funds that were set aside for BRIC "decrease[s] funding" for the BRIC grant program and is therefore unlawful. *See* 6 U.S.C. § 316(d) (confirming that Defendants are required to follow restrictions in appropriations Acts).

### 3.  Defendants' withholding of funds appropriated for BRIC is unlawful (Counts V, VI, IX, X)

Defendants' withholding of funds Congress appropriated directly for BRIC is illegal too. "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018). Doing so "violates the constitutional principle of the Separation of Powers," the Appropriations Clause, and the Spending Clause. *Id.*

Here, Congress appropriated funds directly to the BRIC program and ordered Defendants to make them available: "$200,000,000 *shall* be made available" for each of fiscal years 2022, 2023, 2024, 2025, and 2026. IIJA, Pub. L. No. 117-58, 135 Stat. 429, 1387 (2021) (emphasis added). Defendants have no lawful authority to ignore that mandate, *In re Aiken County*, 725 F.3d at 260, yet they have announced that that is what they are doing: "Approximately $882 million of funding from the Infrastructure Investment and Jobs Act will be returned to the U.S. Treasury." ECF No. 96 at 55; *see also id.* at 102-04 (internal "Decision" memo signed and approved by

---

[14] U.S. Gov't Accountability Off., GAO-05-734SP, A Glossary of Terms Used in the Federal Budget Process 85 (2005), https://www.gao.gov/assets/gao-05-734sp.pdf.

Secretary Noem stating that $854 million in IIJA funding "will not be awarded" and "will remain unspent at FEMA").

Defendants' refusal to make these funds available as required also constitutes agency action "unlawfully withheld" under the APA. 5 U.S.C. § 706(1). To establish an "unlawfully withheld" claim, a plaintiff must show that "an agency failed to take a *discrete* agency action that it is *required* to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Here Defendants are required by the IIJA to make BRIC funds available for fiscal years 2024, 2025, and 2026, and they have flatly refused to do so.

### 4. Cameron Hamilton and David Richardson were unlawfully appointed so their implementation of the BRIC Termination is unlawful (Counts VII, VIII, IX)

Not only does the BRIC Termination violate these laws, but Mr. Hamilton was not lawfully acting as the FEMA Administrator when he gave the order to shut down the program. The Constitution's Appointments Clause provides the "exclusive means" of appointing Officers of the United States. *Lucia v. SEC*, 585 U.S. 237, 244 (2018). That Clause provides that principal "Officers of the United States" may be appointed only if they are nominated by the President "by and with the Advice and Consent of the Senate." U.S. Const. art. II, § 2, cl. 2. This "is also the default manner of appointment for inferior officers," which applies unless Congress authorizes the President, "Courts of Law," or the head of a department to appoint the inferior officer. *Edmond v. United States*, 520 U.S. 651, 660 (1997); U.S. Const. art. II, § 2, cl. 2.

FEMA's Administrator is an Officer of the United States because the Administrator's duties on behalf of the United States are ongoing, and not occasional or temporary, and the Administrator exercises significant authority on behalf of the United States. *See Lucia*, 585 U.S. at 245-46. The Administrator is responsible for "lead[ing] the Nation's efforts to prepare for, protect against, respond to, recover from, and mitigate against the risk of natural disasters."

6 U.S.C. § 313(b)(2)(A). In doing so, the Administrator oversees a multi-billion-dollar annual budget, and a workforce in the thousands. SMF ¶¶ 102-103; Chung Decl., Ex. 11 at 2; Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 607–609 (2024). FEMA's Administrator must therefore be nominated by the President and confirmed by the Senate unless the Administrator is an inferior officer and Congress has selected another permissible method of appointment. U.S. Const., art. II, § 2, cl. 2. But Congress has not done so. Instead, Congress doubled down on the default rule: "The Administrator shall be appointed by the President, by and with the advice and consent of the Senate." 6 U.S.C. § 313(c)(1).

