**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF WASHINGTON, et al., <br><br>             Plaintiffs, <br><br>   v. <br><br> FEDERAL EMERGENCY MANAGEMENT AGENCY, et al., <br><br>             Defendants. | Civil Action No. 25-cv-12006-RGS |

**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

This case concerns the scope of a federal court's authority under the Administrative Procedure Act ("APA") to intervene in the Federal Emergency Management Agency's ("FEMA") administration of a discretionary government program—the Building Resilient Infrastructure and Communities or BRIC.  Plaintiffs claim BRIC has been terminated and frame their Amended Complaint in terms of purported violations of the APA and separation of powers principles based on FEMA's alleged refusal to "spend funds Congress directed to BRIC or trying to spend them on other programs."  Doc. 102, p. 3.

But BRIC has not been terminated.  Nor has FEMA refused to spend funds directed to BRIC or spent the funds on other programs.  As stated earlier in this litigation, "FEMA and DHS continue to evaluate whether to end the BRIC program or revise it in a manner to achieve its original purpose."  Doc. 96, p. 108, ¶ 9.  While they are conducting this evaluation—to ensure that BRIC is being implemented in a way that best protects American citizens against natural disasters—some aspects of the program are operating differently than in the past.  Some timelines

1

have paused, and some workflows have changed. But other aspects of the program have not changed at all. BRIC grant recipients have continued to drawdown on their awards,[1] for example, and during this evaluation period not a single BRIC grant that has been awarded to any Plaintiff has been terminated. Doc. 96, p. 109, ¶ 11(B); *see also* Defendants' Statement of Material Facts ("DSOMF"), filed herewith, ¶¶ 109, 145-146. Plaintiffs have not established otherwise.

Instead, what Plaintiffs really seek in this lawsuit is a return to the "status quo" that existed prior to FEMA's announcement in April 2025 that it was evaluating "all existing grants and their priorities, scope, and implementation timelines to ensure consistency with [Department of Homeland Security] and the Administration's direction and guidance." Doc. 96, pp. 108-109, ¶ 7. And in their effort to secure the "status quo", Plaintiffs seek relief that is extraordinarily broad in scope. They ask this Court to permanently enjoin FEMA from *ever* terminating BRIC (and from taking any steps even to *try* to terminate BRIC), and they request an order requiring FEMA to, among other things, "reopen the fiscal year 2024 Notice of Funding Opportunity, evaluate applications, and select recipients in a reasonable period." Doc. 85 p. 76. This is relief this Court cannot provide.

The APA confines judicial intervention to those instances in which the agency has taken, or has a duty to take, a discrete final agency action. This is because the APA does not permit a court to interfere with an agency's exercise of its judgment and discretion; while a court may direct an agency *to* act when action is clearly required by law, a court may not direct an agency

---

[1] Between April 2, 2025, and October 2, 2025, BRIC grant recipients continued to draw down on their awards until FEMA Grants Outcomes ("FEMA GO"), BRIC's grants management system, went offline because of the government shutdown. DSOMF, ¶ 109. During the government shutdown recipients cannot receive communication regarding the status of their extension requests, but once the government is funded and FEMA GO is back online, recipients will be able to receive notices and submit requests for reimbursement. DSOMF, ¶¶ 145-146.

*how* to act.  *See Norton v. Southern Utah Wilderness Alliance ("SUWA")*, 542 U.S. 55, 64 (2004).

Plaintiffs argue that FEMA should be required to "resume operating [BRIC]", Doc. 102, p. 30

(citing 5 U.S.C. § 706(1)).  Putting aside that FEMA disputes BRIC ever stopped operating, what

Plaintiffs seek would turn the APA on its head.  What was intended to be a narrow avenue of

relief available only in extraordinary circumstances to compel performance of a discrete and

clearly defined legal duty would become the broadest scope of all the judicial review provisions

of the APA.  The APA has built in limitations designed to avoid this very kind of "judicial

entanglement in abstract policy disagreements which courts lack both expertise and information

to resolve."  *SUWA*, 542 U.S. at 66.  In short, judicial intervention is not warranted here where

FEMA has neither taken final agency action nor failed to take an action it was required to take.

For these reasons, and for the reasons outlined and discussed more fully below, Plaintiffs'

Motion for Summary Judgment should be denied, and Defendants' Cross-Motion for Summary

Judgment should be allowed.

*First*, this Court lacks jurisdiction because Plaintiffs lack standing and their claims are not

ripe for review.  Plaintiffs lack actual or imminent injury because, despite Plaintiffs' allegations

to the contrary, FEMA has not terminated BRIC, FEMA has not refused to spend funds directed

to BRIC, and FEMA has not repurposed funds directed for BRIC.

*Second*, this Court lacks jurisdiction because 1) the Robert T. Stafford Disaster Relief and

Emergency Assistance Act of 1988 ("Stafford Act"), 42 U.S.C. §§ 5121–5207, precludes judicial

review of discretionary decisions regarding disaster assistance; and 2) even if the Stafford Act's

discretionary function exception did not apply, the claims are breach of contract claims over

which the Court of Federal Claims has exclusive jurisdiction.

*Third*, Plaintiffs' APA claims are unreviewable because 1) there has been no final agency action; 2) decisions to discontinue grant funding based on changed agency priorities are committed to agency discretion by law; and 3) Plaintiffs seek to compel agency action that is neither discrete nor required by law.

*Fourth*, Plaintiffs' APA claims fail on their merits.  Plaintiffs' claim that the termination of BRIC is contrary to law goes nowhere because there is no law that requires FEMA to operate *this* program or to provide grants to *these* Plaintiffs.  And, despite Plaintiffs' allegations to the contrary, the funds appropriated for BRIC remain available for mitigation functions and have not been spent, repurposed, or withdrawn.  There has thus been no substantial reduction in mitigation functions as contemplated by 6 U.S.C. § 316 while FEMA evaluates how grants can best be used to further the Administration's policies.  Plaintiffs' claims asserting violations of separation of power principles and the Spending and Appropriations clauses fail for the same reason.

*Fifth*, all of Plaintiffs' claims that hinge upon their mistaken belief that Cameron Hamilton and David Richardson were appointed FEMA Administrator fail because all actions taken by Cameron Hamilton and David Richardson were lawfully delegated to them in their role as Senior Official Performing the Duties of FEMA Administrator.  Neither Cameron Hamilton nor David Richardson has ever been appointed FEMA Administrator.

*Sixth*, Plaintiffs' *ultra vires* claim fails because there is a meaningful and adequate remedy of vindicating Plaintiffs' rights—a contract action in the Court of Federal Claims.

*Lastly*, even if any of Plaintiffs' claims could survive, Plaintiffs have not proven that the broad declaratory and injunctive relief they seek here is warranted.  Plaintiffs have failed to show that they will suffer irreparable harm without a permanent injunction, that public policy weighs in favor of their requested injunctive relief, or that they are likely to succeed on the merits.

# BACKGROUND

## I.    BRIC Background

FEMA's statutory authority is derived primarily from the Stafford Act.  The Stafford Act provides the framework for presidential emergency and disaster declarations, enabling FEMA to provide both physical and financial assistance to affected states, territories, tribes, and localities. 42 U.S.C. § 5170.  It also authorizes funding for pre-disaster mitigation projects to reduce future risks and costs.  *See* 42 U.S.C. § 5133(b) ("The President may establish a program to provide technical and financial assistance to States and local governments to assist in the implementation of predisaster hazard mitigation measures that are cost-effective and are designed to reduce injuries, loss of life, and damage and destruction of property, including damage to critical services and facilities under the jurisdiction of the States or local governments").  BRIC is one such discretionary program.  Doc. 96, p. 106, ¶ 4.

### A.    Funding

BRIC is currently funded in two ways:  by set-asides from the Disaster Relief Fund ("DRF") and appropriations through the Infrastructure Investment and Jobs Act ("IIJA").  Doc. 96, p. 107, ¶ 6; *see also* DSOMF, ¶ 105.

Section 203(i) of the Stafford Act, 42 U.S.C. § 1533(i), gives the President discretion to set aside an amount equal to 6% of the estimated aggregate amount of certain grants within the DRF.[2] Doc. 96, p. 107, ¶ 6.  Set-aside funds are housed in the Major Disasters portion of the DRF.  DSOMF, ¶ 106.  This is to ensure that the amounts set aside do not reduce the funding that is available for major disaster assistance as required by Section 1533(i) ("The amount set

---

[2] These grants include those issued pursuant to 42 U.S.C. §§ 5170b, 5172, 5173, 5174, 5183, and 5189f.

aside…shall not reduce the amounts otherwise made available for [major disaster assistance]"). Put another way, the amounts set aside for BRIC do not lose their character of being legally available for expenses of major disaster declarations, should the need arise. *See id.*

In terms of IIJA funding, in 2021 Congress appropriated BRIC one billion dollars to be disbursed between fiscal years 2022 to 2026, with $200 million being made available per fiscal year. Doc. 96, p. 107, ¶ 6. To date, FEMA has received $800 million of these IIJA funds with the remaining $200 million expected in Fiscal Year 2026. Doc. 96, p. 107, ¶ 6. IIJA funds appropriated for BRIC are only available for that program and cannot be used for other purposes. Doc. 96, p. 111, ¶ 12.

