**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF WASHINGTON, et al.,

Plaintiffs,

v.

FEDERAL EMERGENCY MANAGEMENT AGENCY, et al.,

Defendants.

No. 1:25-cv-12006-RGS

LEAVE TO FILE EXCESS PAGES GRANTED ON SEPTEMBER 23, 2025

# PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. ARGUMENT ..... 3

A. This Case Is Justiciable and Defendants Have Taken Final Agency Action ..... 3

1. Plaintiffs have standing and their claims are ripe ..... 3

2. The BRIC Termination is final agency action ..... 6

a. The BRIC Termination is not tentative or interlocutory ..... 7

b. The BRIC Termination has determined obligations and had legal consequences ..... 8

c. Defendants' purported internal policy does not defeat final agency action ..... 8

B. Defendants' Remaining Jurisdictional Arguments Are Meritless ..... 9

1. Plaintiffs' claims are not based on discretionary decisions ..... 9

2. The Tucker Act does not apply ..... 10

C. The BRIC Termination Is Unlawful ..... 11

1. Defendants' repurposing of funds set aside for BRIC is unlawful (Counts II, IV, IX) ..... 12

2. Defendants' withholding of funds appropriated for BRIC is unlawful (Counts V, VI, IX, X) ..... 13

3. Hamilton and Richardson were unlawfully appointed (Counts VII, VIII, IX) ..... 15

D. The Court Should Vacate the BRIC Termination, Enter a Permanent Injunction, and Declare it Unlawful ..... 17

1. Plaintiffs face irreparable harm ..... 18

2. The balance of the equities and public interest weigh in favor of an injunction. ..... 19

3. The Court should enter Plaintiffs' proposed order ..... 20

III. CONCLUSION ..... 20

# I. INTRODUCTION

In April, Cameron Hamilton directed FEMA staff to shut down the BRIC program and Defendants then announced that they are "ending" the program because they deem it "wasteful," "ineffective," and "politicized." *See* ECF No. 96 at 43-44, 55. They explained that as the program closes down they will allow some ongoing projects to finish, but others will not be allowed to progress, and they will not make any new funding available. *Id*. at 63-64. Instead, they said they would divert nearly all the funds to other grant programs or the Treasury. *Id*. at 64. Since then, Defendants have taken, or attempted to take, every one of those steps. *See* ECF No. 102 at 11-14.

Shortly after the announcement, Defendants cancelled the 2024 Notice of Funding Opportunity and attempted to divert roughly $4.1 billion—84% of the funds for BRIC—to other programs. *See* ECF No. 102 at 13; ECF No. 96 at 86; ECF No. 104-13 at 4. They then stopped hundreds of projects in their tracks. Defendants have not since allowed a single phased project for any of the 23 Plaintiffs to move to construction. ECF No. 117 ¶ 54. And they have not approved *a single project* to move from selected to awarded, even though several are ready, compared with more than 150 over the same period in each of the last three years. ECF No. 117 ¶¶ 50, 73; ECF No. 104-19 ¶ 9. Nor have they made any new BRIC funds available. ECF No. 117 ¶¶ 45-48.

Internal agency documents produced after the preliminary injunction hearing confirm what Defendants announced publicly: "the Building Resilient Infrastructure and Communities program [is] ending," ECF No. 96 at 53, "progression to phase 2 will not be authorized," *id.* at 52, 73, "[n]o new projects or additional phases will be awarded," *id*. at 102, and "[n]o additional BRIC funding opportunities will occur annually." *Id*. at 74. In fact, even David Richardson admitted in an internal memo that "FEMA announced termination of the BRIC Program on April 4, 2025" and "FEMA began activities to close out the BRIC program." *Id*. at 102-03.

The result is that many of Plaintiffs' projects are frozen as deadlines loom, permits expire, costs increase, and partners lose trust. *See* ECF No. 102 at 31-34. Defendants do not genuinely dispute any of this.[1] In fact, they admit, albeit with considerable understatement, that "some timelines have paused, and some workflows have changed." ECF No. 116 at 1-2.

But rather than defending the Termination on the merits, Defendants spend most of their brief reimagining Plaintiffs' claims as depending on either Defendants having sent individualized termination letters or the BRIC Termination having reached its conclusion. Defendants then alternate between these strawmen to claim that Plaintiffs are not being harmed and there is no case or controversy here. But Plaintiffs' claims do not depend on either premise. The undisputed facts show that Defendants announced and implemented a detailed plan for "ending" the BRIC program by, among other things, withholding necessary approvals, diverting more than $4 billion in BRIC funds to other programs, and withholding any future funding. By substantially reducing FEMA's mitigation functions in this way, Defendants are starving the BRIC program of the resources it needs to continue and are effectively extinguishing hundreds of critical mitigation projects, all without sending a single termination letter. The fact that these efforts are ongoing, and not yet finished, is no barrier to review. Plaintiffs therefore respectfully request that the Court vacate the BRIC Termination and enjoin Defendants from continuing to carry it out.

[1] While the word "disputed" appears in Defendants' response to the Statement of Material Facts, in many cases the accompanying explanations are non-responsive and reveal no genuine dispute of material fact, *see, e.g.*, ECF 117 ¶¶ 4, 5, 51, 56, 74, or show that Defendants dispute only part of a statement and failed to dispute to the rest, *see id.* ¶¶ 77-85. "Only disputes of fact that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and Defendants have not "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256; Fed. R. Civ. P. 56(c)(1).

## II. ARGUMENT

### A. This Case Is Justiciable and Defendants Have Taken Final Agency Action

#### 1. Plaintiffs have standing and their claims are ripe

To establish standing, Plaintiffs must show that they face actual or imminent injury that is fairly traceable to Defendants' challenged conduct, and that the Court can likely redress the injury. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). "[T]he injury required for standing need not be actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Davis v. FEC*, 554 U.S. 724, 734 (2008). Standing tends to overlap with ripeness. When analyzing ripeness, courts consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). "Fitness involves issues of 'finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed,' while hardship 'typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties.'" *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 53 (1st Cir. 2021) (quoting *R.I. Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 33 (1st Cir. 1999)). These requirements are satisfied.