Mr. Hamilton was not nominated by the President or confirmed by the Senate, nor was he lawfully appointed to act as Administrator temporarily, so he had no lawful authority to exercise the authority of the FEMA Administrator when he terminated BRIC. Congress has provided the "*exclusive* means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive Agency . . . for which appointment is required to be made by the President, by and with the advice and consent of the Senate" through the Federal Vacancies Reform Act of 1998 (FVRA). 5 U.S.C. § 3347(a) (emphasis added). The FVRA provides that when a Presidentially-nominated and Senate-confirmed officer resigns, the "first assistant to the office" automatically becomes the acting officer unless "the President (and only the President)" directs either another Presidentially nominated and Senate-confirmed person to temporarily fill the role or appoints a senior officer or employee of the agency who was in that position for at least "90 days" in "the 365-day period preceding the date of" the resignation. *Id.* § 3345(a).

Defendants admit that Mr. Hamilton did not satisfy any of these criteria. *See* ECF No. 89 ¶¶ 120, 123. On January 20, 2025, when President Biden's outgoing FEMA Administrator resigned, Mr. Hamilton was not the first assistant to the FEMA Administrator, he had not been

nominated by the President and confirmed by the Senate to any office, and he was not a senior officer or employee at FEMA or DHS for at least 90 days in the year preceding the vacancy. *See generally* SMF ¶¶ 90-95. Instead, during the year prior to the vacancy, Mr. Hamilton was the Director of Business Strategy at a consulting firm called ProSoDel, LLC and a candidate for Congress. ECF No. 89 ¶ 123. Mr. Hamilton thus could not lawfully act as FEMA Administrator, and his termination of the BRIC program should be declared void and set aside. *See Lucia*, 585 U.S. at 251 (holding that plaintiffs who make successful Appointments Clause challenges are "entitled to relief"); *Ryder v. United States*, 515 U.S. 177, 182–83 (1995) (holding same and that "[a]ny other rule would create a disincentive to raise Appointments Clause challenges"); *Noel Canning v. NLRB*, 705 F.3d 490, 493 (D.C. Cir. 2013) (declaring actions taken by unlawfully appointed NLRB board members "void *ab initio*" and vacating challenged order), *aff'd* 573 U.S. 513 (2014); *United States v. Trump*, 740 F.Supp.3d 1245, 1303 (S.D. Fla. 2024) (holding that "the appropriate remedy is invalidation of the officer's *ultra vires* acts").

The current acting Administrator, David Richardson, also has no lawful authority to implement the BRIC Termination as he, too, was unlawfully appointed. Defendants admit that Mr. Richardson was not nominated by the President or confirmed by the Senate, nor does he meet the criteria set out by the FVRA: he was not the first assistant to the FEMA Administrator on January 20, 2025, he had not been nominated by the President and confirmed by the Senate to any office at that time, and he was not a senior officer or employee at FEMA or DHS for at least 90 days in the 365 days preceding the vacancy.[15] SMF ¶¶ 96-100.

---

[15] Although Mr. Richardson was a senior officer at DHS before Mr. Hamilton was fired, the relevant lookback period under the FVRA is the "period preceding the date of . . . resignation . . . of the applicable officer"—*i.e.*, the time before the vacancy occurred—which was on January 20, 2025, when the outgoing FEMA Administrator resigned. 5 U.S.C. § 3345(a)(3)(A). Mr. Richardson was not a senior official at FEMA or DHS during that time. SMF ¶¶ 99-100; ECF No. 89 ¶ 125.

Making matters worse, Mr. Richardson was appointed by Secretary Noem, not the President, *id.* ¶ 101, in direct violation of the FVRA's express instructions that "only the President" may appoint an eligible acting officer, 5 U.S.C. §§ 3345(a)(2)-(3), and that agency heads, like Secretary Noem, may not rely on their "general authority . . . to delegate . . . or to reassign duties" to install an acting officer, *id.* § 3347(b). *See also United States v. Garcia*, No. 2:25-CR-00227-DGC-BNW, 2025 WL 2784640, *8 (D. Nev. Sept. 30, 2025) ("The FVRA also makes clear that general delegation powers cannot be used to fill vacancies."); *United States v. Giraud*, ---F.Supp.3d ----, 2025 WL 2416737, at *27 (D.N.J. Aug. 21, 2025) (same).