### B.    Types of Assistance

BRIC provides both financial and technical assistance to States and local governments. Doc. 96, p. 106, ¶ 4. Financial assistance is offered through notices of funding opportunities ("NOFO") while technical assistance is offered through a FEMA initiative called direct technical assistance ("DTA"). Doc. 96, p. 106, ¶ 4; *see also* DSOMF at ¶¶ 115-118.

### 1.    Financial Assistance

To apply for a funding opportunity that is available, an applicant must submit a timely application. DSOMF, ¶ 125. Once FEMA reviews all subapplications, it assigns each of them one of three statuses: "Identified for Further Review",[3] "Not Selected", or "Does Not Meet HMA Requirements". DSOMF, ¶ 126. When an application is marked "Identified for Further Review", that does not mean an award is guaranteed. DSOMF, ¶ 130. Instead, FEMA may request additional information from applicants by issuing a Request for Information ("ROI"). DSOMF,

---

[3] Plaintiffs appear to use the term "Selected" to describe applications that have been given the status "Identified for Further Review".

¶¶ 127-129.  The additional information requested from the applicant may impact eligibility for funding.  DSOMF, ¶ 129.  There is no statute, policy, or regulation that prescribes a timeline for how long the review process may take.

Some BRIC grants fund phased projects.  DSOMF, ¶ 134.  The purpose of a phased project is to support the development of subapplication materials when it is beyond the subapplicant's technical and financial resources to provide the information necessary to produce the required technical information.  DSOMF, ¶ 135.  A phased project may also be used when a subapplicant has a preliminary plan or concept where FEMA is able to make an initial eligibility determination.  DSOMF, ¶ 136.  If an initial eligibility determination is made, FEMA will work with the subapplicant and applicant during the first phase ("Phase I") to identify the technical information required to determine project eligibility.  DSOMF, ¶ 137.  If the project is determined to be eligible, technically feasible, cost effective, and compliant with Environmental and Historic Preservation requirements under the technical review of Phase I, the project may then be approved for construction under Phase II.  DSOMF, ¶ 138.  That said, Phase II funding is not guaranteed and is contingent upon the outcomes of the evaluation of the Phase I deliverables.  DSOMF, ¶ 139.

For projects that have been awarded, recipients may request extensions of BRIC project periods of performance pursuant to their award agreements.  DSOMF, ¶ 140.  These extensions are not guaranteed, however, as FEMA has discretion to grant or deny a request.  DSOMF, ¶ 141.

Lastly, NOFOs are funded by "no year" funds, meaning that funds remain available indefinitely until expended, regardless of the fiscal year.  *See* GAO, Principles of Federal Appropriations Law, ch. 5, 5-6 (4th ed. 2016 rev.); *see also* DSOMF, ¶ 124.  Consequently, Congress has not constrained FEMA's ability to spend these funds by any temporal limit that would cause the funds to expire or render them unavailable for a future award.

### 2.    Technical Assistance

BRIC also offers non-financial DTA to help communities, territories, and Tribal Nations become more resilient by helping eligible entities build capacity to reduce risk of future disaster damage, increase community resilience, and establish community-based partnerships to sustain successful mitigation programs.  DSOMF, ¶¶ 115-117.  DTA is available at various project stages, from pre-application activities to closing out a grant.  DSOMF, ¶ 118.  To deliver DTA, FEMA enters into Memoranda of Understanding ("MOUs") with selected communities.  DSOMF, ¶ 119.

## II.    Factual Background

On April 2, 2025, Cameron Hamilton, in his role as the Senior Official Performing the Duties ("SOPD") of FEMA Administrator, signed a memorandum entitled "Future of the Building Resilient Infrastructure and Communities (BRIC) Program" (the "Hamilton Memo"). Doc. 96, pp. 43-44.  The Hamilton Memo addressed how FEMA planned to "evaluate all existing grants and their priorities, scope, and implementation timelines to ensure consistency with DHS and the Administration's direction and guidance."  Doc. 96, pp. 107-108, ¶ 7.  The Hamilton Memo laid out the proposed next steps for the future of the BRIC program, including proposing the cancelation of the 2024 NOFO, cancelation of projects selected for further review and not yet awarded, evaluation of obligated projects that have not yet been completed, and requiring that any additional period of performance extensions on any BRIC projects be subject to the SOPD of the FEMA Administrator's approval.  Doc. 96, pp. 43-44; Doc. 96, pp. 107-108, ¶ 7.

Despite publicity to the contrary after the Hamilton Memo was signed, BRIC has not been terminated.  Doc. 96, p. 108, ¶ 8.  BRIC's continued operation is evidenced, at a minimum, by the following:

- FEMA has not terminated any projects selected for further review (including those recommended for termination from fiscal years 2020-2023 in the Hamilton Memo).[4] Doc. 96, p. 109, ¶ 11(B);

- FEMA has not terminated any BRIC grants, including any grants issued to Plaintiffs. Doc. 96, p. 109, ¶ 11(B);

- From April 2, 2025, until the government shut down on or about October 2, 2025, FEMA continued to pay awards (and once the government is funded and FEMA GO is back online, recipients will be able to receive notices and submit requests for reimbursement). DSOMF, ¶¶ 109, 145-146;

- Between April 4, 2025, and September 30, 2025, FEMA reimbursed BRIC grant recipients a total of $109,878,774. DSOMF, ¶ 111;

- Between April 4, 2025, and September 30, 2025, FEMA made 804 individual payments on 150 grants and 398 subgrants. DSOMF, ¶ 112;

- Between April 4, 2025, and September 30, 2025, FEMA made payments to 76 applicants and 298 subapplicants. DSOMF, ¶ 113;

- All funds that have been set aside for BRIC remain in the DRF and are available for BRIC expenses, including BRIC grants. Doc. 96, p. 111, ¶ 12; *see also* DSOMF, ¶¶ 107-108. Defendants have not "withdrawn" these funds. *Id.*

- All funds that have been appropriated for BRIC through IIJA have not been spent, diverted, or used for any other programs or projects. Doc. 96, p. 111, ¶ 12.

- FEMA has not sought a recission of IIJA funds by Congress. Doc. 96, p. 111, ¶ 12.

---

[4] If FEMA decides to terminate any such project (which, again, it has not done), it will follow the proper termination and close out procedures established by 2 C.F.R. Part 200 and the terms and conditions of the award. Doc. 96, pp. 109-110, ¶ 11(B).

- Since April 2025, FEMA has not terminated any existing MOUs for DTA.[5]  DSOMF, ¶ 121.

- Between May 1, 2025, and November 5, 2025, FEMA sent seven RFIs to BRIC applicants whose projects were Identified for Further Review.  DSOMF, ¶ 131.  This included an RFI to the Plaintiff State of California dated May 21, 2025.  DSOMF, ¶ 132;

- Since the Hamilton Memo, FEMA has established that all period of performance extension requests should be submitted to David Richardson as the Senior Official Performing the Duties of the FEMA Administrator, who will evaluate and approve or deny the request.  DSOMF, ¶ 142.

- On September 4, 2025, FEMA approved a period of performance extension request under the evaluation process described above for the State of Utah's FY2021 BRIC grant award.  DSOMF, ¶ 144.

- FEMA is in the process of reviewing 24 other requests to extend periods of performance.  DSOMF, ¶ 143.

## III.    Procedural Background

Plaintiffs filed a Complaint on July 16, 2025.  Doc. 1.  That same day, Plaintiffs filed a Motion for a Preliminary Injunction, in which they sought to enjoin Defendants from spending funds appropriated or set aside for BRIC for non-BRIC purposes during the pendency of the litigation.  Doc. 5.  Plaintiffs' Motion was allowed on August 5, 2025.  Doc. 79.  On August 29, 2025, Plaintiffs filed an Amended Complaint in which they asked the Court to declare unlawful

---

[5] If FEMA decides to terminate any MOU, it will follow the termination provisions included in each MOU.  DSOMF, ¶ 122

and set aside "Defendants' termination of the BRIC program, withholding of Congressionally appropriated funds, and redirecting funds set aside for the BRIC program to other agency initiatives."  Doc. 85, p. 76.  Plaintiffs ask the Court to enjoin "Defendants' termination of the BRIC program, and any action to implement that termination, and restore the status quo as it existed before the termination, including by requiring Defendants to reopen the fiscal year 2024 Notice of Funding Opportunity, evaluate applications, and select recipients in a reasonable time period."  Doc. 89, p. 76.