To start, Plaintiffs' selected but not yet obligated and phased projects are frozen, with no way to move them forward. *See* ECF No. 117 ¶¶ 50-54, 73-74. And each day that passes increases the likelihood that these projects will *never* move forward, as deadlines loom, permits expire, costs increase, and stakeholders lose trust. *See* ECF No. 102 at 31-34. As projects are delayed, scaled back, and cancelled, Plaintiffs face more deaths, injuries, damage to property, interruption of state business, and higher post-disaster costs. *See id.*

Plaintiffs are also unable to obtain any *new* BRIC funding. *See* ECF No. 117 ¶¶ 45-48. Congress provided that Defendants "shall ensure" that each State receives at least $575,000 in

BRIC funding each year or 1% of the amount appropriated for the program. 42 U.S.C. § 5133(f)(2) (setting "minimum and maximum amounts"). But with the program shut down and Defendants withholding new funds, there is no way for Plaintiffs to do so. And Plaintiffs are also unable to compete for BRIC funding *beyond* the statutory minimum. *See W. Va. Ass'n of Cmty. Health Ctrs., Inc. v. Heckler*, 734 F.2d 1570, 1576 (D.C. Cir. 1984) ("[A]ppellants have standing to seek relief that would allow them to compete for additional funding.").

Defendants nevertheless contend that Plaintiffs lack standing because they are "not guaranteed" funding and "BRIC has not been terminated." *See* ECF No. 116 at 13-15. They are wrong on both counts. First, Plaintiffs *are* guaranteed funding: either $575,000 or 1% of the appropriated funds. 42 U.S.C. § 5133(f)(2). But even if that were not so, "a plaintiff suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit* . . . even though the plaintiff may not be able to show that it was *certain to receive* that benefit had it been accorded the lost opportunity." *CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989); *see also W. Va. Ass'n of Cmty. Health Ctrs.*, 734 F.2d at 1576 ("once [plaintiffs] demonstrate[] that they would qualify to receive these funds, they need not shoulder the additional burden of demonstrating that they are certain to receive funding").[2] So Defendants' objection is meritless.

That leaves Defendants' claim that "BRIC has not been terminated." ECF No. 116 at 14. This is wordplay. There is no genuine dispute that, in Mr. Richardson's words, "FEMA announced termination of the BRIC Program on April 4, 2025" and "FEMA began activities to close out the BRIC program." ECF No. 96 at 102-03. Defendants have not awarded new projects, not allowed phased projects to progress, and have not made new funds available. They also attempted to divert

---

[2] There is no dispute Plaintiffs qualify for BRIC; Plaintiffs have received BRIC awards for years, and each plaintiff has "received a major disaster declaration in the previous 7 years" as required. 42 U.S.C. § 5133(g); *see, e.g.*, Major Disaster Declarations; COVID-19 Pandemic, 87 Fed. Reg. 26,366 (May 4, 2022).

the entire $4 billion BRIC set aside to other programs. Defendants nevertheless contend that Plaintiffs cannot possibly be injured because "*other* aspects of the program have not changed." ECF No. 116 at 2 (emphasis added). And they point to *these* aspects of the program—that Defendants are reimbursing for some projects, that they sent seven requests for information over the last six months, and that Mr. Richardson has approved a single period of performance extension since April—to suggest that "BRIC has not been terminated" and Plaintiffs cannot be injured. *See* ECF No. 116 at 9-10. But pointing to the few components of the program that are still operating does not erase the harm Plaintiffs are experiencing from those that have stopped. Defendants' plan for shutting down BRIC has *always* been to allow some projects to proceed while blocking others and withholding new funds. Indeed, Defendants said in April that "[r]ecipients will be able to complete fully obligated projects that have started construction and will be able to expend all associated funds." ECF No. 96 at 63. So the fact that they are allowing some projects to wrap up, just as they announced, does not mean the program is not closing down, nor does it erase the harm Plaintiffs are experiencing from the components of the program that *are* shut down. In fact, Defendants' evidence only underscores the problem. At the time of the BRIC Termination, there were roughly 694 selected or partially obligated projects, *id.* at 52, and 993 fully obligated projects, *id.* at 58. So the fact that Defendants issued only *seven* requests for information over the last six months and granted only a *single* deadline extension under their new process just confirms that they are doing next to nothing to operate the program.[3] Similarly, that Defendants claim to have

[3] Even these numbers appear to be overstated. Defendants trumpet their request for information to California, but contrary to Defendants' representations, that request was *not* for a project that had been selected/identified for further review. That request addresses "BRIC23 proposed management costs" for "four *awarded* FY23 subgrants." ECF No. 117-3 at 2 (emphasis added); *see also* Green Decl., Ex. 1 ¶¶ 3-5. But Defendants said from the start that "management costs . . . for fully obligated projects" would "continue." ECF No. 96 at 66.

paid roughly $110 million on 150 grants since April does not somehow eliminate the harm from Defendants freezing at least 694 *other* projects worth *$3.6 billion*. ECF No. 96 at 52.

Defendants' remaining arguments also miss the mark. For instance, while Defendants suggest that subsequent events—like their compliance with the Court's preliminary injunction—defeat standing, the "standing inquiry [is] focused on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*," *Davis v. FEC*, 554 U.S. 724, 734 (2008) (emphasis added). For similar reasons, Mr. Richardson's mid-litigation claim that Defendants are still deciding whether to resurrect BRIC does not strip the Court of jurisdiction. *See N.H. Lottery Comm'n*, 986 F.3d at 49, 51-52 (holding that mid-litigation DOJ memo claiming DOJ was "now reviewing" the contested issue did not defeat ripeness). Once litigation has begun, the proper framework is mootness, not ripeness, and Defendants have not even tried to establish that. *See FBI v. Fikre*, 601 U.S. 234, 241 (2024) (defendants must meet "formidable burden" of demonstrating voluntary cessation and that the challenged conduct "cannot reasonably be expected to recur").