Defendants seem to have taken the position that they can sidestep the Appointments Clause by labeling the person acting as Administrator the "Senior Official Performing the Duties of the Administrator," but the Constitution is concerned with substance, not labels, and cannot be so easily evaded. *See Bullock v. U.S. Bureau of Land Mgmt.*, 489 F.Supp.3d 1112, 1125 (D. Mont. 2020) ("Federal Defendants' argument attempting to distinguish an 'Acting Director' from an 'official performing the Director's duties under the Secretary's delegation' represents a distinction without a difference."). Indeed, even Mr. Richardson has acknowledged that, regardless of the label, he is acting as Administrator: "I can't recall the full title, but essentially, I'm acting. I don't need the full title. All I need is the authority from the president to put me in here as some degree of acting and I will make sure that his intent gets completed."[16]

Because neither Cameron Hamilton nor David Richardson were appointed through the constitutionally required process, their termination of the BRIC program and implementation of that termination should be declared void, and Mr. Richardson should be enjoined from implementing it.

---

[16] Nicole Sganga, *New FEMA head tells staff: 'Don't get in my way… I will run right over you'*, CBS, May 9, 2025, https://www.cbsnews.com/news/fema-acting-administrator-david-richardson-staff-meeting.

**C.     The Court Should Vacate the BRIC Termination, Enter a Permanent Injunction, and Declare it Unlawful**

The APA directs that "a reviewing court shall . . . hold unlawful and set aside agency action" found to be unlawful. 5 U.S.C. § 706(2). The Court should thus vacate the BRIC Termination. *See Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs,* 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.") (citation modified) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)); *Env't Def. Fund v. Fed. Energy Regul. Comm'n*, 2 F.4th 953, 976 (D.C. Cir. 2021) ("vacatur is the normal remedy") (citation modified).

The Court should also issue a permanent injunction barring Defendants from carrying out the BRIC Termination and requiring them to resume operating the program. *See* 5 U.S.C. § 703 (authorizing injunctions under APA); *Armstrong v. Exceptional Child Care Ctr.*, 575 U.S. 320, 326-27 (2015) (recognizing courts' equitable authority to enjoin unlawful executive action); 5 U.S.C. § 706(1) (courts "shall . . . compel agency action unlawfully withheld"); *Oxfam Am., Inc. v. SEC*, 126 F. Supp. 3d 168, 176 (D. Mass. 2015) (compelling unlawfully withheld agency action).

To obtain a permanent injunction plaintiffs must generally establish success on the merits, irreparable harm for which damages are inadequate, and that the balance of the equities and public interest weigh in favor of an injunction. *See eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). The balance of the equities and the public interest impact "merge when the Government is the opposing party." *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). As detailed above, Plaintiffs have established success on the merits. The non-merits considerations weigh in favor of an injunction too.

First, Plaintiffs have been, and will continue to be, irreparably harmed absent injunctive relief because they cannot move forward with these critical, lifesaving projects unless the BRIC Termination is reversed. *See* SMF ¶¶ 50-59, 73-75, 77; ECF No. 96 at 58 (Defendants admitting that "States would not be able to complete a large number of projects within their communities, leaving projects unfunded and natural hazard risk reduction would not be achieved.").