The Amended Complaint contains ten counts.  In Counts I, III, and V, Plaintiffs claim the purported termination of BRIC, repurposing of BRIC funds, and withholding of appropriated funds violates separation of power principles.  Doc. 89, ¶¶ 214-225, 232-238, 245-258.  In Counts II, IV, VI, and VIII, Plaintiffs invoke 5 U.S.C. § 706(2) and claim the purported termination of BRIC, repurposing of BRIC funds, and withholding of appropriated funds is contrary to law.  Doc. 89, ¶¶ 226-231, 239-244, 259-270, 284-289.  In Count VII, Plaintiffs claim Defendants violated the Appointments Clause because Cameron Hamilton was not lawfully appointed as FEMA Administrator at the time he issued the Hamilton Memo.  Doc. 89, ¶¶ 271-283.  In Count IX, Plaintiffs seek *ultra vires* review of Defendants' purported "redirecting of funds set aside for the BRIC program for other purposes[.]"  Doc. 89, ¶¶ 290-300.  In Count X, Plaintiffs invoke 5 U.S.C. § 706(1) and claim that Defendants have unlawfully withheld or unreasonably delayed funds that should be available to Plaintiffs.  Doc. 89, ¶¶ 301-305.

## LEGAL STANDARDS

### I.    Subject Matter Jurisdiction

Plaintiffs in this case must establish subject matter jurisdiction, first, by meeting Article III's case-or-controversy requirement, and second, by showing whether Congress has waived

sovereign immunity and, if so, whether this Court may hear their claims. Article III restricts federal court jurisdiction to "Cases" and "Controversies," U.S. Const. art. III, § 2, and two manifestations of this Article III limitation are the interrelated justiciability doctrines of standing and ripeness, which must be established before a case may be heard. *Reddy v. Foster*, 845 F.3d 493, 499 (1st Cir. 2017). Moreover, the United States is immune from suit except where it has explicitly waived its immunity. *United States v. Mitchell*, 445 U.S. 535, 538 (1980). The test for deciding whether sovereign immunity has been waived is "stringent," the waiver must be "unmistakably clear," and the Court must "indulge every reasonable presumption against" waiver. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675, 678, 682 (1999).

## II.    Summary Judgment

Summary judgment is permissible when "there is no genuine issue as to any material fact and…the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment must be decided on the record as it stands, not on litigants' vision of what the facts might someday reveal. To that end, "[b]rash conjecture, coupled with earnest hope that something concrete will eventually materialize, is insufficient to block summary judgment." *Dow v. United Bhd. of Carpenters*, 1 F.3d 56, 58 (1st Cir. 1993).

"[I]n cases involving review of agency action under the APA, the traditional Rule 56 standard does not apply [at summary judgment] due to the limited role of a court in reviewing the administrative record." *Int'l Junior Coll. of Bus. & Tech., Inc. v. Duncan*, 802 F.3d 99, 106 (1st Cir. 2015). "In the administrative context, a motion for summary judgment is 'simply a vehicle to tee up a case for judicial review." *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016). Thus, "an inquiring court must review an agency action not to determine whether

a dispute of fact remains but, rather, to determine whether the agency action was arbitrary or capricious" or otherwise unlawful.  *Id.*

## ARGUMENT

### I.    This Court Lacks Jurisdiction.

This Court lacks jurisdiction over Plaintiffs' claims for several reasons:  1) Plaintiffs lack standing and their claims are not ripe for review; 2) Plaintiffs fail to establish a waiver of sovereign immunity; 3) even if Plaintiffs could establish a waiver of sovereign immunity, Plaintiffs' claims are contract claims that must be heard by the Court of Federal Claims.

### A.    Plaintiffs Lack Standing And Their Claims Are Not Ripe for Review.

At the preliminary injunction stage of this litigation, Defendants argued that Plaintiffs' purported injuries existed in the abstract and were contingent on future events that had not yet occurred.  More than three months later, Plaintiffs' purported injuries still have not occurred—and may never occur.  For this reason, Plaintiffs have failed to establish subject matter jurisdiction under Article III.

To establish standing, a plaintiff must establish an injury in fact—that is, an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Susan B. Anthony List. v. Driehaus*, 573 U.S. 149, 158 (2014).  An allegation of future injury may suffice if the threatened injury is "certainly impending" or if there is a "substantial risk that the harm will occur."  *Id.*  But, if a future injury is "too speculative for Article III purposes", then there is no standing to sue.  *Blum v. Holder*, 744 F.3d 790, 799 (1st Cir. 2014).  Because "standing is not dispensed in gross," each plaintiff must demonstrate standing for each claim that it presses against each defendant, and for each form of relief that it seeks.  *Murthy v. Missouri*, 603 U.S. 43, 61

(2024).  In short, the standing doctrine seeks "to keep federal courts out of disputes involving conjectural or hypothetical injuries[.]" *Reddy*, 845 F.3d at 500.

The ripeness doctrine seeks to prevent the adjudication of claims relating to "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998).  "Determining whether administrative action is ripe for judicial review requires [courts] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citation omitted).  As explained by the Supreme Court, the basic function of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbot Lab'ys v. Gardner*, 387 U.S. 136, 148-49 (1967).  Such is the case here.

Plaintiffs' claims are premature.  To start, all of Plaintiffs' purported harms flow from their misunderstanding that BRIC has been terminated.  *See, e.g.*, Doc. 104-31 at ¶ 8 ("In April 2025, FEMA terminated the BRIC program"); Doc. 104-33 at ¶ 7 (same); Doc. 104-34 at ¶ 7 (same); Doc. 104-35 at ¶ 7 (same); Doc. 104-38, at ¶ 28 (same); Doc. 140-39, at ¶ 8 (same); Doc. 140-40, at ¶ 8 (same).  But BRIC has not been terminated.  Doc. 96, p. 108, ¶ 8.  And not a single grant award issued to any Plaintiff has been terminated.  Doc. 96, p. 109, ¶ 11(B).  Plaintiffs have no evidence to the contrary.  Simply put, Plaintiffs' purported harms have not occurred.

Nor are they "certainly impending".  *Susan B. Anthony*, 573 U.S. at 158.  The "certainly impending" harm Plaintiffs alleged at the preliminary injunction stage of this litigation has not come to fruition more than three months later.  And the *possibility* that BRIC *might* be terminated at an unknown point in the future is not sufficient to establish standing.  *See Whitmore v. Arkansas*, 495 U.S. 149, 159-160 (1990).  That is particularly true where, even if BRIC *were* to be terminated,

it is entirely speculative to assume that Plaintiffs' grant awards would be affected.  FEMA has demonstrated that it continues to pay for all partially and fully obligated grant awards, Doc. 96, p. 109, ¶ 11(B); DSOMF, ¶ 109, even while it "has been working to identify how grants can accomplish the Trump Administration's priorities most effectively and efficiently to support states and local communities in disaster planning, response, and recovery", Doc. 96, p. 103.  And as for any of Plaintiffs' projects that have been Identified for Further Review, they are not guaranteed funding for these projects to begin with.  DSOMF, ¶¶ 129-130.  Plaintiffs' "expectation" of receiving funds to which they are not guaranteed does not give rise to standing.[6]

Moreover, if FEMA decided to terminate one of Plaintiffs' grants (which, again, it has not done), it will follow the proper termination and close out procedures established by 2 C.F.R. Part 200 which include, among other things, providing notification of the termination to the recipient and an opportunity for the recipient to object to the termination.  Doc. 96, p. 109, ¶ 11(B); 2 C.F.R. §§ 200.341.  There can be no impending harm when this process has not even begun, much less been completed.

For these reasons, this Court should follow Supreme Court precedent and decline to "entangle" itself in an abstract disagreement based on events and purported harms that undisputedly have not occurred—and, indeed, may *never* occur.  *Abbot Lab'ys*, 387 U.S. at 148-49.

---

[6] *See e.g.* Doc. 104-38, ¶ 6 ("The City of New York has…an additional five projects selected for BRIC funding from Federal Fiscal Year 2023.  For these projects, the City expected to receive $351,424,696 of federal funding"); Doc. 104-33, ¶¶ 5-13 (describing purported harms from projects that have been selected but not yet awarded); Doc. 104-34, ¶¶ 6-11 (same); Doc. 104-39, ¶ 14 (describing purported harms from projects that have not been approved for Phase II); Doc. 104-32, ¶ 13 (same).

**B.      Plaintiffs Fail to Establish a Waiver of Sovereign Immunity.**

Plaintiffs' failure to demonstrate a specific waiver of the government's sovereign immunity is another jurisdictional bar to this case.  Plaintiffs attempt to invoke the APA as a source of the Court's federal question jurisdiction.  But the APA's waiver of sovereign immunity does not apply to matters for which "another statute precludes judicial review" or matters that are "committed to agency discretion by law."  5 U.S.C. § 701(a); *see Heckler v. Chaney*, 470 U.S. 821, 830 (1985) ("The APA's comprehensive provisions for judicial review of 'agency actions,' are contained in 5 U.S.C. §§ 701-706 . . . [b]ut before any review at all may be had, a party must first clear the hurdle of § 701(a).").  The Stafford Act "preclude[s] judicial review" as contemplated by APA § 701(a)(1) in the circumstances presented here.