**2. The BRIC Termination is final agency action**

Defendants next contend that there is no final agency action because they "continue to evaluate whether to end the BRIC program," ECF No. 116 at 1, there have been no "legal consequences for Plaintiffs," *id.* at 26, and Mr. Hamilton violated an internal policy requiring DHS leadership to sign off on the BRIC Termination, *id.* at 27. These arguments are unpersuasive.

In assessing finality, the Court analyzes whether the action marks "the consummation of the agency's decisionmaking process" and whether it determines rights or obligations or has legal consequences. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). These are *legal* determinations for the Court to make; Defendants' characterization is owed no deference. *See* 5 U.S.C. § 706 ("To the extent necessary to decision and when presented *the reviewing court* shall . . . determine the meaning or applicability of the terms of an agency action.") (emphasis added); *Fid. Television, Inc.*

*v. FCC*, 502 F.2d 443, 448 (D.C. Cir. 1974) ("The principle of finality in administrative law is not, however, governed by the administrative agency's characterization of its action, but rather by a realistic assessment of the nature and effect of the order sought to be reviewed.").

**a. The BRIC Termination is not tentative or interlocutory**

Defendants' central claim is that the BRIC Termination is not final agency action because Defendants "continue to evaluate whether to end the BRIC program or revise it." ECF No. 116 at 1. But the Court need not accept this account, and given the undisputed evidence showing that Defendants already decided to "end" BRIC, the Court should not. *See Nat'l Env't Dev. Assn's Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014) (agency action final despite agency's claim that its "deliberations surrounding the matter are ongoing").[4] Even accepting the premise, the BRIC Termination is reviewable. Given that BRIC has been largely shut down for the past seven months, Defendants seem to be saying that they have not yet foreclosed the possibility that they will revive the program in the future. But the fact that Defendants may change their minds and take a *new* final agency action to restore the program does not mean that their *existing* final agency action to shut it down indefinitely is unreviewable. *See, e.g.*, *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 598 (2016) (The "possibility" that an agency "may revise" a decision "is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal."); *Sackett v. EPA.*, 566 U.S. 120, 127 (2012) (same). As one court put it, "*final* does not mean *permanent*—just because [Defendant] maintains the ability to reverse these actions at some unidentified point in the future, that does not change the fact that the agency has made decisions, communicated them to their employees, contractors, and grantees, and thereby altered their rights and obligations." *Widakuswara v. Lake*, 779 F.Supp.3d 10, 32-33 (D.D.C. 2025). That is true

[4] *See also Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1020-23 (D.C. Cir. 2000) (agency action final despite disclaimer stating it did "not represent final Agency action"); *Nat'l Educ. Ass'n v. Dep't of Ed.*, 779 F. Supp. 3d 149, 184 (D.N.H. 2025) ("[A]n agency's characterization of its own action is not dispositive.").

regardless of whether the shutdown is characterized as a termination, as the record evidence shows, or an indefinite "pause," as Defendants now insist. *See Massachusetts v. Trump*, 790 F.Supp.3d 8, 26 (D. Mass. 2025) ("[S]ignificant pauses and blanket moratoria are final agency actions that cannot be exempted from judicial review merely by being characterized as intermediate.").

#### b. The BRIC Termination has determined obligations and had legal consequences

Defendants next argue against final agency action because there have been no "legal consequences for Plaintiffs." ECF No. 116 at 26. That is wrong; there are many legal consequences for Plaintiffs, including that they cannot obtain legal approvals necessary to begin work, the time legally available to complete their projects continues to dwindle and expire, and they cannot obtain new funding. *See* ECF No. 117 ¶¶ 45-48, 50-54. Regardless, legal consequences for Plaintiffs are not required. While that is one way to satisfy *Bennett*'s second prong, it can *also* be satisfied by agency action that determines obligations for agency staff, as the Hamilton Memo did here. *See* ECF No. 102 at 18-19.

#### c. Defendants' purported internal policy does not defeat final agency action

Defendants next suggest that there is no final agency action because Mr. Hamilton violated a secret[5] internal policy requiring DHS leadership to sign off on the BRIC Termination. Defendants cite zero authority supporting this argument, but, regardless, Secretary Noem *did* sign off. The undisputed evidence shows that Mr. Richardson sent a memo to Secretary Noem asking her to approve his recommendation that "[n]o new projects or additional phases will be awarded" and that the "remaining $854M [in IIJA funding] will remain unspent," and that Secretary Noem signed the "Approved" line on this memo. ECF No. 96 at 102.; ECF No. 117 ¶¶ 28-29. In any event, the

[5] Mr. Richardson's mere description of the purported policy is not competent evidence. *See* ECF No. 96 at 108, ¶ 8; Fed. R. Civ. P. 56(c)(2). To prove the contents of a writing Defendants were required to submit the policy itself, not just a self-serving description. Fed. R. Evid. 1002; *Caban-Rodriguez v. Jimenez-Perez*, 558 F. App'x 1, *6-*7 (1st Cir. 2014) (plaintiff's description of alleged letter insufficient to avoid summary judgment; actual letter was required).

fact that the agency treated the Hamilton Memo as binding regardless of any alleged policy violation demonstrates finality. *See* ECF No. 102 at 18.

### B. Defendants' Remaining Jurisdictional Arguments Are Meritless

#### 1. Plaintiffs' claims are not based on discretionary decisions

Defendants once again contend that the Stafford Act's discretionary immunity provision applies, and that this matter is committed to agency discretion by law. *See* ECF No. 116 at 16-18, 27-28. But Defendants do not have discretion to shut down BRIC, to repurpose and withhold BRIC funds, or to act through unconstitutionally appointed officers. *See* ECF No. 102 at 16.