As just one example, in April 2025, while severe flooding was ravaging Kentucky, the state learned of the BRIC Termination—and the potentially fatal impact it would have on the ongoing BRIC project that was specifically intended to address these floods:

> The City of Frankfort … is bisected by the Kentucky River. In April 2025, the Kentucky River flooded at the second highest level in the city's history, causing multiple deaths, destroying many homes, and impacting hundreds of residences, businesses, and government buildings. Through BRIC Phase 1 funding awarded in 2021, Frankfort had worked tirelessly with engineers and flood experts to identify the most effective flood protection for the city. The $10.5 million Phase 2 project to construct the protective features was scheduled to be awarded through BRIC upon completion of Phase 1 in late fall of 2025, but the Commonwealth and the city were notified by FEMA in April of 2025, while Frankfort was losing homes, businesses, and lives to flood waters, that the BRIC funding was cancelled. The flood recovery costs now facing Frankfort have depleted the fiscal capacity to put any of the Phase 2 measures in place, leaving Frankfort citizens gravely vulnerable if the BRIC program is not restored.

Chung Decl., Ex. 29 ¶ 7. These harms will be reduced or avoided if the BRIC program is restored and Plaintiffs' BRIC projects are allowed to move forward. Indeed, avoiding these harms is the central purpose of the BRIC program.

To make matters worse, the BRIC Termination may cause projects to lose funds from other sources, making it even harder for projects to move forward. SMF ¶ 80; *see, e.g.*, Chung Decl., Ex. 28 ¶ 11(b) ("[T]he bank financing the initial loan has paused its support for the project due to uncertainties about BRIC funding."). Communities may become ineligible for other FEMA grant programs due to the expiration of hazard mitigation plans that were supposed to be updated with BRIC funds that FEMA has not obligated. SMF ¶ 71; *see, e.g.*, Chung Decl., Ex. 21 ¶ 37; Ex. 30

¶ 24; Ex. 33 ¶¶ 6, 13; Ex. 43 ¶¶ 25-27. Indeed, one county's plan has since expired, rendering it ineligible for certain types of potential post-disaster grant funding following floods in August 2025. *See* Chung Decl., Ex. 43 ¶¶ 26-28.

And the longer the program remains frozen, the more the shutdown will "threaten the existence of" Plaintiffs' projects, which is irreparable harm. *Rhode Island v. Trump*, No. 25-1477, --- F.4th ----, 2025 WL 2621593, at *10 (1st Cir. Sept. 11, 2025); *Commodities Futures Trading Comm'n v. Brit. Am. Commodity Options Corp.*, 434 U.S. 1316, 1320 (1977) (being "driven out of business" is irreparable harm); *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (same); *see* SMF ¶¶ 77, 86. "When an . . . infrastructure project predicated on [federal funding] loses that funding—even, as Defendants insist, temporarily—that program runs the risk of dying on the vine." *Washington v. U.S. Dep't of Transp.*, No. 2:25-cv-00848-TL, --- F.Supp.3d ----, 2025 WL 1742893, at *28 (W.D. Wash. June 24, 2025). That is because infrastructure projects require more than just money; they also require time-sensitive coordination among numerous stakeholders through permits, cost estimates, and subcontracts. *See id.* (infrastructure projects depend on federal funding "to pay for particular things, at particular times, in particular places"). As one state agency director has explained,

> When communities secure a BRIC grant to fund their construction project, it means they have also managed to secure the required matching funds … often from multiple funding sources each with their own unique requirements and timelines. They have also managed to choreograph the timeframes of various agreements and contracts, permits and temporary easements, equipment and material lead-times, fish windows (for in-water work), migratory bird windows (for wildfire forestry work), local budget cycles, and a host of other project-specific time constraints. … When FEMA suddenly withholds a community's BRIC grant, their project is not just delayed, it is existentially threatened; the longer they must wait for resolution, the less likely they will be able to re-align all the components needed to complete the work. Money alone cannot recreate all the overlapping conditions and opportunities required to orchestrate and complete a complex local mitigation project. That is why, in construction, money is important, but timing is everything.