Under the Stafford Act, Congress has specifically immunized the government from "any claim based on the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a Federal agency or an employee of the Federal Government in carrying out the provisions of this chapter."  42 U.S.C. § 5148.  In other words, Congress has "precluded judicial review of all disaster relief claims based upon the discretionary actions of federal employees." *Rosas v. Brock*, 826 F.2d 1004, 1008 (11th Cir. 1987); *see also Ornellas v. United States*, 2 Cl. Ct. 378, 380 (1993) ("Liability should not be imposed on the federal government for discretionary acts or omissions of its agencies or employees in distributing benefits under such gratuitous programs.").

Plaintiffs argue the discretionary immunity provision does not apply because the statute "does not allow Defendants to flout Congress's directives or the Constitution."  Doc. 102, p. 16. This argument is inapposite.  Plaintiffs are right that Defendants cannot "flout" Congress's directives—and there is no evidence that they have done so here.  All funding Plaintiffs claim has

been "refused" or "withdrawn" remains available for mitigation functions—including BRIC grants—while DHS and FEMA assess the program.  But more to the point, Plaintiffs' purported harms here do not flow from these general statutory requirements.  They flow from FEMA's purported refusal to pay *these Plaintiffs* funds to which they claim to be entitled.

To that end, the relevant question here is whether FEMA's decision to award funding to *these Plaintiffs* is discretionary.  To answer that question, courts rely on the two-part test developed by the Supreme Court in *United States v. Gaubert*, 499 U.S. 315 (1991): (1) whether the challenged conduct involves an "'element of judgment or choice'" and (2) whether "judgment is of the kind that the discretionary function exception was designed to shield." *St. Tammany Par., ex rel. Davis v. FEMA,* 556 F.3d 307, 323 (5th Cir. 2009) (quoting *Gaubert*, 499 U.S. at 322-23).  Both prongs are met here.

FEMA retains broad discretion in setting priorities and determining which projects further the agency's goals.  The Stafford Act's pre-disaster mitigation provision, 42 U.S.C. § 5133, is couched in discretionary terms and does not mandate funding for any particular entity.  *See, e.g.,* 42 U.S.C. § 5133(b) ("The President *may* establish a program…to assist in the implementation of predisaster mitigation measures…."); *id.* § 5133(c) ("…the President, using amounts…established under subjection (i)…*may* provide technical and financial assistance…).  And case law supports that "[e]ligibility determinations, the distribution of limited funds, and other decisions regarding the funding of eligible projects are inherently discretionary." *St. Tammany Par.*, 556 F.3d at 325; *see, e.g.*, *Santos v. FEMA*, 327 F. Supp. 3d 328, 344 (D. Mass. 2018) (finding that housing assistance under the Stafford Act comes under the discretionary function exception); *Ridgely v. FEMA*, 512 F.3d 727, 735-36 (5th Cir. 2008) (finding that FEMA decision to discontinue rental assistance is discretionary and does not create an entitlement, "even if assistance is being offered

and [the individual] meets the eligibility criteria"); *City of San Bruno v. FEMA*, 181 F. Supp. 2d 1010, 1014 (N.D. Cal. 2001) ("Distributing limited funds is inherently a discretionary responsibility."); *Fargo v. FEMA*, No. 19-CV-00004, 2019 WL 1769746, at *3 (D. N. Mar. I. Apr. 23, 2019) ("Most FEMA funding decisions are discretionary and not subject to review in the courts.").  There is no question that these discretionary funding decisions are grounded in the policy objectives of the Administration.

Plaintiffs have undisputedly received all funding to which they are entitled.  No Plaintiff has established that FEMA has terminated one of their grant awards or refused to pay one of their fully obligated awards.  We are left, then, only with FEMA's purported refusal to fund projects of Plaintiffs that have been Identified for Further Review or are in Phase I of their eligibility determination.  But as described above, these decisions are entirely discretionary, and Plaintiffs are not entitled to funding under either circumstance.  DSOMF, ¶¶ 127-130.

Because the provision of disaster relief assistance to these Plaintiffs is discretionary and grounded in public policy, and because Plaintiffs have not—and cannot—cite any language to the contrary, the Stafford Act's discretionary function exception applies and "preclude[s] judicial review" as contemplated by APA § 701(a)(1).

### C.    The Court of Federal Claims Has Exclusive Jurisdiction Over Plaintiffs' Claims.

Though Plaintiffs style their claims as APA or constitutional claims, what Plaintiffs ultimately seek is the payment of billions of dollars pursuant to funding agreements that, in their view, either have been terminated or will be terminated soon.  Indeed, the majority—if not all—of Plaintiffs' purported harms flow directly from Defendants' alleged refusal to pay them money to which they believe they are entitled.  *See e.g.* Doc. 104-20, ¶ 17 ("Without this BRIC grant, Shoreline will face a multimillion-dollar funding gap requiring them to initiate a new funding

search that would likely take several years"); Doc. 104-21, ¶ 35 ("If FEMA's termination of the BRIC program is not reversed, the Commonwealth could potentially lose approximately $123 million in BRIC grant funds for the FFY20-23 cycles"); Doc. 104-24, ¶ 15 ("Many of the BRIC projects in Colorado cannot move forward without BRIC funding"); Doc. 104-27, ¶¶ 9-10 ("Many of the BRIC projects in Delaware cannot move forward without BRIC funding…Delaware does not have the budgetary resources of flexibility to make up for the lost funding without drawing funding away from other important initiatives").  In challenging the purported terminations of these agreements (which, again, has not occurred), Plaintiffs seek an order to enforce FEMA's contractual obligation to pay.  Specifically, Plaintiffs seek to permanently enjoin FEMA's purported "termination of the BRIC program" and to "restore the status quo as it existed before the termination".  Doc. 85, p. 76.  In short, Plaintiffs ask for specific performance of contractual agreements.

The Tucker Act confers exclusive jurisdiction on the Court of Federal Claims to hear cases involving express or implied contracts with the United States which exceed $10,000.  28 U.S.C. § 1491(a)(1).  Therefore, "the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court" under the APA.  *Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004); *see also Glaskin v. Klass*, 996 F. Supp. 67, 72 (D. Mass. 1998).  Moreover, Congress has by statute explicitly forbidden district court jurisdiction for such contractual claims.  28 U.S.C. § 1346(a)(2) ("the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States…").  This jurisdictional divide ensures that contract claims against the government are channeled to the court that has "unique expertise" in that area.  *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir.

1985). And it respects Congress's deliberate choice to limit the remedies available for such claims. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 971 (D.C. Cir. 1982).

Determining whether a claim "is 'at its essence' contractual"—and therefore falls outside of the APA's waiver of sovereign immunity—"depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Crowley Gov't Srvc., Inc. v. General Services Administration*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quoting *Megapulse*, 672 F.2d at 968)). Applying this two-pronged test here confirms that Plaintiffs' claims amount to the very sort of contractual claims for monetary relief against the federal government over which this Court lacks jurisdiction.

Plaintiffs argue that their claims are "based on the Constitution and on statutes barring Defendants from substantially reducing FEMA's mitigation functions, repurposing or withholding funds, and acting through unlawfully appointed officials." Doc. 102, p. 16. This is wrong. None of these authorities in any way mandates that funds be allocated to Plaintiffs specifically. Only grant agreements can do that. In short, the "ultimate source of [Plaintiffs'] rights" are grant agreements. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 895 (D.C. Cir. 1985). Plaintiffs have no colorable claim to any future funding whatsoever absent a grant agreement.

And the relief Plaintiffs seek only confirms that their claims are essentially contractual in nature. *See Crowley*, 38 F.4th at 1110 ("We turn next to the type of relief sought."). Courts have found this factor "dispositive." *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, --- F. Supp. 3d ---, 2025 WL 763738, at *4–*8 (D.D.C. Mar. 11, 2025), *dismissed*, 2025 WL 1350103 (D.C. Cir. May 2, 2025). In *Catholic Bishops*, for example, it was determinative that "[t]he nature of the relief the Conference seeks"—an "order [that] the Government . . . stop withholding the money due under the Cooperative Agreements"—"'sounds in contract.'" *Id.* at *5. So too here. Plaintiffs

ask the Court to "preliminarily and permanently enjoin Defendants' termination of the BRIC program, *and any action to implement that termination*"—*i.e.*, an order that the government keep paying money Plaintiffs believe are due to them under agreements. Doc. 85, p. 76. In other words, "[s]tripped of its equitable flair," Plaintiffs "seek[] the classic contractual remedy of specific performance." *Cath. Bishops*, 2025 WL 763738, at *5 (quoting *Spectrum Leasing*, 764 F.2d at 894).

In *Department of Education v. California*, the Supreme Court addressed this issue in the same context in which Plaintiffs' claims arise, *i.e.*, grant awards. 604 U.S. ----, 145 S. Ct. 966 (2025) (per curiam). The Court explained that the government is "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA," *id.* at 968-69, because suits seeking such relief belong in the Court of Federal Claims:

> The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U. S. C. §702. Nor does the waiver apply to claims seeking "money damages." *Ibid.* True, a district court's jurisdiction "is not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds. *Bowen* v. *Massachusetts*, 487 U. S. 879, 910 (1988).[2] But, as we have recognized, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here. *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 212 (2002). Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." 28 U. S. C. §1491(a)(1).