Defendants argue that the immunity provision nevertheless applies because FEMA has some discretion in selecting BRIC projects. *See* ECF No. 116 at 16-18. But discretion to select projects is not discretion to shutter the program. After the BRIC statute was enacted, Congress provided that Defendants "may not substantially or significantly reduce" FEMA's mitigation functions unless "specifically" authorized in a law passed after October 4, 2006. 6 U.S.C. § 316(c)(1). Defendants cite no law "specifically" authorizing them to shut down BRIC or substantially reduce FEMA's mitigation functions, and certainly none enacted after October 4, 2006. In fact, they do not address this statute at all. Congress's appropriation of funds for BRIC and command that Defendants "shall" make them available *also* requires Defendants to operate the program. Because Defendants lack discretion to shut down BRIC, their decision to do so is not committed to agency discretion by law, and the immunity provision does not apply.[6]

[6] The "committed to agency discretion by law" exception is inapplicable for a second reason: it is "very narrow," and applies only "in those rare instances where . . . there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). An agency's termination of a program does not qualify and is reviewable under the APA. *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 18-19 (2020) (holding DACA termination reviewable).

**2. The Tucker Act does not apply**

Defendants next contend the Court lacks jurisdiction based on their misapprehension that Plaintiffs seek payment "pursuant to funding agreements." ECF No. 116 at 18. That is incorrect.

The Tucker Act grants the Court of Federal Claims jurisdiction over suits "based on" a contract with the United States, namely those seeking "to enforce a contractual obligation to pay money." *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (citation modified) (quoting *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). But in *National Institutes of Health v. American Public Health Ass'n*, which is conspicuously omitted from Defendants' brief, five Justices reaffirmed that challenges to "policies related to grants" belong in federal district court under the APA. 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring) (preliminarily distinguishing between "challenges to . . . grant terminations," which "belong in the Court of Federal Claims," and challenges to "policies related to grants," which belong in federal district court); *see also Bowen v. Massachusetts*, 487 U.S. 879, 892-901 (1988) (claims seeking enforcement of statutory requirements governing federal funding fall within APA).

As this Court determined, the Tucker Act, 28 U.S.C. § 1491, "is inapplicable here" because Plaintiffs "do not assert any contract-based claims or seek any contractual remedies." ECF No. 79 at 9 n.1. Plaintiffs challenge Defendants' decision to shut down the program, not the termination of individual grants. In fact, the parties agree that no grants have been terminated. ECF No. 116 at 14. And because many BRIC projects have been selected but not yet obligated, for many projects Plaintiffs do not yet even have a grant agreement, let alone one upon which they could base their claims. *See, e.g.*, ECF No. 104-20 ¶¶ 7-10; ECF No. 104-21 ¶ 29; ECF No. 104-24 ¶¶ 6-8. Plaintiffs' claims are instead based on the Constitution and on statutes barring Defendants from substantially reducing FEMA's mitigation functions, repurposing or withholding BRIC funds, and acting through unlawfully appointed officials.

Nor do Plaintiffs seek specific performance, to enforce a contractual obligation to pay money, or what the Supreme Court described in *California* as an "order . . . to pay out past-due grant obligations." 604 U.S. at 650. Instead, Plaintiffs seek APA remedies—declaratory and injunctive relief—to vacate the unlawful directives terminating the BRIC program and to bar enforcement of those directives. *See* ECF No. 101-1; *NIH*, 145 S. Ct. at 2661 (Barrett, J. concurring) (holding that claims seeking vacatur of agency directives fall within the scope of the APA and belong in district court). As such, Plaintiffs seek "prospective relief" in the context of "the rather complex ongoing relationship" between a federal agency and a state grant recipient—relief that the Court of Federal Claims "has no power to grant." *See Bowen*, 487 U.S. at 905. Vacating the BRIC Termination and barring Defendants from carrying it out will not order Defendants to pay any plaintiff any money – it will simply restore the BRIC program, including the opportunity for Plaintiffs to seek BRIC funds.

### C. The BRIC Termination Is Unlawful

Having spent most of their brief trying to convince the Court that the BRIC termination is not happening, Defendants scarcely try to defend it. *See* ECF No. 116 at 32-39. Defendants do not dispute that shutting down the BRIC program substantially reduces FEMA's mitigation functions and capabilities; that Congress barred them from withdrawing funds from selected projects except in narrow circumstances, which they did not rely on here; or that refusing to spend Congressionally appropriated funds is unlawful. As a result, the Court can treat these points as conceded. *See Johnson v. Ocwen Loan Serv'g., LLC*, No. 17-cv-11944-ADB, 2020 WL 1063083, at *10 (D. Mass. Mar. 5, 2020). Defendants' responses to the remaining claims are that (1) Congress has authorized them to spend BRIC funds on other programs, (2) they have not refused to spend BRIC funds, and that (3) Hamilton and Richardson were lawfully appointed. None of these arguments are persuasive.

**1. Defendants' repurposing of funds set aside for BRIC is unlawful (Counts II, IV, IX)**

Defendants contend that they can divert BRIC funds to non-BRIC programs based on a provision that says the "amount set aside [for BRIC] . . . shall not reduce the amounts *otherwise* made available for [post-disaster grants]." 42 U.S.C. § 5133(i)(3) (emphasis added). But that provision just means that Congress will appropriate *additional* funds to ensure that the amount set aside for BRIC does not reduce the amount available for post-disaster grants. *See* William L. Painter, Cong. Rsch. Serv. R45484, The Disaster Relief Fund: Overview and Issues 31 (2024) ("The law, as it requires there to be no reduction in [post-disaster] grants as a result of the set-aside, implies the need for additional funding."). The word "otherwise" clarifies that the funds for post-disaster grants that shall not be reduced are funds *other than* the funds set aside for BRIC. It does not mean that funds in the BRIC set aside must remain available for post-disaster grants. That is why, until now, Defendants have *always* requested additional funding for BRIC from Congress. *See, e.g.,* ECF No. 117 ¶ 2; ECF No. 104-1 at 9-10; ECF No. 104-5 at 8-9.