Chung Decl., Ex. 20 ¶ 23; *see also, e.g., id.*, Ex. 23 ¶ 5 (BRIC projects are "typically large, complicated projects," and "can take years … to develop engineering and design plans, to secure necessary permits, to conduct environmental review, [and] to coordinate numerous contractors and suppliers . . . before construction can begin."). "Continued delay and uncertainty will not merely delay projects—it will end projects." Ex. 23 ¶ 19. The longer the delay, the more projects that will fold, as permits expire, costs increase, and partners lose trust. *See* SMF ¶¶ 77-82; *cf.* Chung Decl., Ex. 39 ¶ 14, pp. 12-13 (requesting approval for Phase II and raising concerns about "avoidable financial harm … due to missed construction windows and associated cost escalations" if construction does not begin by September 26, 2025).

As these projects are delayed, scaled back, and cancelled Plaintiffs will face loss of lives, increased injuries, damage to property, interruption of State business, and dramatically increased post-disaster costs. *See* SMF ¶¶ 60-72; 83-84; *see, e.g., Rhode Island*, 2025 WL 2621593, at *10 ("impediments to planning, hiring, and operations; and disruptions to [state business]" constitute irreparable harm). For instance:

- In Kentucky, flood mitigation projects imperiled by the BRIC Termination "would have provided warning sirens, flood control measures, emergency generators, and building inspection and code enforcement measures" in a state where "flooding threats range from flash flooding in the Appalachian Mountains . . . to statewide fluvial flooding." *Id.*, Ex. 29 ¶ 8, 17.

- In Wisconsin, tornado shelter projects threatened by the BRIC Termination would "provide near-absolute life safety protection . . . against 250 mile per hour wind speeds . . . offering protection to students, staff, and nearby residents during high wind and tornadic events" in a county that "has averaged a tornado every year since 1950." *Id.*, Ex. 43 ¶¶ 7-8, 23.

- In California, an ongoing massive landslide threatens "a major arterial roadway . . . that provides community and emergency access, sanitation sewer lines located along this roadway, electric and communication lines, potable water lines, and gas lines" as well as "over 15,000 homes and nearly 40,000 people." Chung Decl., Ex. 23 ¶ 6(b).

31

- In Connecticut, recurrent flooding and coastal storm surges threaten "two critical power-generating facilities capable of supplying energy to approximately 1.1 million homes." *Id.*, Ex. 25 ¶ 16.

- In Illinois, a rural community faces contaminated drinking water, raw sewage backing up into homes, and contamination of local waterways. *Id.*, Ex. 28 ¶ 7.

- In Maryland, communities at "very high risk" of sea level rise face even more flooding. *Id.*, Ex. 30 ¶ 25.

- In Massachusetts, recurrent flooding "threaten[s] the release of petrochemicals and other hazardous materials" and "puts at risk over $7 billion in annual economic activity, access to the region's supply of fresh produce, major and vital transportation corridor, and the safety of more than 5,000 residents living in the floodplain." *Id.*, Ex. 21 ¶¶ 14-15.

- In New Jersey, "critical electrical and mechanical systems" at "Port Newark-Elizabeth Marine Terminal's primary water and fire pump station" are at risk, threatening interrupted "firefighting, potable water, and transportation operations at one of the nation's busiest ports." *Id.*, Ex. 35 ¶ 6(c).

- In Oregon, hospital patients, staff, and members of the local coastal community are left with nowhere to evacuate if a tsunami hits. *See id.*, Ex. 39 ¶ 14, pp. 12-13.

- In Washington, communities face the risk of earthquake-induced soil liquefaction beneath a major roadway, which will "effectively cripple the community's first-responder and emergency-service capabilities" and damage underground utilities. *Id.*, Ex. 20 ¶13-14.

The uncertainty and delay threatens not only Plaintiffs' current projects, but also future mitigation projects because the sudden withdrawal of federal funding undermines the trust and goodwill built with other funders, stakeholders, industry partners, and the public needed to get these projects done. SMF ¶¶ 81-82.; *see also, e.g.*, Chung Decl., Ex. 43 ¶ 19 (project delays and cancellations cause loss of public trust, making it more difficult to secure matching funds); Ex. 20 ¶ 24 ("Many . . . small, rural communities were already wary of state and federal grant assistance . . . and the state hazard mitigation team will be hard-pressed to bring them back to the table for future partnerships."); Ex. 40 ¶ 19 ("The relationships between the multitude of stakeholders are just as valuable as the funding."). This harm is irreparable too. *Ross-Simons of*

*Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) ("By its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages.").