*Id.* at 968.

Even before the Supreme Court's decision in *California*, the First Circuit held that where "the essence of the [Plaintiffs'] action is in contract," a plaintiff may not evade the Tucker Act's exclusive grant of jurisdiction "by the mystique of a different form of complaint," such as a suit under the APA. *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978); *see also Diaz v. Johnson, No. 19-1501,* 2020 WL 9437887, at *5 (1st Cir. Nov. 12, 2020) (holding that plaintiff

"cannot manufacture an APA claim by asking the court to declare that the failure to fund his proposal was an arbitrary or capricious act"). And, here, Plaintiffs seek to compel continued payment of money under funding agreements, and to prevent the termination of funding agreements—all of which is to say Plaintiffs seek continued payment under contracts. *See* Doc. 85, p. 76 (requesting an injunction to "restore the status quo as it existed before the termination").

"[D]espite [Plaintiffs'] valiant effort to frame the suit as one for declaratory or injunctive relief"—or as a suit under the APA—"this kind of litigation should be understood for what it is," a "suit for money for which the Court of Federal Claims can provide an adequate remedy," and which "therefore belongs in that court." *Suburban Mortg. Assocs. v. U.S. Dep't of Housing & Urban Dev.*, 480 F.3d 1116, 1118 (Fed. Cir. 2007); *see also Catholic Bishops*, 2025 WL 763738, at *7 ("Sure, the Conference seeks to set aside agency action. But the agency action that it asks the Court to reverse is the Government's decision to cease a financial relationship with the Conference."). Just as the Supreme Court held in *California*, this Court should hold that Plaintiffs' claims belong in the Court of Federal Claims.

### D. The United States Has Not Waived Sovereign Immunity To Compel Specific Performance of Contracts.

The Court also lacks jurisdiction because the relief that Plaintiffs request would bar Defendants from terminating grant agreements—compelling the United States to specifically perform those agreements—and Congress has not waived the United States' sovereign immunity for that relief. First Circuit precedent recognizes that the United States has not waived sovereign immunity for specific performance and requires courts to dismiss actions that would compel the United States to perform a contract. *See Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3-4 (1st Cir. 1989) (stating "[w]e are unaware of any waiver of sovereign immunity by the United States

as to specific performance for breach of contract" and dismissing for lack of subject matter jurisdiction).

Here, Plaintiffs ask the Court to compel specific performance of grants as described above. Of course, if the Court bars Defendants from terminating grant awards, then the Court is ordering Defendants to perform those agreements by paying the grants. Because courts cannot order agencies to specifically perform agreements, a district court in Utah—citing the First Circuit's holding in *Coggeshall*—recently dismissed a purported APA claim brought by a grantee against the Small Business Administration ("SBA") following SBA's termination of a grant. *Imaginarium LLC v. United States Small Bus. Admin.*, 618 F. Supp. 3d 1225, 1232 (D. Utah 2022). There, SBA approved a grant then denied the grant, and the grantee sued for relief under the APA that would order the SBA to follow the law (as the grantee saw law). *Id.* at 1228, 1231. The court explained "some of Plaintiff's requests for declaratory judgment require the Court to order specific performance by the SBA of its alleged contractual obligations to Plaintiff—this is well beyond the Court's power." *Id.* at 1232. Just so here.

## II.    Plaintiffs' APA Claims Are Unreviewable For Independent Threshold Reasons And Fail On The Merits.

The APA confines judicial review to those instances in which an agency has taken—or has a clear, mandatory duty to take—a discrete "agency action," such as the issuance of a rule or order. *See* 5 U.S.C. § 704. And judicial review is further confined to agency action that is "final," *i.e.*, that both concludes the agency's decisionmaking process and determines rights and obligations. *Id.* To that end, even if this Court concludes that it has subject matter jurisdiction, judicial review of Plaintiffs' APA claims is nonetheless unavailable for the separate threshold reasons that 1) there has been no final agency action; 2) FEMA's funding decisions are committed to agency discretion by law; and 3) Plaintiffs seek to compel agency action that is neither discrete nor required by law.

### A.    No Final Agency Action.

In creating judicial review under the APA, Congress sought to strike an appropriate balance "between the goal of efficient and effective agency action, on the one hand, and the value of judicial review in ensuring the rationality and fairness of agency decisionmaking on the other." *NRDC, Inc. v. SEC*, 606 F.2d 1031, 1048 (D.C. Cir. 1979).  The Attorney General's Committee on Administrative Procedure, whose work informed the drafting of the APA, advised Congress that the object of judicial review is "to *check*—not to *supplant*—administrative action."  S. Doc. No. 8, 77th Cong., 1st Sess. 77 (1941).  The Committee explained that "[r]eview must not be so extensive as to destroy the values—expertness, specialization, and the like—which were sought in the establishment of administrative agencies."  S. Doc. No. 8, *supra* at 77.  The Committee added that the Constitution—in particular, its requirement that federal judicial power may be exercised only in cases and controversies—also operates to constrain courts from assuming legislative or administrative powers.  *Id.* at 79, 88 ("[m]aintenance of amicable relations between [courts and agencies] and avoidance of disrupting conflict requires generally that the administrative agency be permitted to finish its job before the court steps in"); *see also Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939) (explaining that the Court's consistent refusal to review agency action that "does not itself adversely affect complainant, but only affects his rights adversely on the contingency of future administrative action" was grounded in "traditional conceptions of federal judicial power" under which "resort to the courts in these situations is either premature or wholly beyond their province").  In that way, reviewable "final agency action" is readily distinguishable from an agency's day-to-day administration of its programs, which is not subject to review.  *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 891, 899 (1990) ("Under the terms of the

24

APA" a plaintiff "must direct its attack against some particular 'agency action' that causes it harm" and "cannot demand a general judicial review of [an agency's] day-to-day operations").

Under the test first laid out in *Bennett v. Spear*, an agency action is considered "final" if two conditions are met:  first, it marks the "consummation" of the agency's decision-making process; and second, the action determines rights or obligations or creates legal consequences.  *See Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2025) (citing *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  On *Bennett*'s second prong, courts follow a "pragmatic" approach and determine whether an action is final "based on the concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it."  *California Communities Against Toxics v. Env't Prot. Agency*, 934 F.3d 627, 637 (D.C. Cir. 2019) (interpreting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016)).

Plaintiffs claim that the "BRIC termination, and the steps taken to implement it" are the final agency actions at issue here.  Defendants dispute that BRIC has been terminated for the reasons discussed above.  And the "steps taken" identified by Plaintiffs—the withdrawal of the FY 2024 NOFO and the issuance of the Hamilton Memo—are not final in that they do not determine rights or create legal consequences for Plaintiffs.

Though FEMA has removed the FY 2024 NOFO from Grants.gov and the FEMA website, this does not amount to final agency action, nor does it constitute a step towards final agency action.  This funding is still available for future BRIC funding opportunities and there is nothing prohibiting FEMA from issuing another NOFO for this funding.  Doc. 96, p. 109, ¶ 11(A); DSOMF, ¶ 124.  This is because, as described above, NOFOs are funded by "no year" funds, meaning that the funds remain available indefinitely until expended, regardless of the fiscal year. *See* GAO, Principles of Federal Appropriations Law, ch. 5, 5-6 (4th ed. 2016 rev.); DSOMF, ¶

124.  Consequently, Congress has not constrained FEMA's ability to spend these funds by any temporal limit that would cause the funds to expire or render them unavailable for a future award. And given that FEMA maintains discretion over the selection of award recipients and overall effectuation of the agency's policy priorities, the agency's decision to withdraw the 2024 NOFO while it evaluates those policy priorities is of no legal consequence to Plaintiffs—who were not entitled to those funds to begin with, and are free to compete for them should FEMA decide to re-issue the NOFO.

Likewise, the Hamilton Memo neither marked the consummation of the agency's decision-making process nor created legal consequences for Plaintiffs.  *See Harper*, 118 F.4th at 116.  The language of the Hamilton Memo makes this clear:  it contemplates that fully obligated and partially completed projects will be subject to a "program review" after which there will be a "recommendation on future activities…based on an analysis of the information collected."  Doc. 96, p. 43.  Similarly, the FEMA Advisory states, under a subheading entitled "Outstanding BRIC Projects and Next Steps"—which, by its plain language, contemplates that future action still needs to occur—that FEMA will be "reaching out and coordinating with recipients on projects."  Doc. 96, p. 63.  It goes on to state that "[f]or phased projects, FEMA Regions will work closely with applicants on already obligated projects to determine the best path forward for those projects."  Doc. 96, p. 63.  And in a Memorandum dated May 16, 2025, Defendants stated that "[a]warded and obligated projects found to be in compliance with the President's EOs will have funds released to complete their current phase."  Doc. 96, p. 102.  While the Memorandum goes on to state that "[n]o new projects or additional phases will be awarded", this only underscores that Defendants are evaluating BRIC and "working to identify how grants can accomplish the Trump Administration's priorities most effectively and efficiently to support states and local communities

in disaster planning, response and recovery." Doc. 96, p. 103. And, more to the point here, final agency action with respect to any of Plaintiffs' projects that have been selected or fully obligated has not occurred.