Defendants' contrary interpretation—that the funds set aside for BRIC must remain available for post-disaster grants—is also self-defeating. Under Defendants' interpretation, those funds could never be used for BRIC, because once they are, they are no longer available for post-disaster grants. And it would also redirect pre-disaster mitigation funding to post-disaster grants, which is the opposite of what Congress intended when it established the BRIC set aside. *See* S. Rep. No. 115-446, at 3 (2018) (seeking "a greater balance . . . between pre- and post-disaster resilience investments").

Finally, that the BRIC set-aside is "housed in" the Major Declarations subaccount is of no moment. ECF No. 116 at 5. "Reprogramming" is "shifting funds *within an . . . account* to use them

for purposes other than those contemplated at the time of appropriation."[7] (emphasis added). So when Congress barred defendants from reprogramming funds "to . . . decrease funding for grant programs," it barred them from diverting BRIC funds to other programs, even if those programs are funded out of the same account.[8] *See* ECF No. 102 at 24-25.

**2. Defendants' withholding of funds appropriated for BRIC is unlawful (Counts V, VI, IX, X)**

Defendants concede that "a refusal to spend appropriated funds" violates both the underlying appropriations statute and the Constitution. ECF No. 116 at 34. Their only response is to assert that "FEMA has not refused to spend funds directed to BRIC," *id.* at 3, and that "there is no evidence to suggest that FEMA will not obligate the funds appropriated to BRIC," *id.* at 34. That is just not true.

Congress appropriated funds to the BRIC program and ordered Defendants to make them available: "$200,000,000 *shall* be made available" for each of fiscal years 2022-2026. IIJA, Pub. L. No. 117-58, 135 Stat. 429, 1387 (2021) (emphasis added). Nevertheless, Defendants announced, on multiple occasions, that instead of making the funds available "[a]pproximately $882 million of funding from the [IIJA] will be returned to the U.S. Treasury." ECF No. 96 at 55, 64. Mr. Richardson then recommended to Secretary Noem that FEMA "conduct a close-out of the [BRIC] [IIJA] funding." *Id.* at 102. Richardson's memo says that "[n]o new projects or additional phases will be awarded" and that the "remaining $854M [in IIJA funds] will remain unspent." *Id.* And it reiterates, a second time, that the "remaining $854M will not be awarded; it will remain unspent at FEMA." *Id.* Instead of making the funds available, Mr. Richardson "recommends that Congress

[7] U.S. Gov't Accountability Off., GAO-05-734SP, A Glossary of Terms Used in the Federal Budget Process 85 (2005), https://www.gao.gov/assets/gao-05-734sp.pdf.

[8] Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 503(d)(2), 138 Stat. 460, 615 (2024). Congress has carried forward this restriction. *See, e.g.*, ECF No. 102 at 24; Continuing Appropriations, Agriculture, Legislative Branch, Military Construction, and Veterans Affairs, and Extensions Act, 2026, Pub. L. No. 119-37, § 101, 139 Stat. 495, 496 (2026).

rescind and return the funds to the Treasury." *Id.* Secretary Noem approved the memo, *id.*, and since then, Defendants have refused to make these funds available. *See* ECF No. 117 ¶¶ 45-48.

Defendants next attack Plaintiffs' alternative claim that Defendants' withholding of these funds is also agency action "unlawfully withheld," 5 U.S.C. § 706(1), arguing based on *Lujan v. National Wildlife Federation* that making the funds available is not a discrete action Defendants are required to take and there is no deadline for doing so. 497 U.S. 871 (1990); *see* ECF No. 116 at 28-32. These objections are meritless. The discreteness problem in *Lujan* was that the plaintiff did not challenge particular "agency actions" within the meaning of the APA. *See New York v. Trump*, 133 F.4th 51, 66-69 (1st Cir. 2025) (summarizing *Lujan*). The APA defines an "agency action" as "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. §§ 701(b)(2), 551(13). Instead of challenging one of those discrete actions, the plaintiff in *Lujan* challenged BLM's "land withdrawal review program," which was "simply the name by which the government had occasionally referred to the <u>continuing (and thus constantly changing) operations</u> of the [BLM] in [making various land use decisions]." *New York*, 133 F.4th at 67. "[S]tyling the challenge as against the 'program'" rather than directing it at particular agency actions was improper. *Id.*

But here Plaintiffs challenge three discrete memos, collectively labeled the "BRIC Termination," reflecting Defendants' decisions to shut down the program and withhold Congressionally appropriated funds.[9] Each of these agency actions is a "rule," which is "an agency statement . . . designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ." 5 U.S.C. §§ 701(b)(2),

[9] The "BRIC Termination" is the Hamilton Memo, as clarified by Defendants' subsequent announcements (ECF No. 96 at 43-44, 55, 63-64); the April 8, 2025 Decision Memo signed by Mr. Hamilton (ECF No. 96 at 56-60); and the May 16, 2025 Decision Memo signed by Secretary Noem (ECF No. 96 at 102-04).

551(4); *see also Biden v. Texas*, 597 U.S. 785, 810 (2022) (memo terminating "Remain in Mexico" program was a "rule" reviewable under the APA); *Regents of Univ. of Cal.*, 591 U.S. at 18-19 (2020) (reviewing memo terminating DACA program under APA). In fact, the First Circuit has already rejected Defendants' argument that a challenge to a decision to withhold appropriated funds is insufficiently discrete. *See New York*, 133 F.4th at 66-69 (holding that challenge to memos directing 23 agencies to withhold funds was discrete).