Plaintiffs will also lose the benefits to the state economy that the projects will generate. SMF ¶ 85; *see, e.g.*, Chung Decl., Ex. 20 ¶¶ 7, 19 (projects "will stimulate the local economy" and "promote economic development and future investments"); Ex. 25 ¶ 16 (project would result in construction, engineering, and management jobs); Ex. 31 ¶ 7 (project would address flood-damaged coastline that "is a critical resource for . . . [the State's] tourism industry, which is a vital part of the State's economy"). This, too, has been recognized as irreparable harm. *Bos. Shipping Ass'n v. Int'l Longshoremen's Ass'n (AFL-CIO)*, 337 F. Supp. 1007, 1010 (D. Mass. 1972) (conduct was "likely to produce permanent and irreparable harm" that had "serious implications to the entire economy of the State").

The balance of the equities and the public interest impact also weigh in favor of an injunction. There is a strong public interest in the government following the law, and "no public interest in the perpetuation of unlawful agency action." *Somerville Pub. Sch. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025) (citation modified) (quoting *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). On one side of the balance is an ongoing illegal campaign to substantially reduce FEMA's mitigation functions and narrow FEMA's mission to only post-disaster response, even though Congress gave FEMA a broader mission. On the other side are scores of communities who have relied on this program for years, who are now unable to complete critical, lifesaving projects into which they have invested countless hours and millions of dollars of their own funds. *See generally* SMF ¶¶ 60-72, 76-77, 83, 88. The public interest is served by restoring this important program that reduces injuries, saves lives, protects property, and saves all affected parties—including Defendants—"significant sums" in post-disaster costs. H.R.

Rep. No. 104-812, at 78–79 (1996) (Conf. Rep.); *see also, e.g.*, ECF No. 96 at 72 (admitting that "pre- and post-disaster mitigation activities have been shown to reduce the costs of future disasters").

When crafting an injunction, the Court has broad discretion to "fashion a remedy that awards complete relief." *Trump v. CASA, Inc.*, 606 U.S. 831, 850 (2025); *see also Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it."). To ensure complete relief, the Court should enter Plaintiffs' proposed order, which requests that the Court enjoin Defendants from carrying out the BRIC Termination, require them to reverse it, and bar them from enforcing against Plaintiffs the period of performance deadlines and the time under 42 U.S.C. § 5133(f)(3)(A) in such a way that any Plaintiff State is prejudiced by the BRIC Termination.

This final component of the injunction is important to ensure complete relief. The periods of performance and 42 U.S.C. § 5133(f)(3) provide that after a certain period (generally three years after a project is selected) Defendants may refuse to reimburse Plaintiffs for certain expenses or withdraw unobligated funds. But since Defendants have frozen the program for the past six months and refused to process projects and provide necessary approvals, Defendants have prevented these projects from moving forward. *See, e.g.*, SMF ¶¶ 50-59, 73-75. To allow Defendants to then withhold or withdraw funds based on Plaintiffs' inability to complete projects in the time that remains would be inequitable and would allow Defendants to effectively complete their unlawful termination of many of these projects.

Finally, the Court should declare the BRIC Termination unlawful. *See* 28 U.S.C. § 2201(a). One purpose of a declaratory judgment is "to determine the rights and obligations of the parties so

that they can act in accordance with the law." *Unión de Empleados de Muelles de Puerto Rico, Inc. v. Int'l Longshoremen's Ass'n*, 884 F.3d 48, 58 (1st Cir. 2018). Courts "assume it is substantially likely that the President and other executive and congressional officials [will] abide by an authoritative interpretation of the [law] by the District Court," *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992), so a declaration will provide Defendants the clarity they need to conform their conduct to the law.