Any final agency action—including the termination of the BRIC program or any individual grant termination—would need to be approved by the Secretary or Deputy Secretary of DHS. Doc. 96, pp. 108, 111 (¶¶ 8, 13). This has not occurred. The withdrawal of the 2024 NOFO and the Hamilton Memo did not create any consequences—certainly not against any named Plaintiffs— and any future plaintiffs injured by FEMA's subsequent actions—should they occur—can pursue their claims in an appropriate forum. Plaintiffs' current claims, however, are not subject to APA review.

### B.    FEMA's Decisions In Entering and Performing Grants Are Committed To Agency Discretion By Law.

Even if Plaintiffs' claims were not based in contract, the APA precludes judicial review because FEMA's grant funding decisions are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The "allocation of funds" is an "administrative decision traditionally regarded as committed to agency discretion." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). "[T]he very point of a lump-sum appropriation," the *Lincoln* Court explained, "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192.

That same principle squarely applies to FEMA discretionary grant funding. The purported terminated grants are not prescribed by any federal statute or regulation, either in terms of amounts or who the recipients are. Nor has BRIC received funding through targeted appropriations that require expenditures on Plaintiffs' specific projects. Instead, "[the] expenditures resulted from executive discretion, not congressional action." *Hein v. Freedom From Religion Found, Inc.*, 551

27

U.S. 587, 605 (2007).  As *Lincoln* made clear, FEMA's "allocation of funds" from those lump-sum appropriations to various programs and priorities "requires 'a complicated balance of a number of factors,'" including whether the agency's "'resources are best spent' on one program or another" and "whether a particular program 'best fits the agency's overall policies.'"  508 U.S. at 193 (quoting *Heckler*, 470 U.S. at 831).  And that discretion includes the authority to terminate grants that no longer advance agency priorities, *i.e.*, pre-disaster hazard mitigation measures that are not, in the governments' view, "cost-effective" and "designed to reduce injuries, loss of life, and damage and destruction of property[.]"  42 U.S.C. § 5133(b).

## C. Plaintiffs Seek To Compel Agency Action That Is Neither Discrete Nor Required By Law.

In its "scope of review" provision, the APA authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed[.]"  5 U.S.C. § 706(1).  Unlike the provision that instructs courts to "set aside" unlawful agency action, *id.* § 706(2), the § 706(1) provision "provides relief for a *failure* to act[.]"  *SUWA*, 542 U.S. at 62.  However, only certain types of agency failures can support a claim under § 706(1).  "A claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."  *Id.* at 64 (emphasis in original).  These two limitations play different roles:  "The limitation to *discrete* agency action precludes…broad programmatic attack[s,]", *id.* (emphasis added), while "[t]he limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law[,]" *id.* at 65.

The discreteness limitation precludes using "broad statutory mandates" to attack agency policy to "avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve."  *SUWA*, 542 U.S. at 64.  A statutory provision "contain[ing] only a general follow-the-law directive…flunks *SUWA*'s discreteness test[,]" for example, because

it does not prescribe a specific action that a court can competently compel and supervise.  *See El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 891 (D.C. Cir. 2014).

The other § 706(1) requirement—that the law must *mandate* the agency action that a plaintiff seeks to compel—reflects that, prior to the APA, courts compelled executive action via writs of mandamus, which were available only for "specific, unequivocal command[s]" as to which the agency had "no discretion whatever."  *SUWA*, 542 U.S. at 63.  The "mandatoriness" requirement means that courts cannot compel agencies to take action beyond what is legally required of them.  For example, "when an agency is compelled to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be."  *Id.* at 65.

For example, Section 706(1) permits a court to order an agency to respond to a rulemaking petition within a reasonable time (*see, e.g.*, *Public Citizen Health Research Group v. Commissioner, Food & Drug Admin.*, 740 F.2d 21, 34-35 (D.C. Cir. 1984)), or to make a "final determination" on an administrative complaint (*see, e.g.*, *Brock v. Pierce County*, 476 U.S. 253, 259, 260 n. 7 (1986)), or to act on a permit application (*see, e.g.*, *Costle v. Pacific Legal Found.*, 445 U.S. 198, 220 n. 14 (1980)).  The relief is straight-forward:  the court simply orders the agency to complete the particular agency action that has been unlawfully withheld or unreasonably delayed, without directing what conclusions the agency should reach.  *See, e.g.*, *Brock*, 476 U.S. at 260 n. 7.  A court may not, however, order an agency to conduct its "day-to-day operations" differently from how they are being conducted.  *Lujan*, 497 U.S. at 899.  This prohibition prevents "interference of the Courts with the performance of the ordinary duties of the executive departments," *Decatur v. Paulding*, 39 U.S. 497, 515-516 (1840), thereby respecting and reinforcing the separation of powers under the Constitution.

What Plaintiffs seek here goes beyond the relief that Section 706(1) can provide.  Plaintiffs seek an order to "restore the status quo as it existed before the termination [of BRIC], including by requiring Defendants to reopen the fiscal year 2024 Notice of Funding Opportunity, evaluate applications, and select recipients in a reasonable time period."  Doc. 85, p. 76.  But these are not discrete agency actions that are required by law.  Instead, these requested actions are akin to programmatic challenges to BRIC's day-to-day operation, which are not permissible.  In *Lujan*, the Supreme Court dispelled any notion that such a programmatic challenge can proceed under the APA:

> [I]t is at least entirely certain that the flaws in the entire "program"—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of them is ripe for review and adversely affects [a plaintiff].

497 U.S. at 892-93 (footnote omitted).  Addressing the type of claims Plaintiffs assert under Section 706(1) would require the Court to supervise all of the agency's activities and decide what is or is not statutorily required—an even more extreme kind of supervisory claim than what as at issue in *Lujan* itself.  But as the Court explained in *SUWA*, the purpose of the APA's discrete agency action requirement is:

> to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve.  If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management…The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA.

542 U.S. at 66-67.  With those principles in mind, the true nature of Plaintiffs' request would require:

- this Court's supervision over the day-to-day operations of BRIC to ensure that the "status quo" is being maintained;

- this Court's supervision over the speed by which FEMA is evaluating and awarding grant applications, even though no time restraints are prescribed by Congress; and

- FEMA to enter into contracts with applicants or on a timetable that agency leadership does not view as being in the agency's interest.

And, at bottom, the law does not require that FEMA maintain the BRIC program, specifically, at all, *see* 42 U.S.C. § 5133(b) ("The President *may* establish a program to provide technical and financial assistance to States and local governments to assist in the implementation of predisaster hazard mitigation measures…..), much less that FEMA must issue NOFOs, evaluate applications, or select recipients in the idealized time period prescribed by Plaintiffs.

And even if this Court were to conclude that these actions amount to discrete agency actions that FEMA is required to take (which FEMA disputes), any argument that FEMA has taken too long to re-issue the 2024 NOFO, "evaluate applications", or "select recipients in a reasonable time period", Doc. 85 p. 76, likewise fails.  While the APA provides that "each agency shall proceed to conclude a matter presented to it" "within a reasonable time," 5 U.S.C. § 555(b), and that courts "shall…compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1), the central question in evaluating such a claim is whether the agency's delay "is so egregious that mandamus is warranted."  *Kokajko v. FERC*, 837 F.2d 524, 526 (1st Cir. 1988). Here, as Congress has not prescribed a time by which the funds appropriated for BRIC must be

spent, FEMA cannot be said to have "unreasonably delayed" these actions while it evaluates the BRIC program—an evaluation that, to date, has lasted less than seven months.

### D. Plaintiffs' APA, Separation of Powers, and Appropriations/Spending Clause Claims Fail On The Merits.

Even if Plaintiffs' claims were reviewable under the APA, they still fail as a matter of law. Plaintiffs' "contrary to law" claims under Section 706(2) all hinge upon Plaintiffs' mistaken belief that FEMA has substantially reduced its mitigation functions by purportedly cancelling the BRIC program, withholding appropriated funds, or repurposing funds directed to BRIC. FEMA has not done any of these things. To start, for the reasons described above, the BRIC program has not been terminated. And all funds that have been set aside for BRIC remain in the DRF and are available for BRIC expenses, including BRIC grants. Doc. 96, p. 111, ¶ 12; DSOMF, ¶¶ 107-108. Defendants have not "withdrawn" these funds. *Id.* Likewise, all funds that have been appropriated for BRIC through IIJA have not been spent, diverted, or used any other programs or projects. Doc. 96, p. 111, ¶ 12. FEMA has thus complied with its statutory requirements under 42 U.S.C. § 5133.

As described at the beginning of this litigation, FEMA is working "to identify how grants can accomplish the new priorities [of the Administration] most effectively and efficiently." Doc. 96, p. 45. That FEMA may opt to fund projects other than those belonging to Plaintiffs does not mean that FEMA has substantially reduced its mitigation functions overall. All of Plaintiffs' "contrary to law" claims under Section 706(2) thus fail.