That leaves Defendants' argument that they may withhold funds indefinitely because Congress did not set a deadline for making them available. ECF No. 116 at 31-32. That is wrong both factually and legally. First, there are deadlines: the statute provides that these funds "shall be made available for fiscal year 2024," "for fiscal year 2025," and "for fiscal year 2026." IIJA, Pub. L. No. 117-58, 135 Stat. 429, 1387 (2021). While the funds do not expire at the end of each fiscal year, Congress still determined when the funds should be made available. And even if there were no deadlines, Defendants cannot withhold the funds indefinitely. *See* ECF No. 116 at 31 (conceding agencies must act "in a reasonable time"); *Caswell v. Califano*, 583 F.2d 9 (1st Cir. 1978) (holding same and compelling agency to act within 90 days even absent deadline).

### 3. Hamilton and Richardson were unlawfully appointed (Counts VII, VIII, IX)

Defendants have failed to establish that Hamilton or Richardson were lawfully appointed. Defendants argue that *United States v. Eaton* allows them to "temporarily" appoint an acting FEMA Administrator without complying with the Appointments Clause or the Federal Vacancies Reform Act of 1998 (FVRA). 169 U.S. 331 (1898). But *Eaton* only underscores the unlawfulness of these appointments. The question presented in *Eaton* was whether Congress could authorize the President to appoint someone to temporarily perform the duties of a principal officer without Senate confirmation. *See id.* at 343. The Court held that Congress could do so because one serving

in a principal office "for a limited time, and under special and temporary conditions," is an *inferior* officer, so the Appointments Clause allows Congress to select a means for their appointment. *See id.* at 343. Since Eaton's appointment complied with Congress's statutory instructions, it was permissible. *See id.* at 339, 343. But *Eaton* is no help to Defendants because Hamilton and Richardson were *not* appointed in compliance with the FVRA. *See* ECF No. 102 at 26-29.

Defendants rely on Secretary Noem's general authority to delegate duties, ECF No. 117 ¶ 101, but there are two problems with that: first, the FVRA provides that "only the President" may appoint an eligible acting officer, 5 U.S.C. §§ 3345(a)(2)-(3), and second, it *bars* agency heads from relying on their "general authority . . . to delegate . . . or to reassign duties" to install acting officers, *id.* § 3347(b). That is why every court to have addressed this administration's attempts to install U.S. Attorneys without Senate confirmation has rejected Defendants' argument. *See, e.g.*, ECF No. 102 at 29.

Defendants seem to argue that § 3347's bar on relying on delegation authority does not apply because some courts have held that the definition of "function or duty" in § 3348 refers to only non-delegable duties.[10] *See* ECF No. 116 at 36-38. So, Defendants claim, the definition of "function or duty" in § 3348 applies all throughout the statute, meaning § 3347(b) does not apply. *Id*. This argument is not persuasive.

First, § 3348's definition of "function or duty" is exclusive to § 3348. It does not apply to § 3347. That is why § 3348(a)(2) says that its definition applies only "in this section." *See, e.g.*, *United States v. Giraud*, No. 1:24-CR-00768, No. 2:25-CR-00436, --- F.Supp.3d ----, 2025 WL

[10] Plaintiffs do not concede this is the correct interpretation but accept the premise for purposes of this discussion only. The Court need not reach this issue at this time because Plaintiffs ask the Court to address Defendants' Appointments Clause violation under the APA. *See L.M.-M. v. Cuccinelli*, 442 F.Supp.3d 1, 37 (D.D.C. 2020) (setting aside agency action taken by unlawfully appointed officer "under both the FVRA . . . *and* the APA") (emphasis added).

2416737, at *24 (D.N.J. Aug. 21, 2025) ("[T]he definitions in section 3348 are expressly limited to application 'in this section.'").

Second, applying § 3348's purported definition of "function or duty" throughout the statute would render the statutory scheme almost meaningless. Section 3345(a)(1), for example, provides that "the first assistant . . . shall perform the functions and duties of the office temporarily in an acting capacity." 5 U.S.C. § 3345(a)(1). But if "functions or duties" meant only *non-delegable* functions or duties, as Defendants insist, then the first assistant would have very little authority because few functions and duties are non-delegable. *See Giraud*, 2025 WL 2416737 at *34 ("On the Government's understanding, this would vest acting officers with essentially no responsibility or authority in many cases.").

Nor would applying the statute as written "freeze FEMA operations whenever the office of the Administrator is vacant." ECF No. 116 at 37. In that case, the first assistant would automatically take over, just as Congress intended, or, if the President wanted to appoint someone else, he would have "a wide array of individuals to choose from," including the many senior officials at FEMA or one of "the hundreds of individuals . . . throughout the Government" who has been Senate confirmed. *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 309 (2017).

### D. The Court Should Vacate the BRIC Termination, Enter a Permanent Injunction, and Declare it Unlawful

Defendants do not contest Plaintiffs' requests for vacatur or declaratory relief, instead focusing exclusively on Plaintiffs' request for injunctive relief. But their arguments against irreparable harm and the balance of the equities and public interest impact fall flat.

**1. Plaintiffs face irreparable harm**

Defendants do not seriously dispute that Plaintiffs are experiencing and, absent injunctive relief, will continue to experience irreparable harm due to Plaintiffs' inability to move forward with critical, lifesaving BRIC projects. *See* ECF No. 116 at 39-40. Nor could they—the record is replete with evidence that Plaintiffs face lost lives, increased injuries, damage to property, and more as projects are delayed or cancelled. *See* ECF No. 102 at 31-35; ECF No. 117 ¶¶ 60-72, ¶¶ 77-85 (not disputing harms).

Instead, Defendants reprise their argument that restoring the BRIC program "does not guarantee" Plaintiffs funding. ECF No. 116 at 40. This rehash of their standing argument fails for the same reasons. *See supra* § II.A.1. And "guaranteed" or not, it is undisputed that some of Plaintiffs' selected BRIC projects are ready to be obligated—including projects that have been awaiting FEMA's signature for more than eight months. *See* ECF No. 117 ¶ 73.