## IV.    CONCLUSION

Plaintiffs respectfully request that the Court enter judgment in their favor; vacate the BRIC Termination; enter a permanent injunction barring Defendants from implementing the BRIC Termination against Plaintiffs, including their subdivisions and instrumentalities; and declare that the BRIC Termination is unlawful.

DATED this 15th day of October 2025.

**ANDREA JOY CAMPBELL**
Attorney General
Commonwealth of Massachusetts

*/s/ Hannah C. Vail*
HANNAH C. VAIL, BBO No. 698577
JAK KUNDL, BBO No. 713951
Assistant Attorneys General
AMY LAURA CAHN, BBO No. 716706
Special Assistant Attorney General
Massachusetts Office of the Attorney General
One Ashburton Place
Boston, MA 02108
617-963-2512
hannah.vail@mass.gov
jak.kundl@mass.gov
amy.laura.cahn@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*

**NICHOLAS W. BROWN**
Attorney General
State of Washington

*/s/ Tyler Roberts*
TYLER ROBERTS*
JENNIFER K. CHUNG*
NIYA TAWACHI*
ANDREW R.W. HUGHES*
Assistant Attorneys General
CRISTINA SEPE*
Deputy Solicitor General
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
tyler.roberts@atg.wa.gov
jennifer.chung@atg.wa.gov
niya.tawachi@atg.wa.gov
andrew.hughes@atg.wa.gov
cristina.sepe@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

**KRISTIN K. MAYES**
Attorney General
State of Arizona

*/s/ Lauren Watford*
LAUREN WATFORD*
Assistant Attorney General
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, Arizona 85004
602-542-3333
Lauren.Watford@azag.gov
*Attorneys for the State of Arizona*

**ROB BONTA**
Attorney General
State of California

*/s/ David Green*
R. MATTHEW WISE*
Supervising Deputy Attorney General
DAVID GREEN*
CHRISTOPHER KISSEL*
HARALD H. KIRN*
Deputy Attorneys General
California Office of the Attorney General
1300 I Street
Sacramento, CA 95814
916-445-9555
matthew.wise@doj.ca.gov
david.green@doj.ca.gov
christopher.kissel@doj.ca.gov
harold.kirn@doj.ca.gov
*Attorneys for Plaintiff State of California*

**PHILIP J. WEISER**
Attorney General
State of Colorado

*/s/ Finnuala Tessier*
FINNUALA TESSIER*
SAMUEL WOLTER*
Assistant Attorneys General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
720-508-6000
finnuala.tessier@coag.gov
samuel.wolter@coag.gov
*Attorneys for Plaintiff State of Colorado*

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Ashley Meskill*
ASHLEY MESKILL*
Assistant Attorney General
Connecticut Office of the Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5270
ashley.meskill@ct.gov
*Attorneys for Plaintiff State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

*/s/ Vanessa L. Kassab*
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

*/s/ Andrew C. Mendrala*
ANDREW C. MENDRALA*
Assistant Attorney General
Public Advocacy Division

Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
vanessa.kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

Office of the Attorney General for the
District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
202-724-9726
andrew.mendrala@dc.gov
*Attorneys for the District of Columbia*

**KWAME RAOUL**
Attorney General
State of Illinois

/s/ Aleeza M. Strubel
ALEEZA M. STRUBEL*
Complex Litigation Counsel
SARAH J. GALLO*
Assistant Attorney General
Illinois Office of the Attorney General
115 S. LaSalle Street
Chicago, IL 60604
773-914-3046
aleeza.strubel@ilag.gov
sarah.gallo@ilag.gov
*Attorneys for Plaintiff State of Illinois*

**OFFICE OF THE GOVERNER**
Andy Beshear, in his official capacity as
Governor of the Commonwealth of Kentucky

/s/ S. Travis Mayo
S. TRAVIS MAYO*
General Counsel
TAYLOR PAYNE*
Chief Deputy General Counsel
LAURA C. TIPTON*
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
502-564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
*Attorneys for the Office of the Governor of Kentucky*