Plaintiffs' attempt to recast these claims as separation-of-powers claims fares no better. As the Supreme Court has cautioned, courts must "take care not to transform every claim that an agency action conflicts with a statute into a freestanding separation of powers claim." *Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 204 (2009). The essence of Plaintiffs' claims here is that FEMA has acted contrary to its statutory mandate and in conflict with statutory

and regulatory requirements, not that FEMA seized some power never before permitted to the Executive Branch.  As recently recognized by another session of this Court in declining to recognize a separation-of-powers claim in a similar context, "[t]his is the stuff of APA litigation, which appears to provide an avenue for complete relief in this matter."  *American Public Health Association v. National Institutes of Health*, 786 F. Supp. 3d 237, 262 (D. Mass. 2025) (internal citation omitted).  So too here.

Plaintiffs' claims under the Appropriations Clause and Spending Clause also fail.  The Appropriations Clause provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I., § 9, cl. 7.  In other words, the Clause requires that "payment of money from the Treasury must be authorized by a statute."  *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990).  At the same time, it is the President's duty to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.

FEMA's actions comport with these constitutional principles.  As discussed, the statutory sources of funding at issue here merely appropriate lump sums to be used for general purposes; it leaves FEMA discretion in overseeing and managing the grant programs within the framework marked by those statutorily indicated purposes.  FEMA is doing so here.  It has not terminated any of Plaintiffs' grants, but even if it did, FEMA is permitted to award and re-obligate funds for projects found to be in compliance with the President's Executive Orders and priorities without offending the Appropriations Clause or revealing an intent to withhold appropriated funds, as Plaintiffs suggest.  Again, Congress has not constrained FEMA's ability to spend these funds by any temporal limit that would cause the funds to expire or render them unavailable for a future award.

Because the record is devoid of any evidence that FEMA has abandoned its statutory obligations, Plaintiffs claims have no chance of success.  The limited cases involving successful Appropriations Clause challenges have involved attempts to spend funds not appropriated by Congress, *see Off. of Pers. Mgmt.*, 496 U.S. at 432, or a refusal to spend appropriated funds where the relevant statutes required that the funds be spent, *see Train v. City of N.Y.*, 420 U.S. 35, 42, 45 (1975).  Neither of those circumstances exist here.  FEMA has not attempted to spend any funds not appropriated to it, and there is no evidence to suggest that FEMA will not obligate the funds appropriated to BRIC in a manner consistent with the appropriations laws.

### III.    Plaintiffs' *Ultra Vires* Claim Fails

Plaintiffs' *ultra vires* challenge fails at the threshold because an alternative procedure for judicial review exists.  *See Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) (finding a non-statutory *ultra vires* claim will not be recognized if there is a "meaningful and adequate means of vindicating" plaintiffs' rights).  Here, for all the reasons that the Tucker Act precludes APA actions for claims that are in essence contractual, the Tucker Act also impliedly precludes a non-statutory equitable *ultra vires* action based on such claims. Plaintiffs can seek relief from the Court of Federal Claims, which can adequately vindicate their asserted rights by awarding damages if they prevail.  Plaintiffs also seek review under the APA in this case.  Plainly, then, even on Plaintiffs' own view, the *ultra vires* cause of action is not the only one available to them.

### IV.    Plaintiffs' Appointments Clause Claim Fails.

Plaintiffs' Appointments Clause claim is predicated on the incorrect assumption that either Cameron Hamilton or David Richardson were at some point designated as Acting Administrator of FEMA.  *See* Doc. 102, pp. 26-29.  Neither individual was ever designated to that role.  Doc. 96,

pp. 105-111, ¶¶ 1, 10, 13.  Since Deanne Criswell's resignation on January 20, 2025, the office of FEMA Administrator—and any "Acting Administrator" designation—has remained vacant.  After the change in administration, Cameron Hamilton was appointed to his role as Assistant Administrator of FEMA's Office of Response and Recovery.  Doc. 96, p. 108, ¶ 10.  He was later assigned to perform the delegable duties of the Administrator as the SOPD of FEMA Administrator.  Doc. 96, p. 108-109, ¶¶ 10, 13.  Following Cameron Hamilton's departure, David Richardson has been performing the same delegable functions in his capacity as SOPD.  Doc. 96, p. 105, 111, ¶¶ 1, 13.

The temporary performance of these duties by a person not confirmed to the role does not raise an Appointments Clause issue.  As the Federal Circuit recently observed, "Although an inferior officer generally cannot issue a final agency decision, he may perform the functions and duties of an absent [Presidentially-nominated, Senate-confirmed officer ("PAS officer")] on a temporary, acting basis."  *Arthrex, Inc. v. Smith & Nephew*, Inc., 35 F.4th 1328, 1333 (Fed. Cir. 2022).  The Supreme Court's decision in *United States v. Eaton*, 169 U.S. 331 (1898), long established that an inferior officer may temporarily exercise the authority of a principal officer without violating the Appointments Clause.  In *Eaton*, the Court upheld the temporary appointment of a "vice consul" to perform the duties of a principal "consul," reasoning that a subordinate who "is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, is not thereby transformed into the superior and permanent official."  *Id.* at 343.  The Court cautioned that, absent this rule, "every delegation of power to an inferior to perform under any circumstances or exigency the duties of a superior officer" would be invalid, seriously hindering the discharge of administrative duties.  *Id.*  *Eaton* confirms that there is no Appointments Clause concern here.  Because Cameron Hamilton and David Richardson have each

performed the Administrator's delegable duties only on a temporary basis during a vacancy, their service raises no Appointments Clause concern.

Nor can Plaintiffs demonstrate a violation of the Federal Vacancies Reform Act ("FVRA") for a straightforward reason: the FVRA limits only the performance of non-delegable functions or duties of an office, and the duties at issue here—including the administration of FEMA grant programs—are delegable.

The FVRA provides the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive Agency . . . for which appointment is required to be made by the President, by and with the advice and consent of the Senate." 5 U.S.C. § 3347(a). The statute further states that any action taken by a person who is not lawfully performing a "function or duty" of a vacant office "shall have no force or effect" and "may not be ratified." 5 U.S.C. § 3348(d)(1)–(2). Plaintiffs ask the Court to void alleged actions taken by Cameron Hamilton and to preclude David Richardson from ratifying them. Doc. 85, p. 76. But that request misapprehends the statute. The actions at issue in this case—BRIC program evaluation, NOFO withdrawal, obligation management, performance extension policies—are delegable. Doc. 96, p. 111, ¶ 13. The FVRA's section 3348 thus does not preclude an official other than a Senate-confirmed or validly Acting Administrator from performing them.

Plaintiffs' argument overlooks the narrow statutory definition of "function or duty." Under § 3348(a)(2), the term is limited to duties that are expressly required "to be performed by the applicable officer (*and only that officer*)" (emphasis added). Duties that are not exclusive to the PAS officer fall outside § 3348 and may be delegated to other officials.

Most courts have endorsed this narrow construction. *See, e.g.*, *Kajmowicz v. Whitaker*, 42 F.4th 138, 148-152 (3d Cir. 2022) ("Of course, the Vacancies Reform Act includes neither the

terms nondelegable nor exclusive.  But Congress need not have included these terms when it already included the parenthetical qualifier 'and only that officer[.]'" (citations omitted)); *Arthrex,* 35 F.4th at 1336 ("This statutory language is unambiguous: the FVRA applies only to functions and duties that a PAS officer alone is permitted by statute or regulation to perform.  It does not apply to delegable functions and duties."); *Stand Up for California! v. U.S. Dep't of Interior*, 994 F.3d 616, 625-26 (D.C. Cir. 2021) (observing FVRA applies to "exclusive duties"); *Schaghticoke Tribal Nation v. Kempthorne*, 587 F.3d 132, 135 (2d Cir. 2009) (holding the FVRA did not prohibit an inferior officer from performing a function of a PAS officer who had resigned because the agency's regulations permitted the PAS officer to delegate that function); *United States v. Harris County*, No. 4:16-CV-2331, 2017 WL 7692396, at *7 n.5 (S.D. Tex. Apr. 26, 2017) (noting, the "actions in this case were not barred by the [FVRA]" because "the relevant duties" were "delegable").  Where statutory language is clear, "the court's work is done."  *Bostock v. Clayton Cnty.*, 590 U.S. 644, 674, 140 S. Ct. 1731, 1749 (2020).