Defendants' claim that "Plaintiffs' primary purported injury is potential loss of money" for which they "could theoretically receive reimbursement," ECF No. 116 at 40, is also a non-starter. First, "reimbursement" does not allow Plaintiffs to compete for *new* projects, and for many selected projects, Plaintiffs do not yet even have contracts upon which Plaintiffs could "theoretically" sue for reimbursement. *See supra* § II.B.2. Defendants also do not explain how Plaintiffs could obtain "reimbursement" for injuries such as interruption of state business, increased post-disaster costs, and lost benefits to the state economy. ECF No. 102 at 33, 35. Second, Plaintiffs do not have the budgetary flexibility to fund these multi-million-dollar infrastructure projects. *See* ECF No. 117 ¶ 86. Without a clear source of funding, these projects will die on the vine, resulting in nothing to be reimbursed. *See* ECF No. 102 at 31-33. Finally, even if there were some way to obtain reimbursement for some injuries, those dollars would not compensate Plaintiffs for the non-monetary harms they are experiencing in the interim, such as lost lives and increased injuries from

disasters, the cancellation of projects, and lost goodwill. *See* ECF No. 102 at 31-35. Plaintiffs thus need injunctive relief.

**2. The balance of the equities and public interest weigh in favor of an injunction.**

Plaintiffs have also shown that the equities and the public interest weigh in favor of an injunction. *See* ECF No. 102 at 35-36. Defendants' only argument regarding these factors is that an injunction barring Defendants from spending BRIC funds on non-BRIC programs could "*potentially* limit[] the agency's ability to respond to major disasters." ECF No. 116 at 41 (emphasis added). But disaster response is not the purpose of these funds. "Although FEMA indicates that [BRIC] funding . . . is available for responding to events if its other funds are depleted, this is not the stated congressional intent for those funds, and FEMA has *never* accessed those resources." William L. Painter, Cong. Rsch. Serv. R45484, The Disaster Relief Fund: Overview and Issues 38 (2024) (emphasis added).

Every year Congress provides *other* funds for post-disaster grants, and when especially large disasters strike, Congress provides supplemental funding. *See, e.g.*, ECF No. 104-5 at 7 (FEMA budget assumes "future catastrophic events during the budget year will be funded separately with emergency supplemental appropriations"). So to the extent an injunction might have *any* impact on disaster response, that is only because it would prevent Defendants from unlawfully diverting BRIC funds to non-BRIC programs. But that is not an affront to the public interest; that is Congress's design. *See, e.g.*, *Washington v. Trump*, 441 F. Supp.3d 1101, 1126-27 (W.D. Wash. 2020) (enjoining unlawful diversion of funds to border wall because "the public's interest in ensuring that the government abides by its laws outweighs the government's proffered interest" in border security). Accepting Defendants' argument would essentially give them free

rein to divert *any* funds into the Major Declarations Fund, raise the specter of impaired disaster response, and evade an injunction.

### 3. The Court should enter Plaintiffs' proposed order

Rather than addressing the relief Plaintiffs actually request (ECF No. 101-1, ECF No. 102 at 36-37), Defendants conjure an imaginary injunction asking this Court to "supervis[e] . . . the day-to-day operations of BRIC." ECF No. 116 at 31. But Plaintiffs do not seek anything of the sort. All Plaintiffs ask is that the Court vacate the BRIC Termination, bar Defendants from carrying it out or reimplementing it under another name, and bar Defendants from effectively completing the Termination by enforcing deadlines it would be inequitable to require Plaintiffs to meet given that Defendants have prevented them from progressing for the past seven months.

While Defendants make much of the fact that vacating their unlawful agency actions will restore the status quo, there is nothing wrong with that. To the extent Defendants suggest that *Lujan* bars APA remedies for an agency's decision to shut down a program, Defendants are mistaken. Plaintiffs are not seeking generalized improvement of a program untethered to any particular agency action. Rather, Plaintiffs are challenging specific agency actions, reflected in specific documents. *Lujan* itself recognized that when a court finds agency action unlawful "even a whole 'program' [may need] to be revised by the agency in order to avoid the unlawful result." 497 U.S. at 894. Indeed, the Supreme Court recently affirmed a district court's order vacating a memo unlawfully terminating the DACA program. *See Regents of Univ. of Cal.*, 591 U.S. at 36 n.7. The Court should do the same here.

## III. CONCLUSION

Plaintiffs respectfully request that the Court enter their proposed order.

DATED this 14th day of November 2025.

**ANDREA JOY CAMPBELL**
Attorney General
Commonwealth of Massachusetts

*/s/ Hannah C. Vail*
HANNAH C. VAIL, BBO No. 698577
JAK KUNDL, BBO No. 713951
Assistant Attorneys General
AMY LAURA CAHN, BBO No. 716706
Special Assistant Attorney General
Massachusetts Office of the Attorney General
One Ashburton Place
Boston, MA 02108
617-963-2512
hannah.vail@mass.gov
jak.kundl@mass.gov
amy.laura.cahn@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*

**NICHOLAS W. BROWN**
Attorney General
State of Washington

*/s/ Tyler Roberts*
TYLER ROBERTS*
JENNIFER K. CHUNG*
NIYA TAWACHI*
ANDREW R.W. HUGHES*
Assistant Attorneys General
CRISTINA SEPE*
Deputy Solicitor General
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
tyler.roberts@atg.wa.gov
jennifer.chung@atg.wa.gov
niya.tawachi@atg.wa.gov
andrew.hughes@atg.wa.gov
cristina.sepe@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

**KRISTIN K. MAYES**
Attorney General
State of Arizona

*/s/ Lauren Watford*
LAUREN WATFORD*
Assistant Attorney General
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, Arizona 85004
602-542-3333
Lauren.Watford@azag.gov
*Attorneys for the State of Arizona*