**AARON M. FREY**
Attorney General
State of Maine

/s/ Reid Hayton-Hull
REID HAYTON-HULL*
Assistant Attorney General
Maine Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
207-626-8800
reid.hayton-hull@maine.gov
*Attorneys for the State of Maine*

**ANTHONY G. BROWN**
Attorney General
State of Maryland

/s/ Robert N. Brewer
ROBERT N. BREWER*
Assistant Attorney General
Maryland Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-6924
rbrewer@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

**DANA NESSEL**
Attorney General
State of Michigan

**KEITH ELLISON**
Attorney General
State of Minnesota

37

*/s/ Neil Giovanatti*
NEIL GIOVANATTI*
ADAM DE BEAR*
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
giovanattin@michigan.gov
deaeara@michigan.gov
*Attorneys for Plaintiff State of Michigan*

**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

*/s/ Phoenix N. Meyers*
PHOENIX N. MEYERS*
Deputy Attorney General
New Jersey Office of the Attorney General
25 Market Street
Trenton, NJ 08625
609-696-5289
phoenix.meyers@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

**LETITIA JAMES**
Attorney General
State of New York

*/s/ Colleen K. Faherty*
COLLEEN K. FAHERTY*
Special Trial Counsel
New York Office of the Attorney General
28 Liberty Street
New York, NY 10005
212-416-6046
Colleen.Faherty@ag.ny.gov
*Attorneys for Plaintiff State of New York*

*/s/ Cat Rios-Keating*
CAT RIOS-KEATING*
Special Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota St., Suite 600
St. Paul, MN 55101
651-300-7302
catherine.rios-keating@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

**RAÚL TORREZ**
Attorney General
State of New Mexico

*/s/ Mark Noferi*
MARK NOFERI**
Senior Litigation Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
505-490-4060
mnoferi@nmdoj.gov
*Attorneys for the State of New Mexico*

**JEFF JACKSON**
Attorney General

LAURA HOWARD
Chief Deputy Attorney General
State of North Carolina

*/s/ Daniel T. Wilkes*
DANIEL T. WILKES*
Assistant Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6415
dwilkes@ncodoj.gov
*Attorneys for Plaintiff State of North Carolina*

**DAN RAYFIELD**
Attorney General
State of Oregon

/s/ Scott P. Kennedy
SCOTT P. KENNEDY*
BRIAN S. MARSHALL*
Senior Assistants Attorney General
Oregon Office of the Attorney General
1162 Court Street NE
Salem, OR 97301
971-453-9050
scott.kennedy@doj.oregon.gov
brian.s.marshall@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*


**PETER F. NERONHA**
Attorney General
State of Rhode Island

/s/ Randelle L. Boots
RANDELLE L. BOOTS*
NICHOLAS M. VAZ*
Special Assistant Attorneys General
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400
rboots@riag.ri.gov
nvaz@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

/s/ Lynn K. Lodahl
LYNN K. LODAHL*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
608-264-6219
lynn.lodahl@wisdoj.gov


**JOSH SHAPIRO**
in his official capacity as Governor of the
Commonwealth of Pennsylvania

JENNIFER SELBER
General Counsel

/s/ Jacob B. Boyer
JACOB B. BOYER*
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
717-460-6786
jacobboyer@pa.gov
*Attorneys for Governor Josh Shapiro*


**CHARITY R. CLARK**
Attorney General
State of Vermont

/s/ Ryan P. Kane
RYAN P. KANE*
Deputy Solicitor General
Vermont Office of the Attorney General
109 State Street
Montpelier, VT 05609
802-828-2153
ryan.kane@vermont.gov
*Attorneys for Plaintiff State of Vermont*

*Attorneys for Plaintiff State of Wisconsin*

*admitted pro hac vice
**pro hac vice application pending or
forthcoming

## <u>CERTIFICATE OF SERVICE</u>

    I certify that this document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

*/s/ Tyler Roberts*
 
TYLER ROBERTS
Assistant Attorney General
State of Washington