The Department of Justice's Office of Legal Counsel (OLC) reached the same conclusion shortly after the statute's enactment.  OLC has stated, "Most, and in many cases all, the responsibilities performed by a PAS officer will not be exclusive, and the Act permits non-exclusive responsibilities to be delegated to other appropriate officers and employees in the agency."  *See* Guidance on Application of Fed. Vacancies Reform Act of 1998, 23 Op. O.L.C. 60, 72 (1999).  OLC found that Congress intentionally confined the FVRA's penalties to non-delegable duties, as Congress understood that government operations could be "seriously impaired" otherwise.  *Id.*

This practical concern is especially acute in the emergency management context.  Reading the FVRA to freeze FEMA operations whenever the office of Administrator is vacant would risk

"administrative paralysis" precisely when the Nation may need immediate federal response capacity. *See Arthrex*, 35 F.4th at 1337 (quoting S. Rep. No. 105-250, at 30–31). Upon a Presidential disaster declaration under the Stafford Act, FEMA must act quickly to allocate resources, approve grants, and coordinate response efforts. The overly broad reading of § 3348 posited by Plaintiffs would cast doubt on essential FEMA decisions rendered during any vacancy in the office of Administrator and could freeze FEMA's operations in precisely the moments when they are most needed.

The FEMA organic statute assigns the Administrator responsibility for, among other things, "supervising grant programs administered by the Agency." 6 U.S.C. § 314(a)(12). Nothing in that provision (or elsewhere in § 314) states that only the Administrator may perform such supervision. The Stafford Act similarly vests broad disaster relief and mitigation authorities in the President. *See, e.g.*, 42 U.S.C. §§ 5133 (pre-disaster hazard mitigation), 5148 (discretionary function). Those authorities have been delegated to DHS and FEMA. *See* Exec. Order 12673, 54 Fed. Reg. 12,571 (Mar. 28, 1989); Exec. Order 13286, 68 Fed. Reg. 10, 617 (Mar. 5, 2003); amending Exec. Order 12148, 44 Fed. Reg. 43,239 (July 24, 1979). FEMA's implementing regulations expressly contemplate sub-delegation: "Administrator means the head of the Federal Emergency Management Agency, *or his/her designated representative*." 44 C.F.R. § 201.2 (emphasis added).

Plaintiffs identify no statute or regulation reserving BRIC grant administration exclusively to the FEMA Administrator. Nor do they identify any specific BRIC-related action taken by Cameron Hamilton (or continued by David Richardson) that falls within a non-delegable category. The record reflects that both officials acted pursuant to delegated authority during a vacancy. Doc. 96, pp. 105-111, ¶¶ 1, 10, 13; Doc. 96, pp. 1-37; Doc. 96, pp. 73-74. Accordingly, § 3348's "no

force or effect" remedy does not apply.  And even if Plaintiffs were correct that Cameron Hamilton was not lawfully "acting" under FVRA succession pathways—a claim Defendants dispute—that would not invalidate his actions.  Because the relevant BRIC-related functions are delegable, the FVRA provides no basis to void them, and David Richardson (as current SOPD) may ratify, modify, or supersede them consistent with governing delegations.

## V.    Plaintiffs Have Not Carried Their Burden For A Permanent Injunction.

Plaintiffs ask this Court to "issue a permanent injunction barring Defendants from carrying out the BRIC termination and requiring them to resume operating the program."  Doc. 102, p. 30.  Plaintiffs have not proven the need for this extraordinary relief.  A plaintiff seeking a permanent injunction must show:  1) that it has suffered an irreparable injury; 2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; 3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and 4) that the public interest would not be disserved by a permanent injunction.  *See Esso Standard Oil Co. v. Lopez-Freytes*, 522 F.3d 136, 148 (1st Cir. 2008).  Where a plaintiff seeks permanent injunctive relief, the test is the same as for preliminary relief, except that the movant must show actual success on the merits of the claim, rather than a mere likelihood of success."  *Siembra Finca Carmen, LLC v. Sec'y of Dep't of Agric. of Puerto Rico*, 437 F. Supp. 3d 119, 137-38 (D.P.R. 2020).

### A.    No Irreparable Harm.

Plaintiffs insist that they will suffer irreparable harm if FEMA is not ordered to restore the BRIC program.  Plaintiffs state that they "cannot move forward with [their] critical, lifesaving projects unless BRIC termination is reversed."  Doc. 102, p. 31.  And Plaintiffs speculate that loss of BRIC funds could "cause projects to lose funds from other sources, making it even harder for

projects to move forward." *Id.* But the relief Plaintiffs seek does not guarantee them funding for the same reasons that their claims fail on the merits. As described above, FEMA retains broad discretion in setting priorities and determining which projects further the agency's goals. The Stafford Act's pre-disaster mitigation provision, 42 U.S.C. § 5133, is couched in discretionary terms and does not mandate funding for any particular entity. *See, e.g.,* 42 U.S.C. § 5133(b) ("The President *may* establish a program…to assist in the implementation of predisaster mitigation measures…."); *id.* § 5133(c) ("…the President, using amounts…established under subjection (i)…*may* provide technical and financial assistance…). And case law supports that "[e]ligibility determinations, the distribution of limited funds, and other decisions regarding the funding of eligible projects are inherently discretionary." *St. Tammany Par.*, 556 F.3d at 325. Thus, even if BRIC were ordered restored, Plaintiffs have no right to continued funding.

Moreover, because Plaintiffs' primary purported injury is potential loss of money, permanent relief is not warranted because Plaintiffs could theoretically receive reimbursement for BRIC awards if they prevail on their claims. *See Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) (stating no irreparable harm where monetary award will make plaintiff whole). *See also United States v. Michigan*, 230 F.R.D. 492, 495 n. 1 (E.D. Mich. 2005) ("[Movant] argues that its ratepayers are low-income and do not have the luxury of saying, 'It's only money.' The rule that equitable remedies cannot issue when the damages are monetary in nature has been ingrained in law for 'half a millennium or so,' and no judge within the English common law tradition has the luxury of ignoring it") (internal citation omitted).

### B.    The Balance Of Equities and Public Interest Disfavor Relief.

Plaintiffs assert that "[t]here is a strong public interest in the government following the law" and "no public interest in the perpetuation of unlawful agency action." Doc. 102, p. 35.

Plaintiffs' arguments stem from their mistaken belief that FEMA either has or intends to reduce its mitigation functions. This is not true. FEMA continues "to evaluate whether to end the BRIC program or revise it in a manner to achieve its original purpose." Doc. 96, p. 108, ¶ 9. Nor has FEMA "repurposed" BRIC funds simply because they are housed within the DRF. Since at least May 2021, FEMA has consistently reported that unobligated BRIC funds remain available for post-disaster response and recovery if necessary.[7] For the past four years, FEMA's monthly reports have consistently noted that unobligated BRIC funds are available to backstop the Disaster Relief Fund for major disasters if the DRF balance becomes insufficient. Thus, contrary to Plaintiffs' assertions, a permanent injunction would not preserve the status quo. It would instead impose a new and significant restriction on FEMA's emergency response flexibility, potentially limiting the agency's ability to respond to major disasters in real time. That outcome would impose substantial public costs and risks—especially during the current hurricane and wildfire seasons—and cannot be justified on the basis of speculative future harms to parties who are not even guaranteed funding under the BRIC program. The equities and public interest therefore weigh strongly against the requested injunction.

And even if FEMA *did* decide to end the BRIC program (again, a decision it has not yet made), it is free to implement another program that better "protects American citizens against natural disasters as it was intended[.]" *Id.* The BRIC program itself is discretionary under the Stafford Act. 42 U.S.C. § 5133(b) ("The President *may* establish a program to provide technical

---

[7] *See* Disaster Relief Fund: Monthly Report, as of April 30, 2021, at 4, available at https://www.fema.gov/sites/default/files/documents/fema_may-2021-disaster-relief-fund-report.pdf ("The BRIC funding continues to be available to FEMA for other purposes should the DRF Majors balance drop too low to cover immediate response or recovery needs."); *see also* Disaster Relief Fund: Monthly Report, as of February 28, 2025, at 4, https://www.fema.gov/sites/default/files/documents/fema_ocfo_march-2025-disaster-relief-fund-report.pdf (same).

and financial assistance to States and local governments to assist in the implementation of predisaster hazard mitigation measures….") (emphasis added).  The equities and public interests therefore weigh strongly against the requested permanent injunction.

## CONCLUSION

For the reasons described above, Plaintiffs' Motion for Summary Judgment should be denied, and Defendants' Cross-Motion for Summary Judgment should be allowed.

<div style="margin-left: 40%;">

Respectfully submitted:

LEAH B. FOLEY
United States Attorney

</div>

Dated: November 5, 2025      By:    */s/ Nicole M. O'Connor*
                                        Nicole M. O'Connor
                                        Assistant United States Attorney
     United States Attorney's Office
     1 Courthouse Way, Suite 9200
     Boston, MA 02210
     Tel.: 617-748-3112
     Email: Nicole.O'Connor@usdoj.gov

## 7.1 CERTIFICATION

I, Nicole M. O'Connor, Assistant United States Attorney, hereby certify that I conferred with counsel for Plaintiffs prior to filing this Cross-Motion for Summary Judgment and was unable to resolve or narrow the issues for review.

Dated: November 5, 2025      By:    */s/ Nicole M. O'Connor*
                                          Nicole M. O'Connor
                                        Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I, Nicole M. O'Connor, Assistant United States Attorney, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated: November 5, 2025              By:     <u>/s/ *Nicole M. O'Connor*</u>
                                              Nicole M. O'Connor
                                              Assistant United States Attorney