**ROB BONTA**
Attorney General
State of California

*/s/ David Green*
R. MATTHEW WISE*
Supervising Deputy Attorney General
DAVID GREEN*
CHRISTOPHER KISSEL*
HARALD H. KIRN*
Deputy Attorneys General
California Office of the Attorney General
1300 I Street
Sacramento, CA 95814
916-445-9555
matthew.wise@doj.ca.gov
david.green@doj.ca.gov
christopher.kissel@doj.ca.gov
harold.kirn@doj.ca.gov
*Attorneys for Plaintiff State of California*

**PHILIP J. WEISER**
Attorney General
State of Colorado

*/s/ Finnuala Tessier*
FINNUALA TESSIER*
Senior Assistant Attorney General
SAMUEL WOLTER*
Assistant Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
720-508-6000
finnuala.tessier@coag.gov
samuel.wolter@coag.gov
*Attorneys for Plaintiff State of Colorado*

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Ashley Meskill*
ASHLEY MESKILL*
Assistant Attorney General
Connecticut Office of the Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5270
ashley.meskill@ct.gov
*Attorneys for Plaintiff State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

*/s/ Vanessa L. Kassab*
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
vanessa.kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

*/s/ Andrew C. Mendrala*
ANDREW C. MENDRALA*
Assistant Attorney General
Public Advocacy Division
Office of the Attorney General for the District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
202-724-9726
andrew.mendrala@dc.gov
*Attorneys for the District of Columbia*

**KWAME RAOUL**
Attorney General
State of Illinois

*/s/ Aleeza M. Strubel*
ALEEZA M. STRUBEL*
Complex Litigation Counsel
SARAH J. GALLO*
Assistant Attorney General
Illinois Office of the Attorney General
115 S. LaSalle Street
Chicago, IL 60604

**OFFICE OF THE GOVERNER**
Andy Beshear, in his official capacity as
Governor of the Commonwealth of Kentucky

*/s/ S. Travis Mayo*
S. TRAVIS MAYO*
General Counsel
TAYLOR PAYNE*
Chief Deputy General Counsel
LAURA C. TIPTON*
Deputy General Counsel
Office of the Governor

773-914-3046
aleeza.strubel@ilag.gov
sarah.gallo@ilag.gov
*Attorneys for Plaintiff State of Illinois*

501 High Street
Frankfort, KY 40601
502-564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
*Attorneys for the Office of the Governor of Kentucky*

**AARON M. FREY**
Attorney General
State of Maine

*/s/ Reid Hayton-Hull*
REID HAYTON-HULL*
Assistant Attorney General
Maine Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
207-626-8800
reid.hayton-hull@maine.gov
*Attorneys for the State of Maine*

**ANTHONY G. BROWN**
Attorney General
State of Maryland

*/s/ Robert N. Brewer*
ROBERT N. BREWER*
Assistant Attorney General
Maryland Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-6924
rbrewer@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

**DANA NESSEL**
Attorney General
State of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI*
ADAM DE BEAR*
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
giovanattin@michigan.gov
deaeara@michigan.gov
*Attorneys for Plaintiff State of Michigan*

**KEITH ELLISON**
Attorney General
State of Minnesota

*/s/ Cat Rios-Keating*
CAT RIOS-KEATING*
Special Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota St., Suite 600
St. Paul, MN 55101
651-300-7302
catherine.rios-keating@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

*/s/ Phoenix N. Meyers*
PHOENIX N. MEYERS*
Deputy Attorney General

**RAÚL TORREZ**
Attorney General
State of New Mexico

*/s/ Mark Noferi*
MARK NOFERI**
Senior Litigation Counsel

New Jersey Office of the Attorney General
25 Market Street
Trenton, NJ 08625
609-696-5289
phoenix.meyers@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

**LETITIA JAMES**
Attorney General
State of New York

*/s/ Colleen K. Faherty*
COLLEEN K. FAHERTY*
Special Trial Counsel
New York Office of the Attorney General
28 Liberty Street
New York, NY 10005
212-416-6046
Colleen.Faherty@ag.ny.gov
*Attorneys for Plaintiff State of New York*

**DAN RAYFIELD**
Attorney General
State of Oregon

*/s/ Scott P. Kennedy*
SCOTT P. KENNEDY*
BRIAN S. MARSHALL*
Senior Assistants Attorney General
Oregon Office of the Attorney General
1162 Court Street NE
Salem, OR 97301
971-453-9050
scott.kennedy@doj.oregon.gov
brian.s.marshall@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

**PETER F. NERONHA**
Attorney General
State of Rhode Island

New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
505-490-4060
mnoferi@nmdoj.gov
*Attorneys for the State of New Mexico*

**JEFF JACKSON**
Attorney General

LAURA HOWARD
Chief Deputy Attorney General
State of North Carolina

*/s/ Daniel T. Wilkes*
DANIEL T. WILKES*
Assistant Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6415
dwilkes@ncodoj.gov
*Attorneys for Plaintiff State of North Carolina*

**JOSH SHAPIRO**
in his official capacity as Governor of the
Commonwealth of Pennsylvania

JENNIFER SELBER
General Counsel

*/s/ Jacob B. Boyer*
JACOB B. BOYER*
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
717-460-6786
jacobboyer@pa.gov
*Attorneys for Governor Josh Shapiro*

**CHARITY R. CLARK**
Attorney General
State of Vermont

*/s/ Randelle L. Boots*
RANDELLE L. BOOTS*
NICHOLAS M. VAZ*
Special Assistant Attorneys General
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400
rboots@riag.ri.gov
nvaz@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

*/s/ Lynn K. Lodahl*
LYNN K. LODAHL*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
608-264-6219
lynn.lodahl@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*

*/s/ Ryan P. Kane*
RYAN P. KANE*
Deputy Solicitor General
Vermont Office of the Attorney General
109 State Street
Montpelier, VT 05609
802-828-2153
ryan.kane@vermont.gov
*Attorneys for Plaintiff State of Vermont*

*admitted pro hac vice
**pro hac vice application pending or forthcoming

## CERTIFICATE OF SERVICE

I certify that this document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

*/s/ Tyler Roberts*
TYLER ROBERTS
Assistant Attorney General
State of Washington